FILED
CLERK, U.S. DISTRICT COURT
3/22/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_VAM\_\_\_\_ DEPUTY

Case: 1:22-cr-00144
Assigned To : Chief Judge Beryl A. Howell
Assign. Date : 4/25/2022
Description: Rule 20 Transfer In

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:22-cr-00104-PA |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1018: Making a False Writing; 18 U.S.C. §§ 207(f)(1)(B), 216(a)(1): Aiding and Assisting a Foreign Government with Intent to Influence Decisions of United States Officers] |
| RICHARD GUSTAVE OLSON, JR., | |
| Defendant. | |
| | [CLASS A MISDEMEANORS] |

The United States Attorney charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

A.   PERSONS AND ENTITIES

1.   Defendant RICHARD GUSTAVE OLSON, JR. was a career foreign service officer employed by the United States ("U.S.") State Department.  Defendant OLSON was appointed by the President and confirmed by the U.S. Senate to serve as Ambassador to the United Arab Emirates ("UAE") from on or about October 14, 2008 through May

2, 2011 and to serve as Ambassador to Pakistan from on or about October 31, 2012 through November 17, 2015.

    a.   From on or about November 17, 2015 through his retirement on November 30, 2016, defendant OLSON served as U.S. Special Representative for Afghanistan and Pakistan ("Special Representative").

    b.   In or about December 2016, after retiring from government service, defendant OLSON created an entity called Medicine Bear International Consulting, LLC ("Medicine Bear").

    2.   Person 1 was a naturalized U.S. citizen born in Pakistan. Person 1 operated various informal and formal business entities collectively referred to as Person 1's Company. As part of his business operations, Person 1 was retained by various foreign governments and individuals to engage in lobbying and public relations efforts. Person 1 received funds from foreign clients, used those funds to make political campaign contributions to U.S. politicians, parlayed those contributions into political influence in the U.S., and lobbied U.S. officials on behalf of his foreign clients.

    a.   In or about March 2013, Person 1 met with defendant OLSON in Islamabad, Pakistan. From in or about March 2013 through November 2016, Person 1 solicited defendant OLSON's advice and assistance in his capacity as Ambassador with respect to a variety of business matters of interest to Person 1.

    b.   In or about November or December 2016, either just prior to, or shortly after, defendant OLSON retired from government service, Person 1 agreed to retain the services of defendant OLSON for $20,000 per month plus expenses. On or about December 15, 2016,

2

1  Person 1 sent defendant OLSON his first monthly check payable to
2  Medicine Bear in the amount of $20,000.
3  B.     ETHICS OBLIGATIONS AND REPORTING REQUIREMENTS
4       3.   To increase public confidence in the federal government,
5  demonstrate the integrity of government officials, and enhance the
6  ability of the citizenry to judge the performance of public
7  officials, the U.S. Congress enacted the Ethics in Government Act of
8  1978 ("the Act").  The Act established an agency within the Executive
9  Branch, the Office of Government Ethics ("OGE"), to oversee public
10 employee compliance with U.S. ethics laws.
11      4.   Because transparency was a critical part of government
12 ethics, Congress determined that U.S. citizens should know their
13 leaders' financial interests.  Accordingly, the Act and its
14 implementing regulations required certain government employees
15 ("public filers") to file public financial disclosure reports on an
16 annual basis.  The annual reports, known as OGE Forms 278, required
17 the employee to disclose financial matters including their income,
18 assets, liabilities, outside employment arrangements, gifts,
19 reimbursements, and travel expenses.  The OGE 278 forms certified
20 that the statements the public filer made on the form and all
21 attached schedules were true, complete, and correct to the best of
22 the public filer's knowledge.  In both his capacities as Ambassador
23 and Special Representative, defendant OLSON was a public filer.
24      5.   OGE and the employee's agency were jointly charged with
25 ensuring compliance with ethics laws and reporting obligations,
26 investigating possible violations, and referring possible violations
27 to the agency's Inspector General and the U.S. Department of Justice
28 for civil enforcement or criminal prosecution.

6. The Act also imposed "revolving door" prohibitions upon senior government officials. After retirement from government service, senior government officials were prohibited from representing foreign entities before U.S. officials or aiding or advising any foreign entity, including through any behind-the-scenes consulting, with the intent to influence U.S. officials during a one-year "cooling off" period. Congress enacted similar "revolving door" restrictions into a criminal statute, Title 18, United States Code, Section 207(f). In accordance with these laws, defendant OLSON was prohibited from engaging in lobbying activity or aiding or advising any foreign government in its attempts to influence U.S. officials during the period December 1, 2016 through December 1, 2017. During this time, defendant OLSON was aware of the "revolving door" prohibitions and understood that they applied to him.

C. <u>WHILE EMPLOYED BY THE FEDERAL GOVERNMENT, DEFENDANT OLSON RECEIVED OVER $18,000 IN TRAVEL EXPENSES FROM PERSON 1 TO ATTEND A JOB INTERVIEW WITH BUSINESSPERSON 2 IN LONDON</u>

7. On or about January 15, 2015, defendant OLSON, who was then still serving as U.S. Ambassador to Pakistan, met with Person 1 in Los Angeles and discussed the possibility that defendant OLSON might work for Person 1's business associate, Businessperson 2, a citizen of Bahrain, who operated Businessperson 2's Company. On or about January 23, 2015, defendant OLSON agreed to meet Person 1 and Businessperson 2 in London on January 31.

8. On or about January 27, 2015, Person 1 procured defendant OLSON's first-class airfare from New Mexico, via Los Angeles, to London. Person 1 paid for the trip with a combination of credit card expenditures and approximately 330,000 frequent flyer miles. In total, the airfare was worth approximately $18,829. Person 1 paid

for his and defendant OLSON's stay at a luxury hotel in London at a combined cost of approximately $2,298.  Person 1 also paid for dinner in London for defendant OLSON, Businessperson 2, Person 1, and another individual at a cost of approximately $589.

9. On or about February 19, 2015, Businessperson 2's Company offered defendant OLSON a one-year contract with Businessperson 2's Company, commencing after defendant OLSON's retirement from government service, that included compensation of $300,000 per year.

D. AFTER HIS RETIREMENT FROM GOVERNMENT SERVICE, DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR

10. After defendant OLSON began working for Person 1 and Person 1's Company in December 2016, despite being aware that he was subject to the "revolving door" prohibitions of the Act and Section 207(f), defendant OLSON violated these prohibitions on multiple occasions.

    a. DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR TO FACILITATE LOBBYING U.S. OFFICIALS TO ESTABLISH U.S. CUSTOMS PRECLEARANCE FACILITIES AT DOHA INTERNATIONAL AIRPORT

11. U.S. Customs and Border Protection ("CBP") preclearance facilities at foreign international airports provided significant benefits to host countries and their national airlines.  CBP allowed flights originating from a precleared airport to fly directly from that airport to over 160 destinations in the United States, regardless of whether the destination airport had a CBP port of entry.  Preclearance facilities thus provided a host country's airport an advantage over competitors for the U.S.-bound traveler market.

12. In or about January 2014, while defendant OLSON was serving as Ambassador to the UAE, the U.S. and the UAE negotiated to

5

establish a CBP preclearance facility at the Abu Dhabi International Airport in the UAE -- one of Qatar's regional rivals.

13. On or about October 25, 2016, Person 1 caused the drafting of a contract between Person 1's Company and a Qatar-based holding company controlled by Qatar Government Official 1, whereby Person 1's Company would be paid $3.5 million per year plus a 20% "success fee."

14. On or about November 14, 2016, Qatar Government Official 1 transferred by wire $2.8 million to Person 1's Company.

15. On or about December 27, 2016, Qatar Government Official 1 transferred by wire $3 million to Person 1's Company.

16. On or about January 23, 2017, Businessperson 3, a business associate of Person 1, sent defendant OLSON a draft plan for a lobbying campaign to convince the White House and the U.S. Department of Homeland Security ("DHS") to establish preclearance facilities at Doha International Airport.

17. The next day, on or about January 24, 2017, defendant OLSON sent Person 1 and Businessperson 3 an email that included his advice on how Qatar could "sell" its preclearance proposal to the U.S. government. For example, defendant OLSON advised that it would be important to secure the support of the U.S. Ambassador to Qatar, stating, "I know her well but can't do it because of State's post employment ethics restrictions, but [Person 1] can charm her she's from LA. The deal closer would be for the Qataris help her get a new Embassy[.]"

18. On or about January 29, 2017, Businessperson 3 emailed a revised lobbying plan to defendant OLSON and Person 1, incorporating defendant OLSON's input. The revised plan called for Qatar to lobby the U.S. House of Representatives, U.S. Senate, White House National

6

1  Security Council, DHS, and specific CBP officials, followed by a
2  negotiated agreement between DHS and the government of Qatar to
3  establish preclearance facilities at Doha International Airport.
4       19.  On or about January 31, 2017, defendant OLSON sent
5  Businessperson 3 further revisions to the lobbying plan.  Defendant
6  OLSON recommended that Qatar leverage its support for the U.S.
7  military to obtain the preclearance facilities it sought, stating,
8  "We also believe it should be possible to leverage Qatar's strong
9  record of support for the U.S., particularly the U.S. military, to
10 push the pre-clearance program through."
11      20.  On or about February 14, 2017, Businessperson 3 emailed the
12 preclearance lobbying plan that incorporated defendant OLSON's advice
13 to a government email address of Qatar Government Official 3, an
14 official with the Qatar Ministry of Interior, copying Qatar
15 Government Official 1, defendant OLSON, and Person 1.
16      21.  On or about March 9, 2017, Person 1 sent Qatar Government
17 Official 1 a copy of Person 1's Company's draft contract with the
18 Qatar-based holding company.  In a cover email, Person 1 stated,
19 "this will incorporate preclearance project."
20           b.   DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR TO
                  FACILITATE LOBBYING U.S. OFFICIALS TO SUPPORT QATAR
21                DURING A DIPLOMATIC CRISIS
22      22.  On or about May 24, 2017, cyber hackers, reportedly funded
23 by the UAE, committed a computer intrusion at the Qatar News Agency
24 website.  The hackers posted statements, purportedly by Qatar
25 Government Official 2, that appeared supportive of the Government of
26 Iran.  Hackers also leaked emails of the UAE's Ambassador to the
27 United States that discussed Qatar's support for the Muslim
28 Brotherhood and militant groups.

23. On or about June 5, 2017, citing Qatar's purported support for Iran and terrorism, several Gulf states, including the UAE and the Kingdom of Saudi Arabia, cut ties with Qatar and implemented a blockade, closing all air and sea lanes to the country ("the Gulf Diplomatic Crisis").

24. On or about June 6, 2017, several U.S. House representatives introduced House Resolution 2712 "to impose sanctions with respect to foreign support for Palestinian terrorism[.]" The Resolution identified Qatar as providing financial support to Hamas, a terrorist organization.

25. On or about June 1, 2017, Person 1 enlisted the help of defendant OLSON, Businessperson 3, and Businessperson 4 to organize and participate in a lobbying and public relations campaign to convince the U.S. government to support Qatar during the Gulf Diplomatic Crisis. The lobbying and public relations effort sought to use the Gulf Diplomatic Crisis as a business opportunity and to profit from defendant OLSON's status as a former U.S. Ambassador to the UAE, Qatar's primary rival in the crisis, and defendant OLSON's ability to provide aid and advice to Qatar.

26. Defendant OLSON's aid included recruiting Person 3 to join defendant OLSON in providing aid and advice to Qatari government officials with the intent to influence U.S. foreign policy with respect to the Gulf Diplomatic Crisis. On or about June 6, 2017, defendant OLSON contacted Person 3 to enlist his support in the endeavor. That same day, defendant OLSON emailed Person 1 that he had been in touch with Person 3 and informed him that Person 3 was "interested in helping out with Qatar."

27. On or about June 10, 2017, defendant OLSON, Person 1, Person 3, Businessperson 4, and Qatar Government Official 1 traveled to Doha, Qatar. After checking into their hotel, defendant OLSON and Person 3 met with the U.S. Ambassador to Qatar to discuss the purpose of their trip.

28. That same day, on or about June 10, 2017, defendant OLSON, Person 1, and Person 3 traveled to the Qatari royal palace to meet with senior Qatari government officials, including Qatar Government Official 2, Qatar Government Official 4, Qatar Government Official 5, and Qatar Government Official 6. The Qatari government officials did not permit Person 1 to attend the meetings.

29. On or about June 15, 2017, defendant OLSON, Person 1, and Person 3 met for dinner with Qatar Government Official 4 at a hotel in Washington, D.C.

30. On or about June 28, 2017, defendant OLSON, Person 1, Person 3, and Qatar Government Official 5 met with several sitting members of the U.S. House of Representatives for the purpose of convincing the U.S. lawmakers to support Qatar rather than its regional rivals in the Gulf Diplomatic Crisis.

31. These Introductory Allegations are incorporated into each Count of this Information.

COUNT ONE

[18 U.S.C. § 1018]

32. On or about May 12, 2016, defendant RICHARD GUSTAVE OLSON, JR., a public officer, knowingly made and delivered his annual OGE Form 278 for the 2015 calendar year, in which he certified his answers were "true, complete and correct to the best of my knowledge." In this OGE Form 278, defendant OLSON knowingly failed to disclose material matters to the U.S. State Department and Office of Government Ethics, as required, namely, the travel benefits he received from Person 1 including the airfare from New Mexico to Los Angeles, the airfare from Los Angeles to London, and the lodging in London, collectively worth over $19,000.

COUNT TWO

[18 U.S.C. §§ 207(f)(1)(B), 216(a)(1)]

33. From on or about February 14, 2017, to on or about June 28, 2017, in Qatar, within the extraterritorial jurisdiction of the United States, and elsewhere, defendant RICHARD GUSTAVE OLSON, JR., a person who was subject to the restrictions contained in Title 18, United States Code, Section 207(c), within one year after leaving the position, office, and employment of United States Special Representative for Afghanistan and Pakistan, knowingly aided and advised a foreign entity, namely, the Government of Qatar, with the intent to influence decisions of officers and employees of departments and agencies of the United States in carrying out their official duties, namely: (1) the decisions of officers and employees of the White House National Security Council, DHS, and CBP as to whether to establish preclearance facilities at Doha International Airport in Doha, Qatar; and (2) the decisions of officers and employees of the Executive Branch of the United States government,

//

//

including the National Security Advisor, as to whether and how to support Qatar in the Gulf Diplomatic Crisis.

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption &
    Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption &
    Civil Rights Section