**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Case No. 22-cr-144-GMH |
| | : | |
| RICHARD GUSTAVE OLSON, JR. | : | |
| | : | Judge G. Michael Harvey |
| Defendant. | : | |

**AMBASSADOR OLSON'S RESPONSE TO THE GOVERNMENT'S**
**MOTION TO CONTINUE SENTENCING MEMORANDA DEADLINE**

Comes now Richard Gustave Olson, Jr., through counsel HANNON LAW GROUP, LLP, and CLARK HILL, PLC, and respectfully presents this response to the Government's Motion to Continue Sentencing Memoranda Deadline. For the reasons set forth below, Ambassador Olson takes no position on the government's request.

The government's motion says nothing about the actual reason for its request for an extension of time. Counsel for Amb. Olson appreciates the courtesies shown by government counsel previously consenting to several continuances while he was in trial and dealing with a family emergency. The government's request for an extension is a request to which counsel would ordinarily consent as a professional courtesy. The dilemma currently facing government counsel of record is not entirely of their own making, as we explain herein.

Amb. Olson and his counsel cooperated with the government and negotiated the final plea agreement over a period of 16 months. The parties executed the Plea Agreement ("Agreement") on January 14, 2022. In the Agreement, Amb. Olson agreed to plead guilty to two misdemeanors: making a false statement on his annual ethics report, an OGE Form 278, in March of 2016 (18 U.S.C. § 1018); and, violating the one-year post-employment "Cooling Off Period" by assisting others to lobby the Trump administration on behalf of Qatar in 2017 (18

USC § 207(f)(1)(B)).  Both statutes are ordinarily enforced through an agency's administrative process.[1]

In the Agreement, the government agreed that the Combined Offense Level for these offenses is 8, before application of the -2 point downward departure for Acceptance of Responsibility.  These scores if adopted by the Court would permit a non-custodial sentence. The U.S. Probation Officer who prepared the Final Presentence Investigation Report [PSR] sent it to the Court and the Parties on December 30, 2022.  The Draft PSR was sent to the Parties on August 10, 2022.  The PSR Writer's calculation of the Total Offense Level in both the Draft and Final PSR is 28, a number that astonished Amb. Olson's counsel.

The manner in which the PSR Writer reached this conclusion is part of the real reason the government is now seeking a further 4-week continuance of the filing of sentencing memoranda. The intellectual author of the full panoply of allegations against Amb. Olson – including those presented to the PSR Writer – is Assistant United States Attorney Daniel J. O'Brien who works in the Central District of California [CDCA].  His participation in this sentencing is somewhat

---

[1]     At the time of execution of the Plea Agreement, counsel for Ambassador Olson had found only one case in which the government had indicted a public official with making a false statement on an OGE Form 278.  *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020). We  found two cases involving its predecessor SF 278.  *United States v. Michael Espy*, No. 97-cr-335 (D.D.C., 1997); *United States v. Ronald Blackley*, No. 97-cr-155 (D.D.C., 1997).  We also located a case from the U.S. Attorney's Office for the Central District of California, reported by the U.S. Office of Government Ethics in its 2020 annual "Conflict of Interest Prosecution Survey" of cases involving the conflict of interest statutes (18 U.S.C. §§ 202-209).  That case was resolved by the USAO for the Central District of California with a Non-Prosecution Agreement and a fine.

Counsel for Ambassador Olson also were unable to find any case charging an offense under the Cooling Off Period statute (18 U.S.C. § 207(f)) in either the CDCA or the DDC.  We also found no reported case charging an offense under 18 U.S.C. § 207(f) in Westlaw or in our review of the annual "Conflict of Interest Prosecution Survey" issued by the Office of Government Ethics for the past 30 years.  Counsel for Ambassador Olson reported this information to the government shortly before the parties agreed to the final Plea Agreement.

unusual because Mr. O'Brien has not entered his appearance in this case. It also appears that government counsel Messrs. Evan N. Turgeon, attorney with the National Security Division of the Department of Justice, and AUSA Stuart D. Allen have only recently become aware of the contents of the PSR and some of the details of AUSA O'Brien's participation in influencing the PSR Writer.[2]

    We believe the assertions and conduct of AUSA O'Brien over time must be examined in the course of considering the proper sentence and the Final PSR. Amb. Olson became a target of AUSA O'Brien as early as 2019. AUSA O'Brien was conducting a Grand Jury investigation into the lobbying and fund-raising activities of a Pakistani American, Imaad Shah Zuberi. On October 22, 2019, the Department of Justice [DOJ] announced that Zuberi would plead guilty to falsifying records and tax evasion in connection with his fund-raising for U.S. politicians from every party and level of government. The DOJ Press Release stated that Zuberi funded his corrupt endeavors by stealing money from his international clients through a variety of schemes. (*See* DOJ Press Release, attached as Exhibit A). The DOJ Press Release recounts Zuberi's high-flying personal association with and contributions to presidents, members of congress, political parties, and others.

---

[2]   When Probation Officer Hana Field sent the draft PSR on August 10, 2022, we learned that Paragraphs 17-54 were allegations by the government that were never shared with Amb. Olson's counsel and not contained in any agreed statement of facts underlying the plea. Counsel contacted Ms. Field the same day. Ms. Field initially laughed and said she thought she would hear from us, given the high offense level score. Ms. Field stated that she assumed – as is the practice in this Court – that the government would have sent its contribution to the PSR to counsel for Amb. Olson at the same time she received it. That did not occur. Counsel for Amb. Olson only last week learned that Mr. O'Brien was solely responsible for providing this information to the PSR Writer. However, both the Probation Office and Messrs. Turgeon and Allen have refused our request to provide us with all of the information Mr. O'Brien provided to the PSR Writer, including any oral communications and email.

Earlier in his investigation, AUSA O'Brien had come to view Amb. Olson as the key to his prospective prosecution of retired United States Marine Corps four-star General John R. Allen.  Mr. O'Brien believed that Zuberi had retained Allen and Amb. Olson to unlawfully lobby the Trump administration on behalf of Qatar.  General Allen was the former commander of the NATO International Security Assistance Force and U.S. Forces – Afghanistan (USFOR-A), and later special envoy for President Obama for the Global Coalition to Counter ISIL (Islamic State of Iraq and the Levant).  In those capacities, he met Amb. Olson.  At the time of O'Brien's investigation, General Allen was serving as the President of the Brookings Institution.  Allen now has resigned from Brookings because of international publicity generated by the leak of secret grand jury material to the press from the CDCA Court on June 6, 2022.  AUSA O'Brien was responsible for maintaining the secrecy of that material, which was contained in a 64-page affidavit in support of a search warrant O'Brien filed in that district on April 25, 2022.

In pursuit of General Allen, AUSA O'Brien caused an FBI Agent to conduct a surprise interview of Amb. Olson on July 17, 2019 and serve a subpoena for production of records and email communications related to Zuberi and Allen.  Amb. Olson complied with the subpoena without feeling any need to obtain counsel.  AUSA O'Brien then caused the FBI to conduct a second interview on December 17, 2019, during which Amb. Olson asked if he was a target of an investigation, to which the agents answered in the affirmative.

After Zuberi pled guilty, O'Brien publicly accused Amb. Olson – whose identity was poorly veiled by O'Brien – of a serious federal crime.  On April 13, 2020, O'Brien publicly filed in Zuberi's case a "Response to Defendant's [Zuberi] Objections to Presentence Report".  This filing was well before Amb. Olson had obtained counsel and begun to cooperate with Mr. O'Brien.  Specifically, Mr. O'Brien alleged that "Person NN, the U.S. official stationed in

Pakistan" and "the journalist with whom Person NN had a relationship" received undisclosed payments "contemporaneous with Person NN providing assistance to Zuberi's business."   Mr. O'Brien specifically described such "undisclosed payments" as gratuities.  Anyone following the case recognized NN as Amb. Olson.  The journalist referred to is Muna Habib, now married to Amb. Olson.  At the time of the "relationship" alleged by O'Brien, they were unmarried and estranged after an earlier period of dating.[3]

Alan Suderman, a reporter for the Associated Press, contacted Ms. Habib in 2020. Suderman provided Ms. Habib with a screen-shot of a page of a pleading filed under seal by Mr. O'Brien in the *Zuberi* case.  The page identifies Amb. Olson and Ms. Habib by name as beneficiaries in Zuberi's alleged payment of a gratuity in the form of a partial tuition payment for Ms. Habib's graduate work at Columbia University.  *See* Screenshot, attached as Exhibit B.  At a meeting with Ms. Habib, Suderman told her that his source for information was "someone inside the DOJ."

On August 31, 2020, Amb. Olson's counsel initiated his cooperation with AUSA O'Brien, in which O'Brien explicitly identified General Allen as a target.  Mr. O'Brien was

---

[3]   DOJ policies strictly prohibit federal prosecutors from identifying and accusing an uncharged third-party of wrong-doing or misconduct.  Specifically, DOJ Manual 9-16.500 "Identifying Uncharged Third-Parties During Plea and Sentencing Proceedings" states "[i]n the absence of some significant justification, it is generally not appropriate for a Untied States Attorney to identify (either by name or unnecessarily-specific description) or cause a defendant to identify, a third-party wrongdoer unless that party has officially been charged with the misconduct at issue. **When referring to the uncharged third party, the use of non-generic descriptors, like a person's initials, is usually an unnecessarily-specific description and should not be used."** (Emphasis added).

Courts have specifically applied this reasoning to preclude the public identification of unindicted third-party wrongdoers in sentencing memoranda and other governmental pleadings. *See Finn v. Schiller*, 72 F.3d 1182 (4th Cir. 1996); *United States v. Briggs*, 513 F.2d 794 (5th Cir. 1975); *United States v. Anderson*, 55 F. Supp. 2d 1163 (D. Kan 1999); *United States v. Smith*, 992 F. Supp. 743 (D.N.J. 1998).

particularly interested in Amb. Olson's cooperation because Amb. Olson attended two meetings among the Qatar royal family and General Allen in Qatar in June of 2017.  Amb. Olson acted as a scrivener at the meetings, from which the Qataris had expelled Zuberi.  Amb. Olson's extensive notes are the only known record of what occurred in the meetings.  These meetings were a critical element of O'Brien's potential case against General Allen, partially outlined in the Statement of Offense in Amb. Olson's Plea Agreement for Count 2.

During initial debriefings , O'Brien threatened to indict Amb. Olson for violations of four criminal statutes:[4]  Amb. Olson participated in four debriefing sessions with O'Brien and the FBI for over 16 hours, and produced numerous pages of documents, notes, and calendars.

On March 22, 2021, Amb. Olson's counsel provided a 32-page rebuttal to O'Brien's allegations of criminal conduct by Amb. Olson and reminded AUSA O'Brien that the DOJ Justice Manual prohibits indicting a public official for accepting a gratuity unless the official personally received the gratuity.  (*See* DOJ Justice Manual Section 2041, attached as Exhibit C). Nevertheless, AUSA O'Brien has persisted in his theory and apparently convinced the PSR Writer that Amb. Olson has accepted gratuities, and his purported acceptance of such gratuities is "relevant conduct" under the Sentencing Guidelines.  The PSR Writer's adoption of O'Brien's argument has resulted in an increase in the Offense Level Score for Count 2 by at least 17 points. The PSR Writer's conclusion is patently absurd, as are her proposed upward departures, as we will demonstrate in our Sentencing Memorandum and at the sentencing hearing.[5]

---

[4]    These were: 18 U.S.C. § 201(c)(1)(B) Receipt of a Gratuity by a Public Officials; 18 U.S.C. § 208(a) Acts Affecting a Personal Financial Interest; 18 U.S.C. § 207(f) Restrictions on Former Officers, Employees, and Elected Officials of the Executive and Legislative Branches; and 18 U.S.C. § 1001(a) False Statements or Entries Generally.

[5]    Simply by way of example, the PSR Writer increases the offense level for Count 2 – the Cooling Off Period offense – because Amb. Olson was a "public official in a high-level decision-

Mr. O'Brien did not respond to Counsel's March 21, 2021, Counter proffer until October 25, 2021.  On that date, O'Brien required Amb. Olson and his counsel to travel to the DOJ to meet with Attorney Evan S. Turgeon.  At that meeting, Amb. Olson and his counsel were provided with an unsigned memorandum, not on stationary of any office within the DOJ or the U.S. Attorney's Office, purportedly rebutting all claims of innocence.  While counsel were permitted to read the memorandum, they were forbidden from taking a copy with them.  In addition, Mr. Turgeon provided counsel with an unsigned plea offer letter.  The plea offer indicated Amb. Olson would be indicted on all but one of the charges outlined by AUSA O'Brien in August of 2020, *as well as additional counts* of destruction of documents and false statements.[6]  In lieu of indictment on these charges in December, Amb. Olson was offered the option of pleading to a felony and a misdemeanor, with the opportunity of a §5K departure for assistance in the prospective prosecution of General Allen.

After additional exchanges between the parties, the government sent a formal plea agreement, on December 17, 2021, including the felony, misdemeanor, and cooperation agreement leading to a potential §5K departure.  Amb. Olson rejected any plea to a felony offense.  The parties finally executed the current Agreement on January 14, 2022, incorporating the two misdemeanors.  AUSA O'Brien then took the position that he would not agree to a cooperation provision and potential §5K departure.  His rationale was that somehow, over the previous two weeks, he no longer considered Amb. Olson sufficiently credible to merit a potential §5K departure motion.  Nevertheless, he expressly stated that it was the goal of the

---

making or sensitive position."  Of course, Amb. Olson had already retired from the Department of State at the time, and thus was no longer a public official.

[6]    The government did agree there is no basis for prosecuting Amb. Olson for an ongoing conflict of interest while serving as Amb. under 18 U.S.C. § 208(a).  We will discuss the implications of this concession for sentencing in our Sentencing Memorandum.

government to fashion a plea agreement that would enable Amb. Olson to receive a non-custodial sentence.  While the cooperation agreement in the prosecution of General Allen was no longer a part of the agreement, Mr. O'Brien held out the possibility of cooperation.

After Mr. O'Brien was unable to achieve an important element of the Plea Agreement – entering the plea in this district – and then threatened Amb. Olson with indictment for not agreeing to an amendment of the Agreement, the Information was filed by AUSA O'Brien in California without agreement from Amb. Olson.  The Information was also filed by Mr. O'Brien on the public record, predictably generating adverse publicity for both Amb. Olson and General Allen.

On June 7, 2022, Hannon was contacted by two reporters with prominent news organizations, one of whom was Alan Suderman of the Associated Press.  They both provided Mr. Hannon with a CDCA Court file-stamped copy of the FBI Agent's 64-page affidavit in support of the search warrants filed by AUSA O'Brien in the CDCA District Court on April 25, 2022.  The affidavit contained not only grand jury material enormously prejudicial to Amb. Olson, but also accusations that General John R. Allen had engaged in lobbying the United States on behalf of Qatar.  The subsequent international press coverage reporting the contents of the affidavit caused irreparable harm to both Amb. Olson and General Allen.  Suderman's story can be found here: https://apnews.com/article/politics-us-news-think-tanks-nato-ap-top-5c30827587d2295012549d5d65fc806e.

Counsel for Amb. Olson then filed a motion to partially unseal the search warrants application in the District Court for the Central District of California from which the affidavit had been leaked.  AUSA O'Brien opposed that motion.  His opposition is attached as Exhibit D. The Magistrate Judge granted Amb. Olson's motion in part on October 28, 2022.  (*See* Order

attached as Exhibit E).  On July 13, 2022, counsel for Amb. Olson filed a complaint regarding AUSA O'Brien's failure to protect the secrecy of grand jury material with the DOJ Office of Professional Responsibility.  Investigation into AUSA O'Brien's role in the release of this affidavit is continuing.

After receiving the Draft PSR Report on August 10, 2022, counsel for Amb. Olson attempted to engage in conversations with Messrs. Turgeon and Allen regarding what we viewed as clearly erroneous conclusions by the PSR Writer, and that Amb. Olson also viewed as a departure from the letter and intent of the Agreement.  In essence, although the Agreement provides for a non-custodial sentence, it is apparent that AUSA O'Brien is intent on seeing Amb. Olson sent to prison.

Mr. Turgeon and Mr. Allen refused to discuss the Draft PSR with counsel, telling them simply to file their objections to the Draft PSR.  Probation Officer Field also rebuffed our attempts to discuss with her the erroneous conclusions she drew from Paragraphs 17-54, which we now know AUSA O'Brien provided to her.

Amb. Olson's counsel sent their objections to the DRAFT PSR Report to Ms. Field, noting that Paragraphs 17-54 are largely unproven, embellished assertions provided by AUSA O'Brien that counsel were unable to review or contest before the August 10, 2022 Draft PSR was delivered.  The PSR Writer adopted these Paragraphs in whole, but she did not include a recitation of the facts included in the Information to which Amb. Olson pled guilty.  We argued that the facts recited in the Information should be substituted for Paragraphs 17-54, which are better left to the government's Sentencing Memorandum or specifically identified contentions in the PSR.  In other words, the inclusion of Mr. O'Brien's unproven allegations in these

paragraphs, without attribution to him, presents a picture to the Court that the Probation Officer herself adopted these paragraphs as uncontested facts.

In her response to Amb. Olson's objections to inclusion of the government's Paragraphs 17-54, the PSR Writer wrote: "[T]he standard of proof is by a preponderance of the evidence – this conduct [Paras. 17-54] need not be formally charged nor admitted to by the defendant." While this statement is not particularly objectionable, the PSR Writer fails to note that the government must prove O'Brien's assertions by a preponderance of evidence at a sentencing hearing. Moreover, the Court must make factual findings on disputed facts to support an increased offense level. *United States v. Leyva*, 916 F.3d 14, 24 (D.C. Cir.), *cert. denied*, 140 S. Ct. 413 (2019); *United States v. Carter*, 489 F.3d 528, 537-38 (2d Cir. 2007); *United States v. Seefried*, 2022 WL 16528415, *11 (D.D.C. 2022) (McFadden, J.).

The PSR Writer's refusal to attribute these paragraphs to the government stands in contrast with the information provided by Amb. Olson's attorneys in Paragraph 57, which she put in quotation marks and specifically attributed to his counsel.

The PSR Writer's reliance on the information provided by AUSA O'Brien has created a potentially devastating and improper effect on the sentencing process. For example, for Count 2 the PSR Writer adds a total of 21 points over the base offense level of 6, accepting Mr. O'Brien's contention that the conduct he alleges in Paras. 17-54 of the Final PSR is conduct "relevant to the offense of conviction" under §1B1.3(a)(1)(A). Count 2, the offense of conviction, is the misdemeanor offense of Aiding and Assisting a Foreign Government during the one-year "Cooling Off Period". As the Plea Agreement states, Amb. Olson during his Cooling Off Period helped draft a proposal that was sent to the Qatar government. As we will discuss in our Sentencing Memorandum, none of the conduct alleged by AUSA O'Brien in Paras. 17-54 occurred during

Amb. Olson's violation of his Cooling Off Period, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, which is required by §1B1.3(a)(1)(A) to constitute relevant conduct.

The PSR Writer also maintains over our objections the following: the base offense level for violation of the Cooling Off Period is 11 (¶ 69); the base offense level should be increased by 2 points because the offense involved "more than one gratuity" (¶ 70); the base offense level is increased another 12 points because the "value of the gratuity" is $325,400 (¶ 71); and, another 4 points must be added because Amb. Olson was a "public official in a high-level decision-making or sensitive position" (¶ 72).

The PSR Writer's response to our objections at Page 48 of the Final PSR is unhelpful:

> A response to the objection regarding gratuities has been previously addressed. Therefore, the report remains unchanged. Defense again states the plea agreement did not "allow the Government to rely upon cross references contained in the sentencing guidelines." As previously stated, the Probation Office is not limited to the plea agreement in application of the guidelines.

Presumably, the reference to the previous comment regarding gratuities is a reference to the PSR Writer's Response to our objection to Paragraph 62 at Page 45 of the Final PSR. She also stated: "Further, in preparation of the presentence report and conducting the analysis, the US Probation Office contacted the US Sentencing Commission. The guidelines calculation in the presentence report was calculated based on their response."

We now know that her reference to "the government" is a reference to AUSA O'Brien. Upon noting the PSR Writer's reliance on the U.S. Sentencing Commission, counsel for Amb. Olson sent a letter to the Chief Probation Officer, the Supervisory Probation Officer and the PSR Writer asking what information was obtained from the U.S. Sentencing Commission upon which this decision was allegedly predicated. The Supervisory Probation Officer responded:

We are in receipt of your email and the attached letter.  As stated, the defendant's objections to the finalized presentence report have been addressed in the report's addendum.  Please note, if ordered to do so by Magistrate Judge Harvey, we will make any revisions to the report at the direction of the Court after sentencing.

The error for adding 4 points to Count 2 for Amb. Olson allegedly being in a high level decision-making position at the time was discussed above and is clearly erroneous.  The remaining increases for Count 2 are all based on the PSR Writer's acceptance of O'Brien's continued contention that Amb. Olson received gratuities.  These are described to the PSR Writer by AUSA O'Brien as the following: (1) $25,000 in partial tuition paid by Zuberi to Columbia University for Muna Habib; (2) a $400 limousine ride shared by Amb. Olson in the company of Zuberi when Amb. Olson was at a speaking engagement in Los Angeles on behalf of the Department of State; and, (3) a $300,000 job offer to Amb. Olson made by ADIH, which Amb. Olson rejected.  One need not be an expert in the Sentencing Guidelines to know that none of this money was ever given to Amb. Olson, and the DOJ Justice Manual would not permit charging Amb. Olson with receiving a gratuity for any of these alleged gratuities.

Government counsel of record at page 1 of their Motion state the following: "defendant Olson has objected to much of the factual narrative in the presentence report as well as many aspects of the Sentencing Guidelines calculation.  Responding to these extensive objections with corresponding exhibits is a significant undertaking."  We wish to be clear that government counsel rejected the opportunity to discuss these objections with Amb. Olson's attorneys immediately after the Draft PSR was issued on August 10, 2022.  No doubt, they rejected this opportunity because the task of influencing the PSR Writer had been left to AUSA O'Brien.

When government counsel conferred with attorneys for Amb. Olson last week, counsel for Amb. Olson again sought to discuss the obvious errors in the Final PSR.  Counsel declined and also refused to produce to us the information that AUSA O'Brien had provided to the PSR

Writer.  Obviously, only after the government filed the consent motion on January 6, 2023, did

government counsel realize the magnitude of the problem AUSA O'Brien had created for them.

Counsel for Amb. Olson did not want to consent to the government's motion without

making a record of AUSA's O'Brien's conduct that makes him unable to consent to the motion.

We hope that government counsel will use the additional time they have requested to at least

engage in dialogue with Amb. Olson's attorneys regarding obvious errors in the Final PSR so the

Parties can narrow the issues the Court must decide.

Dated: January 13, 2023                    Respectfully submitted,

                                           HANNON LAW GROUP, LLP

                                           *s/J. Michael Hannon*
                                           _____
                                           J. Michael Hannon, #352526
                                           1800 M Street, N.W., Suite 850 S
                                           Washington, DC 20036
                                           Tel: (202) 232-1907
                                           Fax: (202) 232-3704
                                           jhannon@hannonlawgroup.com

                                           CLARK HILL, PLC

                                           *s/Russell D. Duncan*
                                           _____
                                           Russell D. Duncan
                                           1001 Pennsylvania Ave. Suite 1300 South
                                           Washington, DC 20004
                                           (202) 640-6637
                                           rduncan@clarkhill.com

                                           *Attorneys for Defendant Richard Gustave Olson, Jr.*

# EXHIBIT A

8/31/2020     Campaign Fundraiser Agrees To Plead Guilty To Falsifying Records to Conceal Work as Foreign Agent, Evading Taxes on Income Obtai…

Case 1:22-cr-00144-GMH Document 37 Filed 01/13/23 Page 15 of 40



🇺🇸 An official website of the United States government
<u>Here's how you know</u>

THE UNITED STATES
**DEPARTMENT** *of* **JUSTICE**
TICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                         Tuesday, October 22, 2019

## Campaign Fundraiser Agrees To Plead Guilty To Falsifying Records to Conceal Work as Foreign Agent, Evading Taxes on Income Obtained by Lobbying on Behalf of Foreign Entities, and Illegal Campaign Contributions

Federal prosecutors today filed a criminal case charging Imaad Shah Zuberi, a Southern California campaign fundraiser, with falsifying records to conceal his work as a foreign agent while lobbying high-level U.S. government officials. The criminal charges allege that Zuberi engaged in lobbying efforts that earned him millions of dollars, most of which was pilfered from his clients, and Zuberi has agreed to plead guilty to those charges at a later date, pursuant to a plea agreement.

"This case should deter individuals who seek to provide false statements to the Department and covertly influence our political process on behalf of foreign governments," said Assistant Attorney General of National Security John C. Demers. "Through misrepresentations in his FARA filing, Mr. Zuberi attempted to deceive our elected officials and the American public on behalf of Sri Lanka. The Department of Justice treats these crimes with the gravity that they deserve and will continue to aggressively identify, investigate and prosecute FARA violations."

"Mr. Zuberi's multi-faceted scheme allowed him to line his pockets by concealing the fact that he was representing foreign clients, obtaining access for clients by making a long series of illegal contributions, and skimming money paid by his clients," said United States Attorney Nick Hanna. "Mr. Zuberi circumvented laws designed to insulate U.S. policy and our election process from foreign intervention. This investigation has halted his illegal conduct, will result in several felony convictions, and could send him to prison for a lengthy period of time."

"American influence is not for sale," said Paul Delacourt, the Assistant Director in Charge of the FBI's Los Angeles Field Office. "Mr. Zuberi lured individuals who were seeking political influence in violation of U.S. law, and in the process, enriched himself by defrauding those with whom he interacted."

"Mr. Zuberi was the primary organizer of paid political efforts to mold the opinion of political officials, including members of Congress, to benefit Sri Lanka. Instead, he used shell business entities to divert millions of dollars for his own personal use," stated Special Agent in Charge Ryan L. Korner of IRS Criminal Investigation's Los Angeles Field Office. "Today's announcement of Mr. Zuberi's anticipated guilty plea to tax and campaign finance violations demonstrates IRS-CI's continued commitment to work alongside our federal law enforcement partners to ensure the system remains fair for everyone."

In addition to violating the Foreign Agents Registration Act (FARA), Zuberi is charged in a criminal information with tax evasion and making almost $1 million in illegal campaign contributions that included funneling money from foreign entities and individuals to influence U.S. elections.

Zuberi, a 49-year-old resident of Arcadia, California, has agreed to plead guilty to the three counts in the information. A plea agreement also filed today in United States District Court notes that Zuberi faces a statutory maximum sentence of 15 years in federal prison once he pleads guilty to the charges.

Zuberi, who operated a venture capital firm called Avenue Ventures, solicited foreign nationals and representatives of foreign governments with claims he could use his influence in Washington, D.C. to change United States foreign policy and create business opportunities for his clients and himself. According to court documents, clients gave Zuberi money for consulting fees, to make investments, or to fund campaign contributions. As part of his efforts to influence public policy, Zuberi hired lobbyists, retained public relations professionals and made campaign contributions – which gave him access to high-level U.S. officials, some of whom took action in support of his clients. As evidence of his access and influence, Zuberi distributed to his clients photographs of himself discussing policy with elected officials.

While some U.S. officials were willing to take action on issues Zuberi put forward, most of Zuberi's business efforts were unsuccessful and his clients suffered significant losses. Many of the lobbyists, public relations consultants, and other subcontractors also suffered losses when Zuberi refused to pay them, according to the information. Zuberi, on the other hand, became wealthy, primarily as the result of fraudulent representations about his background, influence, and the use of client funds, much of which constituted an "outright conversion of client money for defendant Zuberi's own personal benefit," the information states.

The information details dozens of illegal campaign contributions – including those paid by Zuberi using the names of other people, "conduit contributions" made by others that Zuberi reimbursed, and contributions to U.S. political campaigns that were financed by foreign entities and individuals.

The information further states that Zuberi accepted money from two foreign companies with promises that the funds would be used to contribute to political campaigns, but Zuberi took the vast majority of the money – more than $1.1 million – for his own personal use.

The information details other aspects of Zuberi's scheme through which he personally profited. Zuberi mounted efforts to convince the government of Bahrain to lift sanctions on a citizen of Bahrain in connection with the development of a large resort in that country. The scheme falsely created the appearance that Avenue Ventures had made a major investment in the Bahrain project. Zuberi lobbied members of Congress to apply political pressure on Bahrain to cease its interference in the project, claiming that it was adversely affecting him as a U.S. investor. In fact, Zuberi designed these efforts to assist the citizen of Bahrain. Zuberi illegally received compensation for these efforts because he failed to register as a foreign agent of the Bahraini citizen.

Zuberi also converted to his own benefit money invested in U.S. Cares, a company established to export humanitarian items to Iran, according to the information. In 2013 and 2014, investors put approximately $7 million into U.S. Cares, but Zuberi used over 90 percent of the investor funds for his personal benefit – to purchase real estate, pay down mortgages, remodel properties, invest in brokerage accounts, donate $250,000 to a non-profit organization established by a former high-ranking elected official, and pay down personal credit card debt, according to court documents.

In 2014, Zuberi entered into a contract with the government of Sri Lanka to rehabilitate Sri Lanka's image in the United States, which had suffered as a result of allegations of persecution of the country's minority Tamil population. Zuberi promised to make substantial expenditures on lobbying efforts, legal expenses and media buys, which prompted Sri Lanka to agree to pay Zuberi a total of $8.5 million over the course of six months in 2014. According to court documents, days after Sri Lanka made an initial payment of $3.5 million, Zuberi transferred $1.6 million into his personal brokerage accounts and used another $1.5 million to purchase real estate.

The information alleges that Sri Lanka wired a total of $6.5 million pursuant to the contract, and Zuberi directed more than $5.65 million of that money to the benefit of himself and his spouse. Zuberi paid less than $850,000 to lobbyists, public relations firms and law firms, and certain subcontractors did not receive full payment after Zuberi falsely claimed that Sri Lanka had not provided sufficient funds to pay invoices, according to the information.

In relation to the FARA charge in the information, Zuberi agreed to plead guilty to submitting false registration statements in which he concealed his direction of the Sri Lanka lobbying effort, as well as the millions of dollars he received.

In relation to the tax charge in the information, Zuberi agreed to plead guilty to one count of tax evasion for failing to report on his 2014 tax return millions of dollars in income he received from Sri Lanka. While the 2014 income tax return claimed income of $558,233, Zuberi failed to report more than $5.65 million he received in relation to the Sri Lanka

8/31/2020     Campaign Fundraiser Agrees to Plead Guilty to Falsifying Records to Conceal Work as Foreign Agent, Evading Taxes on Income Obtai…

Case 1:22-cr-00144-GMH   Document 27   Filed 01/13/23   Page 17 of 40

lobbying effort. Zuberi admits in his plea agreement that his tax evasion over the course of four years – 2012 through 2015 – caused tax losses of at least $3.5 million and as much as $9.5 million.

In relation to the campaign finance charge, Zuberi agreed to plead guilty to a charge of violating the Federal Election Campaign Act in 2015 by making conduit contributions in the names of other people, reimbursing contributions made by others, and being reimbursed for contributions he made. In his plea agreement, Zuberi admits that over a five-year period – 2012 through 2016 – he made or solicited more than $250,000 in illegal campaign contributions.

Zuberi is expected to make his initial appearance in this case in United States District Court on October 30.

This matter is being investigated by the FBI and IRS Criminal Investigation.

This case is being prosecuted by Assistant United States Attorneys Daniel J. O'Brien and Elisa Fernandez of the Public Corruption and Civil Rights Section with support from the Counterintelligence and Export Control Section of the National Security Division.

---

**Attachment(s):**
Download Zuberi_Information
Download Zuberi_Plea_Agreement

**Topic(s):**
Counterintelligence and Export Control
National Security

**Component(s):**
National Security Division (NSD)
USAO - California, Central

**Press Release Number:**
19-1136

*Updated October 22, 2019*

# EXHIBIT B

Pakistan

56. Richard Olson was the U.S. Ambassador to Pakistan from October 2012 through October 2015. He was then appointed Special Representative for Afghanistan and Pakistan from November 2015 through November 2016. At the time, Olson was married to the U.S. Ambassador to Libya, Deborah Jones.

57. Zuberi paid for Olson's first-class airfare from New Mexico (where Olson maintained a residence) to London in order to meet with Esam Janahi who offered him a position with his company, Abu Dhabi Investment House.

158. On December 19, 2015, Avenue Ventures sought reimbursement from Abu Dhabi Investment House for a $15,988 reimbursement for "Ambassador Richard Olson ticket and hotel Los Angeles to Abu Dhabi to Los Angeles." This was in connection with a "contract for services to Abu Dhabi Investment House by Avenue Ventures."

159. Janahi offered Olson a $300,000 contract plus a 2% success fee for business he generated, plus expenses. Olson services would consist of "leveraging you unique relationships in the US and the UAE in terms of positioning ADIH in respect of both private and public sectors."

160. In addition, Zuberi paid for $25,000 towards the graduate school tuition of Muna Habib, a Pakistani reporter who was in a relationship with Olsen.

161. Olson did not report on his annual financial disclosure forms any financial benefits from Zuberi. Olson did report similar travel expense benefits from other private sources, such as a conferences in Guatemala ($2,500), Malta ($1,200), and Iceland ($2,500).

162. In October 2015, Olson met with Zuberi and his business associates, including former Pakistani President Zardari or his son, to provide support to one of Zuberi's projects. Subsequent to the meeting, Zuberi asked Olson to relay emails from Zardari to Secretary of State Kerry and Olson agreed to do so.

163. Olson authored a policy statement for the State Department concerning a $952 million helicopter sale to Pakistan and other topics that were not available to the U.S. (or international) public. In April of 2015, Olson asked Zuberi not to share the information because it had not been cleared.

164. In January 2017, after Olson's retirement, he began receiving $20,000 per month from Zuberi for consulting work which continues to this day.



# EXHIBIT C

 An official website of the United States government
Here's how you know

 THE UNITED STATES DEPARTMENT OF JUSTICE ARCHIVES
This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 2041. BRIBERY OF PUBLIC OFFICIALS

Section 201 of Title 18 is entitled "Bribery of public officials and witnesses." The statute comprises two distinct offenses, however, and in common parlance only the first of these is true "bribery."

The first offense, codified in section 201(b), prohibits the giving or accepting of anything of value to or by a public official, if the thing is given "with intent to influence" an official act, or if it is received by the official "in return for being influenced."

The second offense, codified in section 201(c), concerns what are commonly known as "gratuities," although that word does not appear anywhere in the statute. Section 201(c) prohibits that same public official from accepting the same thing of value, if he does so "for or because of" any official act, and prohibits anyone from giving any such thing to him for such a reason.

The specific subsections of the statute are:

*Bribery*

1. a. § 201(b)(1): offering a bribe to a public official
   b. § 201(b)(2): acceptance of a bribe by a public official

   *Gratuities*

   a. § 201(c)(1)(A): offering a gratuity to a public official

   b. § 201(c)(1)(B): acceptance of a gratuity by a public official.

The two offenses differ in several respects. The most important of these differences concerns how close a connection there is between the giving (or receiving) of the thing of value, on the one hand, and the doing of the official act, on the other. If the connection is causally direct - if money was given essentially to purchase or ensure an official act, as a "quid pro quo" then the crime is bribery. If the connection is looser - if money was given after the fact, as "thanks" for an act but not in exchange for it, or if it was given with a nonspecific intent to "curry favor" with the public official to whom it was given -then it is a gratuity. The distinction is sometimes hard to see, but the statute makes it critical: a § 201(b) "bribe" conviction is punishable by up to 15 years in prison, while a § 201(c) "gratuity" conviction permits only a maximum 2-year sentence. In addition, with a "bribe" the payment may go to anyone or to anything and may include campaign contributions, while with a "gratuity" the payment must inure to the personal benefit of the public official and cannot include campaign contributions.

[cited in JM 9-85.101]

‹ 2040. Bank Records And Foreign Transactions -- Financial Crimes Enforcement Network (FinCEN)     up     2042. Elements Common To Both Bribery And Gratuity Offenses ›

*Updated January 17, 2020*

 An official website of the United States government
**Here's how you know**



THE UNITED STATES
DEPARTMENT OF JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 2042. ELEMENTS COMMON TO BOTH BRIBERY AND GRATUITY OFFENSES

The crime of bribery (in violation of § 201(b)) and the crime of accepting a gratuity (in violation of § 201(c)) require proof of the same basic elements: In general terms, these are the following:

1. 1. A public official;
   2. A thing of value;

   3. A request or receipt by the official, or an offer or promise to the official, of that thing of value;

   4. For the benefit of the official or (in the case of section 201(b) bribery) of some other person or entity);

   5. With the requisite connection to an official act;

   6. With the requisite intent.

The differences between the two sections (§ 201(b) and § 201(c)) are found in the details of these common features. For purposes of comparison, the chart Criminal Resource Manual 2043 sets out the elements in parallel form, for the offenses of accepting a bribe and accepting a gratuity. This should be helpful in seeing exactly how the offenses differ and how they are similar. The differences are marked either by brackets (for features that are found in only one of the two sections) or by bold text (to highlight the key distinction in how the sections specify the required connection between the thing of value and the official act). The corresponding offenses of *giving* a bribe and *giving* a gratuity involve the same components, from the opposite perspective.

[updated November 1998] [cited in JM 9-85.101]

‹ 2041. Bribery Of Public Officials          up          2043. Comparison Of The Elements Of The Crimes Of Bribery And Gratuities ›

*Updated January 17, 2020*

 An official website of the United States government
[Here's how you know](#)



THE UNITED STATES
DEPARTMENT OF JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 2043. COMPARISON OF THE ELEMENTS OF THE CRIMES OF BRIBERY AND GRATUITIES

The differences between the offense of bribery and the offense of accepting a gratuity are marked in the chart below either by brackets (for features that are found in only one of the two sections) or by UPPER CASE TEXT (to highlight the key distinction in how the sections specify the required connection between the thing of value and the official act).

|  | § 201(b): *Accepting a Bribe* | § 201(c): *Accepting a Gratuity* |
|---|---|---|
| *Status* | Whoever, being a public official [ ] or person selected to be a public official | Whoever, being a public a public official, [former public official], or person selected to be a public official |
| *Intent* | CORRUPTLY | [ ] |
| *Act* | *[ ]<br>* directly or indirectly<br>* demands, seeks, receives, accepts, or agrees to receive or accept | * [otherwise than as provided by law for the proper discharge of offical duty,]<br>* directly or indirectly<br>* demands, seeks, receives, accepts, or agrees to receive or accept |
| *Thing* | anything of value | anything of value |
| *For Whom* | PERSONALLY [OR FOR ANY OTHER PERSON OR ENTITY] | PERSONALLY [ ] |
| *Purpose* | IN RETURN FOR:<br>* being influenced in the performance of any official act;<br>* being influenced to commit or aid in committing any fraud on the U.S.; or<br>* being induced to do or omit to do any act in violation of his or her official duties. | FOR OR BECAUSE OF any official act performed or to be performed by such official or person. |

[updated November 1998] [cited in Criminal Resource Manual 2042; Criminal Resource Manual 2045; JM 9-85.101]

‹ 2042. Elements Common To Both Bribery And Gratuity Offenses     up     2044. Particular Elements ›

*Updated January 17, 2020*



🇺🇸 An official website of the United States government
Here's how you know



THE UNITED STATES
DEPARTMENT OF JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 2044. PARTICULAR ELEMENTS

- *"Public Official"*

The terms "public official" and "person who has been selected to be a public official" are defined in section 201(a). "Public official" includes any garden-variety Federal employee, regardless of the branch of government involved, employees of the District of Columbia, Members of Congress, and Federal jurors. The breadth of the definition should be noted, for it includes any "person acting for or on behalf of the United States, or any department, agency, or branch of government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of government." 18 U.S.C. § 201(a)(1). The Supreme Court has liberally interpreted this language to include persons who are not Federal employees, but who have the power to allocate and expend Federal monies under grant programs. *Dixson v. United States*, 465 U.S. 482 (1984).

*PRACTICE TIP*: Even if the broad definition of "public official" under § 201 cannot be met, a charge under 18 U.S.C. § 666 may nonetheless be appropriate if the solicitor or intended recipient of the bribe is a person who acts as an agent of an organization that receives in one year $10,000 or more in Federal grant, loan, contract, or insurance funds.

- *"Thing of Value"*

The term "thing of value" is used throughout Title 18, and includes intangible as well as tangible things. *See United States v. Girard*, 601 F.2d 69, 71 (2d Cir.), *cert. denied*, 444 U.S. 871 (1979). It has been broadly construed to focus on the worth attached to the bribe by the defendant, rather than its commercial value. *United States v. Williams*, 704 F.2d 603, 622-23 (2d Cir.), *cert. denied*, 464 U.S. 1007 (1983).

- *"Official Act"*

"Official act" for the purposes of Section 201(b) and (c) is defined to mean:

> "Any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."

18 U.S.C. § 201(a)(3). In order for an act to fall within this definition, it need not be specified by statute, rule, or regulation; established practice within the department is sufficient to prove official action. *United States v. Birdsall*, 233 U.S. 223 (1914).

- *Authority or Power to Do the Official Act*

It is not essential to a bribery charge against a public official that he or she have the authority to make a final decision on an official matter. When the advice and recommendation of the public official would be influential, a violation of Section 201(b) may be established. *United States v. Heffler*, 402 F.2d 924 (3d Cir. 1968), *cert. denied*, 394 U.S. 946 (1969); *Wilson v. United States*, 230 F.2d 521 (4th Cir.), *cert. denied*, 351 U.S. 931 (1956); *Krogmann v. United States*, 225 F.2d 220 (6th Cir. 1955).

It is also possible in some circuits to convict either the giver or the taker of a bribe (or both) even if the public official does not have the power to bring about the result that prompted the bribe. It is sufficient as to a charge against the

public official that the public official represented that the official act in question was within his or her power, *United States v. Arroyo*, 581 F.2d 649 (7th Cir. 1978), *cert. denied*, 439 U.S. 1069 (1979); or as to the giver of the bribe that the giver believed the recipient had the power to bring about the desired result. *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817 (9th Cir.), *cert. denied*, 471 U.S. 1139 (1985); *United States v. Gjieli*, 717 F.2d 968 (6th Cir. 1983), *cert. denied*, 465 U.S. 1101 (1984). If, however, the public official has no authority at all to act in the matter and his or her acts in response to the payment of a bribe are unauthorized and illegal, it has been held that the "official act" component is lacking. *Blunden v. United States*, 169 F.2d 991 (6th Cir. 1948). Such a case could nonetheless be charged as an effort to induce a public official to commit a fraud on the United States or to do an act in violation of official duty. *United States v. Gjieli*, *supra*.

- *Intent*

Under section 201(b), the offender must have acted "corruptly." This is, properly speaking, the intent element of the offense. The word "corruptly" simply means "with a bad or evil purpose." It is also frequently defined to mean the same thing as "willfully," and thus to connote "specific intent." *See, e.g.*, 1 Devitt & Blackmar, Federal Jury Practice and Instructions, §§ 14.03, 14.06, 34.08. A number of cases speak of section 201(b) as a specific intent crime; however, this reference is sometimes not to "intent" in the strict sense of criminal intent or mens rea, but to the purpose or reason for the act - namely, intent to influence or be influenced. The statute is a little confusing in this respect, since it does speak of the briber-giver acting "with intent to influence." That phrase refers, however, to what the briber expects to accomplish, not to his level of "criminal intent." Accordingly, take care to specify this clearly when communicating with a court about "intent" in bribery/gratuity cases.

Section 201(c) lacks the word "corruptly" and has no corresponding specification of a particular level of criminal intent. Some courts seem to have taken the phrase "otherwise than as provided by law for the proper discharge of official duties" to be parallel to section 201(b)'s "corruptly," and therefore to be an intent provision. The Public Integrity Section does not believe this to be correct. The "otherwise than as provided by . . ." phrase simply ensures that authorized payments will be construed as illegal gratuities. Rather the intent requirement for section 201(c), lacking any other specification, is simply that the defendant acted "knowingly and purposefully" and not by mistake or inadvertence, as opposed to "corruptly" or willfully." *United States v. Evans*, 572 F.2d 455, 480-81 (5th Cir.), *cert. denied*, 439 U.S. 870 (1978).

- *Purpose: Causal Connection Between Payment and Act*

Section 201(b) requires that the offender have acted with the intent (as to the giver of a bribe) to influence or (as to the taker of a bribe) to be influenced. Thus, the bribery statute requires proof of an actual or intended quid pro quo: one thing given in exchange for another. It specifies a bargained-for exchange, like a contract. *E.g.*, *United States v. Strand*, 574 F.2d 993 (9th Cir. 1978); *United States v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974). This requirement can be met by proof of a pattern of payments and official acts flowing between the giver and the taker of bribes. *See United States v. Campbell*, 684 F.2d 141 (D.C. Cir. 1982).

This direct exchange of "quid pro quo" requirement is the factor that chiefly distinguishes bribery from the lesser offense, a gratuity violation. *E.g.*, *United States v. Hsieh Hui Mei Chen*, *supra*. Under section 201(c), the thing of value must be given or received "for or because of any official act performed or to be performed" by the public official. This requirement under the gratuity statute has been interpreted not to require proof of a quid pro quo as for the bribery statute, but rather a lesser connection between the payment and an official act. *United States v. Niederberger*, 580 F.2d 63 (3d Cir.), *cert. denied*, 439 U.S. 980 (1978); *United States v. Alessio*, 528 F.2d 1079 (9th Cir.), *cert. denied*, 426 U.S. 948 (1976); *United States v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974). Indeed, under the most liberal interpretation of the gratuity statute, the link is really between the payment and the official position of the recipient. *United States v. Evans*, 572 F.2d 455 (5th Cir.), *cert. denied*, 439 U.S. 870 (1978). Under this interpretation, it is unnecessary to show that the payments were "earmarked for a particular matter then pending" before the public official and over which the public official had authority. *Id*. at 481. Thus, if the motivating factor for the payment is even "to keep [the public official] 'happy,'" *id*., or to "create a better working atmosphere" with a public official, the payment can form the basis of a gratuity charge. *United States v. Standefer*, 452 F. Supp. 1178, 1183 (W.D. Pa. 1978), *aff'd*, 610 F.2d 1076 (3d Cir. 1979), *aff'd*, 447 U.S. 10 (1980); *United States v. Niederberger*; *United States v. Barash*, 412 F.2d 26 (2d Cir.), *cert. denied*, 396 U.S. 832 (1969).

PRACTICE TIP: There must be some connection between the receipt of the thing of value and the *official* position of the public official. In *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979), the court held the proof insufficient to establish a gratuity charge when the defendant public official accepted commissions from a private company to steer business to that company. The official's efforts to profit from his contacts as a government official with potential customers of the company were held not to constitute a gratuity violation because these acts were "totally unrelated to his official duties." 610 F.2d at 970.

An aphorism sometimes used to sum up the distinction between a bribe and a gratuity is that a bribe says "please" and a gratuity says "thank you." Remember, though, that a gratuity can precede the official action that prompted it, as the "to be performed" language in the statute attests. Such pre-act "gratuities" are customarily made for a generalized purpose to "curry official favor" with the recipient. Another way of looking at it is that a bribe purchases a service (or at least is intended to do so) and is therefore bargained-for; a gratuity is more in the nature of a tip (hence the name) because it is not bargained-for.

This is easy to say, but not so easy to see. Suppose, for example, there is a contract proposal pending before a Government contracting officer, and the prospective contractor takes the contracting officer on an all-expense paid cruise the week before the contract is to be awarded. Assuming that the prospective contractor and the contracting officer do not otherwise know each other, this looks suspiciously like a bribe or a gratuity. But which? Absent direct evidence of an agreement between the prospective contractor and the contracting officer, the answer will probably depend on such factual circumstances as the following:

- Did the prospective contractor get the contract?
  - Did the contracting officer have the power to decide who received the contract? If not, what role did the contracting officer play in making the decision?
  - What is the value of the cruise?
  - How much competition did the prospective contractor have?
  - How qualified was the prospective contractor to get the contract? How did the contractor rank in relation to the competitors?
  - How important financially or otherwise was the contract to the prospective contractor?
  - How important was the cruise to the contracting officer?
  - Are there contemporaneous admissions from either the contracting officer or the prospective contractor or both regarding the purpose of the cruise?

Absent good proof of incriminating admissions, or the lack of qualifications of the prospective contractor, or the essential nature of the contract to the business of the prospective contractor, this scenario will likely end up charged as a gratuity. However, the addition of one or more of the above facts may convince a jury that the intent of the donor was to influence official action, or that the intent of the donee was to be influenced, and thus sustain a bribery charge.

[cited in JM 9-85.101]

‹ 2043. Comparison Of The Elements Of The Crimes Of Bribery And Gratuities     up     2045. U.S. V. Brewster ›

*Updated January 17, 2020*

 An official website of the United States government
[Here's how you know](#)

 THE UNITED STATES DEPARTMENT OF JUSTICE ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 2045. U.S. V. BREWSTER

COMMENT: The Federal offenses of "bribery" and "gratuities" described in 18 U.S.C. § 201, and the differences between them, were first--and perhaps best--described in the landmark case of *United States v. Brewster*, 506 F.2d. 62 (D.C. Cir. 1974). This comment will discuss this significant decision.

*Brewster* concerned payments made by a lobbyist to a United States Senator for the alleged purpose of corruptly influencing the performance of the Senator's official duties. The payments in question were made to the Senator in the form of "political contributions" to a political committee that allegedly had been established to support the Senator's re-election. The prosecution's position was that this committee was a sham, and that the payments were either "bribes," or illegal corrupt personal gifts to the Senator--i.e., "gratuities."

The district judge had attempted to instruct the jury on the elements of the two related Federal crimes of receiving "bribes" and receiving illegal "gratuities." The district judge also attempted to instruct the jury on the difference between these two crimes and the receipt of legal "political contributions." The jury then convicted the Senator of receiving "illegal gratuities."

However, the district judge's instructions were not very precise. This required the D.C. Circuit Court of Appeals to define the three critical concepts of illegal "bribery," receiving illegal "gratuities," and receiving legal "political contributions." The Court of Appeals then had to determine whether the district judge's jury instructions had adequately incorporated these distinctions.

The D.C. Circuit Court's decision held that the Federal crime of *bribery* requires that there have been an express corrupt understanding between the private donor and the public officer donee that the donee will perform specific official acts in exchange for the payment (called a *quid pro quo*). If that condition is present, the crime of "bribery" is complete regardless of whether the corpus of the payment went directly to the donee, or whether the corpus went instead to a "third party" such as a *bona fide* political committee.

The Court then held that the less serious Federal crime of receiving "illegal gratuities," which is also addressed by 18 U.S.C. § 201, does not require proof that a specific understanding existed between the public and the private parties concerning the corrupt "sale" of an official act (i.e., a *quid pro quo*). Rather, the Court held that this lesser offense is complete if the prosecution proved that the following three factors were present: 1. the public officer was not entitled to receive the gift by virtue of the office (s)he held; 2. the motive for the gift was either to thank the official for a past act, or to curry general favor with the public officer in the expectation that the public officer will be better disposed to performing official acts favorable to the donor in the future; and 3. the public officer was aware of this motive when (s)he accepted the gift. However, for such gifts to be "gratuity" crimes under § 201, the Court held that there must be proof that the corpus of the gift inured to the *personal benefit* of the public officer donee.

Finally, the *Brewster* Court differentiated both of these crimes from the act of receiving lawful political contributions. It held that genuine political contributions made to *bona fide* political committees representing elected Federal public officers do not violate either the "bribery" or the "graft" offenses described in § 201. This is because such contributions are not made as part of a *quid pro quo* agreement with the public officer, and because a *bona fide* political committee--rather than the public officer--is the true beneficial recipient of the gift.

The *Brewster* case had a companion: *United States v. Anderson*, 509 F.2d 312 (D.C. Cir. 1974). *Anderson* involved the prosecution of the lobbyist who had sought to corrupt Senator Brewster. In *Anderson*, the jury had convicted the lobbyist of bribery, finding that he had expected a specific act in exchange for the money he had given to the Senator's campaign committee. The D.C.Circuit upheld this verdict, notwithstanding that the jury in *Brewster* had convicted the Senator only of the less serious offense of receiving a gratuity. This companion case highlights the fact that the offense of gratuities can be--and often is--a lesser included offense within the offense of bribery, and that the two parties to a corrupt transaction may act with differing levels of corrupt intent, allowing properly instructed juries to convict one party to a corrupt transaction of the crime of bribery, while convicting the other party of the lesser offense of gratuities.

AUSAs are encouraged to read and familiarize themselves with these two critically important companion cases before initiating a bribery or a gratuities case under 18 U.S.C. § 201.

PRACTICE TIP: As explained in *Brewster* and *Anderson*, and as demonstrated in the chart in this <u>Manual at 2043</u>, the offense of soliciting, giving, accepting and receiving a gratuity is a lesser included offense within the greater crime of soliciting, giving, accepting or receiving a bribe.

[cited in <u>JM 9-85.101</u>]

<u>‹ 2044. Particular Elements</u>                    <u>up</u>                    <u>2046. Other Issues ›</u>

*Updated January 17, 2020*

 An official website of the United States government

<u>Here's how you know</u>



THE UNITED STATES
DEPARTMENT OF JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

# 2046. OTHER ISSUES

- *Bribery and Conspiracy*

Wharton's Rule does not preclude a charge under 18 U.S.C. § 371 of conspiring to commit bribery. For one thing, the agreement may involve more participants than were necessary for the commission of the substantive offense. *See, e.g.*, *United States v. Benter*, 457 F.2d 1174 (2d Cir.), *cert. denied*, 407 U.S. 842 (1972). Moreover, the Rule has been held not to apply in any event because the gratuity provision (in this particular case, but the observation is also true of the bribery provisions) does not require the culpable participation of two persons. *United States v. Previte*, 648 F.2d 73 (1st Cir. 1981).

- *Coercion*

Economic coercion is a factor that bears on the existence of specific intent under the bribery provisions. *United States v. Barash*, 365 F.2d 395 (2d Cir. 1966). It is irrelevant to a gratuity charge. *United States v. Barash*, 412 F.2d 26 (2d Cir.), *cert. denied*, 396 U.S. 832 (1969).

- *Knowledge of Federal Status*

It is not necessary to prove that the offender knew he was paying a Federal official. Although the Government must prove that the payee was a Federal official and that the offender believed the person he attempted to bribe had official authority to act in a particular matter, it is not necessary to prove that the offender believed the official was exercising *Federal* authority. *United States v. Jennings*, 471 F.2d 1310 (2d Cir.), *cert. denied*, 411 U.S. 935 (1973) (FBI agents posing as local police officers bribed by defendant, who did not know they were Federal officials).

- *Campaign Contributions*

A bribery charge can be premised on a campaign contribution. *But be careful*. It is problematical that a gratuity charge under 201(c) can rest on a *bona fide* campaign contribution, unless the contribution was a ruse that masqueraded for a gift to the personal benefit of the public officer as was the case in *Brewster*, *supra*. This is because campaign contributions represent a necessary feature of the American political process, they normally inure to the benefit of a campaign committee rather than directly to the personal benefit of a public officer, and they are almost always given and received with a generalized expectation of currying favor with the candidate benefitting therefrom. For these reasons, recent Federal jurisprudence on the subject suggests substantial judicial reluctance to extend the Federal crime of gratuities under section 201(c) to *bona fide* campaign donations.

PRACTICE TIP: Where the transaction represents a *bona fide* campaign contribution, prosecutors must normally be prepared to prove that it involved a *quid pro quo* understanding and thereby constituted a "bribe" offense actionable under section 201(b).

COMMENT: This same distinction between bribes, gratuities and lawful campaign contributions has recently been applied to some of the Federal prosecutive theories that are currently used to address bribery and corruption by state and local public officials. For example, in *McCormick v. United States*, 500 U.S. 257 (1991) the Supreme Court held that the Hobbs Act (18 U.S.C. § 1951) did not apply to a series of campaign contributions that were made with a general intent to curry favor with a state senator and to thank him for his support. Noting that campaign contributions are a

necessary part of the American political process, the Court held that when an allegedly corrupt payment represents a *bona fide* campaign contribution, the prosecution must prove the existence of a *quid pro quo*. This principle was thereafter affirmed shortly thereafter in *Evans v. United States*, 504 U.S. 255 (1992).

- *The Speech and Debate Clause*

The Federal offenses of bribery and gratuities apply to payments made in consideration for, or to thank or curry favor with, Members of Congress and their legislative staffs. However, where an official of the Legislative Branch is the intended recipient, the task of proving the "official act" element can present prosecutors with unique challenges rooted in the Speech and Debate Clause of the U.S..Constitution. U.S. Constit. Art I, sec 6, cl 1.

The Speech and Debate Clause provides the "legislative acts" of a Senator or a Representative "shall not be questioned in any place." It applies in criminal as well as civil litigation involving the Senator or Representative, and provides absolute immunity to United States Senators and Representatives while they are engaged in legislative acts. *United States v. Brewster*, 408 U.S. 501 (1972); *United States v. Helstoski*, 442 U.S. 477 (1976). Its purpose is to assure the Congress a wide and unfettered latitude of freedom of speech in the deliberative process surrounding enacting legislation, and to shield that process from potential intimidation from the Executive and Judicial Branches. *Gravel v. United States*, 408 U.S. 606 (1972); *Powell v. McCormick*, 395 U.S. 486 (1969).

While the Speech and Debate Clause has been expressly held not to shield Senators or Representatives against bribery charges, *Johnson v. United States*, 383 U.S. 169 (1964), it does impose significant limits on the type of evidence that can be used to prove such an offense. The Clause broadly protects members of Congress "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts," *United States v. Brewster*, 408 U.S. 501, 525 (1972), and "precludes any showing of how [a member of Congress], acted, voted, or decided." Id. at 527. The Supreme Court has declared that "past legislative acts of a Member cannot be admitted without undermining the values protected by the Clause," including speeches in committee as well as those on the Floor of the Chamber, the Senator or Representative's votes, and his or her explanations for them. A somewhat wider latitude has been allowed insofar as the admissibility of activities that took place occurred prior to a legislative act. *United States v. Helstoski*, 442 U.S. 477, 489 (1979). However, the parameters of what constitutes a "legislative act" are quite broad, and can severely impair the ability of prosecutors to prove bribery and gratuity cases where the recipient is an elected Member of the Legislative Branch.

When evidence embraced by this privilege is introduced--either in trial or in grand jury proceedings--the effect can be as troubling to the prosecution as introducing the fruits of an illegal search. *See United States v. Durenberger*, 1993 WL 738477 (D.Minn 1993); *Helstoski*, *supra*; *compare Johnson*.

In addition, both the House and the Senate consider that the Speech and Debate Clause gives them an institutional right to refuse requests for information that originate in the Executive or the Judicial Branches that concern the legislative process. Thus, most requests for information and testimony dealing with the legislative process must be presented to the Chamber affected, and that Chamber permitted to vote on whether or not to produce the information sought. This applies to grand jury subpoenas, and to requests that seek testimony as well as documents. The customary practice when seeking information from the Legislative Branch which is not voluntarily forthcoming from a Senator or Member is to route the request through the Clerk of the House or the Secretary of the Senate. This process can be time-consuming. However, *bona fide* requests for information bearing on ongoing criminal inquiries have been rarely refused.

PRACTICE TIP: The Public Integrity Section of Criminal Division has significant expertise in addressing and overcoming Speech and Debate issues. Prosecutors are encouraged to contact Public Integrity when the official acts of an elected Member of the Legislative Branch become the focus of a criminal inquiry. Public Integrity can be reached at (202) 514-1412 (phone) or (202) 514-3003 (fax).

- *Included offenses*

The offense of soliciting, giving, accepting and receiving a gratuity is a lesser included offense within the greater crime of soliciting, giving, accepting or receiving a bribe. *See United States v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974); and *United States v. Anderson*, 509 F.2d 312 (D.C. Cir. 1974).

[cited in JM 9-85.101]

‹ 2045. U.S. V. Brewster                              up                              2047. Sample Charging Language ›

*Updated January 17, 2020*



🇺🇸 An official website of the United States government
<u>Here's how you know</u>



THE UNITED STATES
DEPARTMENT OF JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 2047. SAMPLE CHARGING LANGUAGE

INDICTMENT

*Giving a Bribe (18 U.S.C. § 201(b)(1)):*

"Beginning on or about *(date)* , and continuing thereafter through on or about *(date)* , in the District of *(venue)* , *(name of defendant)* , the defendant herein, did directly and indirectly, corruptly give, offer and promise a thing of value, that is *(description of corpus of the bribe)* to *(name of recipient)* , a public official, that is *(recipient's job title or position)* , with the intent to influence official acts, that is *(description of official act defendant sought to be influence)* , in violation of Section 201(b)(1) of Title 18, United States Code."

*Receiving a Bribe (18 U.S.C. § 201(b)(2)):*

"Beginning on or about *(date)* , and continuing thereafter through on or about *(date)* , in the District of *(venue)* , *(name of defendant)* , the defendant herein, being a public official, that is *(defendant's job title or position)* , did directly and indirectly corruptly demand, seek, receive, accept, and agree to receive and accept something of value, that is *(description of the corpus of the bribe)* , with the intent of being influenced in the performance of official acts, that is *(description of official act influenced by bribe)* , in violation of Section 201(b)(2) of Title 18, United States Code.

*Giving a Gratuity (18 U.S.C. 201(c)(1)):*

"Beginning on or about *(date)* , and continuing thereafter through on or about *(date)* , in the District of *(venue)* , *(name of defendant)* , the defendant herein, did directly and indirectly give, offer and promise a thing of value, that is *(description of corpus of the gratuity)* to *(name of recipient)* , a public official, that is *(recipient's title or job)* , otherwise than provided for by law for the proper discharge of his/her official duties for and because of official acts performed or to be performed by the said *(name of recipient)* , that is *(describe official act which gratuity sought to influence or reward)* , in violation of Section 201(c)(1) of Title 18, United States Code.

*Receiving a Gratuity (18 U.S.C. § 201(c)(2)):*

"Beginning on or about *(date)* , and continuing thereafter through on or about *(date)* , in the District of *(venue)* , *(name of defendant)* , the defendant herein, being a public official, that is *(defendant's job title or position)* , otherwise than as provided for by law for the proper discharge of his/her official duties, did directly and indirectly demand, seek, receive, accept, and agree to receive and accept, something of value, that is *(description of corpus of the gratuity)* , for or because of an official act performed or to be performed by the said defendant, that is *(description of official act for which the gratuity was made)* , in violation of Section 201(c)(2) of Title 18, United States Code.

[cited in <u>JM 9-85.101</u>]

‹ 2046. Other Issues       up       <u>2048. January 23, 1992, Memorandum Directing U.S. Attys To Designate A Prosecutor As An International And National Security Coordinator</u> ›

*Updated January 17, 2020*

# EXHIBIT D

1  E. MARTIN ESTRADA
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   DANIEL J. O'BRIEN (Cal. Bar No. 141720)
4  Assistant United States Attorney
   Public Corruption and Civil Rights Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-2468
7       Facsimile: (213) 894-7631
        E-mail:    Daniel.obrien@usdoj.gov
8
   Attorneys for Applicant
9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12 Information stored within the        Case No. 2:22-MJ-1530
   iCloud Account associated with
13 DSID/Apple Account Number            GOVERNMENT'S OPPOSITION TO
   1338547227 and/or email address     MOTION TO PARTIALLY UNSEAL
14 rickscafedxb@yahoo.com at Apple      THE DOCKET; DECLARATION OF DANIEL
   Inc., One Apple Parkway,             J. O'BRIEN
15 Cupertino, CA 95014
                                        **(UNDER SEAL)**
16

17
18      The government files this opposition to the Motion to Partially

19 Unseal the Docket filed by Richard Gustave Olson, Jr.  This

20 opposition is based upon the attached declaration of Daniel J.

   O'Brien and the records and files in this case.
21
        The Movant does not have a right to access the materials he
22
   seeks.  The Ninth Circuit has held that neither the First Amendment
23
   nor common law establishes a qualified right of access to search
24
   warrant proceedings and materials where, as here, a criminal
25
   investigation is ongoing.  Times Mirror Co. v. United States, 873
26
   F.2d 1210, 1216 (9th Cir. 1989).
27

28

In discussing the need for secrecy in grand jury proceedings, the Supreme Court has listed several concerns that weigh in favor of preserving the proceedings' secrecy:

> [I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment.

Id. (quoting Douglas Oil Co. of California v. Petrol Stops Nw., 441 U.S. 211, 219 (1979)). These concerns apply with equal force here. Contra United States v. Kott, 135 F. App'x 69, 71 (9th Cir. 2005) (ordering records unsealed because investigation had been completed, concluding, "the justification for keeping the materials sealed has now fallen away").

Finally, because the search warrant at issue was obtained pursuant to the Electronic Communications Privacy Act of 1986 (ECPA), none of the Movant's physical property was seized, so unsealing the records would not enable him to seek the return of property under Federal Rule of Criminal Procedure 41(g). Contra In re Searches & Seizures, No. 08-SW-0361 DAD, 2008 WL 5411772, at *2 (E.D. Cal. Dec. 19, 2008) (considering movant's need to recover physical property as an argument in favor of unsealing search warrant materials).

Because the law does not grant movant a right of access to the sealed materials, his motion should be denied.

Dated: October 20, 2022          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                      /s/ *Daniel J. O'Brien*
                                  DANIEL J. O'BRIEN
                                  Assistant United States Attorney

                                  Attorneys for Applicant
                                  UNITED STATES OF AMERICA

<u>DECLARATION OF DANIEL J. O'BRIEN</u>

I, Daniel J. O'Brien, declare as follows:

1.    I am an Assistant United States Attorney for United States Attorney's Office for the Central District of California.  I am the attorney responsible for handling the search warrant application in this matter and the investigation that spawned it.  The search warrant application was one of three search warrants obtained by the government pursuant to the same affidavit.  My co-counsel in the investigation is Evan Turgeon, a trial attorney for the Department of Justice's National Security Division in Washington, D.C.

2.    Movant Richard Gustave Olson, Jr. ("Olson") is the defendant charged in *United States v. Olson*, CR 22-104-PA, with two offenses.  One of the charges, a violation of aiding or advising a foreign government in violation of Title 18, United States Code, Section 207(f), related to the investigation referenced above.  On April 7, 2022, the government and the defendant agreed to transfer the matter to the District Court for the District of Columbia pursuant to Rule 20 for a change of plea and sentencing.  Counsel of record for the government in the transferred case, case number 22-CR-144-GMH, are Mr. Turgeon and Assistant United States Attorney Stuart Allen.  On June 3, 2022, Olson pleaded guilty to the two charged offenses.  Sentencing is currently scheduled for November 29, 2022, before Magistrate Judge G. Michael Harvey.

3.    Olson is also the subscriber of the iCloud account rickscafedxb@yahoo.com, which was the subject of the search warrant in this matter.  On September 27, 2022, the court granted the application by Olson's counsel to appear as a non-resident attorney in this matter.

4.    The search warrant application (Dkt 1, ¶¶ 147-153) sets forth the justification for withholding the search warrant application and related documents from Olson, the subscriber.

5.    The sealing application (Dkt 4, Declaration ¶¶ 3-6) sets forth a detailed justification for sealing the search warrant application and related documents.

6.    The circumstances identified in the sealing application have not changed, and the criminal investigation remains ongoing as to other individuals.  Thus, the government has not moved to unseal the search warrant application and related documents and opposes Olson's motion to unseal.

7.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

DATED: October 20, 2022

                              /s/

                              DANIEL J. O'BRIEN

# EXHIBIT E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.   2:22-mj-01530                                    Date: October 28, 2022

Present: The Honorable Steve Kim, U.S. Magistrate Judge

Interpreter   N/A

|  Connie Chung  |  N/A  |  Not present  |
|---|---|---|
|  *Deputy Clerk*  |  *Court Reporter / Recorder*  |  *Assistant U.S. Attorney*  |

|  U.S.A. v. Defendant(s)  Present  Cust  Bond  |  Attorneys for Defendants:  Present  App  Ret  |
|---|---|
|  Not present  |  Not present  |

## Proceedings: (IN CHAMBERS) ORDER RE MOTION TO PARTIALLY UNSEAL THE DOCKET [ECF 13]

Movant Richard G. Olson Jr.'s motion to partially unseal the docket is GRANTED IN PART ONLY. The Court Clerk is instructed to unseal this case except for the underlying documents filed at ECF 1 through ECF 5, which shall remain under seal in accordance with Judge Rosenbluth's June 8, 2022 sealing order. By the terms of that order (ECF 5), no documents were to be automatically filed under seal afterward in this case; instead, they were ordered to be sealed only on a document-by-document basis pursuant to properly filed applications to seal supported by the required legal cause for each document. Thus, the documents filed at ECF 6 through ECF 16 should never have been filed under seal without an accompany application and court order, and so they are now ordered unsealed, along with this order itself. There never should have been, and so there shall no longer be, any automatic sealing of documents filed in this case without a court order.

As a result, movant's request to unseal the ex parte application and attachments filed at ECF 4 is DENIED to the extent that he seeks to obtain the attached Declaration of Daniel O'Brien by means of unsealing the application and its attachments to the public at large. However, to the extent that movant seeks to obtain the O'Brien Declaration for litigation purposes in his criminal case, including for the upcoming sentencing on December 21, 2022, he is entitled to that declaration as criminal discovery. Therefore, the United States government is ordered to produce the O'Brien Declaration filed at ECF 4 to the movant subject to the protective order for confidential information already issued in the District Court for the District of Columbia (Case No. 1:22-cr-144, ECF 16).