## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Case No. 22-cr-144-GMH |
| | : | |
| RICHARD GUSTAVE OLSON, JR. | : | |
| | : | Judge G. Michael Harvey |
| Defendant. | : | |

## AMBASSADOR OLSON'S SENTENCING MEMORANDUM

HANNON LAW GROUP, LLP
J. Michael Hannon, #352526
333 8th Street, NE
Washington, DC 20002
Tel: (202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

CLARK HILL, PLC
Russell D. Duncan
1001 Pennsylvania Ave. Suite 1300 South
Washington, DC 20004
(202) 640-6637
rduncan@clarkhill.com

*Attorneys for Defendant Richard Gustave Olson, Jr.*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

I.    THE HISTORY OF AMB. OLSON'S COOPERATION WITH THE GOVERNMENT
      AND NEGOTIATION OF THE PLEA AGREEMENT BEFORE THE COURT........ 2

      A.    Amb. Olson Cooperates with the Government ................................................. 3

      B.    Amb. Olson's Counter Proffer ......................................................................... 5

            1.  The Unproven Gratuity Allegations Do Not Relate To The Offenses To
                Which Amb. Olson Pled Guilty. ....................................................................... 7

                    a.  Government's Factual Narrative ......................................................... 10

                    b.  Ambassador Olson's Factual Narrative ............................................... 12

                    c.  Legal Argument .................................................................................. 15

                        (1) Zuberi's payment of part of Ms. Habib's tuition was not something
                            Ambassador Olson demanded, sought, received, or accepted. ...... 16

                        (2) Zuberi's payment of part of Ms. Habib's tuition was not a thing of
                            value personally for Ambassador Olson. ...................................... 16

                        (3) Ambassador Olson did not perform an official act or series of
                            official acts to benefit Zuberi's business and certainly did not do so
                            for or because of the payment of Ms. Habib's tuition. ................. 18

                        (4) Conflict of Interest ........................................................................ 21

                    a.  Government's Factual Narrative ......................................................... 23

                    b.  Ambassador Olson's Factual Narrative ............................................... 24

                    c.  Legal Argument .................................................................................. 28

                        (1) Ambassador Olson did not participate personally or substantially in
                            his "official governmental capacity" through decision, approval,
                            disapproval, recommendation, the rendering of advice,
                            investigation, or otherwise in a judicial or other proceeding,
                            application, request for a ruling or other determination, contract,
                            claim, controversy, charge, accusation, arrest, or other particular
                            matter. ............................................................................................ 29

                        (2) Ambassador Olson had no financial interest in the sale of drones
                            nor was he negotiating potential employment with Zuberi. ......... 29

(3) The False Statement and Obstruction Enhancements.................. 32

a.  Legal Background................................................................................. 32

b.  Application to O'Brien Contentions .................................................... 34

(1) False statement that defendant OLSON never received a specific
job offer from ADIH: "we had a conversation in London about . . .
possibilities for post-employment.  There was never a specific job
offer.  There was never anything."  In fact, ADHI had offered
OLSON a $300,000 per year job. ................................................. 35

(2) False statement that defendant OLSON had "no idea" how Zuberi
helped finance Habib's college tuition, when, in fact, Zuberi
forwarded to defendant OLSON a bank statement showing that a
$20,000 check had been deposited into Columbia's account for
Habib and Zuberi told OLSON that both checks he issued had been
cashed............................................................................................. 36

(3) False/misleading statements that defendant OLSON had no
knowledge of Zuberi's business interests in military sales to
foreign governments they discussed, claiming, "I had no reason to
believe that [Zuberi] had any business interests in any of these
[military] deals" and that his understanding was that Zuberi's
interest in the sales was merely for "general information," when, in
fact, OLSON was aware that Zuberi was engaged in brokering
military sales between General Atomics and foreign governments.
    37

(4) False/misleading statements that he and Zuberi only engaged in
general-interest political discussions and "political gossip," that
there "was no business relationship" between the two, and that he
could not recall any "ask" from Zuberi, when, in fact,  OLSON
agreed to assist Zuberi's efforts in lobbying members of Congress
and provided Zuberi with talking points to promote weapon sales
to foreign governments in response to a request from Zuberi. ..... 38

(5) False/misleading statements that he didn't "know much about
Zuberi actual business operations because he has me advising him
on, sort of, broadly speaking government relations, sort of
strategic, ah, aspects of business" when, in fact, OLSON
participated in Zuberi's business operations with respect to
lobbying campaigns to procure Qatar preclearance facilities and to
modify U.S. policy with respect to the Gulf Diplomatic Crisis, by
participating in the drafting of a lobbying proposal submitted to the
Qatar government with respect to Qatar preclearance facilities and
by meeting with Qatar Government Officials as well as U.S.

Government officials to assist the Qatar government in its effort to modify the U.S. Government's response to the Gulf Diplomatic Crisis. ............................................................................................... 38

II.    THE PRESENTENCE INVESTIGATION GUIDELINE CALCULATIONS .......... 40

       A.    General Objections to the Final Presentence Investigation Report ................ 40

       B.    The Government Must Prove its Contested Facts by a Preponderance of the Evidence ........................................................................................................ 42

       C.    The PSR Writer Erroneously Relied on Conduct Alleged by the Government in ¶¶ 17-54 That is not Relevant Conduct. ...................................................... 42

       D.    The Final PSR Erroneously Includes a 2-Point Enhancement for Obstruction of Justice .......................................................................................................... 44

       E.    The PSR Writer's Proposed Enhancements to Count 2 are Wrong ............... 48

             1.    The Base Offense Level for Count 2 Should be 6 .......................................... 49

             2.    Amb. Olson Was Not a "Public Official in a High-Level Decision-Making or Sensitive Position" ............................................................................................ 50

III.   FACTORS THAT MAY WARRANT DEPARTURE ................................................ 51

IV.    THE PLEA AGREEMENT AND CONDUCT OF AUSA O'BRIEN REQUIRE IMPOSITION OF A NON-CUSTODIAL SENTENCE ............................................. 53

V.     APPLICATION OF THE SENTENCING FACTORS SHOULD RESULT ON A NON-CUSTODIAL SENTENCE ............................................................................... 58

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :
                               :
       v.                       :      Case No. 22-cr-144-GMH
                               :
RICHARD GUSTAVE OLSON, JR.    :
                               :      Judge G. Michael Harvey
                 Defendant.       :

### RICHARD G. OLSON, JR.'s SENTENCING MEMORANDUM

Comes now Amb. Richard Gustave Olson Jr. (Ret.), through counsel HANNON LAW GROUP, LLP, and CLARK HILL, PLC, and respectfully presents this Memorandum in Aid of Sentencing.

### INTRODUCTION

The sentencing of Amb. Richard G. Olson, Jr. (Ret.) presents complexities that require more than the ordinary allocution. These complexities arise because in 2019, Amb. Olson was viewed by Assistant United States Attorney Daniel J. O'Brien of the Central District of California as the key to the prospective prosecution of retired United States Marine Corps four-star General John R. Allen, the former commander of the NATO International Security Assistance Force and U.S. Forces – Afghanistan (USFOR-A), and later special envoy for President Obama for the Global Coalition to Counter ISIL (Islamic State of Iraq and the Levant). We have partly described the conduct of AUSA O'Brien in his pursuit of Amb. Olson in our "Response to the Government's Motion to Continue Sentencing Memoranda Deadline" ("Response") [ECF No. 37] which we incorporate herein.

In this memorandum, we first describe the history of the cooperation by Amb. Olson with Mr. O'Brien and his colleague from the Department of Justice ("DOJ") National Security Division ("NSD"), attorney Evan N. Turgeon, and the history of negotiations towards the plea

agreement now before the Court.[1]  We then turn to the evolution of the Final Presentence

Investigation Report ("PSR") wherein the Probation Officer opines that the Total Offense Level

for these two misdemeanor offenses should be 28; whereas, in the Plea Agreement the

government and Amb. Olson agreed that the Combined Offense Level is 8, before consideration

of a downward departure of -2 for Acceptance of Responsibility.  This section of the

memorandum also describes why the proper application of the Sentencing Guidelines in this case

results in the same Combined Offense Level of 8 agreed upon by the parties.

The next sections of the memorandum address the following: interpretation of the Plea

Agreement; the possibility of downward departures; and, application of the sentencing factors

from 18 U.S. C. § 3553(a).

## I.      THE HISTORY OF AMB. OLSON'S COOPERATION WITH THE GOVERNMENT AND NEGOTIATION OF THE PLEA AGREEMENT BEFORE THE COURT.

Amb. Olson first met with Federal Bureau of Investigation ("FBI") Agents Greenfield

and Harvey on July 17, 2019, at the FBI's Field Office in Washington, D.C.  (FD302, dated

August 6, 2019, attached as Ex. A).  Amb. Olson subsequently met with Agents Harvey and

Kutlu at his residence on December 17, 2019.  (FD302, dated December 18, 2019, attached as

Ex. B).  Amb. Olson, an experienced government official, did not even consider consulting with

an attorney in advance of these interviews.  He thought the first interview related to an FBI field

investigation of a potential federal employee.  At the second meeting, the Agents eventually told

Amb. Olson that he was the target of the government investigation.  Subsequently, Amb. Olson

---

[1]      The NSD joined the investigation when AUSA O'Brien embarked on a pursuit of potential violations of the Foreign Agents Registration Act ["FARA"] which requires participation by the NSD.

retained HANNON LAW GROUP and then CLARKHILL to address the allegations against him.

Mr. O'Brien also obtained the cooperation of Ms. Muna Habib, now the spouse of Amb. Olson, in Los Angeles on July 2, 2020, where he interviewed her in the presence of an FBI Agent.  Ms. Habib provided documents to the government.  Ms. Habib also did not seek counsel.

### A.  Amb. Olson Cooperates with the Government

Mr. Hannon spoke with Messrs. O'Brien and Turgeon on August 31, 2020.  During this call, O'Brien told Hannon that Amb. Olson had become the target of a government investigation arising from *United States v. Imaad Shah Zuberi* (2:19-cr-642) filed in the Central District of California.  Mr. O'Brien alleged that Amb. Olson violated four separate criminal statutes: 18 U.S.C. § 201(c)(1)(B) Receipt of a Gratuity by a Public Officials; 18 U.S.C. § 208(a) Acts Affecting a Personal Financial Interest; 18 U.S.C. § 207(f) Restrictions on Former Officers, Employees, and Elected Officials of the Executive and Legislative Branches; and 18 U.S.C. § 1001(a) False Statements or Entries Generally.

During a call on September 2, 2020, AUSA O'Brien reported that he had already prepared a prosecution memo and obtained authority for the filing of an indictment against Amb. Olson on certain counts.  Nevertheless, Mr. O'Brien inquired whether Amb. Olson would be willing to cooperate with the government.  He also indicated that the statute of limitations would expire on September 21, 2020, for any indictment under 18 U.S.C. § 201(c)(1)(B) (Receipt of a Gratuity by a Public Official).  In order to facilitate a cooperative dialogue, Amb. Olson eventually executed ten tolling agreements.

On September 23, 2020, in a lengthy "reverse proffer" session via video conference.  Mr. O'Brien described the government's theory of the case, along with its supporting evidence.  To

counsel for Amb. Olson the proffer was a mystifying trail of allegations.  Amb. Olson purportedly unlawfully received thousands of dollars in travel benefits; conspired with Abu Dhabi potentates; received $25,000 and more in gratuities from Zuberi for the promise of a post retirement job; aided a Zuberi plot to obtain money through a Ukrainian subterfuge; assisted General Atomics to sell drones to Pakistan; lobbied congressmen and senators to support the sale of drones to Pakistan; and recruited former Marine Corps four-star General John R. Allen to resolve the blockade of Qatar by its Muslim neighbors during the first year of the Trump administration.

Nevertheless, Amb. Olson agreed to cooperate with the government and made himself available for further questioning on three separate occasions—October 30, 2020; November 6, 2020; and March 4, 2021, for a total of 16 hours.  Each side signed and executed a cooperation letter for each session.  All such sessions would be reported by FBI Agent Greenfield in a Form 302, to be shared with Amb. Olson.  Amb. Olson was forthcoming, honest, and cooperative throughout these extensive sessions, including providing numerous documents and his detailed calendars.  Amb. Olson has expended thousands of dollars in his cooperation with the government.  He is now unemployed and a pariah among his former international colleagues due to the egregious misconduct of AUSA O'Brien, which is further discussed below.

Despite Amb. Olson's assistance to the government, at the end of the final debriefing on March 4, 2021, both Mr. Turgeon and AUSA O'Brien volunteered their assessment of the case in the presence of Amb. Olson, perhaps to intimidate him.  Both opined that Amb. Olson was trading special favors with Imaad Zuberi from 2013 to the end of 2016, when Amb. Olson retired from his State Department service, in order to curry favor with Zuberi with the hopes of post-retirement employment by Zuberi.  AUSA O'Brien, in particular, described Amb. Olson as

having a conflict of interest throughout this period, essentially betraying his position with the hopes of post-retirement employment by Zuberi:

> I think he was subjected to somebody like Zuberi who . . . I think you know my a –my assessment of him based upon the filing that I made in the [Zuberi] sentencing proceedings. A most unscrupulous individual and Ambassador Olson succumbed to that. I don't have any history prior to the Zuberi involvement of Olson engaging in misconduct. I think this occurred a brief moment of . . . time in his career and . . . and I think it was influenced largely by . . . pressures brought upon him by an unscrupulous individual.

(Tr. 03.04.2021 Interview at 98). Yet, both prosecutors maintained that General John Allen remained a "subject" of the investigation into FARA violations, and expressed the hope that a cooperation agreement could be reached after receiving Amb. Olson's promised written response (hereafter "Counter Proffer") to the allegations. The government abandoned this prosecution theory later in the negotiations with Amb. Olson's attorneys, as we discuss at pages 21-22, below; however, Mr. O'Brien has resurrected these allegations for sentencing purposes.

### B. Amb. Olson's Counter Proffer

Amb. Olson's counsel prepared a 32-page Counter Proffer with exhibits and delivered it to government counsel on March 22, 2021. In rejoinder to the government's ethical conflict of interest allegation, we said that the case described by O'Brien is built on erroneous inferences about the conduct of Amb. Olson drawn from thousands of email messages with Zuberi, a convicted conspirator whose unindicted co-conspirators include congressmen, senators, presidential candidates, and the leaders of both parties operating in the political market place. None of these co-conspirators will pay a price for their willing acceptance of Zuberi's ill-gotten money in the guise of campaign contributions.

The government would never call Zuberi as a witness against Amb. Olson. Zuberi has never pointed a finger at Amb. Olson during his own travel through the criminal justice system

to a lengthy prison sentence.  In fact, Zuberi's attorneys denied O'Brien's public contention that the payment of Muna Habib's tuition was a gratuity to Amb. Olson.[2]  Ironically, much of the government's case depends on assigning credibility to Zuberi's email messages; whereas, the government publicly has portrayed Zuberi as a prolific liar.  The government's theory for an indictment against Amb. Olson emerged from its unsophisticated interpretation of these thousands of emails.  The government attorneys had not consulted with ethics experts with the Department of State or the Office of Government Ethics in drawing their conclusions.

The venue of international intrigue – with sheiks, royal families, British gentlemen, notorious American generals, presidents and politicians, ineluctably attracted Mr. O'Brien to Amb. Olson's work around the world: a world in which Mr. O'Brien never walked.  Nor did Mr. O'Brien have a historic sense of the contributions Amb. Olson has made, at great sacrifice, to our diplomatic goals in a dangerous part of the world.  In essence, AUSA O'Brien falsely portrays Amb. Olson as fully consumed with Zuberi when Amb. Olson served as Ambassador to Pakistan and then the Special Representative for Afghanistan and Pakistan, working to bring peace to the Middle East.

And now Amb. Olson is O'Brien's only high visibility victim.  On January 31, 2023, the *New York Times*, the *Wall Street Journal* and other news outlets reported that DOJ has given up O'Brien's pursuit of criminal charges against General John R. Allen, only after General Allen was ruined by the leak of protected grand jury information to the press.

---

[2]      *See* Excerpt from *United States v. Zuberi*, 2:19-cr-642, Defendant Zuberi's Objections to the Presentence Report, filed March 23, 2020, attached as Ex. N.)  Mr. Zuberi's esteemed attorney, the former United States Attorney for the Central District of California, made clear in this filing that not only was Zuberi "unaware that Person NN [Amb. Olson] was in any type of personal relationship with the journalist [Ms. Habib]," but that "he was interested in hiring the journalist" and therefore "contribut[ed] to her tuition [as] an effort to boost her competency." *Id*.

In the March 22, 2021, Counter Proffer, counsel for Amb. Olson addressed in detail the deficiencies in the government's threatened charges. AUSA O'Brien – although finally agreeing to allow Amb. Olson to plead to two misdemeanor counts – now resurrects these far more serious charges in his effort to enhance the sentence of Amb. Olson. O'Brien's crafted arguments for enhancement, that have persuaded the PSR Writer to propose an offense level of 28, now remain relevant to sentencing. The government relented to the misdemeanors in the plea agreement, so we now must repeat our debunking of O'Brien's threatened charges.

### 1. The Unproven Gratuity Allegations Do Not Relate To The Offenses To Which Amb. Olson Pled Guilty.

Mr. O'Brien advised the PSR Writer that the sentence must be enhanced because Amb. Olson violated 18 U.S.C. § 201(c)(1)(B), the gratuity provision of the federal bribery statute, in three respects: Zuberi paid $25,000 for Muna Habib's tuition at Columbia University; Amb. Olson accompanied Zuberi on a $400 limousine ride while he was on a business trip in Los Angeles; and Amb. Olson received a $300,000 job offer from Mr. Janahi on behalf of the Abu Dhabi Investment House ("ADIH"). Putting aside the Guidelines requirement that these "offenses" must be "relevant conduct" to the misdemeanor offenses to which Amb. Olson has pled guilty, the government cannot prove by a preponderance of evidence that these amounts are unlawful gratuities. We made this clear to Mr. O'Brien in our Counter Proffer, some of which we include here.

Title 18 U.S.C. § 201 criminalizes both bribery violations and unlawful gratuity violations. The specific gratuity provision, 18 U.S.C. § 201(c), is intended to prohibit rewarding a public official with additional compensation for the performance of official acts while in office. The purpose of 18 U.S.C. § 201 is to "reach any situation in which the judgment of a government agent might be clouded because of payments or gifts made to him by reason of his position

'otherwise than as provided by law for the proper discharge of an official duty.'" *United States v. Evans*, 572 F.2d 455, 480 (5ᵗʰ Cir. 1978).

Amb. Olson neither took action nor made any decision for or because of Zuberi's payment of monies to Columbia University or Zuberi's sharing of the limousine ride.[3]  Indeed, DOJ, well before AUSA O'Brien threatened to indict Amb. Olson for accepting a gratuity, had advised prosecutors in its *Justice Manual* that an indictment under the facts of this case would be impermissible.  (*See* DOJ Manual 2043- Comparison of the Elements of the Crimes of Bribery and Gratuities, attached as Ex. Y).   Title 18 U.S.C. § 201(c)(1)(B) specifically forbids a "public official, former public official, or person selected to be a public official, otherwise as provided by law for the proper discharge of official duty" from "directly or indirectly demand[ing], seek[ing], accept[ing], or agree[ing] to receive or accept anything of value *personally* for or because of an official act performed or to be performed by such official or person." (Emphasis added).  By the very language of the statute, the government must prove the official received the thing of value personally because of an official act performed or to be performed.  The government must show a link between the thing of value received and a specific official act for or because of which it was received.  *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 407-08 (1999).

Thus, a vital component of the unlawful gratuity provision, recognized by the *Justice Manual*, is that the government must prove that the federal official personally received something to which he was not lawfully entitled for performance of an official act.  This is

---

[3]      Little needs to be said regarding the PSR Writer's contention that the $300,000 job offer was a gratuity.  Amb. Olson did not accept the offer, so the gratuity statute is not applicable.  Incidentally, the offer was made by Mr. Janahi on behalf of ADIH, and the government cannot prove that the offer came from Zuberi.

contrasted with a bribe, which the very language of the statute does not require be received *personally* by the official.

Amb. Olson did not receive anything for the performance of an official act.  In the light most favorable to the government, at best, Zuberi paid a portion of Ms. Habib's tuition as a "goodwill" gift to Amb. Olson.  A "goodwill gift," made with "no more than 'some generalized hope or expectation of ultimate benefit on the part of the donor'" is neither a bribe nor a gratuity. *United States v. Jennings*, 160 F.3d 1006, 1020, n.5 (4th Cir. 1998) (quoting *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980)).  The "official act requirement [cannot] be satisfied by some vague hope of inducing warm feelings toward the donor." *United States v. Sun-Diamond Growers of California*, 138 F.3d 961, 967 (D.C. Cir. 1998), *aff'd*, 526 U.S. 398 (1999).  The Supreme Court in *Sun-Diamond* specifically declined to follow the government's broad reading of the illegal gratuity statute as to prohibit "gifts given by reason of the donee's office." *Sun-Diamond*, 526 U.S. at 408.

In addition, the government must also prove that the public official undertook some official act.  To prove an official act, the government must first "identify a question, matter, case, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official." *McDonnell v. United States*, 550 U.S. 550, 567 (2016) (internal quotations omitted).  Importantly, a "typical meeting, call, or event does not qualify" because it "is not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id*. at 569.

The government must also prove "the public official [made] a decision or [took] an action on the question or matter, or agree[d] to do so." *Id*. at 570.  "Pending" and "may by law be brought" suggest "the kind of thing that can be put on an agenda, tracked for progress, and then

checked off as complete." *Id.* Further, "[m]ay *by law* be brought conveys something within the specific duties of an official's position." *Id.* (emphasis in original) (internal quotations omitted). In addition, the "pertinent matter must instead be more focused and discrete." *Id.* (holding that something as nebulous as "Virginia business and economic development" was not sufficiently concrete as to qualify as a "matter").

### a. Government's Factual Narrative

Long before AUSA O'Brien asked Amb. Olson to cooperate with the government, O'Brien had cast the die alleging in his case against Zuberi that Amb. Olson solicited Zuberi to pay for Ms. Habib's tuition at Columbia University in exchange for Amb. Olson's "assistance with Zuberi's business" ventures.  (Excerpt from *United States v. Zuberi*, 2:19-cr-642, Government's Response to Defendant's Objections to Presentence Report, filed April 13, 2020, attached as Ex. M.)  The government falsely alleged that Ms. Habib was Amb. Olson's "paramour" at the time of the solicitation and execution of payment.  Specifically, the government asserted that "[u]ndisclosed payments [were] received by Person NN [Amb. Olson] and the journalist with whom Person NN had a relationship[,] were contemporaneous with Person NN providing assistance to Zuberi's business." *Id.*  This statement, made in a publicly filed pleading, is factually incorrect, and will be addressed in turn.

The government plays matchmaker and requires the Court to find by a preponderance of the evidence that Amb. Olson was in a relationship with Ms. Habib at the time of her matriculation sufficient to cause her to return to his arms on account of the tuition payment by Zuberi.  Both Amb. Olson and Ms. Habib's have told the FBI and Mr. O'Brien this assertion is false and the evidence shows that these two individuals had broken off their relationship months prior to Amb. Olson's introduction of Zuberi to Ms. Habib.   Zuberi's attorneys stated that he

was unaware of any romantic relationship between Amb. Olson and Ms. Habib at the time. (*See* footnote 2, above). This professional relationship between Zuberi and Ms. Habib is also thoroughly represented in the email exchanges between them that were already in the government's possession. (*See* Assortment of Emails between Zuberi and Ms. Habib, attached as Ex. O.) Yet, Mr. O'Brien has indicated that he does not find this uncontradicted evidence dispositive, believing the Court, for sentencing purposes, will find a romantic relationship contemporaneous with Zuberi's payment of Ms. Habib's tuition.

The government's position that Amb. Olson performed an "official act" in consideration of the tuition payment also has no support in the law. Either aware of the lack of evidence that Amb. Olson performed some "official act" or "official acts," or perhaps because the government has not fully explored its theory of the case, the government has made multiple allegations of multiple "official acts" taken by Amb. Olson prior to receiving the Counter Proffer. None fall within the ambit of the statutory definition of "official act." For example, the government has alleged that providing "talking points" to Zuberi is an official act, that attempting to provide Zuberi with a "backdoor" channel to Secretary John Kerry is an official act, that taking a trip to Dubai and attending a "large" dinner with Zuberi the weekend of October 10-12th of 2015 is an official act, that meeting with Arabs in the UAE in an alleged effort to influence Congress and the United States is an official act, that conducting an alleged "lobbying effort" of Congressional leaders on behalf of Zuberi's attempts to sell drones is an official act, and that suggesting a point of contact for Zuberi and Lord Rigsby's "Ukraine project"[4] is an official act. In summary, the

---

[4]     At first the government suggested that Amb. Olson assisted Zuberi's business efforts by providing the names of William B. Taylor, Jr., former Ambassador to Ukraine, and Victoria Nuland ("VN"), Under Secretary of State, as resources for his "Ukraine project." (*See* Emails between Zuberi and Amb. Olson, dated February 3, 2015, attached as Ex. SS.) Realizing that suggesting the names of two well-known and respected former government officials to

theory seems to be that Zuberi had purchased Amb. Olson's constant participation in his "business"; however, we have found no case which would justify treating any of these activities as an "official act" by a United States Ambassador.  Our review included the Office of Government Ethics annual "Conflict of Interest Prosecution Survey" for the past 30 years.  The PSR Writer's adoption of O'Brien's description of these items as "gratuities" has a profound impact on the guideline score as we explain further below.

### b.  Ambassador Olson's Factual Narrative

Amb. Olson met Ms. Habib in 2012 in Pakistan while serving as the United States Ambassador to Pakistan.  Shortly after they met, they began dating.  Amb. Olson and Ms. Habib had very different understandings about the nature of their relationship.  Ms. Habib believed that they were dating exclusively, while Amb. Olson was not under that same impression.  This is well documented in the emails between them in the government's possession.  During the time Amb. Olson was dating Ms. Habib, he dated others.  There came a point when Ms. Habib discovered their disparate understandings about the nature of their relationship and broke it off in the fall of 2014.

Shortly after Ms. Habib broke up with Amb. Olson in late 2014, she moved back to London to care for her ill father who died on May 4, 2015.  After her father's death, and having only spoken a few times since 2014, Ms. Habib and Amb. Olson reconnected as friends.  Ms. Habib told Amb. Olson that she had been accepted to Columbia University's Journalism School, but that she missed all the scholarship deadlines while taking care of her ailing father.  She

---

Zuberi hardly constitutes an official act, the government rescinded their statement that this constituted an official act and indicated that its interest in the matter related only to a sentencing dispute in Zuberi's criminal case.  This is another instance of the government assuming that Amb. Olson was somehow conspiring or involved in Zuberi's illegal business activities.

therefore did not have enough money to attend in the fall.  At which point, Amb. Olson offered

to introduce Ms. Habib to Zuberi to see if he could help her "crowdfund" for her tuition.

Amb. Olson provided Ms. Habib with Zuberi's contact information.  (*See* Email from

Amb. Olson to Ms. Habib, dated June 15, 2015, attached as Ex. P.)  Amb. Olson also informed

Zuberi that an individual by the name of Ms. Muna Habib might be contacting him for advice.

(*See* Email from Zuberi to Amb. Olson, dated June 15, 2015, attached as Ex. Q.)  That was the

extent of Amb. Olson's involvement.  Amb. Olson never requested that Zuberi pay Ms. Habib's

tuition.  Ms. Habib reached out to Zuberi on her own and told him that "a mutual friend of ours,

Ambassador Olson, []passed along [his] email contact."  (*See* Email from Zuberi to Ms. Habib,

dated June 15, 2015, attached as Ex. R.).  Nowhere did Ms. Habib mention any previous or

current romantic relationship with Amb. Olson.  Zuberi responded and asked for details of her

program including its cost and length.  (*Id*.)  Zuberi's inquiries about the details of Ms. Habib's

matriculation would be unlikely if he cared only about pleasing Amb. Olson.

Ms. Habib and Zuberi then spoke at length, discussing her father's struggle with

Huntington's disease and Zuberi's mother's struggle with Parkinson's disease.  The two bonded

over this connection.  Zuberi also was interested in Ms. Habib's background in helping abused

women in Pakistan.  To Ms. Habib's surprise, Zuberi agreed to sponsor Ms. Habib's education

so that she could attain her Master's in Journalism at Columbia University.  Zuberi had formally

sponsored other individuals' educations.[5]  Ms. Habib believed that Zuberi had committed to be

responsible for the full year's cost of her education in the amount of $93,000.  However, Zuberi

---

[5]  (*See* Email from Zuberi, dated September 10, 2015, attached as Ex. O indicating "Muna
is a Masters Student at Columbia Journalism School.  She is doing write up on my nonprofit stuff
because she know [*sic*] the background of help I provide to deserving students with their tuitions
and etc at colleges and universities.")

later agreed to pay only $25,000 for her tuition and housing and offered to arrange a loan from a friend for the remainder of the money needed to fund her education.  This loan never materialized.  The email exchanges make clear that it was Ms. Habib's understanding that Zuberi agreed to sponsor her "out of the kindness of [his] heart."  (*See* Assortment of Emails between Zuberi and Ms. Habib, attached as Ex. O.)  Ms. Habib's time at Columbia University was fraught with significant financial difficulties, of which the government is well aware.  Although Zuberi agreed to formally sponsor Ms. Habib's tuition, Ms. Habib faced continuous struggles attempting to receive the funds that were promised her.  As the government is aware from reviewing the emails between Ms. Habib and Zuberi, Zuberi was constantly requesting that Ms. Habib write articles for him about his vendetta with the Pakistani Consular General to the United States.  (*See* Assortment of Emails between Zuberi and Ms. Habib, attached as Ex. O.)

Zuberi withheld the promised funds from Ms. Habib and would use his payment of her tuition to force Ms. Habib to write these articles.  Ms. Habib's financial difficulties even required her to defend herself in court in a pending eviction, and to solicit the Columbia administration to see whether the University could help.  Eventually, Ms. Habib took out a loan to cover the remainder of her education expenses, which she is still paying.  The email exchanges between Ms. Habib and Zuberi make clear that this was strictly an agreement between them, in which Amb. Olson had no involvement apart from the initial introduction.  Zuberi even tells Ms. Habib multiple times that she "owes him."  (*See* Email from Zuberi to Ms. Habib, dated October 24, 2015, attached as Ex. O.)  In other instances, Zuberi tells Ms. Habib that "[s]he is selfish" and that he "got less than $500 value from her.]  (*See* Email from Zuberi to Ms. Habib, dated October 8, 2015, attached as Ex. O.)  These email exchanges are hardly consistent with the government's theory that Zuberi paid Ms. Habib's tuition for or because of a past or future official act on the

part of Amb. Olson.  It also hardly seems plausible that Zuberi's behavior towards Ms. Habib would engender any appreciation from Amb. Olson, let alone the performance of some "official act."

Amb. Olson admits that he accepted a ride with Zuberi in a limousine on March 1, 2016. Amb. Olson had no idea if Zuberi incurred any additional expense for the shared ride.  Amb. Olson had traveled from Doha, Qatar, to Los Angeles, California on February 26, 2016, to speak at the World Affairs Council Orange County Luncheon and at the National Association of Pakistani Americans Annual Dinner.  These events and this trip were officially sponsored by the United States government.  All travel was paid by the government.  Any hotel accommodations or limo ride that Ambassador Olson received during this trip to Los Angeles was of benefit to the United State government, and not to Ambassador Olson.

### c.  Legal Argument

The government's contention that Amb. Olson violated 18 U.S.C. § 201(c)(1)(B) contains significant factual and legal flaws that would make a conviction under this criminal statute impossible.  The government's legal impediments include the following: 1) Amb. Olson did not demand, seek, receive, or accept Zuberi's payment of Ms. Habib's tuition or the limousine ride; 2) the payment of Ms. Habib's tuition was not given to Amb. Olson personally and was not something of value to Amb. Olson; 3) even assuming the payment of Ms. Habib's tuition and the limousine ride was something Amb. Olson sought and was of personal value to him, the tuition and the ride were not "for or because of an official act;" 4) even assuming the government can prove a link to an official act, Amb. Olson did not take action or agree to take action on a "question or matter"; 5) and even if the tuition and ride was of personal value to

Amb. Olson, at best, the "gratuity" was a "goodwill gift" that does not constitute an unlawful gratuity.

**(1) Zuberi's payment of part of Ms. Habib's tuition was not something Ambassador Olson demanded, sought, received, or accepted.**

There is no evidence that Amb. Olson solicited the tuition payment. Amb. Olson merely made an introduction, a very common practice for a diplomat, between the two individuals. The criminal law cannot be stretched beyond its words, particularly in the maze of ethics regulations. In other instances, the government has publicly alleged that Amb. Olson received the payment from Zuberi. (*See* Ex. M.) This is also untrue. Amb. Olson did not receive $25,000 from Zuberi. The receipt of money by Ms. Habib cannot be imputed to Amb. Olson, especially given their lack of a romantic relationship at the time.

**(2) Zuberi's payment of part of Ms. Habib's tuition was not a thing of value personally for Ambassador Olson.**

A significant factual and legal hurdle that the government has is proving that payment of Ms. Habib's tuition was 1) personally for Amb. Olson and 2) was of value to him. In essence, the government must prove that Amb. Olson and Ms. Habib were in a romantic relationship contemporaneous with the "solicitation" and payment of the tuition. Both Amb. Olson and Ms. Habib say otherwise. The email trail between Ms. Habib and Amb. Olson corroborates their statements. The government's burden of proof is unattainable. A simple look at the email exchanges between them clearly dispels the government's claim that they were engaged in a romantic relationship. After they broke up in the fall of 2014, they did not exchange emails until December 29, 2014. (*See* Email from Ms. Habib to Amb. Olson, dated December 29, 2014, attached as Ex. S.) Ms. Habib then sent Amb. Olson a platonic email wishing him a Happy New Year. (*See* Email from Ms. Habib to Amb. Olson, dated January 2, 2015, attached as Ex. T.) It

is apparent from the lack of frequency in email exchanges and the tone of email exchanges that did ensue, that during this point in time Ms. Habib and Amb. Olson were not romantically involved whatsoever.  Amb. Olson then traveled to London to meet with Mr. Janahi on January 31, 2015, to discuss a position with ADIH.  Despite the fact that Ms. Habib was living in London, Amb. Olson and Ms. Habib did not meet.  This is hardly indicative of two individuals seeking to rekindle a romance.

Ms. Habib and Amb. Olson once again ceased email communications from approximately January 2, 2015, until approximately May 12, 2015.  (*See* Email from Ms. Habib to Amb. Olson, dated May 12, 2015, attached as Ex. U.)  Again, the tone and language of these emails when they resume are of two individuals who are friends.  (*See id*. Ms. Habib saying "Rick, please do take care of yourself.")  As discussed, Ms. Habib returned to Pakistan in June of 2015 when she met with Amb. Olson.  The next email exchange between Amb. Olson and Ms. Habib consisted of Amb. Olson telling Ms. Habib "[a]s discussed, suggest you be in touch with Mr. Imaad Zuberi" on June 15, 2015.  (Ex. P.)

Once again, looking at these emails the tone is very much of acquaintances.  One day later Ms. Habib even tells Amb. Olson that she is "[g]lad we're still friends" and details her thoughts on their break-up.  (*See* Emails from Ms. Habib to Amb. Olson, dated June 16, 2015, attached as Ex. V.)  Ms. Habib and Amb. Olson then exchange approximately eight emails from June 20, 2015 to February 5, 2016, most of which involve news articles or current events.[6]  (*See* Emails between Ms. Habib and Amb. Olson, attached as Ex. W.)  This is the time during which the government alleges that Ms. Habib and Amb. Olson were romantically engaged.  That hardly

---

[6]      Ms. Habib later tells Amb. Olson on May 14, 2016, that she is "with someone new who understands me."  (Email from Ms. Habib to Amb. Olson, dated May 14, 2016, attached as Ex. X.)

seems plausible given the limited paper communication.  Yet, despite the Counter Proffer documenting this evidence showing the true nature of their relationship, O'Brien continues to write his own story.  His Zhivago-like story today only brings embarrassment to both Amb. Olson and Ms. Habib.  Although Amb. Olson and Ms. Habib eventually rekindled their relationship, this did not occur until 2017, a year-and-a-half after Zuberi provided Ms. Habib with some money for her tuition.

We find it troubling that Mr. O'Brien has persisted in his application of the gratuity statute to the sentencing calculation in this case.  The *Justice Manual* recognized the differences between the bribery provision, 201(b), and the gratuity provision, 201(c).  The *Justice Manual* forbids a gratuity charge on the facts we presented to Mr. O'Brien, because Amb. Olson received nothing personally.  (Ex. Y.)  The *Manual* states that with a bribe "payment may go to anyone or to anything and may include campaign contributions, while with a gratuity the payment must inure to the personal benefit of the public official and cannot include campaign contributions." (*See* Department of Justice Manual 2041- Bribery of Public Officials, attached as Ex. Z.).

> ### (3) Ambassador Olson did not perform an official act or series of official acts to benefit Zuberi's business and certainly did not do so for or because of the payment of Ms. Habib's tuition.

Not only can the government not prove that Amb. Olson personally accepted a benefit from Zuberi, the government also cannot prove that Amb. Olson performed an "official act" or a series of "official acts" or that Zuberi provided Ms. Habib with the tuition payment "for or because of any official act performed or to be performed by Amb. Olson."  The same is true of the limousine ride.

The government has named numerous actions allegedly taken by Amb. Olson that they believe constitute "official actions."  First, the government alleged that providing Zuberi with a

"backdoor" channel to Secretary Kerry was an official act.[7]  It is not, as there is nothing in Amb.

Olson's official duties regarding how citizens communicate with the Department of State.  In

fact, if Amb. Olson had Secretary Kerry's cell phone number, it would not be a crime to provide

it to anyone.  In addition, facilitating communication does not fall within the definition of an

"official action."  *See McDonnell*, 579 U.S. at 567 (holding that "setting up a meeting, calling

another public official, or hosting an event does not, standing alone, qualify as an 'official

act.'").  Second, the government contends that Amb. Olson traveled to Dubai from October 10-

12, 2015, to assist in Zuberi's business.  As explained by Amb. Olson, he traveled to Dubai for a

job interview with Abraaj.  (*See* Emails and Assorted Documents between Amb. Olson and

Abraaj officials, attached as Ex. CC.)  In addition, while Amb. Olson did attend a dinner with

Zuberi and a few businessmen, it was a purely social dinner that in no way constitutes an

"official act."  Nor has the government even attempted to try and explain how Amb. Olson could

act "officially" at all with respect to any of the events of the trip.

Third, the government contends that providing "talking points" to Zuberi constitutes an

official act.  It also does not.  First, the talking points were based on unclassified information,

publicly available information, and were written by Amb. Olson based on State Department

policy relating to United States-Pakistan relations.  (*See* Email from Amb. Olson to Zuberi, dated

April 9, 2015, attached as Ex. PP.)  Second, these talking points were not sent from Amb.

Olson's official email, but rather his personal email.  Third, providing readily available

---

[7]      The characterization by the government of the email chain related to this is typical
of the O'Brien's exaggerations.  Zuberi claimed that former Pakistan President Asif Ali Zardari
wanted to send an email to Secretary John Kerry in October of 2015.  Amb. Olson explicitly says
he does not have an email for Kerry and would not provide the email of Kerry's Chief of Staff.
The government has presented no evidence this is even true.  (*See* Emails between Mr. Zuberi
and Amb. Olson, dated October 16-19, 2015, attached as Ex. OO.)

information to a United States citizen, in particular one whom you know to have ill-informed beliefs, is not an "official act" within the statutory definition.  Fourth, Amb. Olson provided these to Zuberi to ensure that he did not convey damaging falsehoods about Pakistan and the United States to the politicians with whom Zuberi claimed to be meeting.  Amb. Olson could well have reported these "talking points" in an appearance on Meet the Press.  To influence the PSR Writer, O'Brien reported to her that "the talking points defendant Olson shared with Zuberi had not been cleared for public distribution."  (PSR at ¶ 52).  There was no need for such clearance, as the content was not classified.

The government's error here is fairly exemplified in the *en banc* Court's decision in *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) (en banc).  MPD Detective Nelson Valdes sold information to an FBI informant which Valdes obtained from WALES.  On appeal, Valdes argued that information from WALES is publicly available and his providing the information to the informant was not an "official act."  The *en banc* Court characterized the government's position as follows: "The government maintains that the bribery and gratuity statute should be construed broadly, to encompass essentially any action which implicates the duties and powers of a public official."  *Id*. at 1322.  In the course of vacating the conviction, the Court quoted an important observation from the Supreme Court: "[T]he numerous ... regulations and statutes littering this field [ ] demonstrate that this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions.  Given that reality, a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter. *Valdes*, 475 F.3d at 1323-24 (quoting *Sun-Diamond*, 526 U.S. at 412).

Fourth, the government contends that Amb. Olson engaged in a lobbying effort on behalf of Zuberi's "business" involving the sale of drones.[8]  First, as already indicated by Amb. Olson, he was unaware of any of the specifics related to Zuberi's business involving drones during this time, and the government has not described this "business."  Second, Amb. Olson was also unaware that Zuberi was interested in the sale of drones to Pakistan.  Third, Amb. Olson did not meet with any Congressional leaders on behalf of Zuberi's business efforts to sell drones.  As already established in the *McDonnell* case, even setting up meetings does not constitute an official act.  Lastly, this alleged "lobbying effort" does not fall within the ambit of an "official act."  The government has not even attempted to demonstrate how Amb. Olson was a decision-maker on the issue.  The legislation before Congress did not even involve the sale of drones to Pakistan, but involved the sale of drones to the UAE.  The sale of drones to Pakistan was not a "suit, proceeding, or controversy" either before Amb. Olson or even before Congress.

**(4) Conflict of Interest**

At the time Amb. Olson offered his written Counter Proffer to the government, the threat remained that the government would indict Amb. Olson under 18 U.S.C. § 208(a) (Acts Affecting a Personal Financial Interest).  This statute is the core protection against conflict of interest by government officials while in office, criminalizing conduct by an official who sells his office for financial gain.  After receipt of Amb. Olson's Counter Proffer, the government, in

---

[8]     These assertions are also a gross exaggeration by Mr. O'Brien.  A review of the email chain related to this issue demonstrates that Zuberi used his cunning to somehow direct Amb. Olson's aid Brian Denver to set up meetings with a number of congressmen.  (*See* Email from Mr. Denver to Mr. Zuberi, dated March 13, 2015, attached as Ex. QQ.)  Mr. Denver failed, and Amb. Olson does not even appear in that email nor does Amb. Olson appear in any of the emails sent by Mr. Denver attempting to schedule these meetings.  (*See* Assortment of Emails, attached as Ex. RR.)  Yet, O'Brien persists in claiming that Amb. Olson lobbied members of Congress on behalf of Zuberi while serving as Ambassador.

its written plea offer, withdrew its threat to indict Amb. Olson for conflict of interest while

serving as Ambassador.  (*See* 2021.10.25 Letter to O'Brien and Turgeon, Ex. UU).  However,

AUSA O'Brien has resurrected these allegations in an attempt to increase the guideline score for

sentencing.  In the PSR Writer's response to Amb. Olson's objections, she reports the following

at page 45, ¶ 62:

> Probation maintains the position the defendant's conduct regarding the gratuities is
> relevant conduct.  The Government has previously advised Probation that the defendant
> and Zuberi were involved in doing favors for each other, continuously over the span of a
> few years (to include while the defendant was serving as Ambassador).  After the
> defendant provided Zuberi with talking points in April 2015, the "pay off" was the
> college tuition for Ms. Habib.

Therefore, we are including in this memorandum some of the arguments we presented in

the Counter Proffer which resulted in the government not pursuing this charge, either by

indictment or plea.

The Conflict of Interest prohibitions in Title 18 are customarily prosecuted through the

Public Integrity Section of the Department of Justice and reported through the United States

Office of Government Ethics.  Title 18 U.S.C. § 208(a) prohibits:

> "an officer or employee of the executive branch of the United States Government" from
> "participat[ing] personally and substantially as a Government officer or employee,
> through decision, approval, disapproval, recommendation, the rendering of advice,
> investigation, or otherwise, in a judicial or other proceeding, application, request for a
> ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or
> other particular matter in which, to his knowledge, he, his spouse, minor child, general
> partner, organization in which he is serving as officer, director, trustee, general partner or
> employee, or any person or organization with whom he is negotiating or has any
> arrangement concerning prospective employment, has a financial interest."

In order for the government to rely on an alleged violation of 18 U.S.C. § 208 for

sentencing purposes, the government must prove by a preponderance of the evidence the

following: 1) the Defendant was an officer or employee of the executive branch or of an

independent agency of the federal government; 2) the Defendant participated personally and

substantially in his official, governmental capacity through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise; 3) the Defendant did so in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter; 4) the Defendant knew that he had a financial interest in that particular matter; and 5) that the Defendant did so willfully.

### a. Government's Factual Narrative

The government contends that while Amb. Olson worked for the State Department, he was also providing assistance to Zuberi and his "business," which remains largely undefined by the government in this case. Specifically, the government states that Amb. Olson facilitated Zuberi's lobbying efforts of United States politicians in 2015 to promote the sale of drones to Arab countries, specifically to Pakistan. To assist Zuberi, the government says that Amb. Olson provided him with "talking points" for him to use when speaking with United States' politicians. (*See also* PSR at ¶¶ 24, 62, and 67-75 and Amb. Olson's Objections at PSR pages 43-47).

In addition, the government alleges that Amb. Olson himself agreed to meet with a variety of Congressional leaders to help facilitate Zuberi's efforts to sell drones to Arab nations. The government appears to derive its belief that Amb. Olson "agreed" to meet with Congressional leaders based on an email between Zuberi and Amb. Olson's aide Brian Denver, in which Amb. Olson does not appear. (*See* Ex. QQ.) The government, however, has agreed there is no evidence that Amb. Olson ever met with any politicians to accomplish this goal.

The government also believes that Amb. Olson agreed to route an email from President Zardari to Secretary John Kerry. All of these actions that Amb. Olson allegedly took were all in the hopes that Imaad Zuberi might provide Amb. Olson with future employment after his retirement. It is also the government's belief that not only were these actions taken by Amb.

Olson with the hope of future employment with Zuberi, but also that Amb. Olson had an

agreement with Zuberi with respect to employment before December of 2016.

**b. Ambassador Olson's Factual Narrative**

Amb. Olson was introduced to Zuberi by his Chief of Staff during his ambassadorship in

Pakistan in 2013.  Ambassador Olson was aware that Zuberi did substantial business of some

sort overseas, specifically in Pakistan.  This was of significance to Ambassador Olson because

the State Department issues standing guidance to support American business overseas.  Given

the nature of the United States and Pakistan's relationship during Amb. Olson's ambassadorship,

there were not many Americans either living there or conducting business there.  As such, Amb.

Olson believed it was part of his job as Ambassador to "keep tabs" on Zuberi.  As time went on

and Amb. Olson learned more about Zuberi, the need to monitor Zuberi's activities became even

more evident.

The beginning of Zuberi and Amb. Olson's relationship consisted of a series of "junk"

emails sent by Zuberi.  These emails consisted of articles, gossip, and invitations to events with

politicians or celebrities.  Amb. Olson had no interest in these emails and rarely responded.  As

the government is well aware after likely reading and examining thousands of emails sent by

Zuberi to a variety of different people, this was his *modus operandi*.  Zuberi was a political

bundler, purporting to be well-connected to many of the "goings-on" of Washington and used

this knowledge and gossip to gain political allies to further his business efforts.  This was the

core of the government's prosecution theory against Zuberi.  His interactions with Amb. Olson

were no different than his interactions with any other individual with any type of political or

social clout with one major and critical exception: Amb. Olson never helped Zuberi raise

political money, never received money, never participated in political fund-raising, and never

knowingly "fronted" for Zuberi in his prolific and illegal funding of political campaigns of both parties from congressmen to presidents.

To impute to Amb. Olson any nefarious acts or intentions because of Zuberi's aggrandizing emails is misplaced and inconsistent with the government's own knowledge of Zuberi's goals.  As time passed and Amb. Olson became more aware of Zuberi's connectedness with United States' politicians, he correctly recognized the potential ramifications of Zuberi's conduct on the fragile relationship between the United States and Pakistan.  Amb. Olson's relationship with Zuberi largely focused on the fact that Zuberi was involved in Amb. Olson's "territory and space."  Amb. Olson was consistently playing defense with Zuberi.  As a Pakistani American, Zuberi had many opinions about Pakistan and United States relations largely based upon erroneous and ill-informed beliefs.  Given the constant email forwards reflecting conversations with high-ranking members of Congress or invitations to political events, Amb. Olson was aware of Zuberi's apparent connectedness and expurgations on political events.

Amb. Olson's tenure as the United States Ambassador to Pakistan was difficult. Relations between the United States and Pakistan were at an all-time low following the killing of Osama bin Ladin in Pakistani territory and the subsequent deaths of Pakistani soldiers by American forces, and Amb. Olson was tasked by President Obama with the difficult job of mending the relationship.  He was particularly concerned with Zuberi's tendencies to make ill-informed and off-handed comments about matters he knew largely nothing about, especially with respect to Pakistan and the United States.  At a time when Amb. Olson was working night and day to fix the delicate relationship between these two nations, he was worried about anything or anyone derailing his efforts, especially someone who proclaimed connections with United States politicians.

Amb. Olson adhered to the principle of "keep your friends close, and your enemies closer" throughout this time.  Amb. Olson even spoke with his boss, Amb. Daniel F. Feldman, then Special Representative for Afghanistan and Pakistan, about Zuberi on multiple occasions. Amb. Olson did provide public information to Zuberi about U.S. policy towards Pakistan.  He did so not based on the hope that Zuberi would hire him, but rather to ensure that Zuberi understood the United States government's position on a variety of unclassified topics.  Having discussions about issues related to Pakistan, the Gulf States, and the United States is anything but illegal and was not undertaken with any illicit or nefarious intent.  To infer that Amb. Olson provided the "talking points" to Zuberi for any other reason requires adoption of the whole of the government's theory and ignores Amb. Olson's job.  Amb. Olson adamantly disputes that he was negotiating future employment with Zuberi or had a solidified plan to work with Zuberi prior to December of 2016.

Amb. Olson was actively pursuing future employment with a variety of companies, none of which has any relationship to Zuberi or his front business Avenue Ventures.  Had Amb. Olson been negotiating employment with Zuberi, he would have filed a recusal notice, just as he had done with the multiple other organizations or persons with whom he was pursuing future employment.  Amb. Olson's ambassadorship in Pakistan was set to end in the Summer of 2015, and he tentatively planned to retire at that point.  The months preceding, Amb. Olson was in the process of looking for other employment options.  However, Amb. Olson's ambassadorship was prolonged due to the upcoming visit of Nawaz Sharif, the Pakistani Prime Minister, to Washington, D.C.  Secretary Kerry then asked Amb. Olson to continue his service and serve as the Special Representative for Afghanistan and Pakistan ("SRAP").  Amb. Olson accepted the

assignment in September or October of 2015 and assumed this role in November of 2015.  (*See* Email from Amb. Olson to Mr. Amend, dated October 4, 2015, attached as Ex. AA.)

Prior to his acceptance of the SRAP position, Amb. Olson was engaged in employment discussions with Mr. Khalaf Habtoor beginning in September of 2014.  (*See* Emails between Khalaf Habtoor and Amb. Olson, attached as Ex. BB.)  He was also engaged in employment discussions with Abraaj beginning in September of 2015 and ending November of 2016.  (*See* Emails and Assorted Documents between Amb. Olson and Abraaj officials, attached as Ex. CC.) On October 13, 2015, immediately after his job interview, Amb. Olson filed a recusal from all matters involving Abraaj.  (Recusal Notice for Abraaj, dated October 13, 2015, attached as Ex. DD.)  Immediately after the election of Donald J. Trump, Abraaj informed Amb. Olson on November 10, 2016, that they had "been trying to look for a role" for Amb. Olson but stated that "[u]nder the circumstances, probably best for you to pursue other options."  (Email from Mr. Naqvi to Amb. Olson, dated November 10, 2016, attached as Ex. CC.)  Amb. Olson was also engaged in discussions with the Cohen Group around July 2015.  (Recusal Notice for Cohen Group and Corresponding Emails, attached as Ex. FF.)  Additionally, Amb. Olson was pursuing post government employment options with Boeing around April 2016.  (Emails with Boeing, attached as Ex. GG.)  Amb. Olson was also engaged in employment discussions with Raytheon beginning in April of 2016, and ultimately ending in August of 2016.  (Emails with Raytheon attached as Ex. HH.)

Not only did Amb. Olson have multiple "irons in the fire" as detailed, Amb. Olson was the one to terminate negotiations with Raytheon.  (Email from Amb. Olson to Mr. Vecchiola, dated August 7, 2016, attached as Ex. II.)  This hardly seems indicative of an individual desperate for post-retirement employment, in which Amb. Olson alleged financial need

outweighed his decades-long adherence to upright government service.  From day one in a foreign service officer's career, the State Department makes clear that a second career may ultimately be necessary for some foreign service officers given the up-or-out policy of the Department of State.  This is true of many federal agencies and is also reflected in the Congressional intent underlying the densely-complicated criminal ethics statutes.  *See United States v. Conlon*, 481 F. Supp. 654, 666 (D.D.C. 1979) (the "dual concerns [the flexile movement of individuals from private to public sectors] reflect a desire to balance the need to protect the Government from the conflicting interests of the employee with 'his eye cocked' toward future private employment against a recognition of the importance of the free flow of talent between the private and public sector.")

Amb. Olson had the greatest success with Abraaj.  He traveled to Dubai from October 10-12th to interview with Abraaj.  After interviewing and subsequent conversations with Abraaj, Amb. Olson anticipated that he would work for this private equity company in Dubai following his retirement in November 2016.  Amb. Olson had not considered becoming an independent consultant until Abraaj notified him that it was no longer interested in hiring him shortly after the 2016 election.  Amb. Olson had no difficulty pivoting to establish an independent consultancy business, Medicine Bear, to afford him the flexibility he required.  Only then did Amb. Olson agree to take on Zuberi as a client.

### c.  Legal Argument

The purpose of 18 U.S.C. § 208 is to "insure honesty in the Government's business dealings by preventing federal agents … from advancing their own interests at the expense of the public welfare."  *United States v. Mississippi Valley Generating Co*., 364 U.S. 520, 548 (1961).  Congress enacted the statute to eliminate "loopholes in existing law," but "even more attention

was paid to the need for avoiding restrictions that would expose government employees unfairly to criminal punishment and, in the long run, deprive the federal government of the services of able men and women." *Conlon*, 481 F. Supp. at 665.  In summary, 18 U.S.C. § 208 prohibits a federal employee from participating in official actions that affect a person or organization in which the employee has a financial interest.  Amb. Olson had no financial interest in the sale of drones to Gulf or Middle Eastern countries, no financial interest in Zuberi's business during this time, and no interest in employment with Zuberi or Zuberi's front company, Avenue Ventures.

> **(1) Ambassador Olson did not participate personally or substantially in his "official governmental capacity" through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter.**

The government during its interaction with Amb. Olson and his counsel failed to identify any manner in which Amb. Olson did anything in his "official governmental capacity" for the benefit of Zuberi.  The provision of publicly available information (the "talking points") is not a decision, recommendation, advice, a ruling or any other enumerated official act in the statute.  In addition, providing these talking points was not "substantial participation" in anything like a judicial proceeding, contract, or some other matter in Amb. Olson's portfolio.  Even assuming that the pending sale of drones to the United States' first non-Nato ally requiring Congressional approval falls within Amb. Olson's sphere of decision, the upcoming Congressional vote was with respect to the United Arab Emirates and not with respect to Pakistan.  There was no pending congressional legislation or vote with respect to the sale of drones to Pakistan.  Nor has the government explained how Amb. Olson holds sway over the passage of such legislation.

> **(2) Ambassador Olson had no financial interest in the sale of drones nor was he negotiating potential employment with Zuberi.**

A key element of 18 U.S.C. § 208 is the requirement that the Defendant had a financial interest in the matter or was negotiating potential employment with an individual who had a financial interest in the matter.  Amb. Olson had no financial interest in the sale of drones to Pakistan or any other Gulf states, nor was Amb. Olson aware of any financial interest that Zuberi had in the sale of drones.  In fact, Amb. Olson opposed the sale of drones to Pakistan on policy grounds.  In addition, Amb. Olson had no financial interest in Zuberi's business activities. Amb. Olson did not discuss potential employment with Zuberi until December 2016, a full year and a half after he provided the talking points to Zuberi.  Even when Amb. Olson worked for Zuberi and Avenue Ventures, he never worked on any projects involving the sale of drones.

Amb. Olson took Zuberi and Avenue Ventures on as a client and provided his independent consulting services.  He was not required to bring in clients nor grow Zuberi's business in any way.  He was to be paid $20,000 per month regardless.  Not until after his retirement from the Foreign Service on November 30, 2016, did Amb. Olson turn to establishing his own consultant service.  The government has made allegations that Amb. Olson began negotiating with Zuberi in October of 2016 about potential employment and in other instances that Amb. Olson traveled to Los Angeles in February of 2016 to discuss potential employment. Yet, the government has produced no evidence of this assertion.  Amb. Olson went to Los Angeles at the end of February of 2016 on State Department business to deliver remarks at officially authorized events.  The government has provided no evidence that Amb. Olson negotiated with Zuberi about potential employment before November of 2016, apart from their unsubstantiated theories.

The government must show specific facts proving the existence of a bilateral agreement or at the very least ongoing events of negotiating between Zuberi and Amb. Olson to survive a

motion to dismiss.  *See Conlon*, 481 F. Supp. At 654.  The court's ruling in *Conlon* is dispositive of this issue.  Mr. James A. Conlon, former Director of the Bureau of Engraving and Printing, was charged with violating 18 U.S.C. § 208(a) by participating as a government officer in a proposal by the American Bank Note Company (ABN) while he was "negotiating and had an arrangement concerning prospective employment" with ABN.  The District Court concluded that the term "negotiating" requires "allegations of specific acts of negotiating by the defendant in concert with a prospective employer."  The term "arrangement" requires "allegations of specific and bilateral arrangements or acts of arranging."  *Conlon*, 481 F. Supp. at 657.  The indictment must allege the "specific events showing the existence of a bilateral agreement or ongoing events of negotiating" or else the "indictment fails to state an offense under section 208(a)."  *Id*. at 669.  To prosecute "indefinite and inchoate links to outside firms such as unsolicited offers of future employment or even unilateral hopes and plans would defeat the congressional purpose of the statute." *Id*. at 667.

The government has provided no evidence of nor do any emails reflect any agreement or negotiations between Zuberi and Amb. Olson regarding potential employment.  The government puts the cart before the horse assuming there must have been an agreement of employment on account of an assortment of Amb. Olson's interactions with Zuberi, such as introductions by Zuberi to individuals such as Mr. Janahi or Mr. Ahmed Al Rumaihi.  The government similarly assumes that the trip to Dubai on October 10, 2015, included Zuberi and Amb. Olson discussing employment, when in fact Amb. Olson went to Dubai to interview with Abraaj.  Amongst the many emails and Whatsapp communications between Zuberi and Amb. Olson, nowhere is there any discussion of potential employment.  The government cannot retroactively look to the fact that Amb. Olson later took on Avenue Ventures as a client as proof that Zuberi and Amb. Olson

had negotiated future employment prior to December 2016, especially given the wealth of

evidence that Amb. Olson was actively engaged in future employment options with other

individuals and companies.  Zuberi was even aware of Amb. Olson's pursuit of other job

opportunities such as with the Cohen Group. (Email from Zuberi to Amb. Olson, dated

September 16, 2015, attached as Ex. JJ.)

**(5) The False Statement and Obstruction Enhancements**

We recount here some of the information provided to the government in our Counter

Proffer regarding Mr. O'Brien's contention that Amb. Olson made false statements in violation

of 18 U.S.C. § 1001.  Mr. O'Brien has alleged to the PSR Writer that Amb. Olson made false

statements to FBI Agents.  Not only are the assertions not applicable under the sentencing law,

but also Mr. O'Brien cannot prove by a preponderance of the evidence that Amb. Olson made

false statements.

**a.  Legal Background**

In the Counter Proffer, we advised Mr. O'Brien that Title 18 U.S.C. § 1001 applies to

those who "knowingly and willfully (2) make[] any materially false, fictitious, or fraudulent

statement or representation" in a matter "within the jurisdiction of the executive, legislative, or

judicial branch of the Government of the United States."  18 U.S.C. § 1001(a)(2).  To prove a

violation of 18 U.S.C. § 1001(a)(2), the government must prove that 1) the Defendant made a

false, fictitious, or fraudulent statement or representation; 2) that the false, fictitious, or

fraudulent statement or representation was material to a matter within the jurisdiction of the

executive, legislative, or judicial branch of the United States government; and 3) that the

32

Defendant acted knowingly and willfully, that is, the defendant knew that the statement or representation was false, fictitious, or fraudulent.[9]

Title 18 U.S.C. § 1001 requires that the government prove the defendant acted with specific intent to knowingly and willfully make a false statement. *United States v. Weatherspoon*, 581 F.2d 595, 601 (7th Cir. 1978), abrogated on other grounds by *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir. 1986). Further, a statement that is made accidentally, carelessly, or unintentionally, cannot be criminalized. *See United States v. Daughtry*, 48 F.3d 829 (4th Cir 1995). "The statement must have been made with an intent to deceive, a design to induce belief in the falsity or to mislead." *United States v. Lichenstein*, 610 F.2d 1272, 1276-77 (5th Cir. 1980). Meaning, the government must offer evidence that the defendant acted deliberately and with the specific knowledge that the statement was false. *See United States v. Hopkins*, 916 F.2d 207, 214 (5th Cir. 1990).

Not only must the government prove the requisite *mens rea*, it must also prove that the false statement was material. Whether something is material or not "focuses on whether the false statement had a natural tendency to influence or was capable of influencing" the relevant decision-making body.[10] The government also must establish that the statement or representation was actually false. A statement can be misleading and still fail to produce a

---

[9]     *See United States v. Dedman*, 527 F.3d 577 (6th Cir. 2008) (quoting *United States v. Luiz*, 154 F.3d 581, 87 (6th Cir. 1998)). The purpose of 18 U.S.C. § 1001 is to "punish those who render positive false statements designed to pervert or undermine functions" of the government. *United States v. Palzer*, 745 F.2d 1350, 1354 (11th Cir. 1984); *see United States v. Tobon-Builes*, 706 F.2d 1092, 1101 (11th Cir. 1983); *Bryson v. United States*, 396 U.S. 64 (1969).

[10]     *United States v. Pizano*, 421 F.3d 707, 722 (8th Cir. 2005) (internal quotations and citations omitted); *see United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. McIntosh*, 655 F.2d 83, 90 (5th Cir. 1981) (court held false statement was material because "disclosure of the truth could have provoked agency to action.")

conviction unless the statement is also false. *See United States v. Diogo*, 320 F.2d 898, 905-09 (2nd Cir. 1963). Importantly, the government must negate any reasonable interpretation that could make the statement factually correct. *See United States v. Race*, 632 F.2d 1114 (4th Cir. 1980); *see also United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978). "A fundamental ambiguity cannot be the basis for a false statement conviction because a person cannot knowingly give a false reply to a question that defies interpretation despite its context." *United States v. Schulte*, 741 F.3d 1141, 1150 (10th Cir. 2014).

## b.   Application to O'Brien Contentions

On December 17, 2021, Attorney Turgeon emailed a written plea offer to Amb. Olson's counsel that required Amb. Olson to plead guilty to a felony for violation of 18 U.S.C. § 1001(a)(3), Use of a False Document, and a misdemeanor for violation of 18 U.S.C. §§ 207(f)(1)(B), 216(a)(1), Aiding and Assisting a Foreign Government with Intent to Influence Decisions of United States Officers. (2021.12.16 Plea Agreement at 2, Ex. KK). The Plea Agreement included a cooperation provision and the opportunity to obtain a § 5K.1.1 departure motion from the government. (2021.12.16 Plea Agreement at 2-3, 6, Ex. KK).

This overture and the following month's events reflect poorly on Mr. O'Brien's contention to the PSR Writer that Amb. Olson should receive an enhanced sentence on account of making false statements in his two uncounseled FBI interviews in 2019. When Amb. Olson refused to accept a felony plea under 18 U.S.C. § 1001(a)(3), O'Brien agreed to the current plea offer to only two misdemeanor counts. He withdrew the offer of an explicit cooperation agreement and a potential § 5K.1.1 departure. His justification for withdrawing the cooperation agreement, which he described in a January 6, 2022, telephone conference among counsel, was that he had concerns about "reconciling" several statements by Amb. Olson. (2022.01.10 Letter

to O'Brien and Turgeon, Ex. LL).  Mr. O'Brien had never posed this as an obstacle to a potential § 5K departure.

We requested that Mr. O'Brien provide us with a specific list of his concerns to which we could respond.  He did so, and the concerns he presented are largely those which he provided to the PSR Writer in ¶¶ 51-54, which he captioned "Scope of Defendant Olson's False Statements and Concealment."  Counsel for Amb. Olson provided a written response to each of Mr. O'Brien's assertions, which we repeat in relevant portion here.

The following alleged false and misleading statements are those presented by O'Brien to Amb. Olson's counsel for "reconciliation", along with the response provided in writing:

> **(1) False statement that defendant OLSON never received a specific job offer from ADIH: "we had a conversation in London about . . . possibilities for post-employment.  There was never a specific job offer.  There was never anything."  In fact, ADHI had offered OLSON a $300,000 per year job.**

The context for this interview was that the FBI contacted Amb. Olson saying they wanted some "background" information.  Amb. Olson assumed this was a routine background investigation for someone he knew who was seeking a government position requiring a security clearance.  Amb. Olson was therefore unprepared to answer detailed questions about events that had taken place up to four years beforehand.  Some of his spontaneous recollections may have been imperfect but were not intended to deceive.  The FBI Agents asked Amb. Olson whether Zuberi had paid for travel while the Ambassador was working for the USG.  Amb. Olson said Zuberi had not, but Amb. Olson volunteered that Esam Janahi had paid for a trip to London on behalf of the prospective employer ADIH.  This led to a discussion about the London trip.  Amb. Olson's answer was specific to the London trip, during which Janahi did not make a specific job offer.  However, Amb. Olson's statement "There was never anything" was an overstatement,

specifically the word "never," since later that year after the London trip Janahi did indeed offer

Amb. Olson a job.  His answer to the FBI was meant to convey only his recollections of what

happened in London, but not to deceive the USG.  The Agents and O'Brien were already aware

of email exchanges in which Amb. Olson later rejected the specific job offer.

During the conversation in London, Janahi described his interest in getting back into the

financial market in the UAE, and how Amb. Olson could assist him, post-retirement, in this

regard with Amb. Olson's connections in Abu Dhabi.  Amb. Olson does not recall Janahi

mentioning any firm name, i.e., ADIH, nor was there any discussion of remuneration, or any

other specifics.  Amb. Olson filed a recusal afterwards in accordance with State Department

ethics guidance, and the recusal accurately noted that Amb. Olson had discussed employment

opportunities with ADIH, but had not received a specific offer.  This was the same format that

Amb. Olson used in his recusals for other employment discussions.

After producing his documents to the FBI, Amb. Olson freely agreed to a second

interview, at which he was very candid and detailed in his answers, including the job offer from

Janahi.  Amb. Olson discontinued the interview to obtain counsel once he was advised he was a

target of the investigation.

> **(2)  False statement that defendant OLSON had "no idea" how
> Zuberi helped finance Habib's college tuition, when, in fact,
> Zuberi forwarded to defendant OLSON a bank statement
> showing that a $20,000 check had been deposited into
> Columbia's account for Habib and Zuberi told OLSON that
> both checks he issued had been cashed.**

Amb. Olson had forgotten about the emails in which Zuberi had informed him of the

details of how the payments to Columbia had been made.  The email exchange took place in

October 2015, and the FBI interview took place in 2019, nearly four years later.  Amb. Olson did

not intend to deceive the USG; he simply had forgotten how Zuberi paid a portion of the tuition

and forgotten about one email exchange in the many thousands of email exchanges he had since that time.  Moreover, the Agents and O'Brien were well aware already of how Zuberi paid the tuition.

In the interval between 2015 and 2019 Amb. Olson had re-established a relationship with Muna Habib (in 2018) and in 2019 they were married.  Subsequent to their reconnection in 2018, Muna told Amb. Olson that Zuberi had not in fact lived up to his early financial commitment to her.  In the context of the FBI interview of 2019, it was difficult for Amb. Olson to accurately recall the details of how Zuberi funded the tuition.  He certainly did not deny that Zuberi paid some of the tuition, the full scope of which he learned of when he and Ms. Habib reconnected.

> **(3) False/misleading statements that defendant OLSON had no knowledge of Zuberi's business interests in military sales to foreign governments they discussed, claiming, "I had no reason to believe that [Zuberi] had any business interests in any of these [military] deals" and that his understanding was that Zuberi's interest in the sales was merely for "general information," when, in fact, OLSON was aware that Zuberi was engaged in brokering military sales between General Atomics and foreign governments.**

Zuberi had mentioned his acquaintanceship with Linden Blue, a leader with General Atomics, as indeed he routinely bragged about his various contacts; mostly political, but also some business leaders.  Amb. Olson did not know anything about any specific contractual arrangements Zuberi might have had with General Atomics.  Amb. Olson was generally aware that General Atomics was interested in selling drones to the UAE (where Amb. Olson had previously served as US Ambassador).  Amb. Olson was not aware that Zuberi and/or General Atomics had any interest in selling drones to Pakistan (where Amb. Olson actually had governmental responsibility at the time of their exchanges).

Amb. Olson would have found such a proposition ludicrous for a variety of policy reasons. So, Amb. Olson's statement was overly broad; a more accurate and narrow statement would have been that he had no reason to believe that Zuberi had any business interest with General Atomics within the area for which he had responsibility at the time – that is, Pakistan.

**(4) False/misleading statements that he and Zuberi only engaged in general-interest political discussions and "political gossip," that there "was no business relationship" between the two, and that he could not recall any "ask" from Zuberi, when, in fact, OLSON agreed to assist Zuberi's efforts in lobbying members of Congress and provided Zuberi with talking points to promote weapon sales to foreign governments in response to a request from Zuberi.**

Again, Amb. Olson did not recall all of his email exchanges from four years beforehand, in an interview that Amb. Olson was completely unprepared for. When shown the email exchange by the agents regarding the "talking points", he did acknowledge having sent the unclassified statement of USG policy as background information. Amb. Olson's motivation in providing the information to him was that in conversations with the Ambassador, Zuberi was very critical of Pakistan, sometimes on the basis of incorrect information. This was especially the case since US-Pakistan relations were tense, and Amb. Olson had a presidential mandate to improve the relationship. Since Zuberi made clear that he was engaging regularly with members of Congress, Amb. Olson thought it important that Zuberi have a correct impression of US policy toward Pakistan. Amb. Olson did not regard this as being part of a private lobbying effort.

**(5) False/misleading statements that he didn't "know much about Zuberi actual business operations because he has me advising him on, sort of, broadly speaking government relations, sort of strategic, ah, aspects of business" when, in fact, OLSON participated in Zuberi's business operations with respect to lobbying campaigns to procure Qatar preclearance facilities and to modify U.S. policy with respect to the Gulf Diplomatic Crisis, by participating in the drafting of a lobbying proposal submitted to the Qatar government with respect to Qatar**

**preclearance facilities and by meeting with Qatar Government Officials as well as U.S. Government officials to assist the Qatar government in its effort to modify the U.S. Government's response to the Gulf Diplomatic Crisis.**

The answer cited above was specifically in response to a question about Zuberi's business activities in Dubai and was a truthful explanation of Amb. Olson's role with regard to Zuberi's business activities in the UAE.  What Amb. Olson meant by not knowing about actual business operations was that Amb. Olson was not privy to any of Zuberi's financial dealings.  It is noteworthy that Zuberi did not include Amb. Olson in the illegal activities which led to Zuberi's 12-year incarceration.

Since Zuberi presented himself as running a private equity firm, Amb. Olson regarded finance as being his core business, and Amb. Olson was not privy to any of his financial arrangements, with one exception.  Zuberi told Amb. Olson during 2018 when they were working with the Government of Qatar on a food security project that Zuberi was being paid $3 million. This was the only time Amb. Olson was ever aware of a specific contractual or financial arrangement.  For the other projects that Amb. Olson worked with Zuberi on, the business terms were opaque.

With regard to the specific statement to the FBI, Amb. Olson meant to convey that his primary role with regard to Zuberi was providing advice on government relations.  Mr. O'Brien's repeated assertions that Zuberi and Amb. Olson were engaged in a "lobbying campaign" is a loaded assertion which begs the question.  The full of extent of Amb. Olson's participation in the pre-clearance facility at the Qatar airport was modest editing of a proposal prepared by attorney John Sandweg, who has not been charged with anything.

To Amb. Olson's mind, he saw his role as being one of advising Zuberi rather than the government of Qatar *per se*.  The July 2019 interview did not focus on the June 2017 interactions

with Qatar, although Amb. Olson did mention that he had traveled to Doha at various points on behalf of Avenue Ventures.  Amb. Olson did note in the interview that part of his job responsibilities with Avenue Ventures was interactions with USG officials, so there was no attempt to mislead on contacts with the U.S. Government.

## II.     THE PRESENTENCE INVESTIGATION GUIDELINE CALCULATIONS

### A.  General Objections to the Final Presentence Investigation Report

Paragraphs 1-4 of the PSR do not accurately capture the road this case has traveled to this Court.  As we note in our "Response" [ECF No. 37], in July of 2019, AUSA O'Brien was conducting a Grand Jury investigation into the lobbying and fund-raising activities of Pakistani American, Imaad Shah Zuberi.  AUSA O'Brien caused an FBI Agent working on the case to conduct a surprise interview of Amb. Olson on July 17, 2019.  From that day, O'Brien became the intellectual author of the investigation and eventual plea agreement of Amb.  Olson.  In fact, O'Brien – although he has not entered his appearance in this matter – was the sole source of information the government provided to the PSR Writer, Probation Officer Hana Field.

The Court is already familiar with some of the following events, described in more detail in Amb. Olson's "Reply to Government's Opposition to Motion to Continue Plea" [ECF No. 13] filed on May 27, 2022.  We incorporate that information for consideration at sentencing.  The plea agreement signed by Amb. Olson on January 14, 2022, required that his plea take place in either the Eastern District of Virginia or the District of Columbia.  After the plea agreement was signed, O'Brien, and Attorney Turgeon were unable to comply with that provision of the agreement, not having obtained the concurrence of either U.S. Attorney from those Districts.  Five weeks passed after the execution of the plea agreement.  On February 28, 2022, Mr. Turgeon said that "a technical glitch in the plea agreement" might result in Amb. Olson being

charged with a felony, a violation of the plea agreement and one of many threats of indictment after the plea agreement was executed.  Mr. Turgeon asked that Amb. Olson agree to an "addendum" to the plea agreement.  The proposed addendum would provide that the plea would take place in the Central District of California "in the event that neither the United States Attorney for the Eastern District of Virginia nor the United States Attorney for the District of Columbia agreed to accept the filing of the plea agreement in their respective district courts."  Mr. Turgeon later threatened that Amb. Olson might be indicted in either the EDVA or DDC if he failed to agree to the addendum.  The email accused Amb. Olson's counsel of "gamesmanship".

Amb. Olson and his counsel did not consent to the addendum, as entering his plea in either the EDVA or this district was material to the agreement, based on their experience over the previous 18-months attempting to cooperate with and negotiating with AUSA O'Brien.  The government without the agreement of Amb. Olson then filed the Information on the public record in the Central District for California on March 22, 2022.  Amb. Olson was alerted to the filing of the information by the press, which promptly published the first significant stories drawing public scrutiny to Amb. Olson as well as General John Allen.  As a result of the conduct of the government attorneys, to effectuate the terms of the plea agreement, Amb. Olson had no choice but to execute the Rule 20 Transfer Request, filed in this Court on April 7, 2022.

As we discussed in more detail in our "Response", O'Brien on June 7, 2022, also negligently or intentionally caused the release to the press of a sealed search warrant affidavit he had early filed in the District Court in Los Angeles.

Paragraphs 17-54 contained in both the Draft PSR and the Final PSR were written by O'Brien and not expressly attributed to him by the PSR Writer.  In addition, in her Addendum to

41

the Final PSR, the Writer does not accurately recount the objections presented to her in writing

by Amb. Olson's counsel.  Consequently, we attach as Exhibit MM to this Memorandum the

actual objections provided to her.  In particular, Amb. Olson objected to the PSR Writer adopting

Paragraphs 17-54 *in toto* from O'Brien's written contribution because such an inclusion

represents an endorsement of those paragraphs as "facts" to which we have lodged objections.

Instead, Amb. Olson urged the PSR Writer to include the facts from the Information filed

in this case, the only facts to which Amb. Olson has agreed.  Those facts are set forth in "Amb.

Olson's Objections to the Presentence Report," Ex. MM at 7-9 and in the Information at ¶ 7-30

[ECF No. 1, Doc. 1-1 at 3-9].

### B.  The Government Must Prove its Contested Facts by a Preponderance of the Evidence

In her response to Amb. Olson's objections to inclusion of the government's Paragraphs

17-54, at page 45 the PSR Writer's response, in part, was the following:

> [T]he standard of proof is by a preponderance of the evidence – this conduct [¶¶ 17-54]
> need not be formally charged nor admitted to by the defendant.  Pursuant to USSG
> §1B1.4, the Court is not precluded from considering information that the guidelines do
> not take into account in determining a sentence within the guideline range or from
> considering that information in determining whether and to what extent to depart from
> the guidelines.  In addition, pursuant to 18 USC § 3661, the Court may consider, without
> limitation, any information concerning the background, character and conduct of the
> defendant, unless prohibited by law when determining the sentence to be imposed.

While this statement is not particularly objectionable, the PSR Writer fails to note that the

government must prove ¶¶ 17-54 by a preponderance of evidence at a sentencing hearing.

Moreover, the Court must make factual findings on disputed facts to support an increased

offense level.  *United States v. Leyva*, 916 F.3d 14, 24 (D.C. Cir.), *cert. denied*, 140 S. Ct. 413

(2019); *United States v. Carter*, 489 F.3d 528, 537-38 (2d Cir. 2007); *United States v. Seefried*,

2022 WL 16528415, *11 (D.D.C. 2022) (McFadden, J.).

**C.  The PSR Writer Erroneously Relied on Conduct Alleged by the Government in ¶¶ 17-54 That is not Relevant Conduct.**

The Final PSR correctly notes in ¶ 62 that the two Counts of the Plea are not grouped pursuant to USSG § 3D1.2 (the PSR contains a typographical error, referring to §2D1.2). Because the counts are not grouped, any "relevant conduct" considered by the Court must fall under §1B1.3(a)(1)(A) to be considered in the sentencing calculation.  Relevant conduct must be "acts and omissions committed . . . by the defendant that occurred during the commission of **the offense of conviction,** preparation for **that offense,** or in the course of attempting to avoid detection or responsibility for **that offense**."  §1B1.3(a)(1)(A) (emphasis supplied).  *See also United States v. Flores*, 149 F.3d 1272, 1281 (10th Cir. 1998).  The PSR Writer erroneously relied throughout the PSR upon conduct alleged by the government in Paragraphs 17-54 that did not occur during the commission of the offenses of conviction, preparation for those offenses, or in the course of attempting to avoid detection or responsibility for those offenses.

For example, the PSR Writer imposes a 2-point increase in the guideline score for Count 1 for Obstruction of Justice.  *See* Final PSR at ¶ 67.  Count 1 is the misdemeanor offense of Making a False Writing in violation of 18 USC § 1018.  That offense involved Amb. Olson's 2016 filing of his financial disclosure form with the Department of State on May 12, 2016.  This mandatory ethics filing required Amb. Olson to report any "gifts" he received during the prior calendar year.  As the Plea Agreement provides at Page 7, Amb. Olson admits that he failed to disclose on his OGE Form 278 the travel benefits he received during his final year of service with the Department of State to interview for a post-retirement position sponsored by Esam Al Janahi with his company ADIH.  *See* 2022.01.14 Plea Agreement attached as Ex. KK).  As we discuss in detail below at 21, none of the conduct alleged by AUSA O'Brien in ¶¶ 17-54 of the

Final PSR occurred during Amb. Olson's submission of the OGE Form 278, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

Similarly for Count 2 the PSR Writer adds a total of 21 points over the base offense level of 6 based on the conduct alleged by AUSA O'Brien in ¶¶ 17-54 of the Final PSR. Count 2 is the misdemeanor offense of Aiding and Assisting a Foreign Government during the one-year "Cooling Off Period" that follows service with the Department of States in violation of 18 USC § 207(f)(1)(B). As the Plea Agreement states, during his Cooling Off Period Amb. Olson helped draft a proposal that was sent to the Qatar government that explained how a U.S.-funded preclearance facility could be achieved for the Doha International Airport. Once again, as we discuss in detail below at page 45, none of the conduct alleged by AUSA O'Brien in ¶¶ 17-54 of the Final PSR was relevant to Count 2. Nor did it occur during Amb. Olson's violation of his Cooling Off Period, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

### D. The Final PSR Erroneously Includes a 2-Point Enhancement for Obstruction of Justice

The only objection by Amb. Olson to the calculation of the offense level for Count 1 is the inclusion of a 2-point enhancement for Obstruction of Justice in ¶ 67. In response to Amb. Olson's objection to this enhancement, the PSR Writer lumps in her response to the same objection to the 2-point enhancement she included for Count 2 in ¶ 75. The response is as follows:

> [D]efendant Olson concealed information related to the benefits he received from Zuberi and concealed information related to the nature of his relationship with Zuberi while serving as US Ambassador and Special Representative. He was interviewed by the FBI and made false statements that Janahi paid for the defendant's travel to London in 2015, that he did not receive a specific job offer from Janahi's company, and that he had "no idea" how Zuberi helped finance Ms. Habib's college tuition. Furthermore, the defendant falsely stated he had no knowledge of Zuberi's business interest in military sales and that

44

the talking points provided by defendant Olson to Zuberi were public record, when in fact they had not been cleared for public distribution. *Probation maintains the position the above conduct was obstructive.*

Final PSR Report at Page 46-47 (Emphasis supplied).

As we noted in Section C above, the PSR Writer erroneously relied upon conduct alleged by the government specifically in ¶¶ 51-54 in the Final PSR that did not occur when Amb. Olson filed his OGE Form 278 in March of 2016, did not occur in Amb. Olson's preparation for the filing of a the false OGE Form 278, or in the course of attempting to avoid detection or responsibility for that filing. In ¶¶ 51-53 AUSA O'Brien predicates his allegations of false statements and concealment on the first FBI interview on July 19, 2019. Paragraph 54 is predicated on the second FBI interview on December 17, 2019. Neither of these interviews was under oath, and both interviews were uncounseled. Notably, the PSR Writer was not provided with the FBI 302s or the tape recordings of those interviews.

Under  USSG §3C1.1, the obstruction of justice enhancement applies only where: (1) "the defendant **willfully** obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing **of the instant offense of conviction**, and (2) the obstructive conduct related to (A) the defendant's **offense of conviction and any relevant conduct**; or (B) a **closely related offense**." (Emphasis supplied).  This is a very high standard that is not met by Mr. O'Brien's reliance on the two FBI interviews.

Application Note 4 to USSG §3C1.1 supplies "Examples of Covered Conduct", including (G) "providing a **materially false** statement to a law enforcement officer that **significantly** obstructed or impeded the official investigation or prosecution of the instant offense." Application Note 5 gives "Examples of Conduct Ordinarily Not Covered", which includes (B)

"making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies."  Application Note 6 defines "material" as any information "that, if believed, would tend **to influence or affect the issue under determination**."  (Emphasis supplied).

The information allegedly "concealed" by Amb. Olson in the interviews, according to O'Brien, was: 1) "information related to benefits he received from Zuberi": specifically, the job interview trip to London, and the job offer that followed from ADIH; and Amb. Olson's lack of knowledge as to how Zuberi paid the partial tuition of Muna Habib (¶ 51); 2) Amb. Olson's alleged knowledge of Zuberi's interests in military sales; an alleged business relationship between Olson and Zuberi; and, Amb. Olson allegedly claiming that he would share the "talking points" with Zuberi and anyone else (when the "talking points" were not cleared for public distribution) (¶ 52); and, 3) information regarding his retirement and a business relationship with Zuberi, including Zuberi's actual business operations in connection with Qatar (¶ 53), and, that Amb. Olson was "uncertain" in the December FBI interview who paid for his travel to London for the post-employment position with ADIH (¶ 54).

The government has the burden of proving an obstruction of justice by a preponderance of the evidence.  *United States v. Rodriguez*, 336 F.3d 67, 71 (1st Cir. 2003); *United States v. Wilson*, 884 F.2d 1355 (11th Cir.1989); *United States v. Ring*, 811 F. Supp. 2d 359 (D.D.C. 2011).   The allegations contained in ¶¶ 51 and 52 are not related to the offenses of conviction or any relevant conduct, as was the case in *United States v. Ring*.  As for ¶ 52, the "concealed" information was not material to the offense of making a false statement on the OGE Form 278.  There is no evidence that any of the "concealed" information significantly affected the investigation.  *See e.g.*, *United States v. Shriver*, 967 F.2d 572, 575 (11th Cir. 1992) (no evidence showing defendant's false statement, not under oath, to IRS agent about "voided" Notice of

Federal Tax Lien significantly obstructed or impeded the official investigation because the agent was already aware that defendant was the one who altered the Notice).[11]

The Fifth Circuit has held that to establish that a defendant's conduct resulted in an actual hindrance, "the government must present evidence of what action it took that it would not have taken had [defendant]'s identity been known" when he gave false information.  *United States v. Surasky*, 976 F.2d 242, 245-246 (5th Cir. 1992) *citing United States v. Banks*, 347 F.3d 1266, 1271 (11th Cir. 2003).  Proof of the offense "requires a causal relationship between the materially false statement given and a resulting impediment upon the instant investigation or prosecution."  *See also United States v. Selvie*, 684 F.3d 679, 684 (7th Cir. 2012) (materially false information provided to law enforcement must actually obstruct or impede the official investigation to merit an obstruction enhancement.  "Without more, false statements to law enforcement authorities, if not made under oath, do not actually impact the investigation or prosecution."); *United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002) (government must prove "a detrimental effect upon [its] efforts to investigate or prosecute the instant offense.").

To show that Amb. Olson committed obstruction, the government must show how his "concealed" information resulted in an "impediment upon the instant investigation or prosecution" or that the "concealed" information had "a detrimental effect" on its investigation. During the course of the plea negotiations in early 2022, O'Brien posed these same assertions to us, and we answered him in writing **explaining** why these are not false or obstructive statements.

_____

[11]     *See also United States v. Manning*, 955 F.2d 770 (1st Cir. 1992) (obstruction enhancement was inappropriate because defendant's use of false identity in response to arresting officer's inquiries did not cause "significant hinderance to the investigation"); *United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991) ("section 3C1.1 specifically permits lies to investigating agents if they do not significantly impede the investigation"); *United States v. Urbanek*, 930 F.2d 1512 (10th Cir. 1991) (false statements denying guilt made to IRS Agent did not support obstruction enhancement).

(*See* 2022.01.11 Letter to O'Brien and Turgeon, Ex. TT).  In this light, Mr. O'Brien's interactions with the PSR Writer are a mark of bad faith.

### E.  The PSR Writer's Proposed Enhancements to Count 2 are Wrong

For Count 2, no doubt influenced by the information provided by AUSA O'Brien, the PSR Writer maintains over our objections that the base offense level for violation of the Cooling Off Period is 11 (¶ 69); the base offense level should be increased by 2 points because the offense involved "more than one gratuity" (¶ 70); the base offense level is increased another 12 points because the "value of the gratuity" is $325,400 (¶ 71); and, another 4 points must be added because Amb. Olson was a "public official in a high-level decision-making or sensitive position" (¶ 72).

The PSR Writer's response at page 48 of the Final PSR is unhelpful:

A response to the objection regarding gratuities has been previously addressed. Therefore, the report remains unchanged.  Defense again states the plea agreement did not "allow the Government to rely upon cross references contained in the sentencing guidelines."  As previously stated, the Probation Office is not limited to the plea agreement in application of the guidelines.

Presumably, the reference to the previous comment regarding gratuities is a reference to the PSR Writer's Response to our objection to ¶ 62 at Page 45 of the Final PSR:

Probation maintains the position the defendant's conduct regarding the gratuities is relevant conduct.  **The Government has previously advised Probation that the defendant and Zuberi were involved in doing favors for each other, continuously over the span of a few years (to include while the defendant was serving as Ambassador).**[12]  After the defendant provided Zuberi with talking points in April 2015, the "pay off" was the college tuition for Ms. Habib.  The Government previously advised Probation that defendant Olson was not charged with gratuity or bribe offenses; however,

---

[12]        After receipt of Amb. Olson's Counter Proffer letter of March 22, 2021, in its plea offer letter of October 25, 2021, the government stated, "Based on our review of the evidence to date, we do not plan to file conflict-of-interest charges at this time."  (*See* 2021.10.25 Letter to O'Brien and Turgeon, Ex. UU).  The assertion by AUSA O'Brien to the PSR Writer that Amb. Olson and Zuberi were doing favors for each other during Amb. Olson's service as Ambassador conflicts with this acknowledgment.

it is **the Government's position that this conduct should be considered towards sentencing in accordance with 18 USC §3553(a) factors**.

USSG §1B1.3 requires the sentence to be calculated on the basis of not only the counts of conviction, but all relevant conduct underlying the counts of conviction.  Probation maintains because the conduct surrounding the gratuities was part of the same course of conduct as the offenses of conviction, the conduct is relevant.  **Further, in preparation of the presentence report and conducting the analysis, the US Probation Office contacted the US Sentencing Commission.  The guidelines calculation in the presentence report was calculated based on their response.**

Upon reviewing the Final PSR, counsel for Amb. Olson promptly wrote a letter to the Chief Probation Officer, the Supervisory Probation Officer and the PSR Writer.  The letter requested details about the information provided by the U.S. Sentencing Commission upon which this decision was predicated.  The Supervisory Probation Officer refused our request.

### 1.   The Base Offense Level for Count 2 Should be 6

The PSR Writer's use of the "cross-reference" contained in §2C1.3(c)(1) to include the alleged gratuities is improper for three reasons: 1) the items the PSR is calling "gratuities" are not relevant conduct to the offense of conviction; 2) even if they somehow *could* be considered relevant conduct, they do not fall within the statutory definition of a "gratuity"; and, 3) the Plea Agreement did not allow the government to rely upon the "cross reference" contained in the sentencing guidelines.

The offense in Count 2 is providing "aid and advice to the government of Qatar" within the one-year Cooling Off Period.  The PSR includes conduct that occurred during Amb. Olson's government service **not** during the Cooling Off Period: the $300,000 job offer to Amb. Olson from Mr. Janahi on behalf of ADIH (that was not accepted), the $25,000 paid to Columbia University, and the alleged value of the limousine ride of $400.  Thus, none of the items the PSR calls "gratuities" fall under the definition of relevant conduct.  Amb. Olson never accepted or received the $300,000 position with ADIH and the proposed position had no relevance to the

offense of conviction; *i.e.*, "aid and advice to the government of Qatar" within the one-year period." The same is true regarding the money paid to Columbia University and the $400 paid for the limousine ride.

Neither the Statement of the Offenses nor the Final PSR address the central issue of whether any of this is even "relevant conduct" with respect to the Cooling Off Period offense as required by § 1B1.3(a)(1)(A). Instead, the PSR bypasses this step and goes straight to an assumption that these are "gratuities" without explaining the basis for considering them as gratuities. This is improper, and the Court should find that the cross-reference should not be used.

Even assuming the three activities *are* relevant conduct, they still were not gratuities and applying the cross-reference is improper.

All three instances that the Final PSR counts as gratuities involve Zuberi, Janahi, and ADIH. If these are to be considered "gratuities" then Amb. Olson had to accept them "for or because of any official act" he had performed or was to perform. His alleged actions after February 16, 2015 (when he received the terms of the job offer from ADIH) were: 1) agree to meet with members of Congress regarding the sale of military hardware to Pakistan (PSR at ¶ 23); 2) provide Zuberi with "talking points" on selling arms to Pakistan (PSR at ¶ 24); and 3) accept the use of a limo service while presenting a State Department approved speech (PSR at ¶ 33). The remainder of his actions set out in the Final PSR revolve around the pre-clearance facility at Doha and conduct charged in Count 2.

As we demonstrate above, none of these items can be interpreted as gratuities.

### 2. Amb. Olson Was Not a "Public Official in a High-Level Decision-Making or Sensitive Position"

There should be no 4-point enhancement for being a public official in a high-level

decision-making or sensitive position for one reason: at the time that Amb. Olson violated the Cooling Off Period – Count 2 – he was no longer an ambassador or employed by the Department of State.  This assertion demonstrates a serious lack of appreciation for the duty to determine an appropriate sentence under the Sentencing Guidelines.

### III.    FACTORS THAT MAY WARRANT DEPARTURE

In Part E. of the PSR, the Writer identifies factors from Parts H. and K. of Chapter Five of the Sentencing Guidelines that may warrant departures.  (PSR at pages 38-40).  All of the information recounted in this section comes from Mr. O'Brien.  Notably, the PSR Writer states, "[P]resentation of the information does not necessarily reflect a recommendation by the Probation Office."  (PSR at ¶ 183).

Preliminary to recounting the information provided by the government, the PSR Writer states the following in ¶ 184:

> Pursuant to USSG §5K2.21 (Dismissed and Uncharged Conduct), the Court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guidelines range.  *Specifically, should the Court rule that the Probation Office's enhancements for obstruction of justice and the gratuities received are not applicable in this case, the Court may consider these as aggravating factors as provided to Probation by the Government.*

(Emphasis supplied).  We are not aware whether this assertion in italics was provided by Mr. O'Brien or was an observation by the PSR Writer.

None of the assertions of Mr. O'Brien warrant an upward departure.  At ¶ 185, Mr. O'Brien reported to the PSR Writer that Amb. Olson deleted email from his own computer regarding General Allen.  Mr. O'Brien fails to report to the PSR Writer that Amb. Olson voluntarily disclosed this information during his protected debriefing sessions with the government.  Nor was any such claim part of the constellation of charges Mr. O'Brien outlined

in order to obtain the cooperation of Amb. Olson.  Amb. Olson's voluntary disclosure of this information cannot be used against him for sentencing purposes.  In a letter of June 23, 2022, counsel for Amb. Olson warned government counsel to abide by this obligation, noting that "Section 1.B.1.8 of the Sentencing Guidelines provides that statements made by Amb. Olson pursuant to his cooperation agreement with the government may not be used in sentencing." (2022.06.23 Letter to O'Brien and Turgeon, Ex. ZZ).  In any event, the government admitted it had obtained the emails from other sources.

At ¶ 185, Mr. O'Brien reports that Amb. Olson made other false statements outside the admission in Count 1 that his OGE form 278 of May 12, 2016, failed to report the travel expenses for his interview with Mr. Janahi of ADIH.  Mr. O'Brien adds that Amb. Olson made a "false certification on his OGE Form 278 on December 1, 2016 when the defendant concealed Mr. Zuberi's gift of limousine rides worth at least $400 in connection with a speaking engagement in Los Angeles."  The facts we have discussed as to Amb. Olson's acceptance of a limousine ride from Zuberi while in Los Angeles on State Department business do not justify calling this alleged "omission" a false certification under any legal analysis.

At ¶ 187 the PSR Writer reports Mr. O'Brien's ever more salacious description of Zuberi's payment of Ms. Habib's tuition: "the defendant solicited the gratuity of $25,000 that was paid to the defendant's wife—Muna Habib (previously his "mistress") by Mr. Zuberi as a reward for the defendant lobbying members of Congress on behalf of Mr. Zuberi with respect to arm sales."  Based on the information provided to Mr. O'Brien by Amb. Olson's counsel – including DOJ's explicit direction in the *Justice Manual* that a gratuity offense can neither be

charged nor publicly asserted on these facts – this conduct by Mr. O'Brien at the sentencing

phase is bad faith and worse.[13]

## IV.   THE PLEA AGREEMENT AND CONDUCT OF AUSA O'BRIEN REQUIRE IMPOSITION OF A NON-CUSTODIAL SENTENCE

As we noted above, on January 31, 2023, the *New York Times*, the *Wall Street Journal*

and other news outlets reported that counsel for General Allen were told by the government that

no criminal charges would be pursued against General Allen.  DOJ did not issue an

announcement of its own to our knowledge.  In addition, this report by DOJ to General Allen's

attorneys comes almost seven months after the 68-page affidavit in support of search warrants

obtained by AUSA O'Brien was leaked to the press.  The resulting international stories ended

General Allen's career as President of the Brookings Institution and likely any further public

service to his country.  Amb. Olson suffered equally from the publication of the secret grand jury

information contained in the affidavit.

---

[13]      At ¶ 188, the PSR Writer, pursuant to 18 USC § 3553(a), states "the Probation Office has identified the following factors that would warrant a variance from the applicable guideline range."  The Writer in ¶ 189 then reports a long story provided by O'Brien about a 2014 Department of State OIG investigation into a gift of jewelry to Amb. Olson's former mother-in-law.  Once again, Mr. O'Brien in his elegant prose states elliptically: "The evidence did not support a finding that defendant Olson accepted or retained the gift; accordingly, he was not listed as a subject of the report."  What Mr. O'Brien does not disclose is that the investigation involved Amb. Olson's former wife, Deborah Jones, herself then a United States Ambassador.  Amb. Jones was cleared of any misconduct.  There was no need to list Amb. Olson as a subject of that investigation.

Mr. O'Brien also fails to disclose – now clearly *Brady* information – that the Department of State did propose discipline of Amb. Olson in a separate investigation for "receipt" of the same jewelry.  Under Department regulations, receipt of a gift by a foreign service officer's dependent can be imputed to the officer.  The notoriously over-aggressive OIG investigators believed that Amb. Olson's mother-in-law was a dependent.  After receiving an opinion letter from a tax attorney that she was not a dependent, the Deciding Official exonerated Amb. Olson. (2016.05.16 Decision of Amb. Williamson, Ex. VV).  This information should be known to Mr. O'Brien, and his intentional misrepresentation to the PSR Writer is an emblem of his bad faith.

Amb. Olson should be given credit by the Court at sentencing for his willingness to cooperate in the investigation of General Allen, notwithstanding the fact that Amb. Olson believed both he and General Allen had done nothing wrong.  Now the government, *sub silentio*, have acknowledged they had no case to prosecute General Allen under FARA.  Recall that on December 16, 2021, Mr. O'Brien offered Amb. Olson a plea with a cooperation agreement and prospect of a § 5K.1.1 departure motion.  In only twenty-one days, O'Brien changes his mind. O'Brien claimed the change was due to his concerns about Amb. Olson's credibility, which apparently only arose in the course of those twenty-one days.

Mr. O'Brien's change is clearly pre-textual.  Such an inference is fair, regardless of whether the government had concluded in December of 2021 not to prosecute General Allen, or the government simply wanted to punish Amb. Olson for pursuing a misdemeanor plea.  If the former is the reason, it is a disgrace not to announce their decision not to prosecute General Allen at that time, rather than over a year later.  If the latter is the reason, then pursuing the charade of having Amb. Olson defend his alleged false statements to FBI Agents is bad faith. The government should be required by the Court to advise both the Court and Amb. Olson when it decided not to prosecute General Allen, and why.

The Post-*Booker* law makes clear that Amb. Olson's cooperation reflects a reduced likelihood of recidivism and good character; therefore, a below-guideline sentence is warranted under 18 U.S.C. § 3553(a)(2)(C), even if government does not file a § 5K.1.1 motion.  *See United States v. Fernandez*, 443 F.2d 19 (2nd Cir. 2006) ("We agree that in formulating a reasonable sentence a sentencing judge must consider 'the history and characteristics of the defendant' ... and should take under advisement... the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure");

*United States v. Murray*, 2005 WL 1200185 (S.D.N.Y. May 20, 2005) (unpub.) (fact that

defendant testified as witness for the government at time when he had nothing to gain "provides

support for his genuine contrition").

Moreover, determination of the terms of a plea agreement are a matter of contract law

which can override in some respects the sentencing guidelines.

> As the Supreme Court stated in *Wade*, district courts have the authority to grant
> relief "if they find that the refusal was based on an unconstitutional motive," or "if the
> prosecutor's refusal to move was not rationally related to any legitimate Government
> end." *Wade* [*v. United States*], 504 U.S. 181, 185–86 (1992). A court may also grant
> relief if the defendant's cooperation was provided pursuant to a plea agreement, and the
> government's refusal to file is attributable to bad faith or other breach of the agreement.

*In re Sealed Case No. 97-3112*, 181 F.3d 128, 143 (D.C. Cir. 1999) (citing cases). *See also*

*United States v. Hubbard*, 369 F.Supp.2d 146, 150 (D. Mass. 2005) (suggesting court can correct

for government's bad faith not making motion under 3553(a)(2)(C); *United States v. Khowy*, 62

F.3d 1138 (9th Cir. 1995) (court may depart downward where government refuses to make

§ 5K1.1 motion because defendant went to trial although government initially offered to do so

and where defendant's cooperation led to arrest of co-defendant); *United States v. Treleaven*, 35

F.2d 458 (9th Cir. 1994); *United States v. Paramo*, 998 F.2d 1212 (3d Cir. 1993) (remanded to

show whether government's refusal to make § 5KI.l motion for only coconspirator who went to

trial was pretextual).

An example of this process is provided in the sentencing of Juan Carlos Schwartzman by

the Honorable Reggie B. Walton on April 19, 2013. (*United States v. Juan Carlos Schwartzman*,

0090 1:11CR00166-001 (D.D.C. 2013). In that case, the plea agreement included the possibility

of a § 5KI.l downward departure, but the government refused to file a motion. The Probation

Office guideline score was 26, resulting in a sentence of incarceration from 63-78 months. Upon

consideration of Mr. Schwartzman's motion for a downward departure, Judge Walton sentenced

Mr. Schwartzman to 30-months.  In departing from the guideline sentence, Judge Walton noted

that Mr. Schwartzman did provide assistance to the government and other factors which

supported a downward sentence.  (Judgment at Ex. WW).

When O'Brien proposed the December 16, 2021, plea agreement that included a felony,

he represented that the agreement would enable Amb. Olson to achieve a non-custodial sentence,

because the felony count had a base offense level of 6, the same as the misdemeanor Count 1 in

the current plea agreement.  (2021.12.28 Hannon to O'Brien, Ex. XX).  Later, in discussing the

misdemeanor plea, Hannon questioned AUSA O'Brien as to why there might be an enhancement

for obstruction of justice under the misdemeanor Count 1, reporting that the case law required

"fairly egregious conduct focused directly on the offense."  O'Brien responded:

> I don't have a specific concern as to the obstruction enhancement other than the *general possibility that the probation office or court might view false statement to the FBI as an obstruction of the broader investigation*, notwithstanding Olson's admission as to the Form 278.  If you have any case law or argument that would allow us to stipulate that the obstruction should not apply, that would be helpful.

(2022.01.06 Email Exchange Among Counsel, Ex. YY).  At that time, Amb. Olson was

presented with the express opportunity that by the time of his sentencing under the plea

agreement, he might yet earn a § 5K.1.1 motion from the government in the prosecution of

General Allen.

After the plea agreement was executed, the government then failed to implement its

promise that the plea take place in this district or the EDVA.  O'Brien then subjected Amb.

Olson to the variety of threats we have recounted – including the threat of indictment on all

counts – in an effort to have Amb. Olson remedy O'Brien's own inability to effectuate the plea

agreement.  O'Brien then unilaterally filed the information on the public record in California,

spawning the first round of adverse publicity.  He later threatened indictment once again if Amb.

Olson did not agree to a prompt plea hearing in this court, contemporaneous with the release of

the 68-page search warrant application from the federal court in California.

      The plea agreement includes a provision that the parties calculate the offense level at 8

before application of a downward departure for acceptance of responsibility.  The plea agreement

also includes a limited waiver of appeal of this Court's sentence of Amb. Olson.  The plea

agreement, corresponding with the parties' agreed calculation of the offense level of 8, provides

for appeal of the sentence by Amb. Olson as follows:

> Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction *within or below the range corresponding to an offense level of 8 and the criminal history category calculated by the Court*, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; . . .

(Plea Agreement at ¶ 20, Ex. NN).

      The conduct of Mr. O'Brien in improperly influencing the PSR Writer to increase the

offense level almost four-fold to that agreed upon is a violation of the plea agreement.  If

government counsel who have actually entered their appearance in this case endorse Mr.

O'Brien's conduct – of which they were oblivious – they too are acting in contravention of the

plea agreement.  We have never encountered a case where counsel of record have abrogated their

responsibility to the Court – of which the Probation Office is a part – to another Assistant U.S.

Attorney from another district.  We have repeatedly asked Messrs. Allen and Turgeon whether

they endorse O'Brien's presentation to the PSR Writer and her calculation of the guidelines.

They avoided answering, no doubt because they were unaware of what Mr. O'Brien had done.

We have not heard from them since that exchange; consequently, we must assume they endorse

the PSR Writer's erroneous conclusions.  In doing so, they also endorse all that Mr. O'Brien has

done.

## V.     APPLICATION OF THE SENTENCING FACTORS SHOULD RESULT ON A NON-CUSTODIAL SENTENCE

Title 18 U.S.C. § 3553(a) requires the Court to consider a number of "factors" in imposing sentence.  The over-arching factor in this case is the character and public service of Amb. Olson.

Amb. Olson had served as a dedicated public servant for 34 years.  His commitment to serving the United States has been substantial and unwavering.  Amb. Olson's interest in working as a diplomat began at an early age.  He was raised as an expatriate child.  His father's business took his family to Venezuela and France, so from an early age he was familiar with embassies and the diplomatic community.  When he was eleven, he joined the American Boy Scout Troop at the United States Embassy in Paris.  This experience planted the idea of working overseas for his country.  Amb. Olson graduated from Brown University in 1981, receiving an A.B. in law and society (Honors) and history.  His interest in history lent itself to the idea of becoming a participant in shaping history by advancing United States interests overseas.  He took the foreign service exam at the age of 21 and subsequently joined the United States Department of State one year later, in 1982.

Amb. Olson considers himself fortunate to have had a career that was both fascinating and rewarding while also having the honor to represent the United States across the globe from Africa to the Middle East to South Asia.  During his early diplomatic career with the State Department, Amb. Olson served in a variety of different posts including posts in Mexico, Uganda, Tunisia, Saudi Arabia, Ethiopia, the United Arab Emirates, and in Najaf Iraq.  Amb. Olson was also Deputy Chief of Mission at the United States Mission to the North Atlantic Treaty Organization ("NATO").  Amb. Olson had multiple Washington assignments including:

State Department Operations Center, NATO Desk, the Office of Israel and Palestinian Affairs, and the Office of Iraqi Affairs.

His career and service to this country has been nothing but honorable and should be taken into consideration when assessing his credibility and character.  To highlight some of his recent posts, Amb. Olson served as the U.S. Ambassador to the United Arab Emirates from 2008 to 2011, and then from 2011 to 2012 as the Coordinating Director for Development and Economic Affairs at the U.S. Embassy in Kabul, Afghanistan, at the height of the US "diplomatic surge". Amb. Olson served as the U.S. Ambassador to Pakistan from 2012 to 2015, running what was at the time one of largest diplomatic missions.  He concluded his service as the U.S. Special Representative for Afghanistan and Pakistan ("SRAP") at the personal request of then-State Department Secretary John Kerry.  Amb. Olson retired from the United States Foreign Service in November 2016 with the distinguished rank of Career Minister.

In the final decade of his career, Amb. Olson was the diplomatic point for the war on terrorism in the Middle East.  He served in four war zones, was shot at twice (including an ambush in Iraq on March 5, 2004) and has been at USG facilities under attack at least a half-dozen times.  Amb. Olson's extensive career has not gone unrecognized.  His hard work, dedication, and steadfastness have been acknowledged through his many awards including the Secretary of State's Distinguished Service Award in 2016, the Afghan Medal of Wazir Akbar Khan in 2016, and the Presidential Distinguished Service Award in 2011, to name a few.  Amb. Olson has received accolades from high-ranking government officials in recognition of his service to the United States.  General Norman Schwarzkopf wrote to Amb. Charles F. Freeman recognizing Amb. Olson's successful efforts pertaining "to the effective and thorough coordination he conducted" "throughout a period which could have been very traumatic for U.S.-

Saudi relations."  Secretary of State Hillary Clinton, thanking him for his service, noted that since he arrived in Islamabad, he "was extremely effective in navigating the diverse set of issues, high-level relationships, and increased publicity on our assistance, all while operating in a tough security environment."

These recognitions are only a snapshot of the praise Amb. Olson has received for his prestigious and successful service on behalf of the United States of America.  For additional documentation highlighting his consistently superior dedication, hard work, and resoluteness throughout extremely challenging and difficult postings, please refer to the 10 years of employee evaluations that have been provided separately to the Court.

At the time the FBI first contacted Amb. Olson, he was a successful independent consultant while maintaining affiliations and employment with the Center for Strategic and International Studies ("CSIS"), the United States Institute of Peace ("USIP"), as well as informal relationships with many in the diplomatic community.  Amb. Olson moderated panels, engaged in press work, and conducted "Track 2" dialogues on behalf of USIP with retired officials from various departments and governments around the world to discuss foreign policies and relations. He was a senior advisor to the influential Afghanistan Study Group, a congressionally-mandated panel for policy luminaries, who provided a report for the incoming Biden Administration.

Because of leaks to the media occurring in the government's investigation, Amb. Olson has lost all of this.  He now lives in complete retirement with his wife Muna Habib in New Mexico.  When Amb. Olson learned that the government intended to file the charges in a public filing in the District Court for the Central District of California, Amb. Olson anticipated negative press coverage, particularly in light of previous leaks to the press reportedly emanating from DOJ.  Amb. Olson formally notified his clients/employers and close associates of this

development.  Specifically, he notified his principal client, Excelerate Energy LLP, his principal

employer, and USIP and CSIS.  All three institutions decided that it would be best to terminate

their relationship with him, as did the Brookings Institution with General Allen.  Amb. Olson has

not worked since then, meaning that his current income is solely derived from his US

Government pension.  In addition, he has dissolved his LLC consulting firm, which he had been

rebuilding after the pandemic.  Also, formerly close associates have chosen not to engage with

him or include him in professional associations, leading to a greater sense of isolation and mental

distress.

A sentence of incarceration would serve no purpose and would be inconsistent with the

agreement between Amb. Olson and the government.  Accordingly, we respectfully request the

Court impose a probationary sentence.

Dated: February 6, 2023                         Respectfully submitted,

HANNON LAW GROUP, LLP

_s/J. Michael Hannon_____
J. Michael Hannon, #352526
333 8th Street, NE
Washington, DC 20002
Tel: (202) 232-1907
Fax: (202) 232-3704
jhannon@hannonlawgroup.com

CLARK HILL, PLC

_s/Russell D. Duncan_____
Russell D. Duncan
1001 Pennsylvania Ave. Suite 1300 South
Washington, DC 20004
(202) 640-6637
rduncan@clarkhill.com

*Attorneys for Defendant Richard Gustave Olson, Jr.*