# EXHIBIT A

FD-302 (Rev. 5-8-10)

- 1 of 4 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry      08/06/2019

 

On 07/17/2019, RICHARD OLSON, date of birth (DOB) 11/03/1959, home address 1513 Cedar Avenue, McLean, Virgina 22101, mobile telephone number (202)848-5846, email address rickscafedxb@yahoo.com was interviewed at FBI Washington Field Office by Special Agents (SAs) Jeremy Greenfield and Joe Harvey. On 07/11/2019, SA Greenfield contacted OLSON by telephone to set up the interview. Further coordination for the interview was conducted by email using the address above.

**The below is an interview summary. It is not intended to be a verbatim account and does not memorialize all the statements made during the interview. Communications by the parties in the interview room were electronically recorded. The recordings captured the actual words spoken. The recordings were added to file as evidence items 1D1 and 1D2. After being advised of the identity of the interviewing Agents and the nature of the interview, OLSON provided the following information:**

OLSON was a retired Foreign Service officer with 34 years' experience. OLSON joined the Foreign Service in 1982 after working one year on Wall Street. OLSON held high-level positions near the end of his career, including US Ambassador to United Arab Emirates (UAE), US Ambassador to Pakistan, and Special Representative for Afghanistan and Pakistan (SRAP). OLSON retired from civil service in 2016 and worked part-time, under contract, at the United States Institute of Peace (USIP). After retiring, OLSON started an LLC which offers consulting for a variety of clients including AVENUE CONSULTING a/k/a AVENUE VENTURES.

IMAAD ZUBERI introduced himself to OLSON in 2013 after OLSON became US Ambassador to Pakistan. ZUBERI knew OLSON's Chief of Staff, who facilitated ZUBERI's introduction to OLSON. Once introduced, OLSON and ZUBERI discussed politics, but did not have a business relationship while OLSON worked for the United States Government (USG). OLSON said ZUBERI did a lot of business

---

Investigation on   07/17/2019   at  Washington, District Of Columbia, United States (In Person)

File #  339H-LA-3063880, 56F-LA-2088834                          Date drafted  07/18/2019

by   GREENFIELD JEREMY ALLEN, HARVEY JOSEPH HOLLAND

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

339H-LA-3063880

(U) Interview of Richard Olson on
Continuation of FD-302 of 07/17/2019 _____, On 07/17/2019 , Page 2 of 4

overseas in Malaysia, Pakistan, and China. OLSON appreciated ZUBERI's
insight into Pakistan and when they got together "it was an exchange" of
information. OLSON was aware of ZUBERI's family ties in Karachi and his
relationship to the president of Pakistan at the time, Zardari. ZUBERI's
cousin was a Minister of Petroleum at the time, but OLSON said he was now in
jail for corruption.

    While preparing to retire from the Foreign Service, OLSON considered
multiple employment options, including work for an investment bank in Dubai.
After agreeing to a position, the role with the Dubai firm ultimately fell
through. ZUBERI subsequently asked OLSON to work with him, and OLSON began
working for ZUBERI as an independent consultant.

    OLSON, began working as an independent consultant for ZUBERI's firm
AVENUE VENTURES immediately after his retirement from the Foreign Service in
2016, and continued since. OLSON advised ZUBERI "broadly" on foreign
governments/government relations and was paid via a monthly retainer.
OLSON's consulting services included liaising to USG for ZUBERI/AVENUE
VENTURES, which sometimes included passing information to the Department of
State (State) and the Central Intelligence Agency (CIA). OLSON did not know
details of how ZUBERI ran his businesses, but was aware of ZUBERI having
real estate in Dubai and business in Abu Dhabi. OLSON said he has completed
approximately one-half dozen international trips for ZUBERI since they began
working together.

    OLSON said ZUBERI was always very careful about sharing information
useful to the USG. OLSON introduced ZUBERI to the CIA station chief in Los
Angeles so ZUBERI could report on Pakistan and China. OLSON described ZUBERI
as a "character" and very "entrepreneurial" with a "high appetite for risk."
OLSON said ZUBERI was very generous and wanted to be on the right side of
the USG. ZUBERI was based in Los Angeles and OLSON has traveled there a
couple of times to see him.

    OLSON said he did not work with ZUBERI while employed by State/USG, but
they occasionally had dinner and talked by telephone. OLSON said ZUBERI
never paid him while employed by the USG because OLSON knew it would have
been illegal.

    When asked if ZUBERI ever offered anything like flights or hotels, OLSON

FD-302a (Rev. 5-8-10)

339H-LA-3063880

(U) Interview of Richard Olson on
Continuation of FD-302 of 07/17/2019 _____ , On 07/17/2019 , Page 3 of 4

said "no, [however] I'm hesitating because there was a banker who was also interested in hiring me in the summer of 2014, and he actually flew me to London." The banker's name was ISIAM JINAHI and OLSON met him through ZUBERI. OLSON said he probably should have reported the trip, but did not. OLSON said ZUBERI never paid for anything while he was employed by State/USG. Agents asked OLSON if the 2014 trip to London was the same as the January 2015 trip to London records showed was paid for by ZUBERI. OLSON said they were the same trip, but OLSON thought JINAHI had paid for it. OLSON was planning to retire in 2015 so was looking for post-government employment. After a discussion with then Secretary of State John Kerry, however, he decided to wait until 2016. OLSON considered working for JINAHI post-retirement, along with Raytheon, the Dubai firm, and others. OLSON noted he had to "recuse" himself from working with JINAHI and others while still employed by State/USG because of the potential post-service employment.

OLSON most recently met with ZUBERI and JINAHI in Abu Dhabi in April 2019. OLSON said he knew JINAHI and ZUBERI conducted business together, but he did not know any of the details.

OLSON did not recall ever giving ZUBERI "talking points" for any meetings. [Agent note: at this point in the interview, SA Greenfield handed OLSON a copy of an email from rickscafedxb@yahoo.com to imaad.zuberi@mindspring.com sent on 04/09/2015 with the subject "Points." The email contained general points about the US relationship with Pakistan and details of an upcoming helicopter deal for the AH-1Z Cobra.] OLSON reviewed the email and said, "okay, well, I guess I did this." OLSON said it was a statement of US policy and nothing was classified. OLSON was "sure" he had never sent classified information.

OLSON recalled informing ZUBERI about a frigate deal in which the US Navy was going to sell Pakistan frigates considered Excess Defense Articles (EDA). The deal needed Congressional approval, but never got it. ZUBERI had asked OLSON about the deal so OLSON gave ZUBERI his understanding. OLSON said he gave ZUBERI the USG perspective or "state of play" on a variety of things.

OLSON married MUNA HABIB on 06/01/2019. OLSON and HABIB had started dating in Pakistan around 2014 while OLSON was stationed there. OLSON and

FD-302a (Rev. 5-8-10)

339H-LA-3063880

Continuation of FD-302 of ___(U) Interview of Richard Olson on___ , On _07/17/2019_ , Page _4 of 4_
07/17/2019

HABIB ended the relationship after approximately a year when HABIB left
Pakistan to be with family in the wake of her father's death. HABIB later
returned to Pakistan and wanted to go to journalism graduate school at
Columbia, but she did not know how to pay for it. OLSON thought HABIB's life
story was interesting so OLSON talked to ZUBERI about financing it. At that
point, sometime in 2015, OLSON and HABIB were not dating. OLSON saw HABIB
"once or twice" before resuming the relationship in 2018. OLSON said he did
not know the details of how ZUBERI financed HABIB's tuition to Columbia.
OLSON said he could ask HABIB if she would be willing to take part in an
interview. HABIB had started working as a reporter for the Daily Times after
graduation. OLSON did not know if anyone else financed HABIB's tuition, but
he thought she got a partial scholarship from Columbia. OLSON could not
recall asking for ZUBERI's assistance to finance anyone else's education and
could not recall asking ZUBERI to assist another person in any other kind of
similar way, but he said he would need to think about it to be sure. OLSON
thought ZUBERI would be willing to pay for HABIB's education since ZUBERI
was very wealthy and HABIB had a compelling personal story. OLSON fostered
the introduction of HABIB to ZUBERI while stationed in Pakistan with
State/USG.

SA Greenfield served OLSON a subpoena from United States District Court
for the Central District of California with call number R 19 10243,
certified by Clerk of Court Kiry Gray on 07/02/2019, for all documents
related to ZUBERI from October 2012 through present and all documents
related to HABIB from October 2012 through November 2016. OLSON provided two
business cards at the end of the interview. The cards listed OLSON's phone
number as (202)848-5846 and email addresses of [rickscafedxb@yahoo.com](mailto:rickscafedxb@yahoo.com) and
[rolson@usip.org](mailto:rolson@usip.org).

# EXHIBIT B

FD-302 (Rev. 5-8-10)

- 1 of 5 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     12/18/2019

On 12/17/2019, RICHARD GUSTAVE OLSON, date of birth (DOB) 11/03/1959, home address 1840 Fonthill Court, McLean, Virgina 22102, mobile telephone number (202)848-5846, email address rickscafedxb@yahoo.com was interviewed at his home by Special Agents (SAs) JOSEPH HARVEY and MUSTAFA KUTLU. After being advised of the identity of the interviewing Agents and the nature of the interview, OLSON voluntarily provided the following information:

OLSON was actively engaged as a consultant for AVENUE VENTURES, a company owned by IMAAD ZUBERI. OLSON was aware of ZUBERI's recent plea agreement in the Central District of California and had seen it in the press. OLSON was unsure of when he first found out about the Federal criminal investigation into ZUBERI, but it was ZUBERI who informed him of the investigation. OLSON spoke with ZUBERI multiple times about ZUBERI's case and the investigation. After ZUBERI informed OLSON of the investigation, OLSON, upon request, provided advice and referrals to ZUBERI for legal and communications representation, including a referral to ROBERT EATINGER, the former General Counsel for the CIA. OLSON continued his work as a consultant for AVENUE VENTURES/ZUBERI throughout ZUBERI's Federal investigation.

OLSON helped ZUBERI channel information to the CIA's Los Angeles Chief of Station over an extended period of time. After OLSON began consulting for AVENUE VENTURES/ZUBERI, ZUBERI requested OLSON introduce him to someone at the CIA. ZUBERI told OLSON he had a previous relationship with the CIA, but OLSON did not have any details on that relationship and had not verified it. ZUBERI told OLSON he had information he wanted to pass to the US Government. OLSON introduced ZUBERI to the CIA Los Angeles Chief of Station (COS/LA). OLSON, ZUBERI, and COS/LA met in Los Angeles. COS/LA and ZUBERI did not have continued contact after the initial meeting. After COS/LA and ZUBERI discontinued contact, OLSON, in his capacity as a consultant for AVENUE VENTURES/ZUBERI, continued to channel information from ZUBERI to the CIA via COS/LA.

Investigation on   12/17/2019   at   McLean, Virginia, United States (In Person)

File #   339H-LA-3063880, 56F-LA-2088834                          Date drafted   12/18/2019

by   HARVEY JOSEPH HOLLAND

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

339H-LA-3063880

(U) Interview of Richard Olson on
Continuation of FD-302 of 12/17/2019 _____ , On 12/17/2019 , Page 2 of 5

While OLSON remained engaged as a consultant for AVENUE VENTURES/ZUBERI,
ZUBERI had been using OLSON's services less frequently since the beginning
of the criminal investigation into ZUBERI. ZUBERI was preoccupied with his
legal issues, as well other ongoing business that did not involve OLSON.

ZUBERI was actively engaged in business interests concerning Pakistan, the
UAE, and China. ZUBERI knew Pakistan Inter-Services Intelligence (ISI) chief
FAIZ HAMEED, and was using that relationship to broker trade deals between
Pakistan and Chinese business interests. ZUBERI made introductions between
ISI and Chinese businesses. OLSON was not a part of these business dealings
and did not have details on the deals. OLSON reported this activity to the
CIA by way of his attorney.

OLSON did not know details about ZUBERI's political lobbying efforts.
OLSON did meet with ZUBERI and Members of Congress in social settings, but
had no first hand knowledge of any of ZUBERI's lobbying efforts.

OLSON was not familiar with the AL AREEN PALACE AND SPA. OLSON was aware of
ZUBERI having some investment interests in UAE-based spas, but was not
familiar with any details and did not know of AL AREEN in particular.

OLSON, to the best of his knowledge, had never been in a text or
WhatsApp conversation with Senator LINDSEY GRAHAM.

[Agent note: SA HARVEY presented OLSON with a WhatsApp transcript from 13
February 2017 between OLSON and ZUBERI where ZUBERI addressed "Lindsey"
[GRAHAM] and [Senator] "John" [MCCAIN].]

OLSON did not specifically recall the WhatsApp conversation and did not know
what the messages were. OLSON, to the best of his knowledge, had never been
in a text or WhatsApp conversation with MCCAIN. OLSON stated it was not out
of the ordinary for ZUBERI to copy and paste news articles or excerpts of
conversations with third parties into his chats and emails to OLSON.
OLSON's "best guess" was this was the case with the WhatsApp conversation
from 13 February 2017.

OLSON had a dinner meeting in the US with Pakistani President ASIF ALI
ZARDARI, MCCAIN, and ZUBERI some time in January-February 2017. Neither
specific business topics nor policies were discussed at the dinner, and the
conversation was general in nature. OLSON surmised the February

FD-302a (Rev. 5-8-10)

339H-LA-3063880

Continuation of FD-302 of   (U) Interview of Richard Olson on 12/17/2019   , On 12/17/2019  , Page 3 of 5

2017 WhatsApp conversation was related to the events around ZARDARI's visit to the US.

OLSON retired from the State Department in November 2016. In January 2015 OLSON made a trip to London to meet with ESAM AL-JANAHI about a post-retirement job opportunity with ABU DHABI INVESTMENT HOUSE (ADIH). ZUBERI helped set up the meeting. OLSON was unsure who paid for the trip, but thought it may have been AL-JANAHI. OLSON made the trip during the course of his regularly scheduled home visit in New Mexico. OLSON flew to London for the meeting on United Airlines. After the London meeting, OLSON returned to his home in New Mexico, and then subsequently returned to his post in Pakistan. OLSON did not agree to specific employment terms with ADIH. OLSON issued a letter of recusal from any State Department business concerning ADIH.

OLSON could not recall if he stopped in Los Angeles or UAE on his return trip to his post in Pakistan. OLSON usually traveled through Washington Dulles International Airport when flying back to Pakistan, but it was possible this trip went through Los Angeles. OLSON often had a layover in UAE on his trips to Pakistan due to common flight routes.

OLSON was also talking to THE ABRAAJ GROUP in Dubai about a post-retirement job opportunity in early 2015. OLSON did not recall a trip to Abu Dhabi in January-February of 2015. OLSON did not take any other trips paid for by third parties while he was employed by the State Department. OLSON did not take any trips, while employed by the State Department, paid for by ZUBERI.

In October 2015 OLSON left Pakistan and returned to the US.

OLSON met with ZARDARI's son in Dubai during one of his transits between the US and Pakistan. OLSON was uncertain of exactly when this meeting took place, but it was while OLSON was still in his role as Ambassador.

OLSON did not recall leaving his phone behind after any meeting with ZARDARI.

OLSON went to Dubai during the spring of 2015 to work on annual State Department employee evaluations for his Pakistan-based employees. OLSON stayed with a friend, MOHAMMED SHERIF AL-HASHEMI, while working on the evaluations. AL-HASHEMI was a neighbor of ZARDARI in Dubai.

FD-302a (Rev. 5-8-10)

339H-LA-3063880

(U) Interview of Richard Olson on

Continuation of FD-302 of   12/17/2019 _____ , On  12/17/2019 , Page  4 of 5

OLSON recalled the $25,000 in tuition assistance that ZUBERI provided to MUNA HABIB in the summer of 2015. OLSON remembered seeing details of the tuition assistance when gathering emails in response to the US Attorney's grand jury subpoena in the summer of 2019. OLSON was not aware of any other conversations he and ZUBERI had about the tuition assistance. OLSON was not aware of any other details regarding the tuition assistance beyond the June-July email exchange with ZUBERI.

OLSON had an on-again off-again romantic relationship with HABIB while stationed in Pakistan. HABIB had left Pakistan to go to London in early 2015 to care for her ailing father who subsequently died. HABIB intended to go to school after her father passed. OLSON referred HABIB to ZUBERI for tuition assistance.

OLSON and HABIB later married one another. [Agent note: per SA HARVEY and SA JEREMY GREENFIELD's interview of OLSON on 17 July 2019, OLSON and HABIB were married in spring-summer 2019].

OLSON had continuous contact with HABIB while stationed in Pakistan with the State Department. OLSON reported his contact with HABIB to the CIA Islamabad Station Chief. OLSON reported his contact with HABIB in this way on a continuing basis. OLSON did not report his contact with HABIB in any other way.

At ZUBERI's request, OLSON provided talking points to ZUBERI in April 2015 for ZUBERI's upcoming meeting with US Congressman TED POE. OLSON did not know why he used his personal email as opposed to his official email to relay the talking points, but it was not unusual for OLSON to communicate with ZUBERI using his personal email account.

OLSON requested ZUBERI not share the talking points with others because he did not want ZUBERI to widely distribute the points, despite being unclassified.

The talking points OLSON provided to ZUBERI were unclassified. None of the talking points were even marked as Sensitive But Unclassified. While the talking points were unclassified, OLSON requested ZUBERI not share them since they were not something the public could find out in the open and were not on a public website.

FD-302a (Rev. 5-8-10)

339H-LA-3063880

(U) Interview of Richard Olson on
Continuation of FD-302 of 12/17/2019 , On 12/17/2019 , Page 5 of 5

OLSON had WhatsApp on multiple phones. [Agent note: SA HARVEY referred
OLSON to the transcript of a WhatsApp conversation from 26 January 2019 that
OLSON had provided to the US Attorney's office.] OLSON had WhatsApp on his
primary phone and used it frequently. OLSON also kept a personal phone that
he primarily used to communicate with his family. The personal/family phone
was New Mexico-based number (505)310-4320. ZUBERI had this number in
addition to OLSON's primary number. OLSON later changed his personal/family
phone. OLSON kept the same number but ported it to a phone without
capability for WhatsApp or other applications.

# EXHIBIT M

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   DANIEL J. O'BRIEN (Cal. Bar No. 141720)
4  Assistant United States Attorney
   Public Corruption & Civil Rights Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone:  (213) 894-2468
7       Facsimile:  (213) 894-2927
        E-mail:    daniel.obrien@usdoj.gov
8  ELISA FERNANDEZ (Cal. Bar No. 172004)
   Assistant United States Attorney
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                   UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,            CR No. CR 19-642-VAP

14          Plaintiff,                  GOVERNMENT'S RESPONSE TO
                                        DEFENDANT'S OBJECTIONS TO
15          v.                          PRESENTENCE REPORT; MEMORANDUM OF
                                        POINTS AND AUTHORITIES
16 IMAAD SHAH ZUBERI,
                                        Date: June 1, 2020
17          Defendant.                  Time: 9:00 a.m.
                                        Courtroom: 8A
18

19

20

21

22

23        Plaintiff, United States of America, by and through its counsel

24 of record, the United States Attorney for the Central District of

25 California, hereby submits its response to defendant Imaad Shah

26 Zuberi's objections to the Presentence Report ("PSR").

27

28
                                    1

1    An under seal declaration of Assistant United States Attorney

2  Daniel J. O'Brien in support of this position, with exhibits, will

3  be filed concurrently with this document.

4  Dated: April 13, 2020                 Respectfully submitted,

5                                         NICOLA T. HANNA
                                          United States Attorney
6
                                          BRANDON D. FOX
7                                         Assistant United States Attorney
                                          Chief, Criminal Division
8

9                                         _____/s/_____
                                          DANIEL J. O'BRIEN
10                                        Assistant United States Attorney

11                                        Attorneys for Plaintiff
                                          UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        2

7-10)  Correspondence that year shows that, rather than consummating a deal in which Avenue Ventures would purchase shares in the project, Zuberi repeatedly pushed Person J into signing a consulting contract to compensate Zuberi for his lobbying efforts.  (Exhibits 46A, 47B, and 46C)  The parties executed the consulting contract in August 2013 (Exhibit 47), Zuberi issued invoices to Person J's company that same month (Exhibit 48), and those invoices appear to have been paid.  (Tax Brief: Exhibit 8)  Bank records demonstrate that neither Zuberi nor any Avenue Ventures entity sent any money to Person J or his companies (Exhibit 15); rather, money flowed in the opposite direction—from Person J to Zuberi.  (Tax Brief, p. 22)

The Share Purchase Agreement, the only document touted by Zuberi as proof of his investment, is another sham.  (Exhibit 49) While the agreement bears the same date as defendant's purported investment, April 30, 2013, the notary stamp bears no date. (Exhibit 50)  Notary records shows the agreement actually was executed on November 10, 2014, well after the events in question. Moreover, the agreement is without legal effect because it consists merely of a promise to purchase shares in Al Areen without a specification as to amount, price, or date.

## VI.   DEFENDANT'S PAYMENTS TO BENEFIT A U.S. OFFICIAL IN PAKISTAN ARE GRATUITIES, NOT FARA VIOLATIONS

The defendant fails to appreciate the significance of his conduct with respect to Person NN, the U.S. official stationed in Pakistan.  Neither the PSR nor the government takes the view that this conduct violated FARA.  Undisclosed payments received by Person NN and the journalist with whom Person NN had a relationship were contemporaneous with Person NN providing assistance to Zuberi's

business.   The payment of gratuities to a public official are relevant to defendant's character.   The government will address the particulars with respect to this issue when it files its sentencing recommendation.

## VII. CONCLUSION

Defendant's objections are largely baseless and include instances of false representation and deceit.  Defendant's has tried to effectively backdate a notarized document, exploit a government error as to the ownership of a bank account, and selectively traced the source of contributions, omitting their foreign source.  Such obfuscations, in tandem with his failure to meet obligations imposed by the plea agreement, bring into question his acceptance of responsibility, particularly with respect to relevant conduct.

While some slight modifications to the PSR are required,[26] the PSR sentencing guideline calculations are correct.  Defendant's guideline level is 32, resulting in a sentencing range of 121 to 151 months imprisonment.  If the court grants defendant complete acceptance of responsibility, his offense level is 29, resulting in a sentencing range of 87 to 108 months imprisonment.

---

[26] At a minimum, the PSR should reflect total illegal campaign contributions of $774,358, not 756,858.  Per the government's Tax Brief (pp. 2-3), the tax loss should be $7,299,556, not 7,694,109.

# EXHIBIT N

1   THOMAS P. O'BRIEN, State Bar No. 166369
    IVY A. WANG, State Bar No. 224899
2   NATHAN F. BROWN, State Bar No. 317300
    BROWNE GEORGE ROSS LLP
3   801 South Figueroa Street Suite 2000
    Los Angeles, CA 90017
4   Telephone: (213) 725-9800
    Facsimile: (213) 725-9808
5   E-mail: tobrien@bgrfirm.com

6   EVAN J. DAVIS, State Bar No. 250484
    HOCHMAN SALKIN TOSCHER PEREZ P.C.
7   9150 Wilshire Boulevard, Suite 300
    Beverly Hills, California 90212-3414
8   Telephone: (310) 281-3200
    Facsimile: (310) 859-1430
9   E-mail: davis@taxlitigator.com

10
    Attorneys for Defendant
11  IMAAD SHAH ZUBERI

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15
    United States of America,              Case No. LACR19-00642-VAP
16
              Plaintiff,                   The Hon. Virginia A. Phillips
17
         vs.                               **DEFENDANT ZUBERI'S**
18                                         **OBJECTIONS TO THE**
    Imaad Shah Zuberi,                     **PRESENTENCE REPORT**
19
              Defendant.
20

21

22

23

24

25

26

27

28

**B.   Pakistan**

Mr. Zuberi objects to the suggestion in Paragraphs 157-158 that his payment for Person NN's travel costs to London was improper.  As discussed in Paragraph 158, Person NN traveled to meet with Person J in furtherance of a business contract. While Mr. Zuberi did initially pay for Person NN's travel, he was merely fronting Person J's payment for that travel, and was later reimbursed by Person J for those expenses.

Mr. Zuberi also objects to the claim in Paragraph 160 that he paid the graduate school tuition of a female journalist in Pakistan as a benefit to Person NN. Mr. Zuberi was interested in hiring the journalist, who is well-known in Pakistan, to work for his family's group of television stations in Pakistan.  Mr. Zuberi's $25,000 contribution to her tuition was an effort to boost her competency to handle this position with his family's stations.  Mr. Zuberi was unaware that Person NN was in any type of personal relationship with the journalist, and therefore did not intend it as a benefit to Person NN.

Mr. Zuberi also objects to Paragraphs 161 and 163, as they are completely irrelevant to Mr. Zuberi's own conduct with respect to Pakistan.  Person NN's failure to disclose financial benefits, or Person NN's efforts to author a policy statement regarding helicopters, are completely irrelevant to Mr. Zuberi's involvement with the Pakistani government.

The government has identified a single email in which Mr. Zuberi asked Person NN for a U.S. government official's email address on behalf of a Pakistani government official.  While this exchange may have occurred, the simple forwarding of an email message should not be sufficient to consider Mr. Zuberi an "agent of a foreign principal" for the purposes of FARA.

**VI.   Offense Level Calculation**

Based on the analysis above, the USPO should revise the offense level calculation as follows:

# EXHIBIT O

 **Gmail**                                          Muna Habib <muna.habib@gmail.com>

## RE: read this ignore previous
1 message

Imaad zuberi <imaad.zuberi@mindspring.com>                     Mon, Jul 6, 2015 at 1:46 PM
To: Muna Habib <muna.habib@gmail.com>

Here it is with minor edits

**From:** Muna Habib [mailto:muna.habib@gmail.com]
**Sent:** Monday, July 6, 2015 6:25 AM
**To:** imaad zuberi
**Subject:** read this ignore previous

I actually enjoyed writing this,

weirdly 😀

---

📄 **LA CONSULAR GENERAL 6 7 15 v1.docx**
18K

 Gmail

Muna Habib <muna.habib@gmail.com>

---

## RE: Columbia Sponsorship

2 messages

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                    Tue, Jul 14, 2015 at 3:20 AM
To: Muna Habib <muna.habib@gmail.com>

Did you get the letter and the bank statement?

**From:** Muna Habib [mailto:muna.habib@gmail.com]
**Sent:** Monday, July 13, 2015 10:21 PM
**To:** imaad zuberi
**Subject:** Columbia Sponsorship

Imaad:

I have not received the letter. I had hoped this would have been completed last week.  I am already late with many Columbia deadlines because of my father's death.

I appreciate your kind offer of sponsorship. However I feel this is now peppered with unrealistic expectations from me, that I can not fill, without compromising mine and my friends journalistic integrity and safety.  There has been further fall out from this story, and it is not fair on my friend.

 I am no longer comfortable trying to place this story in other media outlets. I gave you  my word I would help to publish in one paper  and I have. I do not want to burn my bridges or reputation in Pakistan as a credible journalist. Especially, as I plan to return after my Masters.  I will NOT reveal you are my source - you have my word.

I understand you may not want to proceed with the sponsorship. Although a huge disappointment I will understand. Please  let me know so that I can contact Columbia to defer entry till next year. There will be no hard feelings.

You have been truly wonderful, generous and kind to me since we met.  I want you to know, I regard you as a friend and want to remain friends, even if Columbia doesn't work out. I  think you are highly talented, rare  and unique individual. Masha'Allah.

Take care, Muna x

MH00000106

**imaad zuberi** <imaad.zuberi@mindspring.com>     **Wed, Jul 15, 2015 at 9:29 AM**
To: Muna Habib <muna.habib@gmail.com>

What is this email about? I just read it

[Quoted text hidden]

MH00000107



## FW: VP Biden photos with Pakistani community in the pages from Pakistan Link of this week

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                    Sat, Aug 1, 2015 at 2:34
To: imaad zuberi <imaad.zuberi@mindspring.com>

-----Original Message-----
From: arifmansuri@yahoo.com
Sent: Wednesday, July 29, 2015 8:46 PM
To: imaad zuberi; Sameen Faruqi; Dr. Asif Mahmood
Subject: VP Biden photos with Pakistani community in the pages from Pakistan
Link of this week

Thanks.

📄 **Pakistan Link - July 31 2015  - Community pages.pdf**
   710K

---

**Muna Habib** <muna.habib@gmail.com>                    Sat, Aug 1, 2015 at 3:07
To: imaad zuberi <imaad.zuberi@mindspring.com>

I will scan and send you a copy of the Urdu newspaper today. It should also be in express this weekend. Now that I have more time I can focus and send out to some other English papers in Pakistan.

But I need something more for DT and express news. Send me the no for the ex high comm again and lets see if he talks. As long as I have him on record I can write the story they want.

Think. Is there anything else I can use??

Visa interview done - should arrive this week IA

THANK YOU Imaad. Without you none of this would have been possible. I am truly grateful.

Sent from my iPhone
[Quoted text hidden]
> <Pakistan Link - July 31 2015 - Community pages.pdf>

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                    Sat, Aug 1, 2015 at 3:10
To: Muna Habib <muna.habib@gmail.com>

Muna-
I don't have time for your disorganization. I text it to you before. You should have saved it. Forget about it just get to NYC
imaad

   Original Message

MH00000172

Gmail – FW: VP Biden photos with Pakistani community in the pages from Pakistan Link of this week                    06/02/2020, 11

From: Muna Habib
Sent: Saturday, August 1, 2015 9:07 AM
To: imaad zuberi
Subject: Re: VP Biden photos with Pakistani community in the pages from Pakistan Link of this week
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                                   Sat, Aug 1, 2015 at 3:25 AI
To: imaad zuberi <imaad.zuberi@mindspring.com>

Imaad: You sent me many no's, which I incidentally I did save.

It was not for 'disorganization' that I do not recall. But I had more urgent matters to deal with.

Like sorting out my visa, resolving my late father's legal issues, dealing with his family and my bereavement

Sent from my iPhone
[Quoted text hidden]

MH00000173

 Gmail

## Introduction

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                                    Thu, Sep 10, 2015 at 1:22
To: Steve Smythe <stephensmythe@gmail.com>, Amber Cordero <amberecordero@gmail.com>, Muna Habib
<muna.habib@gmail.com>

Hello Steve and Amber-

Muna is Masters Student at Columbia Journalism School. She is doing write up on my nonprofit stuff because she
know the background of help I provide to deserving students with their tuitions and etc at colleges and universities

imaad

---

**Amber Cordero** <amberecordero@gmail.com>                                    Thu, Sep 10, 2015 at 11:19 A
To: imaad zuberi <imaad.zuberi@mindspring.com>
Cc: Steve Smythe <stephensmythe@gmail.com>, Muna Habib <muna.habib@gmail.com>

Hi Muna,

Pleasure to meet you via email. Steve and I are looking forward to working together on our search results initiative.

Best,
Amber
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                                          Fri, Sep 11, 2015 at 12:10 A
To: Amber Cordero <amberecordero@gmail.com>

Hi Amber,

Good to meet you. Let me know what content you require. My no 917 498 4502

Best, Muna.
[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                                  Fri, Sep 11, 2015 at 1:58 AM
To: Muna Habib <muna.habib@gmail.com>

Muna-
Please email me to check and edit prior to emailing everyone
imaad
[Quoted text hidden]

---

MH00000231

**imaad zuberi** <imaad.zuberi@mindspring.com>                              Fri, Sep 11, 2015 at 6:59 P
To: Muna Habib <muna.habib@gmail.com>, Bill Burton <BBurton@skdknick.com>

Muna-can you please call Bill Burton. He will give you some pointers for the write up. He used to be Deputy Press
Secretary under President Obama and a great guy. He is helping me with my PR issue. His mobile: (312) 237 –
0490

Thanks

imaad

[Quoted text hidden]

 Gmail

**FIRST DRAFT**
8 messages

---

**Muna Habib** <muna.habib@gmail.com>                                   Sun, Sep 13, 2015 at 8:33 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

read, edit, add, you know the drill.

I think we need one strong thing to focus on. I think the war warriors is a good angle.

It feels a bit flimsy at the moment - not sure -still need to find a good hook. maybe think about something happening in your community in LA that you are or will participate in.

I am going to have another read and reedit later.

 **Imaad Zuberi bio.docx**
17K

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                          Mon, Sep 14, 2015 at 12:08 PM
To: Muna Habib <muna.habib@gmail.com>

What did you write? English? My mother was microbiologist. She worked for New York State Health Department. How can I say my parents didn't know English? You have written something which is totally useless

[Quoted text hidden]

 **Imaad Zuberi bio.docx**
17K

---

**Muna Habib** <muna.habib@gmail.com>                                   Mon, Sep 14, 2015 at 12:10 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

Well you didn't tell me this. In fact I was trying to find a hook as to why you do what you claim to have done
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                                   Mon, Sep 14, 2015 at 12:10 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I it's useless bin it I don't have time
For this.
[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                          Mon, Sep 14, 2015 at 12:22 PM
To: Muna Habib <muna.habib@gmail.com>

---

MH00000244

Muna-i don't have time for this either. I prefer you be straight. If you didn't have time then just tell me for me to have someone do it. This write up like it is written can't be printed anywhere. I hate wasting your time, my time and now other people time

imaad

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>
To: Muna Habib <muna.habib@gmail.com>

Mon, Sep 14, 2015 at 12:23 PM

Don't worry. I will have someone else handle this

**From:** Muna Habib
**Sent:** Monday, September 14, 2015 5:10 PM
**To:** imaad zuberi
**Subject:** Re: FIRST DRAFT

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>
To: imaad zuberi <imaad.zuberi@mindspring.com>

Mon, Sep 14, 2015 at 12:30 PM

Imaad: I wrote it as you told me over the phone. I want to help you. I have 2 deadlines today. If you want it changed tell me what your don't like and I will change - redraft later
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>
To: imaad zuberi <imaad.zuberi@mindspring.com>

Mon, Sep 14, 2015 at 12:32 PM

You need to focus on what good aspect of work you've done - then I can elaborate. At the moment it is vague - but that's what you gave me.
[Quoted text hidden]



Muna Habib <muna.habib@gmail.com>

## FW: We Need Your Help

6 messages

**imaad zuberi** <imaad.zuberi@mindspring.com>                                    Thu, Oct 8, 2015 at 9:43 AM
To: Muna Habib <muna.habib@gmail.com>

**From:** Shoaib Patail [mailto:hsp91701@gmail.com]
**Sent:** Thursday, October 8, 2015 12:29 AM
**To:** aizaz.chaudhry@mofa.gov.pk; tfatimi2000@yahoo.com; SarfrazAliCh@icloud.com;
ishaq.dar786@gmail.com; Sartajaziz@hotmail.com; **asif mahmood** <AMChaudhry@hotmail.com>;
jajilani@hotmail.com; OlsonRG@state.gov; **imaad zuberi** <imaad.zuberi@mindspring.com>;
amcbuilder@gmail.com
**Subject:** We Need Your Help

October 8, 2015

Subject: Pakistan and her reputation is at its lowest ebbs in Los Angeles, California, USA

Honorable Mr. Sartaj Aziz, Adviser to the Prime Minister on Foreign Affairs

Honorable Ambassador Tariq Fatemi, Minister of State

Honorable Mr. Aizaz Chaudhry, Foreign Secretary

Honorable Mr. Ishaq Dar, Finance Minister

Honorable Ambassador Jaleel Jelani

Your Excellency:

I hope this letter finds you and your family in the best of health.

This is a follow up of my first correspondence dated May 26, 2015 and this is a second one of its nature that I am
writing to bring to your kind attention (second request) regarding the funky and despicable businesses going on in
our Consulate General in Los Angeles under the supervision of our mischievous, disgraceful and notorious Consul
General Mr. Hamid Asghar Khan.

As I mentioned in my previous letter that Hamid is a playboy and Pakistani Gigolo.  He has no moral, etic-ate and
respect neither for himself nor for our country.  He has transformed our Consulate for his lust, greed and power

MH00000267

house.  Because of his shameful behavior, his staffs are following his footsteps and cues.

He had hired three female Interns when he first started; they belong to the respected and honorable Pakistani-American families.  I am told none of them are working there because of embarrassment, sexually harassment and emotionally tortured. Even one of the senior female staffs Ms. Ashraf Nanji with immaculate character and reputation left the Consulate. One may wonder and ponder WHY?

A true story circulating  in our community in LA and other cities that his crony and Head of Chancery Mr. Qamar Abbas Khokhar has usurp his power under Mr. Hamid's back and support and has sexually harassed one of the Interns physically, mentally, emotionally and financially.

It's saying in our language "Baray Mian to Baray Mian, Chotay Mian Subhanallah. We called it "You scratch my back and I scratch yours". Mr. Khokhar is his confidant and accomplice in their disgraceful activity.

Instead of learning from their previous mistakes and offenses that we highlighted, they started writing about those (whistleblowers) to Embassy, FO and ISI in retaliation and characterized us unpatriotic, agents of some sorts and enemy of our country.  Also calling us senile and insane to cover up their misdeeds.  Vow and amazing, they have some audacity and nerve to write about us.  Look who is talking – "Ulta Chor Kotwal Ko Dantay".

These are just the tips of iceberg, many more to come.  These are not our observations and experiences with them only, there are many reputed Pakistani-American community members are talking about it and I am afraid this time some will write in our local and American newspapers, social media and on the TV Channel.

As you know American media especially Tabloid Magazines are very attracted by these stories and will publish especially when anything to defame our beloved country.

In addition, if her complaints were not heard genuinely and actions were not taken, I heard she will take legal ramification that would tremendously cause financial constraint to our exchequer in addition to defamation of Pakistan.

I am very distraught and could not understand why Hamid and his Cronies are still working in our Consulate causing harm and damage to our country.  It is very disgusting, despicable and deploring to see we have staffs in Consulate with tarnished and poor records and no actions have been taking so far.

I am told that he was leaving for good to Pakistan few months ago but he is requesting monthly extension from FO by putting lame excuses that he has some important tasks to finish (Nothing but Partying, socializing with opportunists). He is very shrewd and cunning guy and knows how to manipulate and milk the system.  Please no more extension.

Honorable members, you have achieved mastery not only in politics but in Foreign affairs and know the tricks of the trade.  I would humbly request to take immediate, stern, and decisive action to remove Hamid and his entire cabinet members without further delay.

The longer they stay; they will be more detrimental and liable to our community and the country.

MH00000268

further embarrassment.

Being a patriotic Pakistani, it is incumbent upon me to bring to your attention and to clear my conscious.

Dear Nobles, I am afraid failure or delay in action may result in too little too late.

Should you have further question, please feel free to contact me.


Warm Regards,


Shoaib C. Patail, MBBS, MD, FAAP, MBA

Cell: 909-731-8875

Landline: 909-375-1915

Facsimile:  909-427-5836

---

**Muna Habib** <muna.habib@gmail.com>                         Thu, Oct 8, 2015 at 9:52 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

Dear Imaad,

The emails are received and understood. However, I'm under a great deal of pressure to deliver at College. As mentioned, BEFORE you kindly offered to ask your friend to give me a loan ( till my loan arrived) . I am under a great deal of pressure - I can NOT work on this outdated lap top -  they are hassling me for tuition fees - insurance and am frankly fed up  and ready to  go home.

They want the money in a week. If you can't help me with this - please let me know and I shall tell them that I shall defer the remainder of the course till next year.

Best, Muna

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                Thu, Oct 8, 2015 at 10:25 AM
To: Muna Habib <muna.habib@gmail.com>

Muna-


I have helped you and want to help you more but at present I am in a bind. You don't know?


I can't believe you are pushing me on this instead of trying to help me. I can't help you until I am out of my mess

MH00000269

You take this seriously and help me now instead of waiting till the weekend. I will then do whatever I can to help. I need to be out of my problem before I can help other people

I am in London on way to China. When I am back in Los Angeles next week I will FedEx you the laptop

imaad

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                                  Thu, Oct 8, 2015 at 10:47 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

Imaad:

Thank you, I appreciate your kindness, difficulties you face and shall endeavour to help. You have my word.

However, this was discussed and agreed before I came to New York. College want their money, I have no control over this. I do not like to constantly hassle you, I hate asking for money and it wastes my time and yours.

I am not pushing you, I understand you have difficulties. But I am tired - you have no idea the pressure I am under to pay my bills. I have not told you, as I assumed my loan would come through quickly. And it is not your responsibility to sort this out - it is mine I should NOT have come to the US without sorting this out.

When you kindly agreed to sponsor me, there was not an expectation that I would also work for you. This has changed - I do not mind - but last time I made you priority and my college work suffered. I will not make that mistake again. As I said, when if I have time over the weekend I shall look at it.

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                                  Thu, Oct 8, 2015 at 11:21 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

To clarify: Can your friend help me? If so, may I have his details, I can contact him directly and leave you alone - I know you are busy.

If this is not possible, please let me know and I can make arrangements with college. The longer this debacle is dragged out, the more difficult it will be for me to defer.

Thanks

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                         Thu, Oct 8, 2015 at 6:39 PM
To: Muna Habib <muna.habib@gmail.com>

[Quoted text hidden]

Please explain the real story and call me this the very distrubing news and this news cand be hide i is all ready public i nned yr views
on camera if this is fals or blamed as media i always suppoted you and the consulate i think Mr HAMID IS NOT FAIRE PERSON  AS HE CLAIMED
this is very pitty that he having a big party at his resident and the hereo of the Nation are siting with you with forur couples very strange at this point
i need the details of the news report against you .

Best Regards

Waqar Ali Khan
Executive Producer
Safeer e Pakistan
www.safeerepakistan.com
www.conceptonecorp.com

---------- Forwarded message ----------
From: Asif Chattha

To whom it may concern:

CG Hamid Asghar Khan has set bad example for his subordinates of the Pakistani Foreign Service Officers. He has set a threshold for everyone in the Pakistan Consulate Office for male employees, which are not disappointing him at all.  Especially, Head of Chancery Qamar Abbbas Khokhar at LA Mission is following his superior Hamid Asghar Khan.

Recently it has come to discovery that Khokhar has sexually harassed, embarrassed and emotionally tortured a female patriotic Pakistani-American.

It is sad that nothing has been done to prevent this unacceptable behavior and she had to go through this horrible and humiliating experience at Pakistani Consulate
while being employed and serving her dear mother land.
I deeply regret her unfortunate moments dealing with ruthless person.

I would request all of Hamid Asghar Khan's superiors past and currently in power to help the Los Angeles Pakistani community not to go through these embarrassment by
our Consulate General and his staff on a daily basis and please help the Pakistani-Americans here live with pride.

We were hopeful that a quick action would have taken to remove Hamid Asghar Khan and his subordinate Khokhar from the Consulate General of Pakistan because these individuals don't belong in such a positions where they are acting in poor demeanor to embarrass Pakistan and our Pakistani community in Los Angeles.

Those community members who are with him have been given perks while those who do not drink, go out partying and strip clubs with him and take his side are labeled as
anti-Pakistan, anti-Islam, he tells Americans that they are ISI agents, while telling Pakistani community members that if any of these individuals go to Pakistan they will be
arrested at the airport. Since past couple of months Hamid Asghar Khan has become more and more vindictive.

Please help Pakistani community not to sustain any further damage and humiliation by these individuals acts and help us to restore untarnished image of Pakistan and our community.

Please see the attached documents from this brilliant and unfortunate female.

Respectfully,
Asif Chattha
Ph# 310-877-5632

---

**4 attachments**

MH00000264

**Sexual Harassment & Retaliation Complaint .pdf**
145K

**Sexual Harassment Complaint Attachments .pdf**
2772K

**Trade Proposal .pdf**
742K

---

**Muna Habib** <muna.habib@gmail.com>                                    Thu, Oct 8, 2015 at 6:44 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

Until my stuff is sorted I'm not doing anything else
[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                           Thu, Oct 8, 2015 at 6:47 PM
To: Muna Habib <muna.habib@gmail.com>

Muna-

You are selfish. I gave you $25,000. I got less than $500 vale from you. With this attitude would I
want to help you? Maybe I should ask you for refund?


imaad

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                           Thu, Oct 8, 2015 at 6:49 PM
To: Muna Habib <muna.habib@gmail.com>

Did you even get even $250 from anyone forget the $25,000?


**From:** imaad zuberi [mailto:imaad.zuberi@mindspring.com]
**Sent:** Thursday, October 8, 2015 3:47 PM
**To:** 'Muna Habib' <muna.habib@gmail.com>
**Subject:** RE: FW: Pakistan community in desperate need of help


Muna-


You are selfish. I gave you $25,000. I got less than $500 vale from you. With this attitude would I
want to help you? Maybe I should ask you for refund?

---

MH00000265

imaad

**From:** Muna Habib [mailto:muna.habib@gmail.com]
**Sent:** Thursday, October 8, 2015 3:44 PM
**To:** imaad zuberi <imaad.zuberi@mindspring.com>

[Quoted text hidden]

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                                      Thu, Oct 8, 2015 at 6:54 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

Imaad: I thought you helped me out of the kindness of your heart. Not because I was of value to you. I offered to
help you - because I know what I can do - I did not expect you to use it against me.

I respect you immensely. And henceforth I would do anything to help you. But at the moment I am stressed, P****d
off and fed up.

I'll repay your money - and btw you got more that 500 value. I got rid of that guy for you. Eventually he'll go back
- My work did that!
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                                      Thu, Oct 8, 2015 at 6:56 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

Btw you do make me laugh. Arguing with you reminds me of my brother 😁 in lecture. Speak soon IA 😍

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                                      Thu, Oct 8, 2015 at 7:25 PM
To: Muna Habib <muna.habib@gmail.com>

I am under stress. Let me sleep and I get back to you

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                                      Thu, Oct 8, 2015 at 7:26 PM
To: Muna Habib <muna.habib@gmail.com>

I miss you too

[Quoted text hidden]

---

**hasnain yousuf** <hasnain106@gmail.com>                                      Fri, Oct 23, 2015 at 5:52 PM
Bcc: muna.habib@gmail.com

[Quoted text hidden]

**4 attachments**

 Gmail

## Not received anything from your guy

24 messages

**Muna Habib** <muna.habib@gmail.com>                                     Sat, Oct 24, 2015 at 10:53 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I have no time now to look at anything now,  as I have to do my assignments in the time allocated.

Get him to write something up - and send it out.

Its a simple story, so shoudn't be difficult. I am in the library for the rest of the day. Will be out tonight.

**imaad zuberi** <imaad.zuberi@mindspring.com>                             Sat, Oct 24, 2015 at 4:10 PM
To: Muna Habib <muna.habib@gmail.com>

It is okay. You have not been reliable to these people and they will handle it themselves

Thank you

[Quoted text hidden]

**Muna Habib** <muna.habib@gmail.com>                                     Sat, Oct 24, 2015 at 4:12 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

What do you mean ' these people' I spoke to you and said I wild look at it this morning - and you had to HAVE
HIM send me ONE FILE
[Quoted text hidden]

**Muna Habib** <muna.habib@gmail.com>                                     Sat, Oct 24, 2015 at 4:13 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I said I would look at it as a favour to you. If you don't send me condensed material - that is not my fault.
[Quoted text hidden]

**imaad zuberi** <imaad.zuberi@mindspring.com>                             Sat, Oct 24, 2015 at 4:15 PM
To: Muna Habib <muna.habib@gmail.com>

Let them handle it. Then it is their responsibility not mine

[Quoted text hidden]

**Muna Habib** <muna.habib@gmail.com>                                     Sat, Oct 24, 2015 at 4:16 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

And I owe nothing to 'these people' So being reliable isn't an issue for anyone
[Quoted text hidden]

**imaad zuberi** <imaad.zuberi@mindspring.com>                            Sat, Oct 24, 2015 at 8:36 PM

MH00000304

Gmail - Not received anything from your guy

06/02/2020, 13:11

To: Muna Habib <muna.habib@gmail.com>

They are my friends as extension they are me

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                    Sat, Oct 24, 2015 at 8:37 PM
To: Muna Habib <muna.habib@gmail.com>

You owe me and you have delivered nothing but keep asking for more

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                    Sat, Oct 24, 2015 at 9:02 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I DO NOT OWE YOU ANYTHING.

You said you gave me that money to help me. Had I known then - you would use it all the time TO GET ME TO DO
YOUR DIRTY WORK   - I WOULD NEVER HAVE TAKEN IT. You are no different to the other Pakis I meet.
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                    Sat, Oct 24, 2015 at 9:05 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I HAVE NOT ASKED YOU FOR ANYTHING.  **YOU OFFERED** TO GIVE ME THE LOAN AND THE LAP TOP.

NEITHER OF WHICH MATERIALISED - SO DO NOT GIVE ME THIS  BS ABOUT ME 'ASKING YOU'

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                    Sat, Oct 24, 2015 at 9:10 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I offered to help you with your petty feud, because I knew I could help.

 I did you a big favour  - with my work - he would be staying there - REMEMBER THAT.

so please LETS JUST BOTH MOVE ON AND STOP THIS NOW. I have enough to deal with.
[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                    Sat, Oct 24, 2015 at 9:37 PM
To: Muna Habib <muna.habib@gmail.com>

Please help

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                    Sat, Oct 24, 2015 at 9:38 PM
To: Muna Habib <muna.habib@gmail.com>

Just help me. Stop being bitchy

Gmail - Not received anything from your guy                                    06/02/2020, 13:11

Thanks brother - remind me, not to be so naive next time

Btw: ask your friends in the pak gov to write it. I'm sure they'd be willing and able
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                    Sat, Oct 24, 2015 at 11:01 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

AND DON'T YOU DARE BRING MY FAMILY INTO THIS.
[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>            Sun, Oct 25, 2015 at 3:53 AM
To: Muna Habib <muna.habib@gmail.com>

You need to relax. When you piss me off then expect that I will get angry and piss you off
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                     Sun, Oct 25, 2015 at 4:39 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

Imaad: I am relaxed. You seem to forget what I am doing here, You have no idea about my work load and pressure
I am under.

I do owe you, and I am committed to helping you, whenever I can.

What exactly do you want me to do here. You have won with the CG in LA he is going. Everyone knows this.

What do you want this story to do?


[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                     Sun, Oct 25, 2015 at 4:50 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

 I have been through all the emails. There is nothing new here. The story is the same as before.
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                     Sun, Oct 25, 2015 at 4:55 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

do you want to get rid if the no 2 also?
[Quoted text hidden]

**imaad zuberi** <imaad.zuberi@mindspring.com>
To: Muna Habib <muna.habib@gmail.com>

Sat, Oct 24, 2015 at 10:49 PM

My dirty work? Please choose your word carefully

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>
To: Muna Habib <muna.habib@gmail.com>
Cc: imaad zuberi - Mindspring <imaad.zuberi@mindspring.com>

Sat, Oct 24, 2015 at 10:51 PM

Listen you ungrateful little woman. I have done more for you than your family

If you don't like it then send me a check for $25,000? I need the money if you are not grateful

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>
To: Muna Habib <muna.habib@gmail.com>

Sat, Oct 24, 2015 at 10:52 PM

No. Contrary to what you believe it is my friends in the Pakistani Government who got it done

**From:** Muna Habib
**Sent:** Saturday, October 24, 2015 6:10 PM
**To:** imaad zuberi
[Quoted text hidden]
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>
To: imaad zuberi <imaad.zuberi@mindspring.com>

Sat, Oct 24, 2015 at 10:52 PM

I am tired - I just printed off your crap to take home and read, because you don't want yo ask your jokers to do it.

Now please leave me alone

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>
To: imaad zuberi <imaad.zuberi@mindspring.com>

Sat, Oct 24, 2015 at 10:54 PM

Just read your email. Imaad go to hell - go ask your friends in the Pak gov to help you.

And to think I was going to do this tonight - you are kidding me. How dare you.

Go to hell

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>
To: imaad zuberi <imaad.zuberi@mindspring.com>

Sat, Oct 24, 2015 at 10:58 PM

You are unbelievable. Like I said I do NOT work for you. You said - The money was to help me - you wanted nothing.

And now when it suits you - you change.

MH00000307

 Gmail

## Apologies

3 messages

**Muna Habib** <muna.habib@gmail.com>                                    Sun, Oct 25, 2015 at 5:35 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

BTW: I am sorry I became annoyed with you. But the things you say, annoy me immensely.

I do not like to argue with you. You have been like a brother to me and I am grateful for your help.

I helped you before and I will again, IA

---

**imaad zuberi** <imaad.zuberi@mindspring.com>                          Sun, Oct 25, 2015 at 9:30 PM
To: Muna Habib <muna.habib@gmail.com>

Relax. You are still like a sister to me. Help me

[Quoted text hidden]

**Muna Habib** <muna.habib@gmail.com>                                    Sun, Oct 25, 2015 at 9:35 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I am IA. You know I can't abandon you 😌 I wouldn't do that.

I know this is important to you. I have asked your guy to send me what he's working on - Between us we'll get it sorted - don't worry!!!

This week is crazy. I have a media law exam on Tuesday and Business on Wednesday. If I fail they kick me out, then I'll have all the free time to help you 😬 😬 😬

[Quoted text hidden]

MH00000309

M Gmail

Muna Habib <muna.habib@gmail.com>

## LOAN

6 messages

**Muna Habib** <muna.habib@gmail.com>                                          Mon, Oct 26, 2015 at 8:01 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

I went to the student finance, they asked why this was not sorted before I came. -They can't help me.

I am not doing anything till this is sorted. You told me getting a loan would be easy and you would arrange it. I SHALL FORWARD YOU THE EMAIL.

let me know if you can arrange the laon by tomorrow. I do not need the additional stress. It is affecting my work.

If not possible let me know and I will tell Columbia I need to drop out.

**imaad zuberi** <imaad.zuberi@mindspring.com>                                   Mon, Oct 26, 2015 at 9:54 PM
To: Muna Habib <muna.habib@gmail.com>

This is a type of loan which I got when I went to school and other people got when they went to school in America who were in same boat as you are in

I have medical procedure tomorrow for which I will have to go under general anesthesia. I can't eat or drink anything for 12 hour prior to the procedure and several hour after the procedure

I will be bed rest for week time

I have called my friend who might be able to help but have not heard back from him

You do what you want to do but I don't need stress from you either. I am tired from all these issues of which you have and you expect me to solve

You are playing games trying to barter or keep me hostage for thing I asked you to help. Help me without asking for anything if you can. If you can't help because you have no power to help then just tell me. I hate when people play game. If you try to barter then forget it I don't need your help

I have helped you to the best of my ability. I don't want you to push me. I have medical procedure tomorrow and don't want other issue now

imaad

MH00000326

Gmail - LOAN

06/02/2020, 13:34

[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>
To: imaad zuberi <imaad.zuberi@mindspring.com>

Mon, Oct 26, 2015 at 10:32 PM

Imaad:I am not holding yo hostage, please see email below: You said you would help me get the loan. Or I I would not have asked you. I am NOT holding you hostage. I have bills to pay. I am stressed. It is affecting my work.

We had the agreement below. I have helped you with several articles about HK and again with your FP article.

I helped not because I wanted something, but  because I AM GRATEFUL for your kindness. I will forward you the emails that Columbia are sending to me and you tell me what you would do.

I HATE  being in this position. I HATE being stressed  I HATE ARGUING WITH YOU AND BEING RUDE - I FEEL AWFUL AFTERWARD - ESPECIALLY, BECAUSE YOU HAVE HELPED ME SO MUCH

This is not the person I want to be and no amount of education is worth me compromising my personality or my values.

 I am happy to get the loan and repay it once I start working, and you said, then, not to worry, and you would arrange this.

I really do not know what else to do. I am stressed - i have exams and assignment deadlines. Plus I am getting threatening emails from Columbia.

I will work on your article - the guy will send me the interview.

I too am exhausted. This mess is not worth out friendship and we need to find a solution.

On Jul 1, 2015, at 8:15 AM, "imaad zuberi" <imaad.zuberi@mindspring.com> wrote:

> Here is what we agreed to base on the meeting:
>
> ·   Grant of $25,000 going directly to Columbia University. This can be immediate when you tell me where to make the payment
>
> ·   Help you get loan of $50,000 from US bank when you are in school or NYC
>
> ·   I can show proof of funds to Columbia University for you to start the school
>
> Did I miss anything?
>
>
> imaad

[Quoted text hidden]

---

**imaad zuberi** <imaad.zuberi@mindspring.com>
To: Muna Habib <muna.habib@gmail.com>

Mon, Oct 26, 2015 at 10:57 PM

Okay. I will have someone handle this give me a couple of day to get back to normal

MH00000327

**Muna Habib** <muna.habib@gmail.com>                    Tue, Oct 27, 2015 at 5:21 AM
To: imaad zuberi <imaad.zuberi@mindspring.com>

thank you
[Quoted text hidden]

---

**Muna Habib** <muna.habib@gmail.com>                    Tue, Nov 10, 2015 at 10:24 PM
To: imaad zuberi <imaad.zuberi@mindspring.com>

[Quoted text hidden]

MH00000328

# EXHIBIT P

## Re: Contact

From:  Rick Olson (rickscafedxb@yahoo.com)

To:     muna.habib@gmail.com

Date:  Monday, June 15, 2015, 05:58 AM EDT

You're welcome.

rgo

Rick Olson

---------------------------------------------
On Mon, 6/15/15, Muna Habib <muna.habib@gmail.com> wrote:

Subject: Re: Contact
To: "Rick Olson" <rickscafedxb@yahoo.com>
Date: Monday, June 15, 2015, 2:43 PM

Thank
you

On Mon, Jun 15, 2015 at
8:32 AM, Rick Olson <rickscafedxb@yahoo.com>
wrote:
Muna:

As discussed, suggest you be in touch with Mr. Imaad
Zuberi.

imaad.zuberi@mindspring.com

ROMH00000643

# EXHIBIT Q

## FW: Hello from Pakistan

From:  imaad zuberi (imaad.zuberi@mindspring.com)

To:      rickscafedxb@yahoo.com

Date:   Monday, June 15, 2015, 04:24 PM EDT

This the person you mentioned?

-----Original Message-----
From: Muna Habib [mailto:muna.habib@gmail.com]
Sent: Monday, June 15, 2015 7:00 AM
To: imaad.zuberi@mindspring.com
Subject: Hello from Pakistan

Dear Mr. Zuberi,

A mutual friend of ours, Ambassador Olson,  has passed on your email
contact. I am writing to introduce myself and say hello.

Kind regards, Muna Habib.


Sent from my iPhone=

# EXHIBIT R

## FW: Hello from Pakistan

From:  imaad zuberi (imaad.zuberi@mindspring.com)

To:     rickscafedxb@yahoo.com

Date:  Monday, June 15, 2015, 04:26 PM EDT

-----Original Message-----
From: imaad zuberi [mailto:imaad.zuberi@mindspring.com]
Sent: Monday, June 15, 2015 1:26 PM
To: 'Muna Habib'
Subject: RE: Hello from Pakistan

Hello Muna-

Yes Ambassador Rick Olson told me. Can you please email me your resume and brief about which program at Columbia you are planning on attending? How long, expenses and etc?

imaad

-----Original Message-----
From: Muna Habib [mailto:muna.habib@gmail.com]
Sent: Monday, June 15, 2015 7:00 AM
To: imaad.zuberi@mindspring.com
Subject: Hello from Pakistan

Dear Mr. Zuberi,

A mutual friend of ours, Ambassador Olson,  has passed on your email contact. I am writing to introduce myself and say hello.

Kind regards, Muna Habib.

Sent from my iPhone=

# EXHIBIT S

## AJK

From:   Muna Habib (muna.habib@gmail.com)

To:     rickscafedxb@yahoo.com

Date:   Monday, December 29, 2014, 11:29 PM EST

P.s THANKYOU

God only knows, I can do with all the help, in that paradise.

Plus it makes returning so much easier.

Along with the lure of the weather --- it's freezing here!

And I know you don't have to.

So, I know I've said it Olson, but I really do appreciate the sentiment.

THANKS again!

Sent from my iPhone

> On Dec 29, 2014, at 4:29 PM, Muna Habib <muna.habib@gmail.com> wrote:
>
> Dear Rick,
>
> Even if the opportunity doesn't arise I am grateful for the sentiment and appreciate the kind offer.
>
> However, if it makes things difficult in anyway or compromises you, I'd rather you refrain from mentioning my case.
>
> Pakistan is hard enough. And you certainly don't need additional baggage.
>
>
> Take care of yourself.
>
>
> Sent from my iPhone

ROMH00000089

# EXHIBIT T

Yahoo Mail - Happy New Year!

## Happy New Year!

From:  Muna Habib (muna.habib@gmail.com)

To:     rickscafedxb@yahoo.com

Date:  Friday, January 2, 2015, 03:41 AM EST

Hope you had great one.

Apologies for the belated wish, I've been at the hospital with my father and rest of family.

Sent from my iPhone

ROMH00000088

# EXHIBIT U

# Call

From:  Muna Habib (muna.habib@gmail.com)

To:     rickscafedxb@yahoo.com

Date:  Tuesday, May 12, 2015, 07:37 PM EDT

Dear Rick,

You sounded drained when we spoke earlier, One is hoping it wasn't my persistent calls :-)

I loathe to ask, as I am aware of how demanding your role in Pakistan already is; both emotionally and physically. However, THANKYOU for agreeing to help.

Let me know if you do require anything else from sunny London, preferably before departure :-)


Rick, please do take good care of yourself.



Sent from my iPhone

ROMH00000087

# EXHIBIT V

## Re: Honesty

**From:** Muna Habib (muna.habib@gmail.com)

**To:** rickscafedxb@yahoo.com

**Date:** Tuesday, June 16, 2015, 03:54 AM EDT

Good glad we got all that sorted. Moving on, the Mirpur issues are a becoming a nightmare. I feel I may need to cut my losses and get out.

Thank you again for trying to help me with this, however as we are both aware, nothing in this country is ever ever simple!

Sent from my iPhone

> On Jun 16, 2015, at 9:27 AM, Rick Olson <rickscafedxb@yahoo.com> wrote:
>
>
>
> Thanks.  Glad we're still friends.  I care deeply about you too.
>
> x
>
>
>
>
> rgo
>
> Rick Olson
>
>
>
> -------------------------------------------
> On Tue, 6/16/15, Muna Habib <muna.habib@gmail.com> wrote:
>
> Subject: Honesty
> To: "Rick Olson" <rickscafedxb@yahoo.com>
> Date: Tuesday, June 16, 2015, 6:29 AM
>
> Dear
> Rick,
>
>
>
> Thank
> you for your
> honesty. On my part, our break up has been one of the most
> difficult periods of
> my life.
>
>
>
> Although, it is very important
> that you know: I understand that you did not intend to hurt
> me, that I did not
> blame you entirely. And I too was responsible for what
> happened.
>

Yahoo Mail - Re: Honesty

>
>
> You
> see, I knew when we
> became involved, about your emotional issues, but I
> continued to see you. I
> knew how, you had behaved in all your previous relationships
> and I continued to
> see you. It didn't matter to me because of how you made me
> feel: loved, special,
> something that I had never experienced before.
>
>
>
> I
> understand now, our
> relationship was not just about a S*** it went beyond this.
> I always said it is
> our friendship, which is far more important to me than
> anything else. From day
> one, we had a special connection on many levels, our
> conversations; honesty and
> understanding of one another are rare.
> Masha'Allah.
>
>
>
> I
> felt towards the end we lost this. I felt
> your vacillation and your distance. For months I was
> unhappy, and thought you
> were too.  I understand now, this is how
> you have dealt with all your relationships. Please do not
> think this is a
> criticism, but at the time I did not understand you and was
> hurt.
>
>
>
> For
> months after our
> break up, every day I thought about you, wondered what you
> were doing, where
> you were, if you had moved on and if you ever, really had
> cared about me.
>
>
>
> I was
> miserable, and
> missed you terribly. I was still in pain and terrified of
> seeing you again.
> This is the honest reason why, I decided to run away to
> Qatar and not return
> here.
>
>
>
> I know
> I hurt you with
> my admission about Cameron. But at the time, I was in pain
> and extremely angry.

ROMH00000083

> I felt you viewed me as just another fling.
>
>
>
> I am
> sorry; I
> underestimated how you really felt about me. I was not
> experienced enough in
> relationships and in hindsight should have handled things
> differently.
>
>
>
> You
> are an extremely
> special individual Olson. Insha'Allah we shall remain good
> friends for life. I
> cherish our friendship, I realize you are far too important
> to me, to simply, let
> go.
>
>
>
> Yes I
> do still love
> you, and care deeply for you, and that will not change.
>
>
>
>
> X

ROMH00000084

**3/3**

# EXHIBIT W

Case 1:22-cr-00144-GMH   Document 38-1   Filed 02/06/23   Page 62 of 319

# BRILLIANT

From:  Muna Habib (muna.habib@gmail.com)

To:    rickscafedxb@yahoo.com

Date:  Saturday, June 20, 2015, 08:33 AM EDT

https://khabaristantimes.com/entertainment/tahir-ashrafi-to-play-dinosaurs-egg-in-jurassic-world-sequel/

## Re:

**From:** Muna Habib (muna.habib@gmail.com)

**To:** rickscafedxb@yahoo.com

**Date:** Sunday, June 21, 2015, 03:50 AM EDT

The U.S needs to be honest in order to progress. Racism is not only in the past. It did not end with the Thirteenth Amendment of 1865 or with the Voting Rights Act of 1965. It is present in the acts and attitudes of many today. As we distinctly observe with Nikki Hayley.

Her attitude does not surprise me. Numerous South Asian's are racist, have you not witnessed it here? The concept of fairer skin, is a class and status symbol.  Asian's especially here, are derogatory to those with darker skin. Growing up in we were taught blacks are inferior. I know white people find it ironic, brown skin is brown – doesn't matter what shade.

The problem is you Yanks have an in ability to talk about your history without everyone getting defensive. It happened, yes, appalling, tragic, but what now?

150 years post slavery, the U.S tried reconstruction, allowing liberated men to vote, earn salaries and claim an equal place in politics. And then Jim Crow was allowed to legitimize black racism. 50 years post – civil rights movement or the second reconstruction, again an attempt to end the fight and give equal status to the descendent of the slaves.

But here you are today, still plagued post –Ferguson, post – Staten Island and now Charleston killings, and the boundaries of colour still evident.

That's why I think the U.S should take a page from South Africa's script.

When Mandela became president of SA, he had two choices. He could have gone down a path of confrontation and retribution against the white Afrikaners who had ruled so oppressively. Or he could have skipped quickly past the history and reality of apartheid and pardoned all its perpetrators in the interests of maintaining order.

He did neither - in one of his many acts of civic genius - he chose a path for his country that exposed the ugliness of the past and opened the way to frank open dialogue and ultimately progress. He launched the Truth and Reconciliation commission.

I know there will be objections to this. People will ask, doesn't cataloging acts of racism from the past just make it harder for everyone to get along?

But I don't think so. Without attempts for formal accounting, without the oppressed  and the oppressor, facing one another the nations challenges won't disappear and these awful acts continue.

An excellent article related to this.

http://www.yesmagazine.org/peace-justice/this-country-needs-a-truth-and-reconciliation-process-on-violence-against-african-americans

On Sat, Jun 20, 2015 at 6:34 PM, Rick Olson <rickscafedxb@yahoo.com> wrote:

A very complicated subject.

ROMH00000079

The battle flag of the Confederacy used to be viewed as a regional eccentricity, tolerated by the rest of the country in what was perhaps a misguided effort to reconcile with the sons of the Confederacy.  That is, until it was used as the symbol of the segregationists in the 60s. It has since enjoyed something of a revival, and I must say I fully sympathize with Blacks who regard it as a stunning insult.  That it flies over several State capitols is to my mind appalling, and one of the reasons I intensely dislike the South.

To add to the complexity, the Governor of South Carolina, who is quoted in this article, is a Desi.  She is the daughter of immigrants from India.  Which has not prevented her from being a right-wing lunatic pandering to the racist impulses of her White male Southern base.  Make of it what you will.


*rgo*

Rick Olson

---

**From:** Muna Habib <muna.habib@gmail.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Friday, June 19, 2015 3:20 AM
**Subject:**

http://www.bbc.com/news/blogs-trending-33186078

ROMH00000080

## Re:

From: Muna Habib (muna.habib@gmail.com)

To: rickscafedxb@yahoo.com

Date: Wednesday, July 1, 2015, 06:51 AM EDT

OMG I am SO VERY VERY SORRY Rick.

I thought you didn't want to hear from me, or a ' read  out' until I was back in Pakistan. When we last met you said, to call when I return to Pakistan.

I know you're busy with work and stressed about many things. Thus I did not want to be an additional hassle.

I wanted to call you on Monday when we first met. But was uncertain about bothering you – then decided against it. I remembered you'd said you needed to take a step back. Which I completely understood.

I am sorry, I was confused I thought...

He continued to Genevae yesterday and I spent the night in Paris alone. I was extremely tired, feeling low, lonely and depressed. It was late in Pakistan by the time I had managed to excuse myself from the trip to Genevae, and I knew you would be asleep.

And I feel I need to protect you with regards to the principal.

Rick: do you understand what you have done for me. I can never, ever, appreciate my gratitude and thanks. Your kindness and help has completely overwhelmed me –  no one has ever gone out of their way for me, ever.

Coupled with the fact that I love you dearly, makes all this extremely hard. I don't know when I am over stepping the friends boundary; with calling you, pestering you and wanting to hang out with you.

I WAS NOT  sending you snarky text messages. I missed you and still do ( which I hate) and just wanted a chat. Hence smiley face and a kiss.

I am sorry, I need to speak to you.  But not to get you involved, but because I trust and respect your advice and opinion.

I was boarding the plane to London when you called and am now in London. I am confused with many things, and need to speak to you.

And for the record.  Do you know how happy it makes me when ever I see a missed call from you. The saddo that I am ( colloquial English for pathetic). So it is not because 'I am intentionally not returning your calls,' After arriving in London I had to rush to board a train to Birmingham to see my mother  and siblings, before I return to Pakistan tomorrow.

And as you know that is another emotional story.X


Sent from my iPhone

> On Jul 1, 2015, at 10:17 AM, Rick Olson <rickscafedxb@yahoo.com> wrote:
>
> Has it occured to you that it might be in your interest to give me a readout of your meeting, since the principal is likely, in fact has, reached out to me?  Rather than sending me snarky SMSes and not returning my calls.
>
>
>
>
>

>
> rgo
>
> Rick Olson
>
>

## Fascinating read

From:   Muna Habib (muna.habib@gmail.com)

To:     rickscafedxb@yahoo.com

Date:   Monday, July 20, 2015, 04:36 PM EDT

http://www.huffingtonpost.com/alastair-crooke/isis-wahhabism-saudi-arabia_b_5717157.html

http://www.huffingtonpost.com/alastair-crooke/isis-aim-saudi-arabia_b_5748744.html

ROMH00000103

Yahoo Mail - Talk

Talk

From: Muna Habib (muna.habib@gmail.com)

To:   rickscafedxb@yahoo.com

Date: Sunday, August 9, 2015, 12:04 PM EDT

Olson: It was good to speak to you earlier. Admittedly, I was worried about you following our previous conversation. I am sorry, of late I have been emotionally drained and unable to really talk. I am also sorry I am not there to speak to you in person.

I know things are obscure and this is a difficult phase in your journey. I guess me telling you everything will work out fine, and you have no need to worry about the future doesn't help. Especially, when you are alone and left to your own negative thoughts.

But you still need to hear it. I am certain: Allah will continue to care of you. That you shall find the right path for your career inshallah. (I known reading this you shall be rolling your eyes 😊, but I always pray for this ). And you will enjoy the next stage of your life.

You are so darn smart and professionally accomplished  (masha'allah)  the average gig will just not cut it. I know your career is a huge part of  your identity and I admire you immensely for exploring the unknown, despite your trepidation. Anthony Robbins once wrote, 'feel the fear, yet do it anyway.' Of which one is a firm believer.

On another note, I would love to see you next week.

Pakistan was wonderful and I am so grateful for the time we spent together. Allhumdullilah. You know I will always cherish our friendship. I want you to know: you are not obliged to see me. I know you have your professional commitments and personal obligation, thus do not want  to be an additional burden. Thus, if you'd rather not meet, please do say.

Besides,  I am going to Columbia! Yay! Happy dance 😊 All thanks to you Olson! So I am sure I can find something to occupy myself with on a Friday night😊 😊x

Sent from my iPhone

ROMH00000099

Fw: Consul General of Pakistan Hamid Asghar Khan Recalled on Community Complaints

From:   Rick Olson (rickscafedxb@yahoo.com)

To:     muna.habib@gmail.com; olsonrg@state.gov

Date:   Thursday, November 5, 2015, 05:10 PM EST

Another notch in Imaad's stock.
*rgo*

Rick Olson

—— Forwarded Message ——
**From:** imaad zuberi <imaad.zuberi@mindspring.com>
**To:** Ambassordor Rick Olson - personal <rickscafedxb@yahoo.com>
**Sent:** Thursday, November 5, 2015 1:25 AM
**Subject:** FW: Consul General of Pakistan Hamid Asghar Khan Recalled on Community Complaints

**Thursday, November 5, 2015**

**Consul General of Pakistan Hamid Asghar Khan
Recalled on Community Complaints**

Los Angeles, CA: The Consul General of Pakistan in Los
Angeles Hamid Asghar Khan has been recalled by the
Government of Pakistan on the complaints of the
community.
Jabbar Memon, who is currently serving as the Director
General Afghanistan in Islamabad, has been designated to
replace Hamid Ashghar Khan at the Pakistan Consulate in
Los Angeles.
Government's dissatisfaction with the Consul General in Los
Angeles Hamid Asghar Khan, largely stemming from the
community complaints against him, forced his premature
replacement, according to insiders. He has served less than
a year at this posting. The normal tenure for such postings
is three years. A report published in Pakistan's leading
newspaper Dawn on October 14, 2015 noted that this is not
the first time that Khan has been recalled from a foreign
posting.
This action by the Government of Pakistan comes after
months of complaints by the Pakistani community in Los

ROMH00000545

Angeles to Pakistani Ambassador to the United States Jalil Abbas Jillani and senior political figures in Pakistan, including Prime Minister Nawaz Sharif's Advisor on National Security and Foreign Affairs Sartaj Aziz, and the Foreign Secretary of Pakistan Aizaz Ahmad Chaudhry and Pakistan Army's top brass.

Reports were filed by numerous individuals against Khan that included allegations of sexual harassment, behavior unbecoming of a diplomat, misconduct, intoxication during work hours and at official events/parties, fund embezzlement, solicitation of bribes, inappropriate/illegal involvement in local politics and mismanagement of Consulate affairs.

According to a Pakistani newspaper Daily Times report published in its July 8, 2015 issue the women at the Consulate office in Los Angeles and the Pakistani American community alleged that Khan repeatedly propositioned them and made untoward sexual suggestions. It has also been reported that Khan's male chauvinistic remarks and behavior towards women created a hostile work environment for them at the Consulate. Three young women were hired by Khan as interns - none of whom is now working at the Consulate due to the poor work environment. It has been alleged that Khan demanded that the interns and the staff bring him alcohol and then consume it, while in the Pakistan Consulate office. He would then proceed to become violent and abusive towards his colleagues. It has been reported that he would scream and yell at the staff and belittle his subordinates in front of the whole Consulate staff regularly. Several reports have been filed about his rude behavior while intoxicated at various private and official parties, some of which were held at his residence in the posh and affluent Beverly Hills area, where alcohol was regularly served.

One such report of Khan's rude behavior while intoxicated was published in the May 5, 2015 issue of Pakistani newspaper Business Recorder. According to this report, in March 2015, Khan while delivering his official speech in the presence of over 100 guests at an event hosted by Pakistan Arts Council, insulted and physically threatened one of the guests, Dr Mansoor Shah. Dr Shah is a prominent and highly respected member of the Pakistani community. Following the speech numerous Pakistani and American guests complained of the incident to the Pakistan ambassador.

There are also reports of Khan's disparaging remarks about the state of affairs in Pakistan and its leadership. One such report described Khan's derogatory remarks towards Prime Minister Nawaz Sharif and Chief of Army Staff Gen Raheel Sharif at a gathering. Khan was reported to lament about Pakistan's political, and energy crisis, and repeatedly said that Pakistan continues to beg and survive on international aid. One of the guests expressed his anger and said, "It is the role of the Consul General to promote Pakistan abroad and to improve its image not to belittle it and bring it ridicule." Following the event, Qamar Abbas Khokar, the Head of Chancery at the Pakistan Consulate, called all the guests present at that occasion, to apologize for Khan's behavior.

It has also been alleged that Khan asked several prominent Pakistani-American and American businessmen for financial rewards. The businessmen reported that they were told by Khan that in order for them to bring much needed investment to Pakistan they would be required to give a commission or "kick back" to him.

It has also been reported that the payments for the interior construction work done at the Pakistan Consulate premises in February 2015, which included the construction of the 'community hall' at the Consulate, by Icon Architects - Icon Atelier Inc., a company owned by Pakistani–Americans, have not been made in full as of now. It has been alleged that the budget for the project was approved before the start of the project, but after the completion of the project in record time, the principles of the company were asked to donate all or portion of the invoice amount. It has been feared that though the Consulate received the full budgeted amount for the project, only portion of the funds was released to the company and the rest of the funds were used for possibly some unauthorized purpose.

It has also been alleged that Khan's behavior has not only offended the Pakistani community but also eminent American politicians and government officials, who have distanced themselves from Khan. These politicians and government officials have now refused to attend any future Pakistan Consular events. Tony Mendoza, a prominent California Senator, has publicly expressed his dismay and regret over Khan's behavior and is one of the many

ROMH00000546

American politicians who no longer attend the Consul
General's events.
Though the exact date of Khan's departure from the
Pakistan Consulate in Los Angeles is not yet announced, he
is expected to leave his post before the end of December
2015.
Hamid Asghar Khan could not be reached for his comments.
— **Published Oct 30, 2015. To read this entire issue click
on Pakistan Link, October 30, 2015**

Editor: Akhtar M. Faruqui
© 2004 pakistanlink.com . All Rights Reserved.

ROMH00000547

Re: I think I pass

From:  Muna Habib (muna.habib@gmail.com)

To:    rickscafedxb@yahoo.com

Date:  Tuesday, November 17, 2015, 07:47 PM EST

Agreed... one is convinced, no 16 shall compensate for not having read one of the greatest British classic literature of our time. And as for the Rose...you trained yours truly to...😊 💌

On Tue, Nov 17, 2015 at 4:38 AM, Rick Olson <rickscafedxb@yahoo.com> wrote:

although I have never read Pride and Prejudice....and I've never trained a rose.  But otherwise .....


The 39 steps to being a gentleman and why I pass (just) - FT.com



### The 39 steps to being a gentleman and why I pass

Do you agree with the latest guide published by Country Life on the 39 steps to being a modern gentleman? It's a good arbitrary list. I just wonder if Richard

View on www.ft.com                    Preview by Yahoo

*rgo*

Rick Olson

ROMH00000097

## Apologies

From:   Muna Habib (muna.habib@gmail.com)

To:       rickscafedxb@yahoo.com

Date:   Friday, February 5, 2016, 10:25 AM EST

I feel awful as to how we have ended up. I am sorry for my lack of trust and belief in us. I don't expect you to respond and neither do I want you to.

I am truly sorry we came to this.

All the best, Muna.

# EXHIBIT X

## Re: Clarification

From:  Muna Habib (muna.habib@gmail.com)

To:    rickscafedxb@yahoo.com

Date:  Monday, May 16, 2016, 07:19 AM EDT

Ok. So I would like to meet, when are you in NY?

On Sun, May 15, 2016 at 12:02 PM, Rick Olson <rickscafedxb@yahoo.com> wrote:

Dear Muna:

I'm glad you are seeing someone, and are happy. I wish you the best.

I don't want to fight and rehash the past, but I feel your email reflects a revisionist history. The reason our relationship ended was not my lack of nurturing or respect. It ended because you -- repeatedly -- accused me falsely of things I had not done, and did so by drawing on notoriously unreliable sources. And apparently you have continued to rely on those sources to keep track of my private life, making you, BTW complicit in what they are up to. I have no interest in facilitating this behavior, and I would hope you would do some examination of your own actions and how they contributed to my frustration.

Of course I regret that we broke up. As I told you, I never would have made it through Islamabad without you, and much of our time together was magical.

But I have had a lot of loss in my life. You've had a lot of pain, more than me, but I had lot of loss early in my life, and my coping mechanism is to move on, very fast. I'm not particularly interested in laying out for you how I moved on, because you apparently share these emails with your friends, but suffice to say that I did. Sort of. But not without considerable regret.

Case 1:22-cr-00144-GMH   Document 38-1   Filed 02/06/23   Page 76 of 319

I wish you the best, but I really urge you to look into your own behavior as you launch into another relationship.

Proud of you for making it through Columbia, with all the challenges you faced.

Best,

rgo

Rick Olson

---

**From:** Muna Habib <muna.habib@gmail.com>
**To:** rickscafedxb@yahoo.com
**Sent:** Saturday, May 14, 2016 4:42 PM
**Subject:** Clarification

My friends appear to think the tone of the previous email  may be perceived as anger

I assure one is not. Hurt and disappointed, let down by your behavior but certainly not anger.

Sympathy is more a word that springs to mind.

Why sympathy you may ask. Because you still haven't learnt the skills required for a nurturing, respectful relationship despite being married and several long term girlfriends. And I know what happened between us will be repeated again by you with others.

I pray for you Rick: that Allah gives you the security within yourself to see difficulties through in life,  and you find someone that will teach you the confidence and security you need.

And I pray, you find the strength to not continue to drag others into your mess.

That said I know I'm not perfect either and am working on me. Inshallah I am with someone new now who  understands me. Allhumdullilah

It's early days but who knows where it may lead.  We talked about marriage, early days yet but lets see.

I do wish you all the best, Olson and it was important for me to clarify this as I do care for you and want you to be happy.

Take care x

ROMH00000023

Case 1:22-cr-00144-GMH    Document 38-1    Filed 02/06/23    Page 77 of 319

Sent from my iPhone

ROMH00000024

# EXHIBIT Y

 An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT OF JUSTICE
ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 2043. COMPARISON OF THE ELEMENTS OF THE CRIMES OF BRIBERY AND GRATUITIES

The differences between the offense of bribery and the offense of accepting a gratuity are marked in the chart below either by brackets (for features that are found in only one of the two sections) or by UPPER CASE TEXT (to highlight the key distinction in how the sections specify the required connection between the thing of value and the official act).

|  | § 201(b): *Accepting a Bribe* | § 201(c): *Accepting a Gratuity* |
|---|---|---|
| *Status* | Whoever, being a public official [ ] or person selected to be a public official | Whoever, being a public a public official, [former public official], or person selected to be a public official |
| *Intent* | CORRUPTLY | [ ] |
| *Act* | *[ ]<br>* directly or indirectly<br>* demands, seeks, receives, accepts, or agrees to receive or accept | * [otherwise than as provided by law for the proper discharge of offical duty,]<br>* directly or indirectly<br>* demands, seeks, receives, accepts, or agrees to receive or accept |
| *Thing* | anything of value | anything of value |
| *For Whom* | PERSONALLY [OR FOR ANY OTHER PERSON OR ENTITY] | PERSONALLY [ ] |
| *Purpose* | IN RETURN FOR:<br>* being influenced in the performance of any official act;<br>* being influenced to commit or aid in committing any fraud on the U.S.; or<br>* being induced to do or omit to do any act in violation of his or her official duties. | FOR OR BECAUSE OF any official act performed or to be performed by such official or person. |

[updated November 1998] [cited in Criminal Resource Manual 2042; Criminal Resource Manual 2045; JM 9-85.101]

‹ 2042. Elements Common To Both Bribery And Gratuity Offenses                           up                           2044. Particular Elements ›

*Updated January 17, 2020*

# EXHIBIT Z

 An official website of the United States government
Here's how you know

 This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

# 2041. BRIBERY OF PUBLIC OFFICIALS

Section 201 of Title 18 is entitled "Bribery of public officials and witnesses." The statute comprises two distinct offenses, however, and in common parlance only the first of these is true "bribery."

The first offense, codified in section 201(b), prohibits the giving or accepting of anything of value to or by a public official, if the thing is given "with intent to influence" an official act, or if it is received by the official "in return for being influenced."

The second offense, codified in section 201(c), concerns what are commonly known as "gratuities," although that word does not appear anywhere in the statute. Section 201(c) prohibits that same public official from accepting the same thing of value, if he does so "for or because of" any official act, and prohibits anyone from giving any such thing to him for such a reason.

The specific subsections of the statute are:

*Bribery*

1. a. § 201(b)(1): offering a bribe to a public official
   b. § 201(b)(2): acceptance of a bribe by a public official

   *Gratuities*

   a. § 201(c)(1)(A): offering a gratuity to a public official

   b. § 201(c)(1)(B): acceptance of a gratuity by a public official.

The two offenses differ in several respects. The most important of these differences concerns how close a connection there is between the giving (or receiving) of the thing of value, on the one hand, and the doing of the official act, on the other. If the connection is causally direct - if money was given essentially to purchase or ensure an official act, as a "quid pro quo" then the crime is bribery. If the connection is looser - if money was given after the fact, as "thanks" for an act but not in exchange for it, or if it was given with a nonspecific intent to "curry favor" with the public official to whom it was given -then it is a gratuity. The distinction is sometimes hard to see, but the statute makes it critical: a § 201(b) "bribe" conviction is punishable by up to 15 years in prison, while a § 201(c) "gratuity" conviction permits only a maximum 2-year sentence. In addition, with a "bribe" the payment may go to anyone or to anything and may include campaign contributions, while with a "gratuity" the payment must inure to the personal benefit of the public official and cannot include campaign contributions.

[cited in JM 9-85.101]

‹ 2040. Bank Records And Foreign Transactions -- Financial Crimes Enforcement Network (FinCEN)

up

2042. Elements Common To Both Bribery And Gratuity Offenses ›

*Updated January 17, 2020*

# EXHIBIT AA

From: Rick Olson (rickscafedxb@yahoo.com)
Sent: Sunday, October 4, 2015 11:40:40 PM
To:   Kurt (private) Amend (amendke@hotmail.com);
Kurt.E.Amend@Raytheon.com (Kurt.E.Amend@Raytheon.com)
Cc:
Bcc:
Subject:   Change of Plans


Kurt:

In the end they convinced me to take the SRAP job, for six months.  I will
have the best seat on the bridge of the sinking ship.

Back in DC in November, let's grab a beverage.




rgo

Rick Olson

# EXHIBIT BB

From: Rick Olson (rickscafedxb@yahoo.com)
Sent: Wednesday, January 7, 2015 1:00:35 AM
To:   kah@habtoor.com (kah@habtoor.com)
Cc:
Bcc:
Subject:    Procedure

Dear Khalaf:

In view of our recent discussion, US Government ethics rules require me to
recuse myself from any USG actions involving the Al Habtoor group.  To the
best of my knowledge, there are none, and certainly none that I would be
involved with in my current job, but I'm afraid I have to send you a memo
for the record.

Sorry I will not be able to join you for the 45th -- my current boss is
coming for a visit and I have to host him.

Best,


rgo

Rick Olson

Â

From: KAH (kah@habtoor.com)
Sent: Monday, September 15, 2014 11:43:50 PM
To:   -Rick Olson- (rickscafedxb@yahoo.com)
Cc:
Bcc:
Subject:   RE: From Rick Olson

Dear Rick

It was a pleasure to see you here and to have dinner with you.
For a person of your calibre the time is open as we discussed till the end
of June 2015. We can speak further during this time when we meet.
I wish you all the best

Khalaf Al Habtoor

-----Original Message-----
From: Rick Olson [mailto:rickscafedxb@yahoo.com]
Sent: 15 September 2014 17:50
To: kah@habtoor.com
Subject: From Rick Olson

Dear Khalaf:

Switching to my private email account for better privacy.

Thanks again for your generous hospitality, but more importantly, for having
the trust to consider me for the position you described.  I am honored. As I
mentioned, I will have to decide whether to leave diplomacy, which has been
my life's work, and that will not be easy.  If I may ask, what is your
timeframe for making a decision.  In other words, when would I need to give
you an answer.

Once again, many thanks.

Best,

rgo

Rick Olson

Â

RECIPIENT NOTICE: This email is confidential and may contain legally
privileged information. If you are not the intended recipient, inform the
sender immediately and destroy this email without using, sending or
storing it. Internet communications cannot be guaranteed to be timely,
secure, error or virus-free.

# EXHIBIT CC

**From:**      "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Sent:**      Mon, 14 Sep 2015 07:41:39 -0500
**To:**        "Olson, Richard G" <olsonrg@state.gov>
**Cc:**        "Rick Olson (rickscafedxb@yahoo.com)" <rickscafedxb@yahoo.com>
**Subject:**   Re: Thanks

Cool, many thanks


On 14 Sep 2015, at 15:55, Olson, Richard G <olsonrg@state.gov> wrote:

Dear Arif:

Thanks for taking my call yesterday.  I'd like to follow up with you once I'm finished in Pakistan and to that end am copying my private e-mail address which will be my permanent one once I leave the Service.

Best,

*rgo*

Rick Olson
US Ambassador to Pakistan

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.

**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.

**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

From: Rick Olson (rickscafedxb@yahoo.com)
Sent: Sunday, September 20, 2015 10:11:16 PM
To:   Arif M. Naqvi (arif.naqvi@abraaj.com)
Cc:
Bcc:
Subject:   Re: Thanks


Dear Arif:

Turns out I'm going to be in Islamabad until nearly November.  You
mentioned the possibility of having some preliminary conversations about
my future plans.  I'd welcome the opportunity to do that in October,
preferably on a Sunday (so I can take advantage of the assymetric
Pak/Emirati weekends).  Would that work for Abraaj?

One caveat: once we started talking I would need to file a recusal from
doing any USG business with Abraaj -- but that should not be a problem,
since I have not been directly involved in any of your activities. And I
am pretty much in purdah here anyway!

Please let me know.

Best,



rgo

Rick Olson

Â

--------------------------------------------
On Mon, 9/14/15, Arif M. Naqvi <arif.naqvi@abraaj.com> wrote:

 Subject: Re: Thanks
 To: "Olson, Richard G" <olsonrg@state.gov>
 Cc: "Rick Olson (rickscafedxb@yahoo.com)" <rickscafedxb@yahoo.com>
 Date: Monday, September 14, 2015, 5:41 PM


 Cool, many thanks




 On 14 Sep 2015, at 15:55, Olson, Richard G <olsonrg@state.gov>

From: Arif M. Naqvi (arif.naqvi@abraaj.com)
Sent: Monday, September 21, 2015 5:59:28 PM
To:   Rick Olson (rickscafedxb@yahoo.com)
Cc:   Mustafa Abdel-Wadood (mustafa.abdel-wadood@abraaj.com); Wahid Hamid (Wahid.Hamid@abraaj.com)
Bcc:
Subject:   October

Rick, thanks for your email; I am copying Mustafa and Wahid, both of whom you know. I have fully briefed them on our discussion and they are as enthused as me in discussing how a potential role may evolve. Equally, they will help you navigate an understanding of what life in the private sector would look like!

Apart from them, I would like you to meet with Omar, who oversees our business in Asia (based out of Singapore), and Sev, based in London who oversees our global Â³thematicÂ² businesses; and Tom, who is based in NYC and oversees our Global Markets Coverage (they are the folks who interface Abraaj to the external world of our stakeholders). For sake of completeness of designations, Mustafa oversees all our global private equity businesses and Wahid runs our Performance Acceleration Group.

5 people to meet over your defined timeline,and those meetings can start in Dubai, and either Tom/Sev/Omar can also meet you in Dubai, or when you are next outward-bound.

Best regards

_____
This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.

CONFIDENTIALITY NOTICE: The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.

DISCLAIMER: Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the

From: Mustafa Abdel-Wadood (mustafa.abdel-wadood@abraaj.com)
Sent: Tuesday, September 22, 2015 2:02:02 AM
To:  Rick Olson (rickscafedxb@yahoo.com)
Cc:  Wahid Hamid (Wahid.Hamid@abraaj.com); Magdalena Hansen
(magda.hansen@abraaj.com)
Bcc:
Subject:   Re: October

Thanks Rick. Look forward to meeting. I can do 11th morning or 18th.

(Moving Arif to BCC)

Regards,
Mustafa

On 22 Sep 2015, at 10:51, Rick Olson <rickscafedxb@yahoo.com> wrote:

Dear Arif, Mustafa and Wahid:

Thanks very much, I look forward to following up in person.

If I were to come to Dubai 11-12 October, or alternatively, 18 October,
would that work for you gentlemen?

Please let me know.

Best,



rgo

Rick Olson



---------------------------------------------
On Tue, 9/22/15, Arif M. Naqvi <arif.naqvi@abraaj.com> wrote:

Subject: October
To: "Rick Olson" <rickscafedxb@yahoo.com>
Cc: "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com>, "Wahid
Hamid" <Wahid.Hamid@abraaj.com>
Date: Tuesday, September 22, 2015, 3:59 AM

Rick, thanks for your email; I am
copying Mustafa and Wahid, both of whom
you know. I have fully briefed them on our discussion and
they are as
enthused as me in discussing how a potential role may
evolve. Equally,
they will help you navigate an understanding of what life in
the private
sector would look like!

From: Rick Olson (rickscafedxb@yahoo.com)
Sent: Tuesday, September 22, 2015 2:25:09 AM
To:   Mustafa Abdel-Wadood (mustafa.abdel-wadood@abraaj.com); Wahid Hamid
(Wahid.Hamid@abraaj.com)
Cc:   Magdalena Hansen (magda.hansen@abraaj.com); Simone Haynes
(simone.haynes@abraaj.com)
Bcc:
Subject:   Re: October


OK, then let's plan for the 11th.  I will make my travel arrangements
accordingly.




rgo

Rick Olson


--------------------------------------------
On Tue, 9/22/15, Wahid Hamid <Wahid.Hamid@abraaj.com> wrote:

 Subject: Re: October
 To: "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com>
 Cc: "Rick Olson" <rickscafedxb@yahoo.com>, "Magdalena Hansen"
<magda.hansen@abraaj.com>, "Simone Haynes" <simone.haynes@abraaj.com>
 Date: Tuesday, September 22, 2015, 12:10 PM

 Dear Rick
 Look forward to meeting. I could do 11th
 morning as well. Need to leave to catch a flight around
 noon. 18th would be challenging.
 Regards
 Wahid

 Sent
 from my iPhone

 > On Sep 22, 2015, at
 10:57 AM, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
 wrote:
 >
 > Thanks
 Rick. Look forward to meeting. I can do 11th morning or
 18th.
 >
 > (Moving Arif
 to BCC)
 >
 >

From: Wahid Hamid (Wahid.Hamid@abraaj.com)
Sent: Tuesday, September 22, 2015 2:10:38 AM
To:   Mustafa Abdel-Wadood (mustafa.abdel-wadood@abraaj.com)
Cc:   Rick Olson (rickscafedxb@yahoo.com); Magdalena Hansen
(magda.hansen@abraaj.com); Simone Haynes (simone.haynes@abraaj.com)
Bcc:
Subject:   Re: October

Dear Rick
Look forward to meeting. I could do 11th morning as well. Need to leave to
catch a flight around noon. 18th would be challenging.
Regards
Wahid

Sent from my iPhone

> On Sep 22, 2015, at 10:57 AM, Mustafa Abdel-Wadood <mustafa.abdel-
wadood@abraaj.com> wrote:
>
> Thanks Rick. Look forward to meeting. I can do 11th morning or 18th.
>
> (Moving Arif to BCC)
>
> Regards,
> Mustafa
>
> On 22 Sep 2015, at 10:51, Rick Olson <rickscafedxb@yahoo.com> wrote:
>
> Dear Arif, Mustafa and Wahid:
>
> Thanks very much, I look forward to following up in person.
>
> If I were to come to Dubai 11-12 October, or alternatively, 18 October,
would that work for you gentlemen?
>
> Please let me know.
>
> Best,
>
>
>
> rgo
>
> Rick Olson
>
>
>
> -------------------------------------------
> On Tue, 9/22/15, Arif M. Naqvi <arif.naqvi@abraaj.com> wrote:
>
> Subject: October
> To: "Rick Olson" <rickscafedxb@yahoo.com>
> Cc: "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com>, "Wahid
Hamid" <Wahid.Hamid@abraaj.com>

From: Rick Olson (rickscafedxb@yahoo.com)
Sent: Sunday, October 4, 2015 11:34:39 PM
To:   Mustafa Abdel-Wadood (mustafa.abdel-wadood@abraaj.com); Wahid Hamid
(Wahid.Hamid@abraaj.com)
Cc:   Magdalena Hansen (magda.hansen@abraaj.com); Simone Haynes
(simone.haynes@abraaj.com)
Bcc:
Subject:   Re: October


Dear Mustafa and Wahid:

Just checking to see that we are still on for meeting next Sunday, 11
October.

If so, please confirm a time and venue.

Many thanks.



rgo

Rick Olson


--------------------------------------------
On Tue, 9/22/15, Wahid Hamid <Wahid.Hamid@abraaj.com> wrote:

 Subject: Re: October
 To: "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com>
 Cc: "Rick Olson" <rickscafedxb@yahoo.com>, "Magdalena Hansen"
<magda.hansen@abraaj.com>, "Simone Haynes" <simone.haynes@abraaj.com>
 Date: Tuesday, September 22, 2015, 12:10 PM

 Dear Rick
 Look forward to meeting. I could do 11th
 morning as well. Need to leave to catch a flight around
 noon. 18th would be challenging.
 Regards
 Wahid

 Sent
 from my iPhone

 > On Sep 22, 2015, at
 10:57 AM, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
 wrote:
 >
 > Thanks
 Rick. Look forward to meeting. I can do 11th morning or
 18th.
 >

From: Wahid Hamid (Wahid.Hamid@abraaj.com)
Sent: Monday, October 5, 2015 6:50:50 AM
To:   Mustafa Abdel-Wadood (mustafa.abdel-wadood@abraaj.com); Rick Olson
(rickscafedxb@yahoo.com)
Cc:   Magdalena Hansen (magda.hansen@abraaj.com); Simone Haynes
(simone.haynes@abraaj.com)
Bcc:
Subject:   Re: October

Confirmed my end as well. Looking forward to it Rick.

Regards

Wahid

On 10/5/15, 3:46 PM, "Mustafa Abdel-Wadood"
<mustafa.abdel-wadood@abraaj.com> wrote:

>Yes. Confirmed on my side. Regards
>
>On 5 Oct 2015, at 00:35, Rick Olson <rickscafedxb@yahoo.com> wrote:
>
>
>Dear Mustafa and Wahid:
>
>Just checking to see that we are still on for meeting next Sunday, 11
>October.
>
>If so, please confirm a time and venue.
>
>Many thanks.
>
>
>
>rgo
>
>Rick Olson
>
>
>
>-------------------------------------------
>On Tue, 9/22/15, Wahid Hamid <Wahid.Hamid@abraaj.com> wrote:
>
>Subject: Re: October
>To: "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com>
>Cc: "Rick Olson" <rickscafedxb@yahoo.com>, "Magdalena Hansen"
><magda.hansen@abraaj.com>, "Simone Haynes" <simone.haynes@abraaj.com>
>Date: Tuesday, September 22, 2015, 12:10 PM
>
>Dear Rick
>Look forward to meeting. I could do 11th
>morning as well. Need to leave to catch a flight around
>noon. 18th would be challenging.
>Regards

From: Magdalena Hansen (magda.hansen@abraaj.com)
Sent: Monday, October 5, 2015 1:06:30 AM
To:   Rick Olson (rickscafedxb@yahoo.com)
Cc:   Simone Haynes (simone.haynes@abraaj.com)
Bcc:
Subject:   RE: October

Dear Rick,

We are confirmed for the 11th October morning. Would 10:30a.m. at our
office in the DIFC be suitable for you? If this is alright, I will send
over a map with directions.

Regards,

Magda Hansen
Executive Assistant
The Abraaj Group

-----Original Message-----
From: Rick Olson [mailto:rickscafedxb@yahoo.com]
Sent: Monday, October 05, 2015 8:35 AM
To: Mustafa Abdel-Wadood; Wahid Hamid
Cc: Magdalena Hansen; Simone Haynes
Subject: Re: October


Dear Mustafa and Wahid:

Just checking to see that we are still on for meeting next Sunday, 11
October.

If so, please confirm a time and venue.

Many thanks.



rgo

Rick Olson



--------------------------------------------
On Tue, 9/22/15, Wahid Hamid <Wahid.Hamid@abraaj.com> wrote:

 Subject: Re: October
 To: "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com>
 Cc: "Rick Olson" <rickscafedxb@yahoo.com>, "Magdalena Hansen"
<magda.hansen@abraaj.com>, "Simone Haynes" <simone.haynes@abraaj.com>
 Date: Tuesday, September 22, 2015, 12:10 PM

 Dear Rick

**From:**       "Rick Olson" <rickscafedxb@yahoo.com>
**Sent:**       Thu, 12 May 2016 09:24:06 -0500
**To:**         "Arif Naqvi" <arif.naqvi@abraaj.com>
**Subject:**    Follow Up

Arif:  Great to see you yesterday. I am very interested in following up our discussion and excited about your concept.

I will be in Istanbul in early June, and could easily come to Dubai around 8 June, if that works for you and your team.  I will also be in Europe in July if that works better.  Please advise.

See you this evening at Vali's.

Best,

*rgo*

Rick Olson

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Fri, 20 May 2016 22:05:30 -0500 |
| **To:** | "Arif M. Naqvi" <arif.naqvi@abraaj.com>; "Mustafa Abdel-Wadood" |

<mustafa.abdel-wadood@abraaj.com>; "Wahid Hamid" <Wahid.Hamid@abraaj.com>

**Subject:**      Re: Follow Up

Arif:  Many thanks.

*rgo*

Rick Olson

---

**From:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>; Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>; Wahid Hamid <Wahid.Hamid@abraaj.com>
**Sent:** Saturday, May 21, 2016 12:27 AM
**Subject:** Re: Follow Up

Rick, I am copying Mustafa and Wahid, who are the two I would like you to meet to discuss the role I envisage; and leave it upto the three of you to coordinate a visit. Best regards

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Friday, May 20, 2016 at 1:06 AM
**To:** "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:** Re: Follow Up

Dear Arif:

Any word on 8 June?  I'll be in Istanbul 7-9 June, so  could come down.  But need to lock in my plans. Would 8 June work for Abraaj? Please advise.

Best,

*rgo*

Rick Olson

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Sat, 21 May 2016 12:10:40 -0500 |
| **To:** | "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com> |
| **Cc:** | "Wahid Hamid" <Wahid.Hamid@abraaj.com> |
| **Subject:** | Re: Follow Up |

Great, thanks


Sent from Yahoo Mail for iPhone


On Saturday, May 21, 2016, 15:05, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com> wrote:

Hi Rick

Good to re-connect. 8th of June could work. We are all in town as we have a board meeting so would need to schedule around it. Will reach out separately with a suggested time

Regards
Mustafa


**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 7:05 AM
**To:** Arif Naqvi <arif.naqvi@abraaj.com>, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>, Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

Arif:  Many thanks.



*rgo*

Rick Olson

**From:**       "Magdalena Hansen" <magda.hansen@abraaj.com>
**Sent:**       Sun, 22 May 2016 05:03:00 -0500
**To:**         "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>
**Subject:**    RE: Follow Up

Hello Rick,

Would the 8th late afternoon in Dubai work for you? We could confirm a meeting at 4 or 5p.m. local time Dubai.

Thank you,

Magda Hansen
Executive Assistant
The Abraaj Group

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 9:10 PM
**To:** Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
**Cc:** Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

Great, thanks

Sent from Yahoo Mail for iPhone

On Saturday, May 21, 2016, 15:05, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com> wrote:

Hi Rick

Good to re-connect. 8th of June could work. We are all in town as we have a board meeting so would need to schedule around it. Will reach out separately with a suggested time

Regards
Mustafa

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 7:05 AM
**To:** Arif Naqvi <arif.naqvi@abraaj.com>, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>, Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Wed, 25 May 2016 04:23:07 -0500 |
| **To:** | "Magdalena Hansen" <magda.hansen@abraaj.com> |
| **Subject:** | Re: Follow Up |

Dear Magdalena:

Yes, that should work.  Sorry for delayed response, am still working the travel arrangements.

Best,

*rgo*

Rick Olson

---

**From:** Magdalena Hansen <magda.hansen@abraaj.com>
**To:** "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>
**Sent:** Wednesday, May 25, 2016 4:08 AM
**Subject:** RE: Follow Up

Good morning Rick,

Just a quick email to follow up on my email below and to make sure you got my email.

Thanks very much,

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Magdalena Hansen
**Sent:** Sunday, May 22, 2016 2:03 PM
**To:** 'rickscafedxb@yahoo.com' <rickscafedxb@yahoo.com>
**Subject:** RE: Follow Up

Hello Rick,

Would the 8th late afternoon in Dubai work for you? We could confirm a meeting at 4 or 5p.m. local time Dubai.

| | |
|---|---|
| **From:** | "Magdalena Hansen" <magda.hansen@abraaj.com> |
| **Sent:** | Wed, 25 May 2016 05:31:37 -0500 |
| **To:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Subject:** | RE: Follow Up |

Excellent thank you, just in case my mobile is 0504513418. We will block 4 p.m for you.

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Wednesday, May 25, 2016 1:23 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

Dear Magdalena:

Yes, that should work.  Sorry for delayed response, am still working the travel arrangements.

Best,

*rgo*

Rick Olson

**From:** Magdalena Hansen <magda.hansen@abraaj.com>
**To:** "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>
**Sent:** Wednesday, May 25, 2016 4:08 AM
**Subject:** RE: Follow Up

Good morning Rick,

Just a quick email to follow up on my email below and to make sure you got my email.

Thanks very much,

Magda Hansen

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Sun, 5 Jun 2016 03:48:13 -0500 |
| **To:** | "Magdalena Hansen" <magda.hansen@abraaj.com> |
| **Subject:** | Re: Follow Up |

Should be doable, my flight gets in around 1300

Sent from Yahoo Mail for iPhone

On Sunday, June 5, 2016, 11:07, Magdalena Hansen <magda.hansen@abraaj.com> wrote:

Great thank you very much. Would it be possible to come in a bit earlier? 15:30 or 15:45?

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Sunday, June 05, 2016 12:02 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

Dear Magdalena: I will be in Dubai and confirm   the meeting: 1600 on 8 June at Abraaj, DIFC, correct?

Sent from Yahoo Mail for iPhone

On Sunday, June 5, 2016, 10:03, Magdalena Hansen <magda.hansen@abraaj.com> wrote:

Hi Rick

Hope you are well. Just a short note to follow up to see if you will be in Dubai this week so we confirm our meting.

Look forward to hearing from you.

Regards,

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Wednesday, May 25, 2016 1:23 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

Dear Magdalena:

Yes, that should work.  Sorry for delayed response, am still working the travel arrangements.

Best,

*rgo*

Rick Olson

---

**From:** Magdalena Hansen <magda.hansen@abraaj.com>
**To:** "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>
**Sent:** Wednesday, May 25, 2016 4:08 AM
**Subject:** RE: Follow Up

Good morning Rick,

Just a quick email to follow up on my email below and to make sure you got my email.

Thanks very much,

Magda Hansen
Executive Assistant
The Abraaj Group

---

**From:** Magdalena Hansen
**Sent:** Sunday, May 22, 2016 2:03 PM
**To:** 'rickscafedxb@yahoo.com' <rickscafedxb@yahoo.com>
**Subject:** RE: Follow Up

Hello Rick,

Would the 8th late afternoon in Dubai work for you? We could confirm a meeting at 4 or 5p.m. local time Dubai.

Thank you,

Magda Hansen
Executive Assistant

The Abraaj Group

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 9:10 PM
**To:** Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
**Cc:** Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

Great, thanks

[Sent from Yahoo Mail for iPhone](#)

On Saturday, May 21, 2016, 15:05, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com> wrote:

Hi Rick

Good to re-connect. 8th of June could work. We are all in town as we have a board meeting so would need to schedule around it. Will reach out separately with a suggested time

Regards
Mustafa

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 7:05 AM
**To:** Arif Naqvi <arif.naqvi@abraaj.com>, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>, Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

Arif:  Many thanks.

*rgo*

Rick Olson

---

**From:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>; Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>; Wahid Hamid <Wahid.Hamid@abraaj.com>
**Sent:** Saturday, May 21, 2016 12:27 AM
**Subject:** Re: Follow Up

Rick, I am copying Mustafa and Wahid, who are the two I would like you to meet to discuss the role I envisage; and leave it upto the three of you to coordinate a visit.

Best regards

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Friday, May 20, 2016 at 1:06 AM
**To:** "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:** Re: Follow Up

## Dear Arif:

Any word on 8 June?  I'll be in Istanbul 7-9 June, so  could come down.  But need to lock in my plans. Would 8 June work for Abraaj? Please advise.

Best,


*rgo*

Rick Olson

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**To:** Arif Naqvi <arif.naqvi@abraaj.com>
**Sent:** Thursday, May 12, 2016 7:24 PM
**Subject:** Follow Up

Arif:  Great to see you yesterday. I am very interested in following up our discussion and excited about your concept.

I will be in Istanbul in early June, and could easily come to Dubai around 8 June, if that works for you and your team.  I will also be in Europe in July if that works better.  Please advise.

See you this evening at Vali's.

Best,

*rgo*

Rick Olson

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at [The Abraaj Group](#) thanks



### The Abraaj Group

The Abraaj Group is a leading investor in growth markets. We currently manage c.US$ 9.5 billion in assets, operating through over 20 offices in Africa, Asia, Latin America, the Middle East and Turkey.

This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at [www.abraaj.com](http://www.abraaj.com). This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at The Abraaj Group



**The Abraaj Group**

The Abraaj Group is a leading investor in growth markets. We currently manage c.US$ 9.5 billion in assets, operating through over 20 offices in Africa, Asia, Latin America, the Middle East and Turkey.

This email may relate to or be sent from other members of The Abraaj Group.

**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.

**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at The Abraaj Group b



**The Abraaj Group**

The Abraaj Group is a leading investor in growth markets. We currently manage c.US$ 9.5 billion in assets, operating through over 20 offices in Africa, Asia, Latin America, the Middle East and Turkey.

This email may relate to or be sent from other members of The Abraaj Group.

**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.

**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Sun, 5 Jun 2016 03:01:33 -0500 |
| **To:** | "Magdalena Hansen" <magda.hansen@abraaj.com> |
| **Subject:** | Re: Follow Up |

Dear Magdalena: I will be in Dubai and confirm   the meeting: 1600 on 8 June at Abraaj, DIFC, correct?

Sent from Yahoo Mail for iPhone

On Sunday, June 5, 2016, 10:03, Magdalena Hansen <magda.hansen@abraaj.com> wrote:

Hi Rick

Hope you are well. Just a short note to follow up to see if you will be in Dubai this week so we confirm our meting.

Look forward to hearing from you.

Regards,

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Wednesday, May 25, 2016 1:23 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

# Dear Magdalena:

Yes, that should work.  Sorry for delayed response, am still working the travel arrangements.

Best,

*rgo*

Rick Olson

**From:** Magdalena Hansen <magda.hansen@abraaj.com>
**To:** "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>
**Sent:** Wednesday, May 25, 2016 4:08 AM
**Subject:** RE: Follow Up

Good morning Rick,

Just a quick email to follow up on my email below and to make sure you got my email.

Thanks very much,

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Magdalena Hansen
**Sent:** Sunday, May 22, 2016 2:03 PM
**To:** 'rickscafedxb@yahoo.com' <rickscafedxb@yahoo.com>
**Subject:** RE: Follow Up

Hello Rick,

Would the 8th late afternoon in Dubai work for you? We could confirm a meeting at 4 or 5p.m. local time Dubai.

Thank you,

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 9:10 PM
**To:** Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
**Cc:** Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

Great, thanks

Sent from Yahoo Mail for iPhone

On Saturday, May 21, 2016, 15:05, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com> wrote:

Hi Rick

Good to re-connect. 8th of June could work. We are all in town as we have a board meeting so would need to schedule around it. Will reach out separately with a suggested time

Regards
Mustafa

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 7:05 AM
**To:** Arif Naqvi <arif.naqvi@abraaj.com>, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>, Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

# Arif:  Many thanks.

*rgo*

Rick Olson

---

**From:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>; Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>; Wahid Hamid <Wahid.Hamid@abraaj.com>
**Sent:** Saturday, May 21, 2016 12:27 AM
**Subject:** Re: Follow Up

Rick, I am copying Mustafa and Wahid, who are the two I would like you to meet to discuss the role I envisage; and leave it upto the three of you to coordinate a visit.

Best regards

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Friday, May 20, 2016 at 1:06 AM

**To:** "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:** Re: Follow Up

Dear Arif:

Any word on 8 June?  I'll be in Istanbul 7-9 June, so
 could come down.  But need to lock in my plans.
Would 8 June work for Abraaj? Please advise.

Best,


*rgo*

Rick Olson

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**To:** Arif Naqvi <arif.naqvi@abraaj.com>
**Sent:** Thursday, May 12, 2016 7:24 PM
**Subject:** Follow Up

Arif:  Great to see you yesterday. I am very interested
in following up our discussion and excited about your
concept.

I will be in Istanbul in early June, and could easily
come to Dubai around 8 June, if that works for you
and your team.  I will also be in Europe in July if that
works better.  Please advise.

See you this evening at Vali's.

Best,

*rgo*

Rick Olson

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at The Abraaj Group thanks



**The Abraaj Group**

The Abraaj Group is a leading investor in growth markets. We currently manage c.US$ 9.5 billion in assets, operating through over 20 offices in

Africa, Asia, Latin America, the Middle East and Turkey.

This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at The Abraaj Group



**The Abraaj Group**

The Abraaj Group is a leading investor in growth markets. We currently manage c.US$ 9.5 billion in assets, operating through over 20 offices in Africa, Asia, Latin America, the Middle East and Turkey.

This email may relate to or be sent from other members of The Abraaj Group.

**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.

**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

| From: | "Arif M. Naqvi" <arif.naqvi@abraaj.com> |
|---|---|
| Sent: | Thu, 10 Nov 2016 12:20:51 -0500 |
| To: | "Rick Olson" <rickscafedxb@yahoo.com> |
| Subject: | Re: From Rick Olson |

Rick, my friend, we have actually been trying to look for a role, even though it may sound like we are being unresponsive; sad part is, in this current world, it is very difficult for a PE firm to do too much on stakeholder engagement without direct bottom line attribution; hence, any and all demands that come for hiring senior people are usually on the business end of the Firm.

Under the circumstances, probably best for you to pursue other options whilst remaining steadfast and close; I know that if we seek your kind of expertise in the future, it will be you, rather than embarking on a search! I wish you well, my friend, and lets stay in touch.

Best regards

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Wednesday, November 9, 2016 at 6:28 PM
**To:** "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:** From Rick Olson

Dear Arif:

I sent the following email to Wahid and Mustafa last week. Since I have not heard back from them I am wondering whether Abraaj is still interested in my services.  I would appreciate it if you could let me know whether I should pursue opportunities with you, since I will shortly begin my job search in earnest and need to realistically know what my options are.

On another note: in a complete state of shock of what the American people have done.  Truly unbelievable.

Best,

*rgo*
Rick Olson

----- Forwarded Message -----
**From:** Rick Olson <rickscafedxb@yahoo.com>
**To:** Wahid Hamid <wahid.hamid@abraaj.com>; Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>

**Cc:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**Sent:** Thursday, November 3, 2016 6:29 PM
**Subject:** Follow Up

Dear Wahid and Mustafa:

I wanted to let you know that I am finishing up at State shortly. Assuming Abraaj is still interested, I would be delighted to follow up our earlier conversations about my joining your team.  I could be in Dubai 17-21 November, or anytime after 29 November.  Please let me know.

Best,

*rgo*

Rick Olson

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.

**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.

**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

**From:**     "Rick Olson" <rickscafedxb@yahoo.com>
**Sent:**     Thu, 10 Nov 2016 13:59:21 -0500
**To:**       "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:**  Re: From Rick Olson

Arif:

Completely understood, thanks for getting back to me.

I will admit to being disappointed, because of all the things I have looked at, Abraaj was far and away the most interesting. I really like your approach to emerging markets, and since I've spent my life on the grittier end of the diplomatic spectrum, the idea of roaming about the developing world looking for opportunities was enormously appealing.  And after this week's developments, I am really keen to get out of Washington.

I would ask as a friend that if you hear about anything where I might fit, I'd be obliged if you keep me in mind. And I welcome any advice you may have on next steps.

If you're in this hemisphere, I hope you will be able to join me for the retirement ceremony on the 28th. Kerry will preside.

Many thanks for considering me.

All the best,


*rgo*

Rick Olson

**From:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Thursday, November 10, 2016 12:20 PM
**Subject:** Re: From Rick Olson

Rick, my friend, we have actually been trying to look for a role, even though it may sound like we are being unresponsive; sad part is, in this current world, it is very difficult for a PE firm to do too much on stakeholder engagement without direct bottom line attribution; hence, any and all demands that come for hiring senior people are usually on the business end of the Firm.
Under the circumstances, probably best for you to pursue other options whilst remaining steadfast and close; I know that if we seek your kind of expertise in the future, it will be you, rather than embarking on a search!
I wish you well, my friend, and lets stay in touch.
Best regards

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Wednesday, November 9, 2016 at 6:28 PM
**To:** "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:** From Rick Olson

Dear Arif:

I sent the following email to Wahid and Mustafa last week. Since I have not heard back from them I am wondering whether Abraaj is still interested in my services.  I would appreciate it if you could let me know whether I should pursue opportunities with you, since I will shortly begin my job search in earnest and need to realistically know what my options are.

On another note: in a complete state of shock of what the American people have done.  Truly unbelievable.

Best,

*rgo*
Rick Olson

----- Forwarded Message -----
**From:** Rick Olson <rickscafedxb@yahoo.com>
**To:** Wahid Hamid <wahid.hamid@abraaj.com>; Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
**Cc:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**Sent:** Thursday, November 3, 2016 6:29 PM
**Subject:** Follow Up

Dear Wahid and Mustafa:

I wanted to let you know that I am finishing up at State shortly. Assuming Abraaj is still interested, I would be delighted to follow up our earlier conversations about my joining your team.  I could be in Dubai 17-21 November, or anytime after 29 November.  Please let me know.

Best,

*rgo*

Rick Olson

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

**From:**        "Rick Olson" <rickscafedxb@yahoo.com>
**Sent:**        Wed, 9 Nov 2016 09:28:57 -0500
**To:**          "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:**     From Rick Olson

Dear Arif:

I sent the following email to Wahid and Mustafa last week. Since I have not heard back from them I am wondering whether Abraaj is still interested in my services.  I would appreciate it if you could let me know whether I should pursue opportunities with you, since I will shortly begin my job search in earnest and need to realistically know what my options are.

On another note: in a complete state of shock of what the American people have done.  Truly unbelievable.

Best,

*rgo*
Rick Olson

----- Forwarded Message -----
**From:** Rick Olson <rickscafedxb@yahoo.com>
**To:** Wahid Hamid <wahid.hamid@abraaj.com>; Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
**Cc:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**Sent:** Thursday, November 3, 2016 6:29 PM
**Subject:** Follow Up

Dear Wahid and Mustafa:

I wanted to let you know that I am finishing up at State shortly. Assuming Abraaj is still interested, I would be delighted to follow

up our earlier conversations about my joining your team.  I could be in Dubai 17-21 November, or anytime after 29 November.  Please let me know.

Best,

*rgo*

Rick Olson

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Thu, 3 Nov 2016 17:29:01 -0500 |
| **To:** | "Wahid Hamid" <wahid.hamid@abraaj.com>; "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com> |
| **Cc:** | "Arif M. Naqvi" <arif.naqvi@abraaj.com> |
| **Subject:** | Follow Up |

Dear Wahid and Mustafa:

I wanted to let you know that I am finishing up at State shortly. Assuming Abraaj is still interested, I would be delighted to follow up our earlier conversations about my joining your team. I could be in Dubai 17-21 November, or anytime after 29 November. Please let me know.

Best,

*rgo*

Rick Olson

| | |
|---|---|
| **From:** | "Magdalena Hansen" <magda.hansen@abraaj.com> |
| **Sent:** | Wed, 8 Jun 2016 01:38:20 -0500 |
| **To:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Subject:** | RE: Follow Up |

Yes thank you Rick we look forward to seeing you later.

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Wednesday, June 08, 2016 10:35 AM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

Magda:  Just to reconfirm, I will plan to be at Abraaj by 1530 this afternoon.

*rgo*

Rick Olson

**From:** Magdalena Hansen <magda.hansen@abraaj.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Sunday, June 5, 2016 5:11 PM
**Subject:** RE: Follow Up

thanks very much!

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Sunday, June 05, 2016 4:44 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

Thanks. Mine is +1 202 412 5951


Sent from Yahoo Mail for iPhone

On Sunday, June 5, 2016, 12:12, Magdalena Hansen <magda.hansen@abraaj.com> wrote:

Ok super thank, just in case of anything my mobile is +971504513418.

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Sunday, June 05, 2016 12:48 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

Should be doable, my flight gets in around 1300


Sent from Yahoo Mail for iPhone

On Sunday, June 5, 2016, 11:07, Magdalena Hansen <magda.hansen@abraaj.com> wrote:

Great thank you very much. Would it be possible to come in a bit earlier? 15:30 or
15:45?


Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Sunday, June 05, 2016 12:02 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

Dear Magdalena: I will be in Dubai and confirm    the meeting: 1600 on 8 June at
Abraaj, DIFC, correct?

Sent from Yahoo Mail for iPhone

On Sunday, June 5, 2016, 10:03, Magdalena Hansen <magda.hansen@abraaj.com>
wrote:

Hi Rick

Hope you are well. Just a short note to follow up to see if you will be in Dubai
this week so we confirm our meting.

Look forward to hearing from you.

Regards,

Magda Hansen
Executive Assistant
The Abraaj Group

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Wednesday, May 25, 2016 1:23 PM
**To:** Magdalena Hansen <magda.hansen@abraaj.com>
**Subject:** Re: Follow Up

# Dear Magdalena:

## Yes, that should work.  Sorry for delayed response, am still working the travel arrangements.

## Best,

*rgo*

Rick Olson

---

**From:** Magdalena Hansen <magda.hansen@abraaj.com>
**To:** "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>
**Sent:** Wednesday, May 25, 2016 4:08 AM
**Subject:** RE: Follow Up

Good morning Rick,

Just a quick email to follow up on my email below and to make sure you got my email.

Thanks very much,

Magda Hansen

Executive Assistant
The Abraaj Group

---

**From:** Magdalena Hansen
**Sent:** Sunday, May 22, 2016 2:03 PM
**To:** 'rickscafedxb@yahoo.com' <rickscafedxb@yahoo.com>
**Subject:** RE: Follow Up

Hello Rick,

Would the 8th late afternoon in Dubai work for you? We could confirm a
meeting at 4 or 5p.m. local time Dubai.

Thank you,

Magda Hansen
Executive Assistant
The Abraaj Group

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 9:10 PM
**To:** Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>
**Cc:** Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

Great, thanks

Sent from Yahoo Mail for iPhone

On Saturday, May 21, 2016, 15:05, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com> wrote:

Hi Rick

Good to re-connect. 8th of June could work. We are all in town as we
have a board meeting so would need to schedule around it. Will reach
out separately with a suggested time

Regards
Mustafa

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Saturday, May 21, 2016 at 7:05 AM
**To:** Arif Naqvi <arif.naqvi@abraaj.com>, Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>, Wahid Hamid <Wahid.Hamid@abraaj.com>
**Subject:** Re: Follow Up

Arif:  Many thanks.

*rgo*

Rick Olson

**From:** Arif M. Naqvi <arif.naqvi@abraaj.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>; Mustafa Abdel-Wadood <mustafa.abdel-wadood@abraaj.com>; Wahid Hamid <Wahid.Hamid@abraaj.com>
**Sent:** Saturday, May 21, 2016 12:27 AM
**Subject:** Re: Follow Up

Rick, I am copying Mustafa and Wahid, who are the two I would like you to meet to discuss the role I envisage; and leave it upto the three of you to coordinate a visit.

Best regards

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Reply-To:** Rick Olson <rickscafedxb@yahoo.com>
**Date:** Friday, May 20, 2016 at 1:06 AM
**To:** "Arif M. Naqvi" <arif.naqvi@abraaj.com>
**Subject:** Re: Follow Up

Dear Arif:

Any word on 8 June?  I'll be in Istanbul 7-9 June, so  could come down.  But need to

lock in my plans. Would 8 June work for Abraaj? Please advise.

Best,


*rgo*

Rick Olson

---

**From:** Rick Olson <rickscafedxb@yahoo.com>
**To:** Arif Naqvi <arif.naqvi@abraaj.com>
**Sent:** Thursday, May 12, 2016 7:24 PM
**Subject:** Follow Up

Arif:  Great to see you yesterday. I am very interested in following up our discussion and excited about your concept.

I will be in Istanbul in early June, and could easily come to Dubai around 8 June, if that works for you and your team.  I will also be in Europe in July if that works better. Please advise.

See you this evening at Vali's.

Best,

*rgo*

Rick Olson

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at The Abraaj Group thanks



**The Abraaj Group**

The Abraaj Group is a leading investor in growth markets. We currently manage c.US$ 9.5 billion in assets, operating through over 20 offices in Africa, Asia, Latin America, the Middle East and Turkey.

This email may relate to or be sent from other members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments
are confidential and may be legally privileged. If you are not the intended recipient, please
immediately inform the sender by replying to this email, and delete this email and any attachments
from your system. Any disclosure, copying or distribution of the information contained in this
email or any action taken or omitted to be taken in reliance thereon is prohibited and may be
unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes
any liability of any kind for the accuracy or reliability of the information contained in this email or
for the transmission, reception, storage or use of such information in any way whatsoever.

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered
in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate
Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and
regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital
Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj
Group, details of which can be viewed at www.abraaj.com. This email may relate to or be sent from other
members of The Abraaj Group.
**CONFIDENTIALITY NOTICE:** The information contained in this email and any attachments are
confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the
sender by replying to this email, and delete this email and any attachments from your system. Any disclosure,
copying or distribution of the information contained in this email or any action taken or omitted to be taken in
reliance thereon is prohibited and may be unlawful.
**DISCLAIMER:** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability
of any kind for the accuracy or reliability of the information contained in this email or for the transmission,
reception, storage or use of such information in any way whatsoever.

---

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered
in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate
Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and
regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital
Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj
Group, details of which can be viewed at The Abraaj Group





**The Abraaj Group**

The Abraaj Group is a leading investor in growth markets. We currently manage c.US$ 9.5 billion in assets, operating through over 20 offices in Africa, Asia, Latin America, the Middle East and Turkey.

This email may relate to or be sent from other members of The Abraaj Group.

**<u>CONFIDENTIALITY NOTICE:</u>** The information contained in this email and any attachments are confidential and may be legally privileged. If you are not the intended recipient, please immediately inform the sender by replying to this email, and delete this email and any attachments from your system. Any disclosure, copying or distribution of the information contained in this email or any action taken or omitted to be taken in reliance thereon is prohibited and may be unlawful.

**<u>DISCLAIMER:</u>** Abraaj Capital Limited, to the fullest extent permitted by law, hereby excludes any liability of any kind for the accuracy or reliability of the information contained in this email or for the transmission, reception, storage or use of such information in any way whatsoever.

This email is sent on behalf of Abraaj Capital Limited, a limited liability company incorporated and registered in the Dubai International Financial Centre under Registered Number (0157), with its registered office at Gate Village 8, Third Floor, Dubai International Financial Centre, United Arab Emirates, and authorized and regulated in the United Arab Emirates by the Dubai Financial Services Authority (DFSA). Abraaj Capital Limited, together with its ultimate holding company Abraaj Holdings and its affiliates, constitute The Abraaj Group, details of which can be viewed at The Abraaj Group b

| From: | "Rick Olson" <rickscafedxb@yahoo.com> |
|---|---|
| Sent: | Tue, 13 Oct 2015 06:58:37 -0500 |
| To: | "Wahid Hamid" <wahid.hamid@abraaj.com>; "Mustafa Abdel-Wadood" <mustafa.abdel-wadood@abraaj.com> |
| Subject: | Thanks |
| Attachments: | RGO CV October 2015.docx, Abraaj Recusal.pdf |

Dear Mustafa and Wahid:

Thanks again for seeing me on Sunday. I appreciated your taking the time to talk collegially about career transition and opportunities at Abraaj. I am very interested in continuing the conversation, and think I could add value in the areas of stakeholder and relationship development.

You had mentioned the possibility of my meeting other members of your team, including Pradeep Ramamurthy. I expect to be in Dubai again on Sunday 25 October, and could meet then if convenient.

I am attaching a copy of resume, and also, as mentioned the recusal letter I have filed with the State Department.

I look forward to hearing from you.

With Best Regards,

*rgo*

Rick Olson

# Proposal

*Senior Advisor for International and Governmental Affairs*

Serve as "Ambassador at Large" for the Abraaj Group. Leverage a thirty three-year diplomatic career to identify new business opportunities, develop a broad range of contacts in Governments and business, and foster ongoing relationships in emerging markets.

Travel extensively to identify new business opportunities for the Abraaj Group. Analyze geopolitical and demographic trends to spot the next breakout nations. Focus on emerging consumer markets, including in countries where Abraaj does not yet have a presence. Draw on Abraaj's institutional strength and global brand to identify new ventures.

Utilize relationships developed over a three-decade long career in the US Foreign Service to access senior policy-makers and business leaders to facilitate business development and troubleshoot problems. Focus particularly on identifying countries with potential for rapid growth of consumer markets and economic expansion.

Strengthen Abraaj's existing relationships with stakeholders, through extensive personal interaction, drawing on Abraaj's commitment to socially responsible development. Raise Abraaj's profile in global policy circles, emphasizing Abraaj's sustainable investment approach which takes account of environmental, social and governance factors. Increase engagement with think thanks and global opinion leaders.

# EXHIBIT DD



**AMBASSADOR OF
THE UNITED STATES OF AMERICA**

**ISLAMABAD**

13 October 2015

# MEMORANDUM

TO:      DCM – Jonathan Pratt

CC:      Mr Mustafa Abdel-Wadood, Partner, Abraaj Group
Mr Wahid Hamid, Partner, Abraaj Group
L/Ethics, Department of State
USAID/Pakistan Mission Director John Groarke

FROM:    Ambassador Richard Olson

SUBJECT: Recusal

In view of the fact that I have discussed with the Abraaj Group future employment possibilities (and notwithstanding that no offer has been made or accepted) I have recused myself from participation in any particular matter that has a direct and predictable effect upon the financial interests of the Abraaj Group.

Since Abraaj has a business relationship with USAID Pakistan, if any matters related to that relationship should come to the Front Office you should handle these matter without recourse to me.

# EXHIBIT FF

**From:**        "Rick Olson" <rickscafedxb@yahoo.com>
**Sent:**        Wed, 8 Jul 2015 01:17:11 -0500
**To:**          "mgrossman@cohengroup.net" <mgrossman@cohengroup.net>
**Subject:**     Recusal
**Attachments:** Cohen Group recusal.pdf

Dear Marc:  as discussed, I am forwarding (simply for your information) the recusal memo I have sent to my DCM and L.

Look forward to talking to you tomorrow.

*rgo*

Rick Olson



**AMBASSADOR OF
THE UNITED STATES OF AMERICA**

**ISLAMABAD**

7 July 2015

<u>**Memorandum**</u>

TO:        DCM – Thomas E. Williams

CC:        Mr. Marc Grossman, Vice Chairman, The Cohen Goup
           L/Ethics, Department of State

FROM:      Ambassador Richard Olson

SUBJECT    Recusal

In view of the fact that I have discussed with the Cohen Group future employment
possibilities (and notwithstanding that no offer has been made or accepted) I have
recused myself from participation in any particular matter that has a direct and
predictable effect upon the financial interests of the Cohen Group.

Although the Cohen Group has no business before the US Mission to Pakistan, if any
such business should come before the Missions you should handle the matter without
recourse to me.

## Re: Plans

From:  Grossman, Marc (mgrossman@cohengroup.net)

To:  rickscafedxb@yahoo.com

Date:  Wednesday, September 30, 2015, 07:24 AM EDT

Dear Rick,

Thank you for this email.  I certainly understand your decision and admire you for meeting the further call to service.  We wish you every success.

I'd be glad for a beer anytime!

Marc

Sent from my iPad

> On Sep 30, 2015, at 6:34 AM, Rick Olson <rickscafedxb@yahoo.com> wrote:
>
>
> Dear Marc:
>
> Thanks again for taking the time to meet with me at several points over the past year. In view of our conversations, I need to let you know that my plans have changed, and want you to hear it from me rather than through the rumor mill.
>
> Yesterday I accepted the Secretary's offer to do the SRAP job, for reasons that I would probably need to explain over a beer sometime, but involving my reluctance to let go of issues that have dominated my life for the past 15 years or so. I'll be SRAP until next summer. This is not public yet, although I'm sure it will leak out in a day or two.
>
> I am flattered at the willingness of TCG to consider me for a key position and I wish you the best in finding the right person.
>
> Sincerely,
>
>
> rgo
>
> Rick Olson
>
>
>

This message is a PRIVATE communication. If you are not the intended recipient, please do not read, copy, or use it, and do not disclose it to others. Please notify the sender of the delivery error by replying to this message, and then delete it from your system.

Thank you.
For more information on The Cohen Group please visit our website at:

http://www.cohengroup.net/

# EXHIBIT GG

| From: | "Rick Olson" <rickscafedxb@yahoo.com> |
|---|---|
| Sent: | Tue, 19 Apr 2016 12:59:47 -0500 |
| To: | "Josephson, Deanna K" <deanna.k.josephson@boeing.com> |
| Subject: | Re: Olsen, Richard // Boeing Interest |

Dear Ms Josephson:

I would just like to confirm that I have sent you the COI questionnaire as well as my recusal memo, and I have completed the questionnaire on the Boeing Website.  Please let me know if you need anything more from me.

Best,

*rgo*

Rick Olson

---

**From:** "Josephson, Deanna K" <deanna.k.josephson@boeing.com>
**To:** "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>
**Sent:** Friday, April 15, 2016 4:27 PM
**Subject:** Olsen, Richard // Boeing Interest

Mr. Olsen -

Good afternoon!  I am the Executive Staffing focal at Boeing and as stated in a previous e-mail from Sue Ellen Lindsey, I will be processing you through our Conflict of Interest (COI) process.

In order to engage in the next steps in Boeing's employment process, please go to The Boeing Company employment website (click here) and register a new user account. Once the profile is completed, the attached COI questionnaire will also need to be completed in order to engage in subsequent communications with a Boeing representative about potential employment opportunities.

**NOTE:  It is very important that once you have started the profile/application that you do not hit your Refresh or back button keys.**

These COI questions inquire about current and past employment with -- and immediate-family connections to -- the U.S. government, the U.S. military and/or state government.

Further since you are currently employed by the US Government, I appreciate that you have already submitted a recusal/disqual letter so we have the acknowledgement to your management that you are entering into employment discussions with The Boeing Company.

Please either fax the COI questionnaire to 253-657-4856 or you may also scan and e-mail the images to my e-mail address.  Once I receive the document,  I will let Boeing management know once the initial employment discussions are authorized.

Thank you,

**deanna**josephson
**The Boeing Company** | Global Staffing/Mobility
**Executive Hiring/Relocation** |
Monday- Friday, 6:00 a.m. – 2:30 p.m.
Anticipated response time to calls/e-mails:  24 hours/1 business day

deanna.k.josephson@boeing.com
☎ 425-234-5010  (Soft phone) |  206.295.4896  (Blackberry)
 253.657.4856 (Fax)



## Conflict of Interest Questionnaire

**Boeing requires all applicants to complete this Conflict of Interest Questionnaire. All questions must be answered completely. Incomplete questionnaires will cause a delay in processing.**

*Throughout this questionnaire, the term "Boeing" refers to any part of The Boeing Company and all of its subsidiaries.*

Question 1

Are you a current employee (full- time or part- time) of any government (U.S. or non-U.S., country, state, province, or local) or military service, including active duty, reserves or National Guard?

☑ Yes  ☐ No

**If yes**, you must provide the following information:
a. Government agency or military branch or office: *U.S. DEPARTMENT OF STATE*
b. Current pay grade or rank: *FE-MC (FOREIGN SERVICE equivalent of SES-II)*
c. Current title or position: *SPECIAL Representative for Afghanistan & Pakistan*
d. Expected last day of employment (<u>not</u> including Transition Leave, if applicable)
   Click here to enter a date.  *31 DEC 2016*
e. Expected last day of employment (including Transition Leave, if applicable)
   Click here to enter a date.  *31 DEC 2016*

Question 2

If you are an employee of a government  (U.S. or non-U.S., country, state, province, or local), or military service do you currently have any responsibility for or are you involved in official matters involving Boeing or directly affecting Boeing?

☐ Yes  ☑ No

*"Involving Boeing" means business or financial interests, including contracts, procurement, safety rulings, program duties, funding decisions, audits, investigations, trade issues, claims, export licenses, product approvals, quality or inspection responsibilities, or litigation. It does not include situations involving the use of Boeing products (such as flying Boeing aircraft) or servicing Boeing products (such as maintaining Boeing aircraft).*

**If yes**, you must provide a full explanation in the space provided below

**Question 3**

To the best of your knowledge, do you have a "family member" who works for a "non-U.S." government or "non-U.S." airline?

☐ Yes ☑ No

***"family member"*** *includes spouses, parents, step-parents, legal guardians, mothers-in-law, fathers-in-law, children, step-children, siblings, sons-in-law, daughters-in-law, sisters-in-law, brothers-in-law, grandparents, spouse's grandparents, grandchildren, uncles, aunts, nephews, nieces, and first cousins.*

***"Non-U.S."*** *means a country that is not the United States.*

**If yes**, you must provide the following information:
a.  Name of the family member and their relationship to you (See description of "family member" above)
b.  Name of the non-U.S. government or non-U.S. airline
    Position or title of your family member
a.  Describe how you found out about the Boeing job opening for which you are applying. (For example, are you responding to an advertisement, or did someone from Boeing refer you)?


**Question 4**

At any time within the last five (5) years, have you been employed as a **manager, executive, officer, director or controlling shareholder** of a non-U.S. airline or non-U.S. aircraft holding company?

☐ Yes ☑ No

**If yes**, you must provide the following information:
a.  Name and country of non-U.S. airline(s) or aircraft holding company(s)
b.  Your position or role at the company(s) and your duties and responsibilities
c.  Dates of employment

**Question 5**

At any time within the last three (3) years from today's date, have you or a close family member been employed (full-time or part-time) by Deloitte, LLP?

☐ Yes ☑ No

*A **"close family member"** in this instance includes a person's spouse, spousal equivalent, parent, dependent, nondependent child or sibling.*

**If yes**, you must provide the following information for each person and position(s) held:
a.  Name of "close family member" and relationship (or yourself)
b.  Position(s)  Title(s) and Level(s)
c.  Start and End Date(s)
d.  Did this person provide professional services to Boeing while in the position(s)?

**Question 6**

**Within the last five (5) years**, have you been employed (full-time or part-time) by any U.S. government or military service, including active duty, reserves or National Guard (including state, city, county, or local government) **in any of the positions listed below?**

☑ Yes   ☐ No

**If yes**, you must check all that apply:
☐ U.S. military officer on active duty at the rank of O-4 or above
☐ U.S. military officer in the military reserves or National Guard at the rank of O-4 or above
☐ Employee of private company "on loan" to the U.S. Government as part of an exchange program such as defined in the Intergovernmental Personnel Act
☑ U.S. Government civilian employee at a **grade GS-11 or above (or equivalent)**
☐ Special Government Employee in the U.S. Government; for example, as a member of an advisory board, panel, or committee of any U.S. Government agency
☐ U.S. FAA Flight Standards Service Aviation Safety Inspector
☐ Employee of any U.S. state, city, county, or local government at a grade equivalent to or greater than GS-11 in Federal Civil Service

If you checked any of the above, you must provide the following information:
a.  Government agency or military branch or office: *U.S. DEPARTMENT OF STATE*
b.  Final pay grade or rank: *FE-MC*
c.  Title or position and duties for all jobs you held during the **last five (5) years**: *(see below)*
d.  Last day of employment for your most recent government or military employment: *Currently employed*

*NOVEMBER 2015 to PRESENT: U.S. SPECIAL REPRESENTATIVE For AFGHANISTAN & PAKISTAN*

*OCT 2012 - OCT 2015 & U.S. AMBASSADOR to PAKISTAN*

*JUN 2011 - JUN 2012: COORDINATING DIRECTOR FOR DEVELOPMENT AND ECONOMIC AFFAIRS, U.S. EMBASSY KABUL*

*SEP 2008 - MAY 2011: US AMBASSADOR to the UNITED ARAB EMIRATES*

| | |
|---|---|
| **From:** | "Josephson, Deanna K" <deanna.k.josephson@boeing.com> |
| **Sent:** | Tue, 19 Apr 2016 13:32:23 -0500 |
| **To:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Subject:** | RE: Olsen, Richard // Boeing Interest |

You gave me everything I needed.   Thank you so much.   At some point I may need an Ethics letter, but that's not something I need right away.

**deanna**josephson
**The Boeing Company** | Global Staffing/Mobility
**Executive Hiring/Relocation** |
Monday- Friday, 6:00 a.m. – 2:30 p.m.
Anticipated response time to calls/e-mails:  24 hours/1 business day

✉ deanna.k.josephson@boeing.com
☎ 425-234-5010  (Soft phone) | 📱 206.295.4896  (Blackberry)
📠 253.657.4856 (Fax)

---

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Tuesday, April 19, 2016 11:00 AM
**To:** Josephson, Deanna K <deanna.k.josephson@boeing.com>
**Subject:** Re: Olsen, Richard // Boeing Interest

Dear Ms Josephson:

I would just like to confirm that I have sent you the COI questionnaire as well as my recusal memo, and I have completed the questionnaire on the Boeing Website.  Please let me know if you need anything more from me.

Best,

*rgo*

Rick Olson

---

**From:** "Josephson, Deanna K" <deanna.k.josephson@boeing.com>
**To:** "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com>

**Sent:** Friday, April 15, 2016 4:27 PM
**Subject:** Olsen, Richard // Boeing Interest



Mr. Olsen -

Good afternoon!  I am the Executive Staffing focal at Boeing and as stated in a previous e-mail from Sue Ellen Lindsey, I will be processing you through our Conflict of Interest (COI) process.

In order to engage in the next steps in Boeing's employment process, please go to The Boeing Company employment website (click here) and register a new user account.  Once the profile is completed, the attached COI questionnaire will also need to be completed in order to engage in subsequent communications with a Boeing representative about potential employment opportunities.

**NOTE:  It is very important that once you have started the profile/application that you do not hit your Refresh or back button keys.**

These COI questions inquire about current and past employment with -- and immediate-family connections to -- the U.S. government, the U.S. military and/or state government.

Further since you are currently employed by the US Government, I appreciate that you have already submitted a recusal/disqual letter so we have the acknowledgement to your management that you are entering into employment discussions with The Boeing Company.

Please either fax the COI questionnaire to 253-657-4856 or you may also scan and e-mail the images to my e-mail address.  Once I receive the document,  I will let Boeing management know once the initial employment discussions are authorized.

Thank you,

**deannajosephson**
**The Boeing Company** | Global Staffing/Mobility

**Executive Hiring/Relocation** |
Monday- Friday, 6:00 a.m. – 2:30 p.m.
Anticipated response time to calls/e-mails:  24 hours/1 business day

✉ deanna.k.josephson@boeing.com
☎ 425-234-5010  (Soft phone) | 📱 206.295.4896  (Blackberry)
📠 253.657.4856 (Fax)

# EXHIBIT HH

**From:**          "Silini Herrmann" <siherrmann@raytheon.com>
**Sent:**          Tue, 26 Apr 2016 14:59:22 -0500
**To:**            "Rick Olson" <rickscafedxb@yahoo.com>
**Subject:**       Re: Informal Introductory meeting


No problem at all on the departure time.  Thank you for letting me know.

Silini Herrmann
Raytheon Company
703-284-4201

▼ Rick Olson ---04/26/2016 03:56:39 PM---No changes, I'll be there.  I will, however, have to leave by
about 0845.  I testify before the Hous

From: Rick Olson <rickscafedxb@yahoo.com>
To: Silini Herrmann <siherrmann@raytheon.com>
Date: 04/26/2016 03:56 PM
Subject: Re: Informal Introductory meeting

---

No changes, I'll be there.  I will, however, have to leave by about 0845.  I testify before the House Foreign Affairs Committee at 1000.

*rgo*

Rick Olson

---

**From:** Silini Herrmann <siherrmann@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Tuesday, April 26, 2016 2:50 PM
**Subject:** Re: Informal Introductory meeting

Hi Rick,

Just want to confirm once more that you are still good with the date/time/location of your meeting with
Tom Vecchiolla.  Please let me know if we need to make any changes.

Thank you,
Silini Herrmann
Raytheon Company
703-284-4201

▼ Rick Olson ---04/21/2016 05:28:01 AM---Sounds good.  0800 at Paul's in Georgetown. rgo  Rick Olson

From: Rick Olson <rickscafedxb@yahoo.com>
To: Silini Herrmann <siherrmann@raytheon.com>
Date: 04/21/2016 05:28 AM

Subject: Re: Informal Introductory meeting

Sounds good.  0800 at Paul's in Georgetown.

*rgo*

Rick Olson

---

**From:** Silini Herrmann <siherrmann@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Wednesday, April 20, 2016 4:42 PM
**Subject:** Re: Informal Introductory meeting

Hi Rick,

Confirming Wednesday, April 27, 8:00 am at Paul's coffee shop on 1078 Wisconsin Avenue, NW, Washington, DC.  Please let me know if we need to adjust.

Silini Herrmann
Raytheon Company
703-284-4201

▽  Rick Olson ---04/19/2016 01:48:21 PM---Yes, that works.  Please let me know the venue.   rgo  Rick Olson

From: Rick Olson <rickscafedxb@yahoo.com>
To: Silini Herrmann <siherrmann@raytheon.com>
Date: 04/19/2016 01:48 PM
Subject: Re: Informal Introductory meeting

---

Yes, that works.  Please let me know the venue.

*rgo*

Rick Olson

---

**From:** Silini Herrmann <siherrmann@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Tuesday, April 19, 2016 1:44 PM
**Subject:** Re: Informal Introductory meeting

Thank you for getting back to me.  Would you be available April 27 at 8:00 am?

Silini Herrmann
Raytheon Company
703-284-4201

▽ Rick Olson ---04/19/2016 01:36:12 PM---Good Afternoon: Unfortunately, I am speaking at Harvard on 28th and out of town all day.   I am free

From: Rick Olson <rickscafedxb@yahoo.com>
To: Silini Herrmann <siherrmann@raytheon.com>
Date: 04/19/2016 01:36 PM
Subject: Re: Informal Introductory meeting

Good Afternoon:

Unfortunately, I am speaking at Harvard on 28th and out of town all day.   I am free on the 29th if that would work for Mr. Vecchiolla.

Many thanks,

*rgo*

Rick Olson

From: Silini Herrmann <siherrmann@raytheon.com>
To: rickscafedxb@yahoo.com
Sent: Tuesday, April 19, 2016 11:30 AM
Subject: Informal Introductory meeting

Good afternoon Mr. Olson,

I've been asked to coordinate an informal introductory meeting between you and Mr. Tom Vecchiolla, President of Raytheon International, Inc.  Would you have some availability on Thursday, April 28, to meet for coffee?

Thank you and I look forward to hearing back from you.

Silini Herrmann
Raytheon Company
703-284-4201

| | |
|---|---|
| **From:** | "Soo K Lagasse" <slagasse@raytheon.com> |
| **Sent:** | Thu, 16 Jun 2016 16:04:56 -0500 |
| **To:** | "rickscafedxb@yahoo.com" <rickscafedxb@yahoo.com> |
| **Subject:** | RE: Raytheon opportunity |
| **Attachments:** | State Advocacy Job Description.docx |

Rick,

Thank you for your updated information.  Please find attached the job description.  Mary Lou will be in touch soon.

*(See attached file: State Advocacy Job Description.docx)*

Regards,

**Soo K. Lagasse**
Executive and Global Talent Acquisition
Human Resources and Security
**Raytheon Company**

+1 978-858-5283   (office)
+1 301-351-0735   (cell)
slagasse@raytheon.com

50 Apple Hill Dr.
Tewksbury, MA 01876 USA
www.raytheon.com

**Follow Raytheon On**



Please consider the environment before printing this e-mail.

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

"Olson, Richard G" ---06/16/2016 04:47:30 PM---Dear Soo:  Good chatting with you.  Am copying my private email on the CC line above.  Contact number

From: "Olson, Richard G" <olsonrg@state.gov>
To: "'Soo K Lagasse'" <slagasse@raytheon.com>
Cc: "Rick Olson (rickscafedxb@yahoo.com)" <rickscafedxb@yahoo.com>
Date: 06/16/2016 04:47 PM
Subject: RE: Raytheon opportunity

---

Dear Soo:

Good chatting with you.  Am copying my private email on the CC line above.  Contact numbers are in the signature block below.

Best,

*rgo*

Rick Olson
Special Representative for Afghanistan and Pakistan
Department of State
Office: +1-202-647-4133
Mobile: +1-202-412-5951

**From:** Soo K Lagasse [mailto:slagasse@raytheon.com]
**Sent:** Thursday, June 16, 2016 12:38 PM
**To:** Olson, Richard G
**Subject:** RE: Raytheon opportunity

Rick,

I will call around 4:15-4:30 if that works for you.  This will allow me to travel back to my office after my 3:00 meeting.

Thank you,

**Soo K. Lagasse**
Executive and Global Talent Acquisition
Human Resources and Security
**Raytheon Company**

+1 978-858-5283   (office)
+1 301-351-0735   (cell)
slagasse@raytheon.com

50 Apple Hill Dr.
Tewksbury, MA 01876 USA
www.raytheon.com

**Follow Raytheon On**



*Please consider the environment before printing this e-mail.*

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

"Olson, Richard G" ---06/16/2016 11:44:04 AM---How about if we talk at 4:00 pm?  Or anytime between 4 and 5? Office number in my signature block be

From: "Olson, Richard G" <olsonrg@state.gov>
To: "'Soo K Lagasse'" <slagasse@raytheon.com>
Date: 06/16/2016 11:44 AM
Subject: RE: Raytheon opportunity

How about if we talk at 4:00 pm?  Or anytime between 4 and 5?

Office number in my signature block below.

*rgo*

Rick Olson
Special Representative for Afghanistan and Pakistan
Department of State
Office:  +1-202-647-4133

**From:** Soo K Lagasse [http://redirect.state.sbu/?url=mailto:slagasse@raytheon.com]
**Sent:** Thursday, June 16, 2016 11:08 AM
**To:** Olson, Richard G
**Subject:** Raytheon opportunity

Rick,

I hope all went well with your recent travels.  I was hoping you might have some time today to catch up on scheduling for in-person interviews with Raytheon in Rosslyn.  Please let me know a good time to call today.  The only time I would not be free today would be from 3-4pm.

Thank you,

**Soo K. Lagasse**
Executive and Global Talent Acquisition
Human Resources and Security
**Raytheon Company**

+1 978-858-5283   (office)
+1 301-351-0735   (cell)
slagasse@raytheon.com

50 Apple Hill Dr.
Tewksbury, MA 01876 USA
www.raytheon.com

**Follow Raytheon On**





*Please consider the environment before printing this e-mail.*

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

From: Olson, Richard G (olsonrg@state.gov)
Sent: Thursday, June 16, 2016 3:47:24 PM
To:  -Soo K Lagasse- (slagasse@raytheon.com)
Cc:  Rick Olson (rickscafedxb@yahoo.com) (rickscafedxb@yahoo.com)
Bcc:
Subject:   RE: Raytheon opportunity
Attachments:     image001.png- image002.jpg- image003.png- image004.jpg-
image005.gif- image006.gif

Dear Soo:

Good chatting with you.  Am copying my private email on the CC line above.
Contact numbers are in the signature block below.

Best,

rgo

Rick Olson
Special Representative for Afghanistan and Pakistan
Department of State
Office:  +1-202-647-4133
Mobile: +1-202-412-5951


From: Soo K Lagasse [mailto:slagasse@raytheon.com]
Sent: Thursday, June 16, 2016 12:38 PM
To: Olson, Richard G
Subject: RE: Raytheon opportunity


Rick,

I will call around 4:15-4:30 if that works for you.  This will allow me to
travel back to my office after my 3:00 meeting.

Thank you,

Soo K. Lagasse
Executive and Global Talent Acquisition
Human Resources and Security
Raytheon Company

+1 978-858-5283   (office)
+1 301-351-0735   (cell)
slagasse@raytheon.com<http://redirect.state.sbu/?url=mailto:slagasse@rayth
eon.com>

50 Apple Hill Dr.
Tewksbury, MA 01876 USA
www.raytheon.com<http://redirect.state.sbu/?url=http://www.raytheon.com/>

Follow Raytheon On

[Twitter]<http://redirect.state.sbu/?url=http://twitter.com/raytheon>
[YouTube]
<http://redirect.state.sbu/?url=http://www.youtube.com/user/raytheoncompan
y> [Facebook]
<http://redirect.state.sbu/?url=http://www.facebook.com/Raytheon>
[LinkedIn]
<http://redirect.state.sbu/?url=http://www.linkedin.com/companies/raytheon
>

[Raytheon Sustainability]

This message contains information that may be confidential and privileged.
Unless you are the addressee (or authorized to receive mail for the
addressee), you should not use, copy or disclose to anyone this message or
any information contained in this message. If you have received this
message in error, please so advise the sender by reply e-mail and delete
this message. Thank you for your cooperation.

[Inactive hide details for "Olson, Richard G" ---06/16/2016 11:44:04 AM---
How about if we talk at 4:00 pm?  Or anytime between 4]"Olson, Richard G"
---06/16/2016 11:44:04 AM---How about if we talk at 4:00 pm?  Or anytime
between 4 and 5? Office number in my signature block be

From: "Olson, Richard G" <olsonrg@state.gov<mailto:olsonrg@state.gov>>
To: "'Soo K Lagasse'"
<slagasse@raytheon.com<mailto:slagasse@raytheon.com>>
Date: 06/16/2016 11:44 AM
Subject: RE: Raytheon opportunity

_____



How about if we talk at 4:00 pm?  Or anytime between 4 and 5?

Office number in my signature block below.

rgo

Rick Olson
Special Representative for Afghanistan and Pakistan
Department of State
Office:  +1-202-647-4133


From: Soo K Lagasse
[http://redirect.state.sbu/?url=mailto:slagasse@raytheon.com]
Sent: Thursday, June 16, 2016 11:08 AM
To: Olson, Richard G
Subject: Raytheon opportunity


Rick,

I hope all went well with your recent travels.  I was hoping you might
have some time today to catch up on scheduling for in-person interviews
with Raytheon in Rosslyn.  Please let me know a good time to call today.
The only time I would not be free today would be from 3-4pm.

Thank you,

Soo K. Lagasse
Executive and Global Talent Acquisition
Human Resources and Security
Raytheon Company

+1 978-858-5283   (office)
+1 301-351-0735   (cell)
slagasse@raytheon.com<http://redirect.state.sbu/?url=http://redirect.state
.sbu/?url=http://redirect.state.sbu/?url=mailto:slagasse@raytheon.com>

50 Apple Hill Dr.
Tewksbury, MA 01876 USA
www.raytheon.com<http://redirect.state.sbu/?url=http://redirect.state.sbu/
?url=http://redirect.state.sbu/?url=http://www.raytheon.com/>

Follow Raytheon On
[Twitter]<http://redirect.state.sbu/?url=http://redirect.state.sbu/?url=ht
tp://redirect.state.sbu/?url=http://twitter.com/raytheon> [YouTube]
<http://redirect.state.sbu/?url=http://redirect.state.sbu/?url=http://redi
rect.state.sbu/?url=http://www.youtube.com/user/raytheoncompany>
[Facebook]
<http://redirect.state.sbu/?url=http://redirect.state.sbu/?url=http://redi
rect.state.sbu/?url=http://www.facebook.com/Raytheon>  [LinkedIn]
<http://redirect.state.sbu/?url=http://redirect.state.sbu/?url=http://redi
rect.state.sbu/?url=http://www.linkedin.com/companies/raytheon>

[Raytheon Sustainability]

This message contains information that may be confidential and privileged.
Unless you are the addressee (or authorized to receive mail for the
addressee), you should not use, copy or disclose to anyone this message or
any information contained in this message. If you have received this
message in error, please so advise the sender by reply e-mail and delete
this message. Thank you for your cooperation.

| From: | "Rick Olson" <rickscafedxb@yahoo.com> |
|---|---|
| Sent: | Fri, 17 Jun 2016 12:35:26 -0500 |
| To: | "Mary Lou Smith" <SmithML@raytheon.com> |
| Cc: | "slagasse@raytheon.com" <slagasse@raytheon.com> |
| Subject: | Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson |

# The 26th.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Cc:** "slagasse@raytheon.com" <slagasse@raytheon.com>
**Sent:** Friday, June 17, 2016 12:53 PM
**Subject:** Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Hi Rick,
Thanks for getting back to me.  I will see what other dates/times we can arrange.  When are you leaving for Beijing?

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

Rick Olson ---06/17/2016 12:40:21 PM---Dear Mary Lou: Thanks for the email.  I talked with Soo yesterday and she had proposed Wednesday 23

From: Rick Olson <rickscafedxb@yahoo.com>
To: Mary Lou Smith <SmithML@raytheon.com>
Cc: "slagasse@raytheon.com" <slagasse@raytheon.com>

Date: 06/17/2016 12:40 PM
Subject: Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Dear Mary Lou:

Thanks for the email.  I talked with Soo yesterday and she had proposed Wednesday 23 June from 1430 to 1600 -- is that slot no longer available?  I ask because I will in transit back to the US from Beijing on the 29th, so I cannot make that date.

I have received the link with the employment application and will fill out right away.

Many thanks.

Best,


*rgo*

Rick Olson


**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** rickscafedxb@yahoo.com
**Sent:** Friday, June 17, 2016 11:15 AM
**Subject:** Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Hi Richard,

I work with Soo Lagasse at Raytheon.  Soo has let me know that she has spoken with you and that I would be in touch to coordinate interviews with you at our Rosslyn, VA office for our Foreign Policy and National Security Affairs Leader position.

Would you be availability on Wednesday, June 29th from 2:30-4:00 ET to meet with members of Raytheon's Business Development Leadership Team at our Rosslyn office?  If you could also provide me with the best number to reach you, that would be great.  When I hear back from you I will follow-up with

details.

You will also receive a separate email from HireRight with a link for the Raytheon employment application.  We would ask that you complete the application as soon as possible so any potential conflicts of interest may be identified and resolved in advance.  Below is a copy of the email from HireRight with the link for the Raytheon Application.

We are pleased that you are exploring employment opportunities with Raytheon Company.  If you have any questions or require additional information, please contact me at 781.522.5867 or Soo Lagasse at 978.858.5283.

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

From: HireRight Customer Support (noreply@hireright.com)
Sent: Sunday, June 19, 2016 4:05:32 PM
To:  rickscafedxb@yahoo.com (rickscafedxb@yahoo.com)
Cc:
Bcc:
Subject:   Your employment application has been received

Raytheon has received your online employment application.  If you have any
technical questions regarding your application, please contact HireRight
Customer Service at 1-800-400-2761 between 5 a.m. and 5 p.m. Pacific time.
A Raytheon representative will contact you if they have any questions
regarding your consideration for employment. Thank you.

| From: | "Rick Olson" <rickscafedxb@yahoo.com> |
|---|---|
| Sent: | Tue, 21 Jun 2016 12:07:50 -0500 |
| To: | "Mary Lou Smith" <SmithML@raytheon.com> |
| Subject: | Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson |

Dear Mary Lou:

Unfortunately, I will now not be back in Washington until late on 1 July.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Tuesday, June 21, 2016 9:58 AM
**Subject:** Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Hi Rick,
Would you be able to come on Thursday, June 30th at 3 pm?

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867  (office)
+1 339.223.1154  (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

▼ Rick Olson ---06/17/2016 01:35:30 PM---The 26th.  rgo  Rick Olson

From: Rick Olson <rickscafedxb@yahoo.com>
To: Mary Lou Smith <SmithML@raytheon.com>

Cc: "slagasse@raytheon.com" <slagasse@raytheon.com>
Date: 06/17/2016 01:35 PM
Subject: Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

---

# The 26th.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Cc:** "slagasse@raytheon.com" <slagasse@raytheon.com>
**Sent:** Friday, June 17, 2016 12:53 PM
**Subject:** Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Hi Rick,
Thanks for getting back to me.  I will see what other dates/times we can arrange.  When are you leaving for Beijing?

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)

SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

▼ Rick Olson ---06/17/2016 12:40:21 PM---Dear Mary Lou: Thanks for the email.  I talked with Soo yesterday and she had proposed Wednesday 23

From: Rick Olson <rickscafedxb@yahoo.com>
To: Mary Lou Smith <SmithML@raytheon.com>
Cc: "slagasse@raytheon.com" <slagasse@raytheon.com>
Date: 06/17/2016 12:40 PM
Subject: Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Dear Mary Lou:

Thanks for the email.  I talked with Soo yesterday and she had proposed Wednesday 23 June from 1430 to 1600 -- is that slot no longer available?  I ask because I will in transit back to the US from Beijing on the 29th, so I cannot make that date.

I have received the link with the employment application and will fill out right away.

Many thanks.

Best,


*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** rickscafedxb@yahoo.com
**Sent:** Friday, June 17, 2016 11:15 AM
**Subject:** Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Hi Richard,

I work with Soo Lagasse at Raytheon.  Soo has let me know that she has spoken with you and that I would be in touch to coordinate interviews with you at our Rosslyn, VA office for our Foreign Policy and National Security Affairs Leader position.

Would you be availability on Wednesday, June 29th from 2:30-4:00 ET to meet with members of Raytheon's Business Development Leadership Team at our Rosslyn office?  If you could also provide me with the best number to reach you, that would be great.  When I hear back from you I will follow-up with details.

You will also receive a separate email from HireRight with a link for the Raytheon employment application.  We would ask that you complete the application as soon as possible so any potential

conflicts of interest may be identified and resolved in advance.  Below is a copy of the email from HireRight with the link for the Raytheon Application.

We are pleased that you are exploring employment opportunities with Raytheon Company.  If you have any questions or require additional information, please contact me at 781.522.5867 or Soo Lagasse at 978.858.5283.

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Tue, 21 Jun 2016 12:23:12 -0500 |
| **To:** | "Mary Lou Smith" <SmithML@raytheon.com> |
| **Subject:** | Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson |

Yes, that works.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Tuesday, June 21, 2016 1:14 PM
**Subject:** Re: Foreign Policy and National Security Affairs Leader - Interview Availability - Richard Olson

Hi Rick,
If I can move some things around, would you be able to come on Friday 6/24 at 2:30?

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| | |
|---|---|
| **From:** | "Mary Lou Smith" <SmithML@raytheon.com> |
| **Sent:** | Thu, 23 Jun 2016 13:37:43 -0500 |
| **To:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Subject:** | Foreign Policy and National Security Affairs Leader - Interview Confirmation - Richard Olson |
| **Attachments:** | Raytheon Corporate Operations Washington.pdf |

Hi Rick, I just realized that I hadn't sent this confirmation to you.

I am confirming your interviews at our Rosslyn Center (Arlington, VA) office to meet with members of Raytheon's Business Development Leadership Team for our Foreign Policy and National Security Affairs Leader position.  This will be a panel interview with members of Raytheon's US and International Business Development and HR team.

Location:  Raytheon Company
1100 Wilson Boulevard  20th Floor
Arlington, VA 22209

Friday, June 24, 2016
2:30 -  4:00 pm

Attached is an information sheet with directions and parking information.
*(See attached file: Raytheon Corporate Operations Washington.pdf)*

Please proceed to 20th Floor Guard's Desk, where you will register as a visitor and obtain a visitor's badge. Please bring a Photo ID and to show the Guard.  Please ask for Lola Aogo when you arrive. Her phone number is 703.284.4416.

We are pleased that you are exploring employment opportunities with Raytheon Company.  If you have any questions or require additional information, please contact me at 781.522.5867 or Soo Lagasse at 978.858.781.  We are looking forward to your visit!


Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com


870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Tue, 5 Jul 2016 11:28:54 -0500 |
| **To:** | "Mary Lou Smith" <SmithML@raytheon.com> |
| **Subject:** | Re: Foreign Policy and National Security Affairs Leader - - Richard Olson |

I could do 0830.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Tuesday, July 5, 2016 12:02 PM
**Subject:** Re: Foreign Policy and National Security Affairs Leader - - Richard Olson

Hi Rick,
I've been asked to see if you can come back to our Rosslyn office tomorrow to meet with Tom Vecchiolla, VP Business Development and Tracy Gee, Director Human Resources.

Would be you available to come either at 8:30 or 12:00 for approximately 2:30-3 hours on Wednesday, July 6th?

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

**From:**           "Rick Olson" <rickscafedxb@yahoo.com>
**Sent:**           Tue, 5 Jul 2016 14:04:06 -0500
**To:**             "Mary Lou Smith" <SmithML@raytheon.com>
**Subject:**        Re: Foreign Policy and National Security Affairs Leader - Interview Confirmation
for 7/6/16 Richard Olson

Acknowledging receipt.  I will be there at 0830.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Tuesday, July 5, 2016 2:28 PM
**Subject:** Foreign Policy and National Security Affairs Leader - Interview Confirmation for 7/6/16 Richard
Olson

Hi Rick,

I am confirming your interviews at our Rosslyn Center (Arlington, VA) office to meet with members of
Raytheon's Business Development Leadership Team for our Foreign Policy and National Security Affairs
Leader position.  You will be meeting with Tom Vecchiolla, Vice President Business Development and
Tracy Gee, Director Human Resources.  We also will have you meet with Jenna Ludden, Steve
Cooperider and Jason Colosky who were not able to meet with you before.

Location:  Raytheon Company
1100 Wilson Boulevard  20th Floor
Arlington, VA 22209

Wednesday, July 6. 2016
8:30 am t11:30 am

Attached is an information sheet with directions and parking information.
*(See attached file: Raytheon Corporate Operations Washington.pdf)*

Please proceed to 20th Floor Guard's Desk, where you will register as a visitor and obtain a visitor's
badge. Please bring a Photo ID and to show the Guard.  Please ask for Lola Aogo when you arrive.  Her
phone number is 703.284.4416.

We are pleased that you are exploring employment opportunities with Raytheon Company.  If you have
any questions please contact me at 781.522.5867.

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Tue, 5 Jul 2016 18:19:53 -0500 |
| **To:** | "Rick Olson" <rickscafedxb@yahoo.com>; "Mary Lou Smith" <SmithML@raytheon.com> |
| **Subject:** | Re: Foreign Policy and National Security Affairs Leader - Interview Confirmation - Richard Olson |

Mary: I was just summoned to the White House for a Presidential rollout tomorrow, I'm afraid I have to cancel. I regret putting Tom out, but don't have much choice

Sent from Yahoo Mail for iPhone

On Thursday, June 23, 2016, 15:03, Rick Olson <rickscafedxb@yahoo.com> wrote:

I'll be there, thanks.

*rgo*

Rick Olson

> **From:** Mary Lou Smith <SmithML@raytheon.com>
> **To:** Rick Olson <rickscafedxb@yahoo.com>
> **Sent:** Thursday, June 23, 2016 2:37 PM
> **Subject:** Foreign Policy and National Security Affairs Leader - Interview Confirmation - Richard Olson
>
> Hi Rick, I just realized that I hadn't sent this confirmation to you.
>
> I am confirming your interviews at our Rosslyn Center (Arlington, VA) office to meet with members of Raytheon's Business Development Leadership Team for our Foreign Policy and National Security Affairs Leader position.  This will be a panel interview with members of Raytheon's US and International Business Development and HR team.
>
> Location:  Raytheon Company
> 1100 Wilson Boulevard  20th Floor

Arlington, VA 22209

Friday, June 24, 2016
2:30 -  4:00 pm

Attached is an information sheet with directions and parking information.
*(See attached file: Raytheon Corporate Operations Washington.pdf)*

Please proceed to 20th Floor Guard's Desk, where you will register as a visitor and obtain a visitor's badge. Please bring a Photo ID and to show the Guard. Please ask for Lola Aogo when you arrive.  Her phone number is 703.284.4416.

We are pleased that you are exploring employment opportunities with Raytheon Company.  If you have any questions or require additional information, please contact me at 781.522.5867 or Soo Lagasse at 978.858.781.  We are looking forward to your visit!

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| From: | "Rick Olson" <rickscafedxb@yahoo.com> |
|---|---|
| Sent: | Wed, 6 Jul 2016 12:02:17 -0500 |
| To: | "Mary Lou Smith" <SmithML@raytheon.com> |
| Subject: | Re: Foreign Policy and National Security Affairs Leader - Interview Confirmation |

- Richard Olson

Dear Mary Lou:

19 July from 1330 to 1430 works best for me.

Many thanks,

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Wednesday, July 6, 2016 9:45 AM
**Subject:** Re: Foreign Policy and National Security Affairs Leader - Interview Confirmation - Richard Olson

Hi Rick,
Will one of these times work for you to see Tom?  These are times he's available.  I will try and schedule you to see Tracy Gee before or after.

July 18 - 12:00-2:00 and 3:00-5:00
July 19 - 1:30-2:30

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have*

*received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Fri, 8 Jul 2016 06:39:16 -0500 |
| **To:** | "Mary Lou Smith" <SmithML@raytheon.com> |
| **Subject:** | Re: Foreign Policy and National Security Affairs Leader - Interview Confirmation for 7/19/16 Richard Olson |

Many thanks, I'll be there.

Sent from Yahoo Mail for iPhone

On Thursday, July 7, 2016, 21:03, Mary Lou Smith <SmithML@raytheon.com> wrote:

Hi Rick,

I am confirming the rescheduled interviews at our Rosslyn Center (Arlington, VA) office to meet with members of Raytheon's Business Development Leadership Team for our Foreign Policy and National Security Affairs Leader position.  You will be meeting with Tom Vecchiolla, Vice President Business Development and Tracy Gee, Director Human Resources.  If scheduling permits we also will have you meet with Jenna Ludden, Steve Cooperider and Jason Colosky who were not able to meet with you before.

Location:  Raytheon Company
1100 Wilson Boulevard  20th Floor
Arlington, VA 22209

Tiuesday, July 19. 2016
1:30 pm to 3:30 pm

Attached is an information sheet with directions and parking information.
*(See attached file: Raytheon Corporate Operations Washington.pdf)*

Please proceed to 20th Floor Guard's Desk, where you will register as a visitor and obtain a visitor's badge. Please bring a Photo ID and to show the Guard.  Please ask for Lola Aogo when you arrive.  Her phone number is 703.284.4416.

We are pleased that you are exploring employment opportunities with Raytheon Company.  If you have any questions please contact me at 781.522.5867.


Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition

Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com


870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Wed, 20 Jul 2016 15:57:57 -0500 |
| **To:** | "Mary Lou Smith" <SmithML@raytheon.com> |
| **Subject:** | Re: Foreign Policy and National Security Affairs Leader - meeting with John Harris |

I could do 10-11, I might be a few minutes late. Have a meeting at State that should end by 0945.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Wednesday, July 20, 2016 4:55 PM
**Subject:** Re: Foreign Policy and National Security Affairs Leader - meeting with John Harris

Hi Rick,
Would you be available to come in on Friday morning  July 22 to meet with John Harris, Vice President Business Development and Chief Executive Officer Raytheon International, Inc.  John is available between 9 -11 am, and would see you for about an hour.  If Friday doesn't work the next time that John is in his DC office is the week of August 1.


Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition
Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

| | |
|---|---|
| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Thu, 21 Jul 2016 10:47:19 -0500 |
| **To:** | "Mary Lou Smith" <SmithML@raytheon.com> |
| **Subject:** | Re: Foreign Policy and National Security Affairs Leader - Interview Confirmation for 7/22/16 Richard Olson |

Thanks, look forward to it.

*rgo*

Rick Olson

---

**From:** Mary Lou Smith <SmithML@raytheon.com>
**To:** rickscafedxb@yahoo.com
**Sent:** Thursday, July 21, 2016 10:58 AM
**Subject:** Foreign Policy and National Security Affairs Leader - Interview Confirmation for 7/22/16 Richard Olson

Hi Rick,

I am confirming your meeting at our Rosslyn Center (Arlington, VA) office to meet with John Harris, Vice President Business Development and Chief Executive Officer Raytheon International, Inc. to discuss our Foreign Policy and National Security Affairs Leader position.

Location:  Raytheon Company
1100 Wilson Boulevard  20th Floor
Arlington, VA 22209

Friday, July 22, 2016
10:15-11:00 am

Attached is an information sheet with directions and parking information.
*(See attached file: Raytheon Corporate Operations Washington.pdf)*

Please proceed to 20th Floor Guard's Desk, where you will register as a visitor and obtain a visitor's badge. Please bring a Photo ID and to show the Guard.  Please ask for Lola Aogo when you arrive.  Her phone number is 703.284.4416.

We are pleased that you are exploring employment opportunities with Raytheon Company.  If you have any questions please contact me at 781.522.5867.

Regards,

Mary Lou Smith
Sr. HR Specialist -TA Coordinator
Human Resources Talent Acquisition

Global Headquarters
Raytheon Company

+1 781.522.5867   (office)
+1 339.223.1154   (cell)
SmithML@raytheon.com

870 Winter Street
Waltham, MA 02451 USA
www.raytheon.com

*This message contains information that may be confidential and privileged. Unless you are the addressee (or authorized to receive mail for the addressee), you should not use, copy or disclose to anyone this message or any information contained in this message. If you have received this message in error, please so advise the sender by reply e-mail and delete this message. Thank you for your cooperation.*

**POSITION DESCRIPTION**

**Position Title:**      VP, Foreign Policy and National Security Affairs
                               Raytheon International, Inc. (RII)

Reporting to the President of Raytheon International, Inc. (RII), the VP, Foreign Policy and
National Security Affairs is responsible for developing and maintaining relationships with senior
officials at the Department of State, executive branch officials in Washington and other senior
US diplomatic officials overseas in support of Raytheon's key international pursuits.  The
incumbent is responsible for engaging with and advising RII and business teams on foreign
policy and the political environment of key countries as it relates to Raytheon priorities in key
countries.  This position resides in Rosslyn, VA.

**General Responsibilities:**
- Develop and maintain relationships with senior officials at the Department of State,
  Department of Defense, Department of Commerce, and National Security Staff
- Advocate with executive branch officials and senior US diplomatic officials overseas in
  support of Raytheon's key international pursuits
- Expand Raytheon relationships with international customers and increase the pipeline for
  international bookings and sales
- Serve as RII's principal point of contact for Washington-based strategic consultants and on
  key international business councils and associations.
- Support Raytheon pursuits and pipeline development in the Middle East and North Africa,
  and Asia regions
- Partner to develop business unit capture strategies; identify potential policy challenges and
  develop effective responses to mitigate the challenges
- Assist in creation and implementation of country strategies for priority countries
- Provide access and prioritize messaging and engagement for Raytheon leaders to engage
  senior U.S. Government officials on Raytheon top priority international business issues
- Provide insights, implications, and recommended Raytheon actions in response to U.S.
  foreign policy initiatives, geopolitical events, and associated changes in the international
  environment
- Integrate and lead cross-Raytheon government advocacy for international business


**Level of Access:**
- White House (National Security Council):  Special Assistant to the President, Senior
  Director, Director
- Executive Departments: Assistant Secretary, Principal Deputy Assistant Secretary, Deputy
  Assistant Secretary, Office Director
- Foreign Missions:  Ambassador, Deputy Chief of Mission, Defense Attache


**Qualifications:**
- Fourteen or more years in progressively responsible leadership positions
- Bachelor's degree in relevant functional discipline
- Direct knowledge of key customers; excellent working relationships with senior White House
  officials and US diplomats, U.S. embassy teams, and industry executives and strategy
  consultants
- Demonstrated success in strategic planning, developing strategies for identifying potential

growth opportunities; ability to analyze and evaluate missions, requirements and capabilities
- Ability to transfer knowledge and guide program teams to develop and execute pipeline generation, integrated solutions and cross-selling strategies for company

# EXHIBIT II

| **From:** | "Rick Olson" <rickscafedxb@yahoo.com> |
| **Sent:** | Sun, 7 Aug 2016 14:51:57 -0500 |
| **To:** | "thomas_a_vecchiola@raytheon.com" <thomas_a_vecchiola@raytheon.com> |
| **Subject:** | Follow Up (From Rick Olson) |

Dear Tom:

Last time we spoke I promised to consider further the points you made.  I have done so, but I'm afraid my decision remains the same.

I thank you for considering me for the position, and wish you the best in finding a terrific candidate, which I am sure you will do.

Again, many thanks.

Best,

*rgo*

Rick Olson

# EXHIBIT JJ

## Re: Assignment at An End

From:  Rick Olson (rickscafedxb@yahoo.com)

To:     imaad.zuberi@mindspring.com

Date:  Wednesday, September 16, 2015, 09:53 PM EDT

Yes, I will send an email.  Will I join the Cohen Group? Don't know, am keeping all my options open.

*rgo*

Rick Olson

---

**From:** imaad zuberi <imaad.zuberi@mindspring.com>
**To:** Ambassordor Rick Olson – personal <rickscafedxb@yahoo.com>
**Sent:** Thursday, September 17, 2015 5:36 AM
**Subject:** FW: Assignment at An End

Please read the email below. You will be sending out same email that you are joining The Cohen Group?

---

**From:** Smith, James B [mailto:SmithJB2@state.gov]
**Sent:** Sunday, September 22, 2013 2:08 AM
**To:** jimsmithf15@yahoo.com; janet smith <jbs_newhampshire@yahoo.com>
**Subject:** Assignment at An End

Dear Friends and Colleagues,

I just completed the humbling experience of going through the many addresses of people who have made an impact on our experience here in the Kingdom of Saudi Arabia these last four years.  Some of you are long time friends who provided encouragement in the challenging days of the assignment; some of you are new found friends who welcomed and mentored us or built business, education or medical relationships in the Kingdom. Regardless, Janet and I offer our profound thanks for the support and friendship.

I end my tenure as U.S. Ambassador this week.  I can say without question that the U.S.-Saudi bilateral relationship is stronger;  U.S. trade has doubled in these last four years, and the people-to-people relationships have grown immeasurably.  Each of you has been a part of the building of that relationship, and for your engagement in the Kingdom, I offer my profound thanks.  Saudi Arabia is as strong an ally as the United States could hope for in the region, and it has been my privilege to be a part of that relationship.

Janet and I hope to stay connected to the Kingdom, and with you as well.  Our home email addresses are posted above.

I will be joining The Cohen Group on 15 October in the Washington, D.C., office.  My contact information there is jsmith@cohengroup.net.  Office: 202-863-7216.  Cell:  603-858-6566.

7/21/2019                                   Yahoo Mail - Re: Assignment at An End

Until our paths cross again, I offer my warmest Maasalama.

Jim Smith
U.S. Ambassador (ret)
Effective 30 Sep 2013

PERSONAL
This email is UNCLASSIFIED.

ROMH00000599

# EXHIBIT KK

1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   DANIEL J. O'BRIEN (Cal. Bar No. 141720)
4  Assistant United States Attorney
   Deputy Chief, Public Corruption & Civil Rights Section
5  Central District of California
        1500 United States Courthouse
6        312 North Spring Street
         Los Angeles, California 90012
7        Telephone: (213) 894-2468
         Facsimile: (213) 894-7631
8        E-mail:    daniel.obrien@usdoj.gov
   EVAN N. TURGEON
9  Trial Attorney
        U.S. Department of Justice
10       National Security Division
         Counterintelligence & Export Control Section
11
   Attorneys for Plaintiff
12 UNITED STATES OF AMERICA

13             UNITED STATES DISTRICT COURT

14         FOR THE CENTRAL DISTRICT OF CALIFORNIA

15 UNITED STATES OF AMERICA,          No. CR

16          Plaintiff,                DOCUMENT

17             v.                     [COOPERATION PLEA AGREEMENT]

18 RICHARD GUSTAVE OLSON, JR.,        [**UNDER SEAL**]

19          Defendant.

20

21      1.   This constitutes the plea agreement between Richard Gustave

22 Olson, Jr. ("defendant"), the United States Attorney's Office for the

23 Central District of California ("the USAO"), and the United States

24 Department of Justice ("DOJ") in the above-captioned case.  This

25 agreement is limited to the USAO and DOJ and cannot bind any other

26 federal, state, local, or foreign prosecuting, enforcement,

27 administrative, or regulatory authorities.

28

<u>DEFENDANT'S OBLIGATIONS</u>

2. Defendant agrees to:

a. Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a two-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with violations of 18 U.S.C. § 1001(a)(3), Use of a False Document, and 18 U.S.C. §§ 207(f)(1)(B), 216(a)(1), Aiding and Assisting a Foreign Government with Intent to Influence Decisions of United States Officers.

b. Not contest facts agreed to in this agreement.

c. Abide by all agreements regarding sentencing contained in this agreement.

d. Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e. Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f. Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g. Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

3. Defendant further agrees to cooperate fully with the USAO, DOJ, and the Federal Bureau of Investigation ("FBI"), and, as directed by the USAO and DOJ, any other federal, state, local, or

foreign prosecuting, enforcement, administrative, or regulatory

authority.  This cooperation requires defendant to:

a.  Respond truthfully and completely to all questions

that may be put to defendant, whether in interviews, before a grand

jury, or at any trial or other court proceeding.

b.  Attend all meetings, grand jury sessions, trials or

other proceedings at which defendant's presence is requested by the

USAO or compelled by subpoena or court order.

c.  Produce voluntarily all documents, records, or other

tangible evidence relating to matters about which the USAO, or its

designee, inquires.

4.  For purposes of this agreement: (1) "Cooperation

Information" shall mean any statements made, or documents, records,

tangible evidence, or other information provided, by defendant

pursuant to defendant's cooperation under this agreement or

statements made by defendant pursuant to letter agreements previously

entered into by the parties with respect to meetings held on October

30, 2020 and March 4, 2021 (the "Letter Agreements"); and (2) "Plea

Information" shall mean any statements made by defendant, under oath,

at the guilty plea hearing and the agreed to factual basis statement

in this agreement.

<u>THE USAO'S OBLIGATIONS</u>

5.  The USAO agrees to:

a.  Not contest facts agreed to in this agreement.

b.  Abide by all agreements regarding sentencing contained

in this agreement.

c.  At the time of sentencing, provided that defendant

demonstrates an acceptance of responsibility for the offenses up to

3

and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

       d.   Not further criminally prosecute defendant for violations of 18 U.S.C. § 201(c)(1)(B), Public Official Receiving Illegal Gratuity, related to September 2015 payments totaling $25,000 to a person with whom defendant OLSON had a personal relationship and 18 U.S.C. § 1519, Destruction of Documents, arising out of the deletion of emails pertaining to work performed for the Qatar Government.  Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement. Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

      6.   Recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range.  For purposes of this agreement, the low end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A, without regard to reductions in the term of imprisonment that may be permissible through the substitution of community confinement or home detention as a result of the offense level falling within Zone B or Zone C of the Sentencing Table.

      7.   The USAO further agrees:

a.    Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.    Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed.  Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c.    In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d.   If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

8.   Defendant understands the following:

a.   Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b.   Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c.   Defendant cannot withdraw defendant's guilty pleas if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d.   At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided

6

1  substantial assistance will rest solely within the exclusive judgment
2  of the USAO.

3          e.   The USAO's determination whether defendant has
4  provided substantial assistance will not depend in any way on whether
5  the government prevails at any trial or court hearing in which
6  defendant testifies or in which the government otherwise presents
7  information resulting from defendant's cooperation.

8                          <u>NATURE OF THE OFFENSES</u>

9      9.   Defendant understands that for defendant to be guilty of
10 the crime charged in Count One, Use of a False Document in violation
11 of 18 U.S.C. § 1001(a)(3), the following must be true:

12         a.   First, the defendant used a writing that contained a
13 false statement;

14         b.   Second, the writing was made in a matter within the
15 jurisdiction of the U.S. Department of State and Office of Government
16 Ethics;

17         c.   Third, the defendant acted willfully, that is, the
18 defendant acted deliberately and with knowledge both that the
19 statement was untrue and that his or her conduct was unlawful; and

20         d.   Fourth, the writing was material to the activities or
21 decisions of the U.S. Department of State and Office of Government
22 Ethics; that is, it had a natural tendency to influence, or was
23 capable of influencing, an agency's decisions or activities.

24 *10.*  Defendant understands that for defendant to be guilty of
25 the crime charged in Count Two, Aiding and Assisting a Foreign
26 Government with Intent to Influence Decisions of United States
27 Officers in violation of 18 U.S.C. §§ 207(f)(1)(B) and 216(a)(1), the
28 government must prove the following:

                              7

a.   First, during his last year of employment with the U.S. Government, defendant's basic pay was over $160,112 (thereby making him a covered person under 18 U.S.C. § 207(c));

b.   Second, defendant knowingly aided or advised a foreign entity, that is, the government of Qatar;

c.   Third, defendant intended to influence a U.S. governmental decision or decisions through his aiding or advising; and

d.   Fourth, defendant's prohibited activities occurred within one year after leaving the government job referenced above.

<u>PENALTIES</u>

11.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1001(a)(3), is: five years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

12.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Sections 207(f)(1)(B) and 216(a)(1) is: one year' imprisonment; a one-year period of supervised release; a fine of $100,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $25.

13. Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: six years' imprisonment; a three-year period of supervised release; a fine of $350,000 or twice the gross gain or gross loss resulting from

the offenses, whichever is greatest; and a mandatory special
assessment of $125.

14.  Defendant understands that supervised release is a period
of time following imprisonment during which defendant will be subject
to various restrictions and requirements.  Defendant understands that
if defendant violates one or more of the conditions of any supervised
release imposed, defendant may be returned to prison for all or part
of the term of supervised release authorized by statute for the
offense that resulted in the term of supervised release, which could
result in defendant serving a total term of imprisonment greater than
the statutory maximum stated above.

15.  Defendant understands that, by pleading guilty, defendant
may be giving up valuable government benefits and valuable civic
rights, such as the right to vote, the right to possess a firearm,
the right to hold office, and the right to serve on a jury.
Defendant understands that one of the offense to which he is pleading
guilty is a felony and that it is a federal crime for a convicted
felon to possess a firearm or ammunition.  Defendant understands that
the convictions in this case may also subject defendant to various
other collateral consequences, including but not limited to
revocation of probation, parole, or supervised release in another
case and suspension or revocation of a professional license.
Defendant understands that unanticipated collateral consequences will
not serve as grounds to withdraw defendant's guilty pleas.

16.  Defendant understands that, if defendant is not a United
States citizen, the felony convictions in this case may subject
defendant to: removal, also known as deportation, which may, under
some circumstances, be mandatory; denial of citizenship; and denial

of admission to the United States in the future.  The Court cannot,
and defendant's attorney also may not be able to, advise defendant
fully regarding the immigration consequences of the felony conviction
in this case.  Defendant understands that unexpected immigration
consequences will not serve as grounds to withdraw defendant's guilty
pleas.

FACTUAL BASIS

17.  Defendant admits that defendant is, in fact, guilty of the
offenses to which defendant is agreeing to plead guilty.  Defendant
and the USAO agree to the statement of facts provided below and agree
that this statement of facts is sufficient to support pleas of guilty
to the charges described in this agreement and to establish the
Sentencing Guidelines factors set forth in paragraph 19 below but is
not meant to be a complete recitation of all facts relevant to the
underlying criminal conduct or all facts known to either party that
relate to that conduct.

<u>False Statement</u>

On January 27, 2015, while serving as the U.S. Ambassador to
Pakistan, defendant received from a third-party, first-class,
round trip airfare tickets from New Mexico, via Los Angeles, to
London and lodging at a hotel in London for the purpose of
attending a job interview.  Defendant also received from the
same third-party lodging at a hotel in London for the period
January 30 through February 2, 2015.  The value of the airfare
exceeded $18,000 and the value of the hotel accommodation
exceeded $1,000.

As a senior U.S. Government official, defendant was required to
file public financial disclosure reports on an annual basis.
The annual reports, known as OGE Forms 278, required the
employee to disclose financial matters including income, assets,
liabilities, outside employment arrangements, gifts,
reimbursements, and travel expenses.

On May 12, 2016, defendant electronically signed and submitted
his annual OGE Form 278 for the 2015 calendar year, in which he

certified his answers were "true, complete and correct to the best of my knowledge."  In this OGE Form 278, defendant knowingly and willfully failed to disclose, as required, the travel benefits he received, namely, the roundtrip airfare between New Mexico and London and the lodging in London collectively worth over $19,000.

On September 1, 2016, the OGE Form 278 was signed by a Designated Ethics Official for the U.S. State Department who opined, "On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations."

Cooling-Off Period Violations

From November 17, 2015 through November 30, 2016, defendant served as the U.S. Special Representative for Afghanistan and Pakistan and received a base salary of $182,328.  Defendant's position and salary placed him within a category of senior government officials subject to a one-year cooling-off period that prohibited him from representing any foreign entity before any employee of any agency of the United States, or from providing aid or advice to any foreign entity with the intent to influence a decision of any employee of the United States.

Within the one-year cooling-off period after his November 30, 2016 retirement, defendant provided aid and advice to the government of Qatar with the intent to influence decisions of U.S. government officials.

Beginning on February 14, 2017, defendant participated in a lobbying effort to convince the U.S. Government to endorse the establishment of U.S. Customs and Border Control preclearance facilities at Doha International Airport in Qatar.  Defendant helped draft a proposal that was sent to the Qatar government which explained how preclearance facilities could be achieved. Defendant provided "two elements to the proposal in terms of selling this to Washington," recommending that the Qataris leverage their close military partnership with the United States and emphasize the positive experience the United States experienced with respect to the establishment of similar preclearance facilities in Abu Dhabi.

On or about June 6, 2017, defendant participated in a lobbying effort to convince the U.S. Government to support Qatar in its efforts to oppose a blockade imposed upon it by its neighbors. Defendant's aid included recruiting a retired U.S. General ("the "General") to join defendant OLSON in providing aid and advice

to Qatari government officials with the intent to influence U.S. foreign policy with respect to the Gulf Diplomatic Crisis.

As part of his efforts to aid the Qatar Government, on June 6, 2017, defendant recruited the General, who was working at a Washington D.C. think tank, to enlist his support in the endeavor.  On June 7, 2017, defendant met with the General, a third party, and others a hotel in Washington, D.C. at which time the General explained how he would conduct the lobbying and public relations campaign.  On June 8, 2017, the third party agreed to pay for the expenses of defendant and the General to travel to Doha to meet with the Emir and representatives of the Qatar Government.  At the time, defendant was being paid $20,000 per month to provide services to the third party.  The third party agreed to pay the General a fee for his efforts.

On June 10, 2017, defendant and the General met with the Qatar Emir and other representatives of his government.  Defendant and the General told the Qatari government officials that they had traveled to Qatar as private citizens, not on behalf of the U.S. government, but noted that they had connections with U.S. government officials that placed them in a position to help Qatar.

During the meetings, the General advised the Qatar government officials to embrace U.S. involvement in resolving the crisis, accept President Trump's offer to mediate, sign a pending deal to purchase U.S. F-15 fighter jets, and use the U.S. Al Udeid Air Base in Qatar as leverage to exert influence over U.S. government officials.  The Qatari officials were further advised to compete with Saudi Arabia's lobbying campaign in the U.S. and to use a full spectrum of information operations to control the political narrative in the United States.  The General informed the Qatar Government that they would use the U.S. National Security Advisor to further their efforts.

From June 9 through June 15, 2017, with the defendant's knowledge, the General solicited the help of the National Security Advisor and his staff to support the Qatar's position with respect to the crisis.  On June 15, 2017, defendant, the General, and a third party met with a senior Qatar Government Official and informed him the U.S. National Security Advisor and another senior U.S. government official had been briefed on their efforts to convince the United States to support Qatar's cause.

On June 16, 2017, the General reported to defendant, the third party, and a senior Qatar Government Official that he personally asked the National Security Advisor to meet with senior Qatar

officials and that while an "embassy request has to work its way up, our request will come down from above."

On June 28, 2017, defendant attended a dinner with the General, representatives of the Qatar Government, and members of Congress in an effort to enlist Congress to support the Qatari cause.

<u>SENTENCING FACTORS</u>

18.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

19.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

1001(a)(3) Base Offense Level      6    U.S.S.G. § 2B1.1

207(f) Base Offense Level      6    U.S.S.G. § 2C1.3

20.   Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

21.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

1                    WAIVER OF CONSTITUTIONAL RIGHTS

2      22.  Defendant understands that by pleading guilty, defendant

3  gives up the following rights:

4            a.   The right to persist in a plea of not guilty.

5            b.   The right to a speedy and public trial by jury.

6            c.   The right to be represented by counsel – and if

7  necessary have the Court appoint counsel - at trial.  Defendant

8  understands, however, that, defendant retains the right to be

9  represented by counsel – and if necessary have the Court appoint

10  counsel – at every other stage of the proceeding.

11            d.   The right to be presumed innocent and to have the

12  burden of proof placed on the government to prove defendant guilty

13  beyond a reasonable doubt.

14            e.   The right to confront and cross-examine witnesses

15  against defendant.

16            f.   The right to testify and to present evidence in

17  opposition to the charges, including the right to compel the

18  attendance of witnesses to testify.

19            g.   The right not to be compelled to testify, and, if

20  defendant chose not to testify or present evidence, to have that

21  choice not be used against defendant.

22            h.   Any and all rights to pursue any affirmative defenses,

23  Fourth Amendment or Fifth Amendment claims, and other pretrial

24  motions that have been filed or could be filed.

25                          WAIVER OF VENUE

26      23.  Having been fully advised by defendant's attorney regarding

27  the requirements of venue with respect to the offenses to which

28  defendant is pleading guilty, to the extent the offenses to which

                                14

defendant is pleading guilty were committed, begun, or completed

outside the venues of the Central District of California, Eastern

District of Virginia, or District of Columbia defendant knowingly,

voluntarily, and intelligently waives, relinquishes, and gives up:

(a) any right that defendant might have to be prosecuted only in the

district where the offenses to which defendant is pleading guilty

were committed, begun, or completed; and (b) any defense, claim, or

argument defendant could raise or assert based upon lack of venue

with respect to the offenses to which defendant is pleading guilty.

WAIVER OF APPEAL OF CONVICTION

24.  Defendant understands that, with the exception of an appeal

based on a claim that defendant's guilty pleas were involuntary, by

pleading guilty, defendant is waiving and giving up any right to

appeal defendant's convictions on the offenses to which defendant is

pleading guilty.  Defendant understands that this waiver includes,

but is not limited to, arguments that the statutes to which defendant

is pleading guilty are unconstitutional, and any and all claims that

the statement of facts provided herein is insufficient to support

defendant's pleas of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

25.  Defendant agrees that, provided the Court imposes a total

term of imprisonment on all counts of conviction within or below the

range corresponding to an offense level of 8 and the criminal history

category calculated by the Court, defendant gives up the right to

appeal all of the following: (a) the procedures and calculations used

to determine and impose any portion of the sentence; (b) the term of

imprisonment imposed by the Court; (c) the fine imposed by the Court,

provided it is within the statutory maximum; (d) to the extent

permitted by law, the constitutionality or legality of defendant's
sentence, provided it is within the statutory maximum; (e) the term
of probation or supervised release imposed by the Court, provided it
is within the statutory maximum; and (d) any of the following
conditions of probation or supervised release imposed by the Court:
the conditions set forth in Second Amended General Order 20-04 of
this Court; the drug testing conditions mandated by 18 U.S.C.
§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
authorized by 18 U.S.C. § 3563(b)(7).

26.   The USAO agrees that, provided (a) all portions of the
sentence are at or below the statutory maximum, the USAO gives up its
right to appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

27.   Defendant agrees that if, after entering guilty pleas
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty pleas on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement, including in particular its
obligations regarding the use of Cooperation Information; (b) in any
investigation, criminal prosecution, or civil, administrative, or
regulatory action, defendant agrees that any Cooperation Information
and any evidence derived from any Cooperation Information shall be
admissible against defendant, and defendant will not assert, and
hereby waives and gives up, any claim under the United States
Constitution, any statute, or any federal rule, that any Cooperation
Information or any evidence derived from any Cooperation Information
should be suppressed or is inadmissible; and (c) should the USAO

16

1  choose to pursue any charge that was either dismissed or not filed as
2  a result of this agreement, then (i) any applicable statute of
3  limitations will be tolled between the date of defendant's signing of
4  this agreement and the filing commencing any such action; and
5  (ii) defendant waives and gives up all defenses based on the statute
6  of limitations, any claim of pre-indictment delay, or any speedy
7  trial claim with respect to any such action, except to the extent
8  that such defenses existed as of the date of defendant's signing this
9  agreement.

10                    RESULT OF VACATUR, REVERSAL OR SET-ASIDE

11       28.  Defendant agrees that if any count of conviction is
12  vacated, reversed, or set aside, the USAO may: (a) ask the Court to
13  resentence defendant on any remaining count of conviction, with both
14  the USAO and defendant being released from any stipulations regarding
15  sentencing contained in this agreement, (b) ask the Court to void the
16  entire plea agreement and vacate defendant's guilty plea on any
17  remaining count of conviction, with both the USAO and defendant being
18  released from all their obligations under this agreement, or
19  (c) leave defendant's remaining conviction, sentence, and plea
20  agreement intact.  Defendant agrees that the choice among these three
21  options rests in the exclusive discretion of the USAO.

22                        EFFECTIVE DATE OF AGREEMENT

23       29.  This agreement is effective upon signature and execution of
24  all required certifications by defendant, defendant's counsel, and an
25  Assistant United States Attorney.

26                           BREACH OF AGREEMENT

27       30.  Defendant agrees that if defendant, at any time after the
28  signature of this agreement and execution of all required

                                    17

certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas.

b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crimes to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated to not to criminally prosecute pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any

investigation, criminal prosecution, or civil, administrative, or regulatory action.

c. The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d. In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

31. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.    Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

OFFICE NOT PARTIES

32. Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

33. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 18 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

34.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

NO ADDITIONAL AGREEMENTS

35.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

36.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

TRACY L. WILKISON
United States Attorney


_____
DANIEL J. O'BRIEN
Assistant United States Attorney

1

EVAN TURGEON                                Date
Trial Attorney

2

3

4

RICHARD GUSTAVE OLSON, JR.                  Date
Defendant

5

6

7

8

J. MICHAEL HANNON                           Date
Attorney for Defendant

9

10

11

12

CERTIFICATION OF DEFENDANT

13

    I have read this agreement in its entirety.  I have had enough

14

time to review and consider this agreement, and I have carefully and

15

thoroughly discussed every part of it with my attorney.  I understand

16

the terms of this agreement, and I voluntarily agree to those terms.

17

I have discussed the evidence with my attorney, and my attorney has

18

advised me of my rights, of possible pretrial motions that might be

19

filed, of possible defenses that might be asserted either prior to or

20

at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

21

of relevant Sentencing Guidelines provisions, and of the consequences

22

of entering into this agreement.  No promises, inducements, or

23

representations of any kind have been made to me other than those

24

contained in this agreement.  No one has threatened or forced me in

25

any way to enter into this agreement.  I am satisfied with the

26

representation of my attorney in this matter, and I am pleading

27

guilty because I am guilty of the charges and wish to take advantage

28

22

of the promises set forth in this agreement, and not for any other reason.

_____        _____
RICHARD GUSTAVE OLSON, JR.                 Date
Defendant


### CERTIFICATION OF DEFENDANT'S ATTORNEY

I am defendant Olson's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____        _____
J. MICHAEL HANNON                          Date
Attorney for Defendant Olson

23

# EXHIBIT LL

J. MICHAEL HANNON *
DANIEL S. CROWLEY *†‡
ANN-KATHRYN SO §†
    PARTNERS

————————

HARRISON E. RICHARDS †
KIERAN L. REILLY*
RACHEL AMSTER
    ASSOCIATES

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
333 8TH STREET NE
WASHINGTON, DC 20002
EST. MARCH 17, 2006

————————

T (202) 232-1907 │ F (202) 232-3704
www.hannonlawgroup.com

WILLIAM CLAYTON BATCHELOR *†
OF COUNSEL

————————

* ALSO ADMITTED IN MARYLAND
† ALSO ADMITTED IN VIRGINIA
‡ ALSO ADMITTED IN MASSACHUSETTS
§ ALSO ADMITTED IN NEW JERSEY

January 10, 2022

**VIA ELECTRONIC TRANSMISSION ONLY**

Daniel J. O'Brien
Assistant United States Attorney
United States Attorney's Office for the Central District of California
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

Evan N. Turgeon
Trial Attorney
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

    Re:  <u>Attorney Proffer (Amb. Richard Olson)</u>

Dear Messrs. O'Brien and Turgeon:

  In our plea discussion on January 6th, you indicated that there are several statements you would like Amb. Olson to reconcile so that you can be assured he will be a trustworthy cooperating witness. You further stated that we could first address these statements through an attorney proffer. Before doing that, we want to confirm that, similar to the previous proffer sessions, the information we disclose to you will not be used by the government in its case in chief or at sentencing. With that assurance, we have prepared an attorney proffer and will send it to you promptly.

  Thank you for your courtesy.

      Sincerely,

      *s/ J. Michael Hannon*

      J. Michael Hannon

# EXHIBIT MM

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **vs.** | **)** | **PRESENTENCE INVESTIGATION REPORT** |
| | **)** | |
| | **)** | **Docket No.:    0090 1:22CR00144-001 (SEALED)** |
| **Richard Gustave Olson Jr.** | **)** | |


### RICHARD D. OLSON, JR.'s OBJECTIONS TO THE PRESENTENCE REPORT

| **Assistant U.S. Attorney** | **Defense Counsel** |
|---|---|
| Evan Nathaniel Turgeon | J. Michael Hannon |
| 950 Pennsylvania Avenue NW, Suite 7700 | 333 8th Street NE |
| (202) 353-0176 | Washington, DC 20002 |
| Washington, DC 20530 | (202) 232-1907 |
| evan.turgeon@usdoj.gov | jhannon@hannonlawgroup.com |
| | |
| Stuart Douglas Allen | Russell D. Duncan |
| 601 D Street NW | 1001 Pennsylvania Avenue NW, Suite 1300 |
| Washington, DC 20530 | South |
| (202) 252-7794 | Washington, DC 20004-2505 |
| Stuart.allen@usdoj.gov | (202) 640-6657 |
| | rduncan@clarkhill.com |

**Sentence Date:**     January 20, 2023, at 3:00 p.m.

**Offense:** Count 1:     Making a False Writing
18 USC § 1018
1 year imprisonment/$100,000 fine

Count 2:     Aiding and Assisting a Foreign Government with Intent
to Influence Decisions of United States Officers
18 USC § 207(f)(1)(B)
1 year imprisonment/$100,000 fine

**PART A. THE OFFENSE**

**Charge(s) and Conviction(s)**

1.    On March 22, 2022, the United States Attorney for the Central District of California filed a two-found Information charging defendant Richard Gustave Olson, Jr. with Making a False Writing, in violation of 18 USC §1018 (Count One) and Aiding and Assisting a Foreign Government with intent to Influence Decisions of United States Officers, in violation of 18 USC §207(f)(1)(B) (Count Two).

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  In the second line, there is a typo [two-found].

The plea agreement signed by Amb. Olson on January 14, 2022, required that his plea take place in either the Eastern District of Virginia or the District of Columbia.  After the plea agreement was signed, attorneys Daniel O'Brien, from the U.S. Attorney's Office for the Central District of California, and Evan N. Turgeon from the National Security Division of the Department of Justice, were unable to comply with that provision of the agreement.  At no time was there any case filed against Amb. Olson in the Central District of California.  Five weeks passed after the execution of the plea agreement.  On February 25, 2022, Mr. Turgeon left a message for Amb. Olson's counsel, J. Michael Hannon, to call him.  Mr. Hannon returned the call on February 28, 2022.

In the telephone call, Mr. Turgeon said that  "a technical glitch in the plea agreement" might result in Amb. Olson being charged with a felony, a violation of the plea agreement.  Mr. Turgeon then stated that the technical glitch could be remedied by Amb. Olson agreeing to an "addendum" to the plea agreement.  The proposed addendum would provide that the plea would take place in the Central District of California "in the event that neither the United States Attorney for the Eastern District of Virginia nor the United States Attorney for the District of Columbia agreed to accept the filing of the plea agreement in their respective district courts."

Mr. Turgeon stated that on February 25, 2022, the United States Attorney for the EDVA refused to accept the filing of the plea in that district.  Mr. Turgeon reported that neither the National Security Division at DOJ nor the U.S. Attorney's Office for the Central District of California had contacted the U.S. Attorney's Office for this district to determine whether that Office would accept the plea.  Mr. Turgeon reported that if Amb. Olson did not accept the proposed "addendum" to the plea agreement, Amb. Olson might be indicted in either the EDVA or this district.  As recounted in Mr., Hannon's letter memorializing the telephone call:

Mr. Turgeon further stated that regardless of whether Amb. Olson agrees to the proposed addendum to the plea agreement, the USAO/CDCA and DOJ/NSD would file the plea agreement very soon in the Central District of California.  Mr. Turgeon stated that he and Mr. O'Brien would then approach the USAO for the District of Columbia for permission to transfer the plea to the District of Columbia.  He stated that in his view, with the plea already filed in CDCA, it would be easier to persuade the USAO/DC to accept the transfer.  In the event such a transfer were not accepted by that office, then under the proposed addendum to the plea agreement, Amb. Olson would enter his plea in the Central District of California and be sentenced in that court.

Mr. Turgeon's email response to the letter was received on the same day.  That email does not vary in material ways from Mr. Hannon's letter, and includes the threat that Amb. Olson might be

indicted in either the EDVA or DDC if he fails to agree to the addendum.  The email accused Amb. Olson's counsel of "gamesmanship".

Amb. Olson did not consent to the addendum, as entering his plea in either the EDVA or this district was material to the agreement.  On March 17, 2022, Messrs. O'Brien and Turgeon reported that they would file an information and the plea agreement in the Central District for California "shortly" and requested that Amb. Olson must execute a Rule 20 Transfer Request for the matter to be transferred to this district.  In a letter the next day, Mr. Hannon did not agree to the transfer and maintained anything filed should remain under seal to preserve the potential of Amb. Olson earning a 5K motion from the government in its purported prosecution of retired Marine Four-Star General John Allen, then director of the Brookings Institute.

The government then filed only an Information in the Central District for California on March 22, 2022, without any notice or agreement from Amb. Olson.  Amb. Olson was alerted to the filing of the information by the press.  Counsel for Amb. Olson previously learned from a national reporter that the reporter had a source in the Department of Justice.  As we discuss further in our Objections, AUSA O'Brien from the U.S. Attorney's Office caused a release of a search warrant affidavit to the press in violation of federal law and or under  Rule 6 of the Rules of Criminal Procedure regarding grand jury secrecy.

To effectuate the terms of the plea agreement, Amb. Olson had no choice but to execute the Rule 20 Transfer Request, which also was personally signed by both the United States Attorney for the Central District of California and the United States Attorney for this district.  The transfer was filed in this Court on April 7, 2022.  Amb. Olson never made an appearance in the Central District of California, nor did any counsel on his behalf.

2. The Information does not provide notice to the defendant the Government intends to seek forfeiture as a part of the sentence.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  There were no proceeds eligible for forfeiture under the counts of conviction.

3. The criminal conduct charged in the Information occurred on or about May 12, 2016 (as to Count One) and from on or about February 14, 2017 to on or about June 28, 2017 (as to Count Two).

4. On June 3, 2022, the defendant pled guilty to the two-count Information, pursuant to a written plea agreement. The defendant understands a violation of Counts One and Two each carry a maximum term of imprisonment of one year, a one-year period of supervised release, a fine of $100,000 or twice the gross gain or gross loss resulting from the offense (whichever is greatest), and a mandatory $25 special assessment. The defendant understands that the total maximum sentence for all offenses to which the defendant is pleading guilty is two years' imprisonment, a one-year period of supervised release, a fine of $200,000 or twice the gross gain or gross loss resulting from the offenses (whichever is greatest), and a mandatory special assessment of $50.

5. The parties agree to the statement of facts and agree the statement of facts is sufficient to support guilty pleas to the charges; however, the statement is not meant to be a complete recitation of all the facts relevant to the underlying criminal conduct. The Government agrees not to further criminally prosecute the defendant for violations of (1) 18 USC § 201(c)(1)(B)—Public Official Receiving Illegal Gratuity, related to September 2015 payments totaling $25,000 to a person with whom the defendant had a personal

relationship; (2) 18 USC §1519—Destruction of Documents, arising out of the deletion of emails pertaining to work performed for the Qatar Government; (3) 18 USC § 1001—False Statements, related to any statements made by the defendant during the pendency of the Government's investigation, (4) 18 USC §208(a)—Acts Affecting a Personal Financial Interest, or (5) any other violations of law relating to conduct described in the factual basis of the plea agreement or Information. The defendant understands the Government is free to criminally prosecute him for any other unlawful past conduct or any unlawful conduct that occurs after the date of the plea agreement

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Amb. Olson by agreeing to this portion of the Plea Agreement did not and does not concede that any of the alleged facts related to the offenses listed are relevant conduct for determining his guideline level or are factually accurate.

6.    The defendant understands at the time of sentencing, the Court may consider the uncharged conduct in determining the applicable guidelines range, the extent of any departures from that range, and the sentence to be imposed after considering the sentencing guidelines and all other relevant factors under 18 USC §3553(a). The parties agree the following US Sentencing Guidelines (USSG) calculation. The base offense level for Count One is 6, pursuant to USSG §2B1.1[3]. The base offense level for Count Two is 6, pursuant to USSG §2C1.3. The parties agree two levels are added because the counts do not group, pursuant to USSG §§3D1.1 through 3D1.4. The combined offense level is 8, pursuant to USSG §3D1.4, and the offense level is reduced by two levels pursuant to USSG §3E1.1, for acceptance of responsibility. The Government agrees, if necessary, to recommend an additional one-point reduction if available under §3E1.1; however, the parties anticipate the defendant's guidelines level will be below the threshold necessary for an additional one-level reduction to be available. The parties reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the USSG are appropriate. The defendant understands there is no agreement as to his criminal history points or criminal history category. The Government agree to recommend the defendant be sentenced to a term of imprisonment within the applicable USSG range.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The PSR Writer failed to note that "the parties anticipate the defendant's guidelines level will be below the threshold necessary for an additional one-level reduction to be available." That threshold is 16; whereas, the guideline level recommended by the PSR Writer is well over that.

7.    On April 26, 2022, the defendant was placed on a personal recognizance bond. He was ordered to report for supervision to Pretrial Services Agency for the District of Columbia (PSADC) as directed; surrender his passport to PSADC within two weeks of his initial appearance and no later than May 10, 2022; not to obtain a passport or other international travel document; notify PSADC in advance of any and all travel outside the District of New Mexico; receive the Court's approval for any travel outside the continental United States; report to PSADC weekly as directed; and contact PSADC on April 27, 2022 to conduct an interview and verify his address.

8.    Automated PSADC records indicate the defendant has complied with all Court ordered conditions of release. His passport was surrendered on May 2, 2022.

**The Offense Conduct**

9.    The following was obtained from the Statement of Offense (ECF doc. 1), the Information (ECF doc. 1), and information received from the Government.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   The information provided by the government to the PSR Writer [Paragraphs 17-54] was not shared with Amb. Olson's counsel at the time it was sent by the government to the PSR Writer as is the conventional conduct.  Consequently, Amb. Olson was unable to contest the information provided by the government before the PSR Writer prepared and delivered the Draft PSR on August 10, 2022.  This information was authored by AUSA Daniel O'Brien, who has caused significant harm to Amb. Olson through his release of grand jury information to the media.

We will note after each of the following paragraphs the source of the information: i.e., whether from the government, or the Information, or the Statement of Offense [ECF No. 1, Doc. 1-1].   Paragraphs 17-54 provided by the government, and they should be eliminated from the PSR.  Including these paragraphs in the PSR indicates an endorsement by the PSR Writer of the government's distorted rendering of the facts.  Instead, the PSR Writer should substitute the objective statement of the offense which come directly from the Plea Agreement as set forth after Paragraph 16, below, in our Proposed Objections and Modifications.

The information contained in Paragraphs 17-54 should be left to the government's use in its sentencing memorandum or in litigation over the facts relevant to sentencing.

Persons and Entities

10.     Defendant Richard Gustave Olson, Jr. was a career foreign service officer employed by the United States (US) State Department. Defendant Olson was appointed by the President and confirmed by the US Senate to serve as Ambassador to the United Arab Emirates (UAE) from on or about October 14, 2008 through May 2, 2011 and to serve as Ambassador to Pakistan from on or about October 31, 2012 through November 17, 2015. From on or about November 17, 2015 through his retirement on November 30, 2016, defendant Olson served as US Special Representative for Afghanistan and Pakistan (Special Representative). In or about December 2016, after retiring from government service, defendant Olson created an entity called Medicine Bear International Consulting, LLC ("Medicine Bear").

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ A.1 [ECF No. 1, Doc. 1-1 at 1-2].

11.     Imaad Zuberi was a naturalized US citizen born in Pakistan. Mr. Zuberi operated various informal and formal business entities collectively referred to as Mr. Zuberi's Company. As part of his business operations, Mr. Zuberi was retained by various foreign governments and individuals to engage in lobbying and public relations efforts. Mr. Zuberi received funds from foreign clients, used those funds to make political campaign contributions to US politicians, parlayed those contributions into political influence in the US, and lobbied US officials on behalf of his foreign clients.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ A.2 [ECF No. 1, Doc. 1-1 at 2].

12.     In or about March 2013, Mr. Zuberi met with defendant Olson in Islamabad, Pakistan. From in or about March 2013 through November 2016, Mr. Zuberi solicited defendant Olson's advice and assistance in his capacity as Ambassador with respect to a variety of business matters of interest to Mr. Zuberi.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ A.2.a. [ECF No. 1, Doc. 1-1 at 2].

Ethics Obligations and Reporting Requirements

13.    To increase public confidence in the federal government, demonstrate the integrity of government officials, and enhance the ability of the citizenry to judge the performance of public officials, the US Congress enacted the Ethics in Government Act of 1978 ("the Act"). The Act established an agency within the Executive Branch, the Office of Government Ethics ("OGE"), to oversee public employee compliance with US ethics laws.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:    Information at ¶ B.3 [ECF No. 1, Doc. 1-1 at 3].

14.    Because transparency was a critical part of government ethics, Congress determined that US citizens should know their leaders' financial interests. Accordingly, the Act and its implementing regulations required certain government employees ("public filers") to file public financial disclosure reports on an annual basis. The annual reports, known as OGE Forms 278, required the employee to disclose financial matters including their income, assets, liabilities, outside employment arrangements, gifts, reimbursements, and travel expenses. The OGE 278 forms certified that the statements the public filer made on the form and all attached schedules were true, complete, and correct to the best of the public filer's knowledge. In both his capacities as Ambassador and Special Representative, defendant Olson was a public filer.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:    Information at ¶ B.4 [ECF No. 1, Doc. 1-1 at 3].

15.    OGE and the employee's agency were jointly charged with ensuring compliance with ethics laws and reporting obligations, investigating possible violations, and referring possible violations to the agency's Inspector General and the US Department of Justice for civil enforcement or criminal prosecution.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:    Information at ¶ B.5 [ECF No. 1, Doc. 1-1 at 5].

16.    The Act also imposed "revolving door" prohibitions upon senior government officials. After retirement from government service, senior government officials were prohibited from representing foreign entities before US officials or aiding or advising any foreign entity, including through any behind-the-scenes consulting, with the intent to influence US officials during a one-year "cooling off" period. Congress enacted similar "revolving door" restrictions into a criminal statute, Title 18, United States Code, Section 207(f). In accordance with these laws, defendant Olson was prohibited from engaging in lobbying activity or aiding or advising any foreign government in its attempts to influence US officials during the period December 1, 2016 through December 1, 2017. During this time, defendant Olson was aware of the "revolving door" prohibitions and understood that they applied to him.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:    Information at ¶ B.6 [ECF No. 1, Doc. 1-1 at 4].

The Offense

6

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Paragraphs 17-54 are embellished assertions provided by the government to the PSR Writer which Amb. Olson was unable to review before the Draft PSR was delivered on August 10, 2021.  These Paragraphs were adopted in whole by the PSR Writer, rather than the recitation of facts included in the Information to which Amb. Olson agreed to plead guilty.  The facts recited in the Information should be substituted for Paragraphs 17-54, which are better left to the government's Memorandum Regarding Sentencing.

Consequently, Amb. Olson requests that the PSR Writer substitute the following, which comes directly from the Information, for Paragraphs 17-54:

> C. WHILE EMPLOYED BY THE FEDERAL GOVERNMENT, DEFENDANT OLSON RECEIVED OVER $18,000 IN TRAVEL EXPENSES FROM PERSON 1 TO ATTEND A JOB INTERVIEW WITH BUSINESSPERSON 2 IN LONDON

> 7. On or about January 15, 2015, defendant OLSON, who was then still serving as U.S. Ambassador to Pakistan, met with Person 1 in Los Angeles and discussed the possibility that defendant OLSON might work for Person 1's business associate, Businessperson 2, a citizen of Bahrain, who operated Businessperson 2's Company. On or about January 23, 2015, defendant OLSON agreed to meet Person 1 and Businessperson 2 in London on January 31.

> 8. On or about January 27, 2015, Person 1 procured defendant OLSON's first-class airfare from New Mexico, via Los Angeles, to London. Person 1 paid for the trip with a combination of credit card expenditures and approximately 330,000 frequent flyer miles. In total, the airfare was worth approximately $18,829. Person 1 paid for his and defendant OLSON's stay at a luxury hotel in London at a combined cost of approximately $2,298. Person 1 also paid for dinner in London for defendant OLSON, Businessperson 2, Person 1, and another individual at a cost of approximately $589.

> 9. On or about February 19, 2015, Businessperson 2's Company offered defendant OLSON a one-year contract with Businessperson 2's Company, commencing after defendant OLSON's retirement from government service, that included compensation of $300,000 per year.

> D. AFTER HIS RETIREMENT FROM GOVERNMENT SERVICE, DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR

> 10. After defendant OLSON began working for Person 1 and Person 1's Company in December 2016, despite being aware that he was subject to the "revolving door" prohibitions of the Act and Section 207(f), defendant OLSON violated these prohibitions on multiple occasions.

>> a. DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR TO FACILITATE LOBBYING U.S. OFFICIALS TO ESTABLISH U.S. CUSTOMS PRECLEARANCE FACILITIES AT DOHA INTERNATIONAL AIRPORT

> 11. U.S. Customs and Border Protection ("CBP") preclearance facilities at foreign international airports provided significant benefits to host countries and their national airlines. CBP allowed flights originating from a precleared airport to fly directly from that airport to over 160 destinations in the United States, regardless of whether the destination airport had a CBP port of entry. Preclearance facilities thus provided a host country's airport an advantage over competitors for the U.S.-bound traveler market.

12. In or about January 2014, while defendant OLSON was serving as Ambassador to the UAE, the U.S. and the UAE negotiated to establish a CBP preclearance facility at the Abu Dhabi International Airport in the UAE -- one of Qatar's regional rivals.

13. On or about October 25, 2016, Person 1 caused the drafting of a contract between Person 1's Company and a Qatar-based holding company controlled by Qatar Government Official 1, whereby Person 1's Company would be paid $3.5 million per year plus a 20% "success fee."

14. On or about November 14, 2016, Qatar Government Official 1 transferred by wire $2.8 million to Person 1's Company.

15. On or about December 27, 2016, Qatar Government Official 1transferred by wire $3 million to Person 1's Company.

16. On or about January 23, 2017, Businessperson 3, a business associate of Person 1, sent defendant OLSON a draft plan for a lobbying campaign to convince the White House and the U.S. Department of Homeland Security ("DHS") to establish preclearance facilities at Doha International Airport.

17. The next day, on or about January 24, 2017, defendant OLSON sent Person 1 and Businessperson 3 an email that included his advice on how Qatar could "sell" its preclearance proposal to the U.S. government. For example, defendant OLSON advised that it would be important to secure the support of the U.S. Ambassador to Qatar, stating, "I know her well but can't do it because of State's post-employment ethics restrictions, but [Person 1] can charm her she's from LA. The deal closer would be for the Qataris help her get a new Embassy[.]"

18. On or about January 29, 2017, Businessperson 3 emailed a revised lobbying plan to defendant OLSON and Person 1, incorporating defendant OLSON's input. The revised plan called for Qatar to lobby the U.S. House of Representatives, U.S. Senate, White House National Security Council, DHS, and specific CBP officials, followed by a negotiated agreement between DHS and the government of Qatar to establish preclearance facilities at Doha International Airport.

19. On or about January 31, 2017, defendant OLSON sent Businessperson 3 further revisions to the lobbying plan. Defendant OLSON recommended that Qatar leverage its support for the U.S. military to obtain the preclearance facilities it sought, stating, "We also believe it should be possible to leverage Qatar's strong record of support for the U.S., particularly the U.S. military, to push the pre-clearance program through."

20. On or about February 14, 2017, Businessperson 3 emailed the preclearance lobbying plan that incorporated defendant OLSON's advice to a government email address of Qatar Government Official 3, an official with the Qatar Ministry of Interior, copying Qatar Government Official 1, defendant OLSON, and Person 1.

21. On or about March 9, 2017, Person 1 sent Qatar Government Official 1 a copy of Person 1's Company's draft contract with the Qatar-based holding company. In a cover email, Person 1 stated, "this will incorporate preclearance project."

      b.     DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR TO FACILITATE LOBBYING U.S. OFFICIALS TO SUPPORT QATAR DURING A DIPLOMATIC CRISIS

22. On or about May 24, 2017, cyber hackers, reportedly funded by the UAE, committed a computer intrusion at the Qatar News Agency website. The hackers posted statements, purportedly by Qatar Government Official 2, that appeared supportive of the Government of Iran. Hackers also leaked emails of the UAE's Ambassador to the United States that discussed Qatar's support for the Muslim Brotherhood and militant groups.

23. On or about June 5, 2017, citing Qatar's purported support for Iran and terrorism, several Gulf states, including the UAE and the Kingdom of Saudi Arabia, cut ties with Qatar and implemented a blockade, closing all air and sea lanes to the country ("the Gulf Diplomatic Crisis").

24. On or about June 6, 2017, several U.S. House representatives introduced House Resolution 2712 "to impose sanctions with respect to foreign support for Palestinian terrorism[.]" The Resolution identified Qatar as providing financial support to Hamas, a terrorist organization.

25. On or about June 1, 2017, Person 1 enlisted the help of defendant OLSON, Businessperson 3, and Businessperson 4 to organize and participate in a lobbying and public relations campaign to convince the U.S. government to support Qatar during the Gulf Diplomatic Crisis. The lobbying and public relations effort sought to use the Gulf Diplomatic Crisis as a business opportunity and to profit from defendant OLSON's status as a former U.S. Ambassador to the UAE, Qatar's primary rival in the crisis, and defendant OLSON's ability to provide aid and advice to Qatar.

26. Defendant OLSON's aid included recruiting Person 3 to join defendant OLSON in providing aid and advice to Qatari government officials with the intent to influence U.S. foreign policy with respect to the Gulf Diplomatic Crisis. On or about June 6, 2017, defendant OLSON contacted Person 3 to enlist his support in the endeavor. That same day, defendant OLSON emailed Person 1 that he had been in touch with Person 3 and informed him that Person 3 was "interested in helping out with Qatar."

27. On or about June 10, 2017, defendant OLSON, Person 1, Person 3, Businessperson 4, and Qatar Government Official 1 traveled to Doha, Qatar. After checking into their hotel, defendant OLSON and Person 3 met with the U.S. Ambassador to Qatar to discuss the purpose of their trip.

28. That same day, on or about June 10, 2017, defendant OLSON, Person 1, and Person 3 traveled to the Qatari royal palace to meet with senior Qatari government officials, including Qatar Government Official 2, Qatar Government Official 4, Qatar Government Official 5, and Qatar Government Official 6. The Qatari government officials did not permit Person 1 to attend the meetings.

29. On or about June 15, 2017, defendant OLSON, Person 1, and Person 3 met for dinner with Qatar Government Official 4 at a hotel in Washington, D.C.

30. On or about June 28, 2017, defendant OLSON, Person 1, Person 3, and Qatar Government Official 5 met with several sitting members of the U.S. House of Representatives for the purpose of convincing the U.S. lawmakers to support Qatar rather than its regional rivals in the Gulf Diplomatic Crisis.

Information at ¶ 7-30 [ECF No. 1, Doc. 1-1 at 3-9].

**BELOW ARE PROPOSED OBJECTIONS TO PARAGRAPHS 17-54 PROVIDED BY THE GOVERNMENT WHICH INDICATE WHY THE PSR WRITER SHOULD REMOVE THEM.**

17.   On January 15, 2015, defendant Olson met with Mr. Zuberi in Los Angeles and discussed the possibility that defendant Olson might work for Mr. Zuberi's business associate, Esam Janahi who operated Abu Dhabi Investment House ("ADIH").

18.   On January 20, 2015, Mr. Zuberi told defendant Olson he "spoke to [Mr. Janahi] about you" and began making arrangements for defendant Olson to meet with Mr. Janahi for the purposes of facilitating an employment offer for defendant Olson. On January 23, 2015, defendant Olson agreed to meet Mr. Zuberi and Mr. Janahi in London on January 31, 2015.

19.   On January 27, 2015, while serving as the US Ambassador to Pakistan, defendant Olson received from Mr. Zuberi first-class airfare from New Mexico, via Los Angeles, to London. Mr. Zuberi paid for the trip with a combination of credit card expenditures and approximately 330,000 frequent flyer miles. In total, the airfare was worth approximately $18,829. Mr. Zuberi paid for his and defendant Olson's stay at a luxury hotel in London at a combined cost of approximately $2,298. Mr. Zuberi also paid for dinner in London for defendant Olson, Mr. Janahi, Mr. Zuberi, and another individual at a cost of approximately $589.

20.   On February 4, 2015, Mr. Zuberi provided defendant Olson with the terms of a one-year contract with ADIH, commencing on July 1, 2015, that included compensation of $300,000 per year, a 1% fee for business developed, compensated expenses, and a position on the advisory board of the company.

21.   On February 8, 2015, Mr. Zuberi told defendant Olson that Mr. Janahi was waiting for defendant Olson's decision. Defendant Olson then sent an email to Mr. Janahi stating that he was "very interested in the position with ADIH and would like to clarify a few points with [him]." Defendant Olson proposed terms identical to those provided by Mr. Zuberi just days earlier.

22.   On February 19, 2015, ADIH offered the same terms of the employment to defendant Olson as those set forth by Mr. Zuberi and as requested by defendant Olson.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The previous Paragraphs 17-22 are the government's misleading assertions of fact that relate to Count One charging failure to report the travel expenses for the job interview held in London to interview for a position with ADIH.

In reality, there is no evidence that Zuberi was a business associate of Janahi or associated with ADIH. In fact, Janahi has filed suit against Zuberi in California.  Amb. Olson did not know the details of who paid for his travel and lodging, which were not important to him for the reason stated directly below. Although Zuberi's office was making the travel arrangements, Amb. Olson believed the costs were being paid by ADIH, as Zuberi had told Amb. Olson.

Moreover, State Department employees are permitted to accept travel expenses for interviews in post-employment positions as they are approaching retirement.  Amb. Olson anticipated retirement, and the ADIH was the least among  the employment prospects Amb. Olson's  was pursuing before his retirement.

Amb. Olson – as required by State Department ethics advisories – filed a formal Recusal Notice with his embassy with respect to any Department dealings with ADIH because of his interviewing for a position.  This filing makes clear that Amb. Olson had no need to hide anything from the government.

Indeed, Amb. Olson filed other recusal notices regarding his other post-employment interviews.

23.     On March 12, 2015, at Mr. Zuberi's request, defendant Olson agreed to meet with members of Congress to convey a positive view with respect to a sale of military hardware to Pakistan. On March 18, 2015, Mr. Zuberi contacted Congressmembers' offices and suggested that they meet with defendant Olson so that he could provide them with an update on Pakistan.

24.     On April 9, 2015, Mr. Zuberi reminded defendant Olson that defendant Olson "owed [him] a set of talking points for [a Congressperson] and asked for similar talking points for [a Senator] regarding a proposed arms sale to Pakistan which would have to be approved by Congress. That same day, defendant Olson sent Mr. Zuberi the talking points "as promised" via defendant Olson's personal email. The talking points consisted of a position paper defendant Olson wrote for the State Department that had not been approved for public release. The talking points portrayed Pakistan in a positive light with respect to its cooperation against terrorism and expressed support for the sale of military helicopters and associated equipment to Pakistan at an estimated cost of $952 million. Defendant Olson told Mr. Zuberi that the argument presented was what he intended to convey in the previously attempted meetings with members of Congress, saying, "This is what I would say if giving the brief."

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Paragraphs 23-24 provided by the government are also a gross distortion attempting to create the appearance of impropriety where none existed.  Zuberi unilaterally sought the participation of Amb. Olson with his efforts to engage members of Congress on behalf of Pakistan.  Amb. Olson did nothing to facilitate these efforts.

The so-called "Talking Points" consisted of publicly available information on the State Department's position as to Pakistan.  Amb. Olson provided them to Zuberi so that Zuberi would not present false information which would undermine the State Department's true position.  Zuberi regularly hob-knobbed with such politicians because of the millions of dollars in illegal campaign contributions he arranged for them.  None of Zuberi's efforts to meet with members of Congress on this issue where successful.

<u>Gratuities From Mr. Zuberi for Defendant Olson's Support for Arms Sales</u>

25.     On June 3, 2015, in response to a Mr. Zuberi invitation that defendant Olson attend a congress member's birthday celebration, defendant Olson responded that they wouldn't want him "because he was poor." On June 14, 2015, defendant Olson told Mr. Zuberi about Muna Habib and her desire to attend Columbia University's School of Journalism and obtain financial support. Ms. Habib and defendant Olson had been romantically involved since 2013 but had a falling out over defendant Olson's affair with another woman.

26.     Despite having not met Ms. Habib, on June 21, 2015, Mr. Zuberi told defendant Olson that "I will offer her $25,000 grant and $50,000 loan to be paid back after she graduates. Will this work for her?" Defendant Olson responded, "It is a very generous offer, and she should take it."

27.     Defendant Olson kept tabs on Mr. Zuberi's offered help.   On July 1, 2015, defendant Olson emailed Ms. Habib for a status report on her meeting with Mr. Zuberi, saying, "Has it

occurred to you that it might be in your interest to give me a readout of your meeting, since the principal is likely, in fact has, reached out to me?"

28. Later that same day, Mr. Zuberi sent an email to Ms. Habib memorializing what he agreed to provide at the meeting: "Grant of $25,000 going directly to Columbia University . . . Help you get loan of $50,000 from US bank when you are in school or NYC . . . I can show proof of funds to Columbia University for you to start the school." Mr. Zuberi forwarded this communication to defendant Olson, and defendant Olson responded, "Many thanks."

29. On July 14, 2015, Mr. Zuberi provided Ms. Habib with a signed letter for Columbia University in which he falsely claimed, "I am professionally acquainted with Muna Habib through the work she has conducted for oppressed women in Pakistan, including the passionate advocacy she has undertaken on their behalf" and pledged to support her with $81,000 for the 2015 – 2016 academic year.

30. On August 6, 2015, Mr. Zuberi paid for Ms. Habib's August 8 flight to New York to begin her studies at Columbia.

31. On September 10, 2015, Mr. Zuberi issued two checks, one for $20,000 payable to Columbia and one for $5,000 payable to Ms. Habib. On September 22, 2015, Mr. Zuberi forwarded a bank statement to Ms. Habib showing that the $20,000 check had been deposited into Columbia's account for Ms. Habib and said, "I was told both your checks were cashed. Hope you are learning lot at Columbia."

32. Mr. Zuberi then forwarded this same email to defendant Olson along with the message, "My job is done." Defendant Olson responded, "Once again, you are very generous."

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The government's supplied Paragraphs 25-32 are a false attempt to convince the PSR Writer that Amb. Olson was receiving gratuities.  Amb. Olson is not charged with receiving gratuities because there is neither a factual nor a legal basis for such assertions.   During plea negotiations, the government actually agreed there was no basis for any charge against Amb. Olson of Conflict of Interest on account of the government's unproven contention that Amb. Olson granted favors to Zuberi while serving as Ambassador.

The government's assertion that Amb. Olson supported Zuberi's schemes for military sales to Pakistan is completely absurd.  Amb. Olson, the State Department, and the administration were uniformly opposed to any such scheme.

Regarding Para. 27, despite AUSA O'Brien's repeated claims that this email refers to Zuberi, the "principal", the email actually is referring to Sardar Yaqoob, President of Azad Jammu and Kashmir (a Pakistani province), to whom Olson had introduced Muna Habib to assist in settling her late father's estate.

33. Mr. Zuberi continued to convey favors to defendant Olson up until his retirement. From February 26 to February 28, 2016, at Mr. Zuberi's invitation, defendant Olson traveled to Los Angeles to be the keynote speaker at a dinner sponsored by a non-profit organization formed to address concerns of Pakistani Americans. Defendant Olson obtained State Department authorization to pay for the trip. Mr. Zuberi gifted defendant Olson with the use of a limousine driver during his stay in Los Angeles that was billed to Mr. Zuberi at a cost of $467.50 and for which Mr. Zuberi paid the vendor $400.

34.     On May 12, 2016, defendant Olson electronically signed and submitted his annual OGE Form 278 for the 2015 calendar year, in which he certified his answers were "true, complete and correct to the best of my knowledge." In this OGE Form 278, defendant Olson knowingly and willfully failed to disclose, as required, the travel benefits he received, namely, the roundtrip airfare between New Mexico and London and the lodging in London collectively worth over $19,000.

35.     On September 1, 2016, the OGE Form 278 was signed by a Designated Ethics Official for the US State Department who opined, "On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations."

36.     On his final financial disclosure form prepared upon his retirement in November 2016, defendant Olson falsely certified on his OGE Form 278 that his answers were true when he concealed Mr. Zuberi's gift of limousine rides worth at least $400 in connection with the speaking engagement in Los Angeles in February 2016. Defendant Olson did, however, disclose another gift on this form valued at $100.

37.     Other than the $300,000 per year job offer from ADIH, defendant Olson received no other job offers prior to his retirement from government service on November 30, 2016. Defendant Olson did not accept the employment offer or board membership from ADIH. However, either shortly before or shortly after his retirement, defendant Olson did accept a contracting relationship with Mr. Zuberi's company Avenue Ventures at a rate of $20,000 per month ($240,000 per year). Defendant Olson also agreed to accept a position on the board of ADIH's successor, Infra Capital, that would increase his compensation, although no final agreement was signed.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The government's misleading Paragraphs 33-37 are intended to convince the PSR Writer that Amb. Olson accepted gratuities and failed to report receipt of money not alleged as part of the reporting violation in Count One. The government did not include in Count One the limousine expense in Paras. 33 and 36.  The government could have insisted on inclusion of this $400 expense in Count One in plea negotiations.  The government did not do so, presumably because it is *de minimis* or because State Department regulations impliedly treat the payment as being made to the government.  The ADIH proposed job and salary of $300,000 were never accepted, and must be ignored completely for sentencing purposes.

Cooling-Off Period Violations

38.     The defendant retired from government service on November 30, 2016. In or about November or December 2016, either just prior to, or shortly after, defendant Olson retired from government service, Mr. Zuberi agreed to retain the services of defendant Olson for $20,000 per month plus expenses. On or about December 15, 2016, Mr. Zuberi sent defendant Olson his first monthly check payable to Medicine Bear in the amount of $20,000.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Amb. Olson interviewed for several positions prior to his retirement.  After the election in November of 2016, his most interesting job prospect was withdrawn, based on the change in administrations anticipated after the election.  Amb. Olson had no interest in working for Zuberi as an employee.  Therefore, Amb. Olson established a consultant business and agreed to represent Zuberi as a consultant.  Amb. Olson did not agree to an engagement with Zuberi until December, after his retirement.

39.     Defendant Olson began working for Mr. Zuberi and Mr. Zuberi's company, despite being aware that he was subject to the "revolving door" prohibitions of Title 18 USC §207(f). Within the one-year cooling-off period after his retirement, the defendant provided aid and advice to the government of Qatar with the intent to influence decisions of US government officials.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Of course Amb. Olson was aware he was engaged in providing consultant services to Zuberi and others during his "Cooling Off" period.  The full extent of the "aid and advice" is detailed by Amb. Olson below.

40.     On January 23, 2017, a business associate of Mr. Zuberi sent defendant Olson a draft plan for a lobbying campaign to convince the White House and the US Department of Homeland Security to establish preclearance facilities at Doha International Airport. The following day, defendant Olson sent Mr. Zuberi and his business associate an email that included his advice on how Qatar could "sell" its preclearance proposal to the US government.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Amb. Olson was responding to his client Zuberi on the plan.  This was not aid to Qatar.

41.     Beginning on February 14, 2017, the defendant participated in a lobbying effort to convince the US Government to endorse the establishment of the US Customs and Border Control preclearance facilities at Doha International Airport in Qatar. Defendant Olson helped draft the proposal that was sent to the Qatar government which explained how preclearance facilities could be achieved. Defendant Olson provided "two elements to the proposal in terms of selling this to Washington," recommending that the Qataris leverage their close military partnership with the United States and emphasize the positive experience the United States experienced with respect to the establishment of similar preclearance facilities in Abu Dhabi.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Amb. Olson provided two edits to the draft proposal prepared by others.   Amb. Olson will provide the Court with an actual copy of the edit showing the full extent of his contribution.

42.     On or about June 6, 2017, defendant Olson participated in a lobbying effort to convince the US Government to support Qatar in its efforts to oppose a blockade imposed upon it by its neighbors. Defendant Olson's aid included recruiting a retired US General ("the "General") to join defendant Olson in providing aid and advice to Qatari government officials with the intent to influence US foreign policy with respect to the Gulf Diplomatic Crisis.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  This is another example of language from the government that the PSR Writer should avoid adopting.  At the time, Amb. Olson was providing advice to his client Zuberi.  The scope of Zuberi's "lobbying" was entirely unknown to Amb. Olson.

43.     As part of his efforts to aid the Qatar Government, on June 6, 2017, defendant Olson recruited the General, who was working at a Washington DC think tank, to enlist his support in the endeavor.  On June 7, 2017, defendant Olson met with the General, a third party, and others a hotel in Washington, DC at which time the General explained how he would conduct the lobbying and public relations campaign. On June 8, 2017, the third party agreed to pay for the expenses of defendant Olson and the General to travel to Doha to meet with representatives of the Qatar Government. At the time, defendant Olson was

being paid $20,000 per month to provide services to the third party. The third party agreed to pay the General a fee for his efforts.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Amb. Olson acted at this time as a consultant to Zuberi, and recommended the General.

44. On June 10, 2017, defendant Olson and the General met with the Qatar Emir and other representatives of his government.  Defendant Olson and the General told the Qatari government officials that they had traveled to Qatar as private citizens, not on behalf of the US government, but noted that they had connections with US government officials that placed them in a position to help Qatar.

45. During the meetings, the General advised the Qatar government officials to embrace US involvement in resolving the crisis, accept President Trump's offer to mediate, sign a pending deal to purchase US F-15 fighter jets, and use the US Al Udeid Air Base in Qatar as leverage to exert influence over US government officials. The Qatari officials were further advised to compete with Saudi Arabia's lobbying campaign in the US and to use a full spectrum of information operations to control the political narrative in the United States. The General informed the Qatar Government that they would use the US National Security Advisor to further their efforts.

**PROPOSED OBJECTIONS AND MODIFICATIONS [Paras. 44-45]:**  Zuberi was thrown out of the meetings by the Qatar representatives before they began.  This signifies that the Qatar representatives were more interested in communication with the General than in treating Zuberi as a member of the team.  It is also likely that the Qataris were relying on others more sophisticated than Zuberi in meeting with the General.  At the meetings, Amb. Olson did not actively participate, but acted as a scrivener.  In fact, his hand-written notes of the meetings – which Amb. Olson retained and provided to the government – became very important evidence to the government.  Amb. Olson created the only known record of the meetings.  In plea negotiations, the government characterized Amb. Olson as the "only witness" as to what occurred during the meetings in Qatar.

46. From June 9 through June 15, 2017, with defendant Olson's knowledge, the General solicited the help of the National Security Advisor and his staff to support the Qatar's position with respect to the crisis.

47. On or about June 15, 2017, the General informed defendant Olson that the US National Security Advisor and another senior US government official had been briefed on their efforts to convince the United States to support Qatar's cause.

48. On June 16, 2017, the General reported to defendant Olson, the third party, and a senior Qatar Government Official that he personally asked the National Security Advisor to meet with senior Qatar officials and that while an "embassy request has to work its way up, our request will come down from above."

49. On June 23, 2017, the General stated that two senior Qatar Government Officials would be visiting Washington, DC the next week and asked the National Security Advisor to meet with them.

50. On June 28, 2017, defendant Olson attended a dinner with the General, representatives of the Qatar Government, and members of Congress to enlist Congress to support the Qatari cause.

**PROPOSED OBJECTIONS AND MODIFICATIONS [Paras. 46-50]:**  Amb. Olson was not actively involved in these activities.  The dinner mentioned in Para. 50 was arranged by Zuberi, which Amb. Olson did attend.

Paragraphs 38-50 were provided to the PSR Writer to adversely influence her understanding of the facts.  As we indicate above, Amb. Olson requests that the PSR Writer report to the Court the "facts" contained in the Information found at ECF No. 1.

<u>Scope of Defendant Olson's False Statements and Concealment</u>

51.   On July 17, 2019, in a voluntary interview with the FBI, defendant Olson concealed information related to benefits he received from Mr. Zuberi by making the following false statements: (1) that his January 2015 travel to London was paid for by Mr. Zuberi's business associate, when in fact Mr. Zuberi paid for the travel; (2) that defendant Olson received no specific job offer from ADIH saying, "we had a conversation in London about . . . possibilities for post-employment. There was never a specific job offer. There was never anything," when in fact, ADIH had formally offered defendant Olson a $300,000 per year job; and (3) that defendant Olson had "no idea" how Mr. Zuberi helped finance Ms. Habib's college tuition, when in fact, Mr. Zuberi forwarded to defendant Olson a bank statement showing that Mr. Zuberi's $20,000 check had been deposited into Columbia University's account for Ms. Habib and Mr. Zuberi told defendant Olson that both checks he issued had been cashed.

**PROPOSED OBJECTIONS AND MODIFICATIONS:** (1) Amb. Olson had no knowledge that Zuberi paid for the London travel, except what Zuberi told him; (2) Amb. Olson in this interview four years after the events had no reason to recall specifics of the job offer because he was fairly dismissive of the opportunity from the beginning; and (3) Amb. Olson had no reason to remember the bank information from years before.  These are hardly false statements and did not interfere with any investigation.

52.   In that same FBI interview, defendant Olson also concealed information related to the nature of his relationship with Mr. Zuberi by making the following false statements: (1) that he had no knowledge of Mr. Zuberi's business interests in military sales to foreign governments they discussed, claiming, "I had no reason to believe that [Zuberi] had any business interests in any of these [military] deals" and that his understanding was that Zuberi's interest in the sales was merely for "general information." In fact, defendant Olson was aware that Mr. Zuberi was engaged in the business of brokering military sales between a manufacturer of military drones and foreign governments; (2) that defendant Olson and Mr. Zuberi only engaged in general-interest political discussions and "political gossip," that there "was no business relationship" between the two, and that he could not recall any "ask" from Mr. Zuberi.  In fact, defendant Olson agreed to assist Mr. Zuberi's business efforts in lobbying members of Congress and provided Mr. Zuberi with talking points to promote weapon sales to foreign governments in response to a request from Mr. Zuberi; and (3) after being handed a copy of the talking points by the FBI, defendant Olson falsely stated that that "whatever information I shared with [Zuberi] . . . I would share with anyone. I mean these were public[.]" In fact, the talking points defendant Olson shared with Mr. Zuberi had not been cleared for public distribution.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Amb. Olson knew Zuberi rarely brought any business relationship across the finish line in a formal sense.  Zuberi's goal, looking back in the light of Zuberi's prosecution for illegal campaign contributions, was to create relationships based on his campaign funding.  If the government had any hard information that Zuberi brokered military sales of weapons,

they surely would have indicted him.  The "Talking Point" were not "cleared for pubic distribution" because there was no need for such a formal review.  Amb. Olson prepared them from publicly available information.

53.     On July 17, 2019, in his initial interview with the FBI, defendant Olson concealed information related to his business relationship with Mr. Zuberi after defendant Olson's retirement by making the following misleading statements: "I don't know much about [Zuberi's] actual business operations because he has me advising him on, sort of, broadly speaking government relations, sort of strategic, ah, aspects of business." In fact, defendant Olson participated in Mr. Zuberi's business operations with respect to lobbying campaigns to procure Qatar preclearance facilities and to modify US policy with respect to the Gulf Diplomatic Crisis, by participating in the drafting of a lobbying proposal submitted to the Qatar government with respect to Qatar preclearance facilities and by meeting with the Emir of Qatar and other high-ranking Qatari officials as well as US Government officials to assist the Qatar government in its effort to modify the US Government's response to the Gulf Diplomatic Crisis.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  This contention assumes that Amb. Olson believed he had lobbied the government of the United States on behalf of Qatar.  If the government wanted to elicit a specific answer related to Qatar, the FBI Agent would need to ask a more directed question for Amb. Olson to have actually made a false statement.

54.     On December 17, 2019, in a second voluntary interview with the FBI, defendant Olson concealed information related to benefits he received from Mr. Zuberi by falsely stating that he was uncertain who paid for defendant Olson's January 2015 travel to London but that Mr. Zuberi did not pay for any trips while defendant Olson was employed by the US State Department. In fact, Mr. Zuberi paid for defendant Olson's travel and lodging in connection with the January 2015 travel to London.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Once again, the government asserts that Amb. Olson knew that Zuberi paid for the travel, which he did not.

In paragraphs 51-54 the government misled the PSR Writer with this information.  If the government believed Amb. Olson made false statements, it would have indicted him.

### Victim Impact

55.     These are Title 18 offenses and there is no identifiable victim. The Government advised there should be no restitution order in this case, and had the defendant been charged with a gratuity violation or bribery, restitution would be applicable. The Government related as these allegations were not charged, they should only be used for sentencing in accordance with 18 USC §3553(a) factors.

### Adjustment for Obstruction of Justice

56.     The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when the defendant concealed information related to the benefits he received from Mr. Zuberi and concealed information related to the nature of his relationship with Mr. Zuberi. Accordingly, a two-level enhancement pursuant to USSG §3C1.1 is warranted.

**PROPOSE OBJECTIONS AND MODIFICATIONS:** See our Proposed Objections and Modifications below after Paragraphs 67 and 68.

### Adjustment for Acceptance of Responsibility

57. The defendant provided a statement to the probation officer wherein admitting involvement in the offense. Further, Defense Counsel provided the following written statement: [No Changes Requested].

58. As provided for in Application Note 3 of USSG §3E1.1, entry of a guilty plea prior to trial combined with truthfully admitting conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct will constitute significant evidence of acceptance of responsibility; however, the evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. The entry of a guilty plea is not an entitlement to an adjustment under this section as a matter of right. Further, as provided for in Application Note 4 of §3E1.1, conduct that normally results in an enhancement under §3C1.1, ordinarily indicates the defendant has not accepted responsibility for his criminal conduct; however, there may be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply. In light of the above Application Notes, and in consideration of defendant Olson's overall conduct, the adjustment for acceptance of responsibility in this case remains applicable.

### Offense Level Computation (2021 US Sentencing Guidelines)

59. Count 1: Making a False Writing, 18 USC § 1018

60. Count 2: Aiding and Assisting a Foreign Government with Intent to Influence Decisions of United States Officers, USC § 18 USC § 207(f)(1)(B)

61. Count 1 is found in USSG §2B1.1 of the guidelines; Count 2 is found in USSG §2C1.3 of the guidelines.

62. Because the conduct in Count 1 does not involve the same risk of harm from the conduct in Count 2, pursuant to USSG §2D1.2, these counts are not grouped. The combined offense level is determined by taking the count producing the highest offense level and increasing that offense level by an amount of 'units' as provided in USSG §3D1.4.

**PROPOSED OBJECTIONS AND MODIFICATIONS**: If the counts are not grouped, any relevant conduct must fall under §1B1.3(a)(1)(A) to be considered in the sentencing calculation. The relevant conduct must be "acts and omissions committed . . . by the defendant that occurred **during the commission of the offense of conviction, preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense**." §1B1.3(a)(1)(A) (emphasis supplied). *See also United States v. Flores*, 149 F.3d 1272, 1281 (10th Cir. 1998). The PSR Writer erroneously relied upon conduct alleged by the government in Paragraphs 17-54 which did not occur during the commission of the offense of conviction, preparation for those offenses, or in the court of attempting to avoid detection or responsibility for those offenses.

Count Group 1

63.  **Base Offense Level:** The guideline for 18 USC § 1018 offenses is found in USSG §2B1.1 of the guidelines. That section provides that an offense involving fraud has a base offense level of six. USSG §2B1.1(a)(2).  **6**

64.  **Specific Offense Characteristics:** None.  **0**

65.  **Victim Related Adjustment:** None.  **0**

66.  **Adjustment for Role in the Offense:** None.  **0**

67.  **Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, or a closely related offense (when he concealed information related to benefits he received from Mr. Zuberi); therefore, two levels are added. USSG §3C1.1.  **+2**

68.  **Adjusted Offense Level (Subtotal):**  **8**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  There should be no enhancement under USSG §3C1.1 for obstruction of justice.  First, the PSR Writer erroneously relied upon conduct alleged by the government in Paragraphs 17-54 which did not occur during the commission of the offense of conviction, preparation for those offenses, or in the court of attempting to avoid detection or responsibility for those offenses.  Second, the obstruction of justice enhancement applies where: (1) "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing **of the instant offense of conviction**, and (2) the obstructive conduct related to (A) the defendant's **offense of conviction and any relevant conduct**; or (B) a **closely related offense**."  (Emphasis supplied).

Application Note 4 supplies "Examples of Covered Conduct", including (G) "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." Application Note 5 gives "Examples of Conduct Ordinarily Not Covered", which includes (B) "making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies."  Application Note 6 defines "material" as any information "that, if believed, would tend to influence or affect the issue under determination."

The information allegedly "concealed" by Olson in the interviews was: 1) "information related to benefits he received from Mr. Zuberi."  Specifically, the trip to London, the job offer, and lack of knowledge as to the payments to Columbia (¶ 51); 2) information regarding Zuberi and his interests in military sales, no business relationship between Olson and Zuberi; and falsely claiming that he would share the "talking points" with Zuberi and anyone else (when the "talking points" were not cleared for public distribution) (¶ 52; and 3) information regarding his retirement and a business relationship with Zuberi, including Zuberi's actual business operations in connection with Qatar (¶ 53 ).

The government has the burden of proving an obstruction of justice by a preponderance of the evidence. *United States v. Rodriguez*, 336 F.3d 67, 71 (1st Cir. 2003); *United States v. Wilson*, 884 F.2d 1355 (11th Cir.1989).

In *United States v. Ring*, 811 F. Supp. 2d 359 (D. D.C. 2011), the government argued for an obstruction enhancement. The trial court found that the government had not met its burden of proving obstruction. *Id.* at 383. Ring, a lobbyist from Greenberg Traurig, was found guilty for payment of an illegal gratuity, honest services wire fraud and conspiracy. The government claimed that Ring made false statements to investigators hired by Greenberg Traurig, specifically pointing to Ring's "false and misleading statements about his knowledge of and participation in the [Michael] Scanlon-Abramoff kickback scheme, his receipt of $135,000 related to the Sandia Pueblo [tribe], as well as his knowledge [of] the corruption scheme involving payments to Julie Doolittle for a little-work job." The court noted that the obstruction enhancement was not triggered unless the obstructive conduct "related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." The court explained that the first two instances of obstruction were not part of the offense of conviction and were not related to the offense of conviction. Regarding the Doolittle matter, Ring at first stated he did not remember much about it, but in a later interview he recounted several details about it. This did not amount to obstruction because Ring had reviewed emails about the matter prior to the last interview. The court refused to impose the enhancement on this basis, holding:

> An enhancement under § 3C1.1 is only appropriate where the defendant acts with the intent to obstruct justice. Where conduct is "directly and inherently obstructive" – that is, where the defendant engages in "behavior that a rational person would expect to obstruct justice" – the court may infer an intent to obstruct justice and need not make a separate finding of specific intent.

*Id*. at 384 (*quoting United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009).

The fact that Ring "changed" his story about the Doolittle job from "I don't remember, I need my recollection refreshed" to later providing additional details after having his recollection refreshed with contemporaneous emails is plainly not "directly and inherently obstructive" and is insufficient to demonstrate that Ring lied about this issue or intended to obstruct justice.

Applying *Ring* to Olson's case, the allegations contained in ¶¶ 51 and 52 are not related to the offenses of conviction or any relevant conduct. As for ¶ 52, the "concealed" information was not material to the offense of violating the one-year "cool-off" period. There is no evidence that any of the "concealed" information significantly affected the investigation. *See e.g.*, *United States v. Shriver*, 967 F.2d 572, 575 (11th Cir. 1992) (no evidence showing defendant's false statement, not under oath, to IRS agent about "voided" Notice of Federal Tax Lien significantly obstructed or impeded the official investigation because the agent was already aware that defendant was the one who altered the Notice); *United States v. Manning*, 955 F.2d 770 (1st Cir. 1992) (obstruction enhancement was inappropriate because defendant's use of false identity in response to arresting officer's inquiries did not cause "significant hinderance to the investigation"); *United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991) ("section 3C1.1 specifically permits lies to investigating agents if they do not significantly impede the investigation"); *United States v. Urbanek*, 930 F.2d 1512 (10th Cir. 1991) (false statements denying guilt made to IRS Agent did not support obstruction enhancement).

The Fifth Circuit has held that to establish that a defendant's conduct resulted in an actual hindrance, "the government must present evidence of what action it took that it would not have taken had [defendant]'s identity been known" when he gave false information. *United States v. Surasky*, 976 F.2d 242, 245-246 (5th Cir. 1992) *citing United States v. Banks*, 347 F.3d 1266, 1271 (11th Cir. 2003). The language of the application notes "requires a

causal relationship between the materially false statement given and a resulting impediment upon the instant investigation or prosecution." *See also United States v. Selvie*, 684 F.3d 679, 684 (7th Cir. 2012) (materially false information provided to law enforcement must actually obstruct or impede the official investigation to merit an obstruction enhancement. "Without more, false statements to law enforcement authorities, if not made under oath, do not actually impact the investigation or prosecution."); *United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002) (government must prove "a detrimental effect upon [its] efforts to investigate or prosecute the instant offense.").

To show that Olson committed obstruction, the government must show how his "concealed" information resulted in an "impediment upon the instant investigation or prosecution" or that the "concealed" information "a detrimental effect" on its investigation. The government has not done so, and this enhancement must be eliminated.

Count Group 2

69.   **Base Offense Level:** The guideline for a violation of 18 USC § 207(f)(1)(B) is USSG §2C1.3. Pursuant to the cross reference at §2C1.3(c)(1), USSG §2C1.2 is used to determine the offense level because the offense involved a bribe or gratuity and that guideline results in a higher offense level. The base offense level is 11 because the defendant was a public official, specifically, a US Ambassador and US Special Representative. USSG §§2C1.2(a)(1) and 2C1.3(c)(1).                                      **11**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**   The proper base offense level should be 6.   The PSR Writer's use of the cross-reference contained in §2C1.3(c)(1) is improper for three reasons: 1) the items the PSR is calling "gratuities" are not relevant conduct to the offense of conviction; 2) even if they somehow *could* be considered relevant conduct, they do not fall within the statutory definition of a "gratuity"; and, 3) the Plea Agreement did not allow the government to rely upon cross references contained in the sentencing guidelines.

The offense in Count 2 is providing "aid and advice to the government of Qatar" within the one-year "cool-off" period.  The PSR includes the $300,000 job offer (that was not accepted), the money paid to Columbia University on behalf of Muna Habib, and the $400 paid to the limo service as gratuities; therefore, the cross-reference should not be applied.

**A.  Not Relevant Conduct**

The PSR, in ¶ 62, states that the two offenses are not grouped.  If the counts are not grouped, any relevant conduct must fall under §1B1.3(a)(1)(A) to be considered in the sentencing calculation.  The relevant conduct must be "acts and omissions committed . . . by the defendant that occurred during the commission of the offense of conviction, preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  §1B1.3(a)(1)(A).  *See also United States v. Flores*, 149 F.3d 1272, 1281 (10th Cir. 1998).

None of the items the PSR calls "gratuities" fall under the definition of relevant conduct.  He did not accept the $300,000 position with ADIH and the proposed position had no relevance to the offense of conviction; *i.e.*, "aid and advice to the government of Qatar" within the one-year period."  For the same reason, the money paid to Columbia University had nothing to do with his providing "aid and advice to the government of Qatar" and was thus not relevant conduct.  Likewise, the $400 paid for the limo service was no way related to his "aid and advice to the government of Qatar."

In *United States v. Flores*, 912 F.3d 613 (D.C. Cir. 2019), the court reversed a sentence where the district court included, as relevant conduct, the defendant's participation in the murder of a Mexican kidnap victim. The court noted that neither the plea agreement nor the initial PSR mentioned §1B1.3. The court also pointed out the neither the record nor the government's brief contained any reference to §1B1.3(a)(1)(a). Further, even if the PSR and the government had argued that the kidnap/murder fell under §1.B1.3(a)(1)(A), the argument would have failed because the kidnap/murder was not related to the underlying racketeering offense of conviction. *See also United States v. West*, 643 F.3d 102 (3rd Cir. 2011) (conduct surrounding arrest five months after defendant was arrested for being a felon in possession should not have been included in relevant  conduct under §1B1.3(a)(1)(a)); *United States v. Wernick*, 691 F.3d 108, 114 (2nd Cir. 2012) (offenses against young children were not relevant conduct because these offenses did not "occur[] during the commission of" or "in preparation for" the crimes against the teenagers "in the sense contemplated by the Guidelines."); *United States v. Caldwell*, 2020 U.S. App. LEXIS 5765; 2020 WL 914922 (11th Cir. 2020) (grand theft of the motor vehicle did not occur during commission of offenses of conviction and was not done in order to avoid detection or responsibility for those offenses. "Thus, under the Guidelines, it is not relevant conduct.").

In Olson's case, neither the Statement of the Offenses nor the PSR mention "relevant conduct" under §1B1.3(a)(1)(A). In fact, the PSR does not explain how the three activities are relevant conduct. Instead, the PSR bypasses this step and goes straight to "gratuity" without explaining the basis for considering them as gratuities. This is improper and the cross-reference should not be used.

**B. Three Activities Were Not Gratuities**

Even assuming the three activities *are* relevant conduct, they still were not gratuities and applying the cross-reference is improper.

Courts frequently refer to 18 U.S. Code § 201(c) as the "Gratuity Statute." *See e.g. United States v. Sun-Diamond Growers*, 138 F.3d 961, 963 (D.C. Cir. 1998) ("it is enough under the gratuity statute, 18 U.S.C.S. § 201(c)(1)(A), if the defendant gives an unpromised benefit for a past governmental favor."); *United States v. Heard*, 709 F.3d 413, 419 (5th Cir. 2013); *United States v. Jefferson*, 674 F.3d 332, 353 (4th Cir. 2012). While Olson was not charged under this statute, it offers the best definition of a "gratuity:"

18 U.S.C. § 201(c) Whoever –
    (1)    otherwise than as provided by law for the proper discharge of official duty –
    (B)    being a public official . . . directly or indirectly . . . agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person.

All three instances that the PSR counts as gratuities involve Zuberi, Janahi, and ADIH. If these are to be considered "gratuities" then Olson had to accept them "for or because of any official act" he had performed or was to perform. His alleged actions after 02/16/2015 (when he received the terms of the job offer from ADIH) were: 1) agree to meet with members of Congress regarding the sale of military hardware to Pakistan (¶ 23); 2) provide Zuberi with "talking points" on selling arms to Pakistan (¶ 24); and 3) accept the use of a limo service while presenting a State Department approved speech. The remainder of his actions set out in the PSR revolve around the pre-clearance facility at Doha and conduct charged in Count 2.

To constitute an illegal gratuity, a connection must be made between a thing of value and official act to be performed by the public official. It is not sufficient to merely show that gratuity was given because of recipient's official position or motivated by recipient's capacity to exert governmental power for donor's benefit. *United States v. Sun-Diamond Growers*, 526 U.S. 398, 413 (1999).

There is no evidence connecting the fact that Olson performed the tasks related to arms sales or his limo ride in return for the "thing of value" (proposed employment contract, money paid to Columbia, or payment for the limo service). Without this connection, there is no gratuity. *See also United States v. Schaffer*, 183 F.3d 833, (D. D.C. 1999) *reversed and vacated on other grounds* 1999 U.S. App. LEXIS 16923 (D.C. Cir. 1999) (vacated due to presidential pardon); *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) (insufficient evidence to convict defendant of illegal gratuity). Furthermore, the Department of Justice Manual explicitly provides that under the facts of this case where the pubic official does not personally receive the gratuity, the offense must not be charged. *See DOJ Manual attached as Exhibit A.* The contention that Amb. Olson received gratuities was contested during plea negotiations, and the government conceded there is no basis for a charge of Conflict of Interest while serving as Ambassador.

## C.   The Plea Agreement Does Not Permit Use of Cross References

Amb. Olson contends the government is bound by the agreed upon in Paragraph 14 of the Plea Agreement, resulting in a sentencing range of 0-6. In the event the government argues for a different guideline range, the Plea Agreement does not include resort to any cross reference for sentencing purposes. Paragraph 15 states: "Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate."

70.   **Specific Offense Characteristics:** Because the offense involved more than one gratuity, specifically, the university grant; the limousine; and the employment offer, two levels are added. USSG §2C1.2(b)(1)**.**                                           **+2**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Because the cross reference does not apply, this provision does not apply.

71.   **Specific Offense Characteristics:** Because the value of the gratuity exceeded $6,500, the base offense level is increased by the levels from the table in §2B1.1. In this case, the number of offense levels from the table in §2B1.1 corresponded to the value of more than $250,000 but less than $550,000 (specifically, the $25,000 college tuition, $400 for the limousine; and $300,000 in the employment offer) thereby resulting in a 12-level increase to the base offense level, USSG §2C1.2(b)(2) and USSG §2B1.1(b)(1)(G).                                  **+12**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Because the cross reference does not apply, this provision does not apply.  The $300,000 salary was not received.  The $400 for the limousine was a benefit to the State Department, not Amb. Olson.

72.   **Specific Offense Characteristics:** Because the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, 4 levels are added. USSG §2C1.2(b)(3).                                          **+4**

**PROPOSED OBJECTIONS AND MODIFICATIONS:** As stated above, here, again, because the cross reference does not apply, this provision does not apply. Moreover, Count 2 involves activities of Amb. Olson at a time when he was no longer serving in government. The commentary to §2C1.3, in Note 3(A), defines high-level decision-making or sensitive position as: "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." Even assuming the cross reference should be applied, none of the conduct that the government alleges occurred while Amb. Olsen was in the government with respect to alleged gratuities is relevant conduct to his post-government lobbying work.

Further, after lengthy negotiations, the Plea Agreement in this case was designed and intended by the parties to make available to Amb. Olson a sentence of probation. AUSA O'Brien and DOJ Attorney Turgeon said so. The parties explicitly agreed that the offense level would be 6. Deference will generally be accorded an agreement negotiated between competent counsel, taking into account the "institutional incentives" that induce a prosecutor to plea bargain, and the observed phenomenon that the plea-bargaining process usually "produces the right result" in terms of the seriousness of the underlying crime. *See United States v. Torres-Echavarria*, 129 F.3d 692, 694695 (2nd Cir. 1997).

In Amb. Olson's case, public safety is not an issue. The prosecution and defense agreed to a specific set of offense conduct, including the calculation of a fair application of the guidelines. The plea agreement and the Statement of The Offenses, agreed upon by both parties, produced the right result and deference to that agreement should be observed by the Court.

The PSR Writer should also report that the government proposed that Amb. Olson cooperate in hopes of obtaining a 5K departure for assistance in the purported prosecution of General John Allen. Whether the government is willing to report to the Court the prospect of such a prosecution, Amb. Olson should be entitled to consideration of his good faith.

73.   **Victim Related Adjustment:** None.                                                            **0**

74.   **Adjustment for Role in the Offense:** None.                                                   **0**

75.   **Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense (specifically, when he concealed information related to his relationship with Mr. Zuberi) ; therefore, two levels are added. USSG §3C1.1.                                                          **+2**

**PROPOSED OBJECTIONS AND MODIFICATIONS:** *See* our Proposed Objections and Modifications after Paragraphs 66 and 67, above.

76.   **Adjusted Offense Level (Subtotal):**                                                          **31**

77.   **Multiple Count Adjustment:** Units are assigned pursuant to USSG §3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

| **Group/Count** | **Adjusted Offense Level** | **Units** |
|---|---|---|

| | | |
|---|---|---|
| Count 1 | 8 | 0.0 |
| Count 2 | 31 | 1.0 |
| **Total Number of Units:** | | 1.0 |

78.     **Greater of the Adjusted Offense Levels Above:**     **31**

79.     **Increase in Offense Level:** The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at USSG §3D1.4.     **0**

80.     **Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.     **31**

81.     **Chapter Four Enhancement:** None.     **0**

82.     **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).     **-2**

83.     **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).     **-1[8]**

84.     **Total Offense Level:**     **28**

**PROPOSED OBJECTIONS AND MODIFICATIONS:** The Total Offense Level should be 6.

       **Educational, Vocational and Special Skills**

119.   **OBJECTION**: Amb. Olson may drink two glasses of wine each evening.

126.   **OBJECTION**: Amb. Olson was a member of the National Honor Society and received an award for ability in French. Amb. Olson was not a member of the "National French Honor Society" to the best of his recollection.

       **Employment Record**

130.   **OBJECTION**: Amb. Olson resigned this position. He was not terminated.

131.   **OBJECTION:** Amb. Olson resigned this position. He was not terminated.

# EXHIBIT NN

 **Gmail**                                                    J. Michael Hannon <jhannon@hannonlawgroup.com>

---

## Your Filings in Zuberi
1 message

---

**J. Michael Hannon** <jhannon@hannonlawgroup.com>                      Thu, Nov 12, 2020 at 9:29 AM
To: "OBrien, Daniel J. (USACAC)" <Daniel.Obrien@usdoj.gov>, "Turgeon, Evan (NSD)" <Evan.Turgeon@usdoj.gov>
Cc: "Greenfield, Jeremy A. (LA) (FBI)" <jagreenfield@fbi.gov>, Gemma Forest <gforest@hannonlawgroup.com>
Bcc: Rick Olson <rickscafedxb@yahoo.com>

Dan,

We have reviewed your public filings in the Zuberi case this week. I thought we had a promise from you that if you filed anything based on information obtained from Amb. Olson, you would alert us. Did we miss something?

Attached are highlighted versions of your filings. There is some new information highlighted, and we would like to know if your source for this information is Amb. Olson.

If so, we assume the supporting evidence is contained in your sealed submissions. This is very unfair to Amb. Olson. We would like to see your sealed submissions if they include information obtained from Amb. Olson. As Amb. Olson told you last week, journalist Alan Suderman recently stated that his source for the identity of person NN is in "DOJ." We remain concerned that your sealed reports about Amb. Olson will similarly become public. And certainly Mr. Zuberi's attorneys and Mr. Zuberi have this information. as well as the esteemed Judge. I don't know what parity Mr. Zuberi's attorneys may seek in this regard.

We also note that in D#233, at page 10 you again refer to Ms. Habib as a "paramour" which is utterly insulting to her and Amb. Olson. Both of them have been most gracious to you and the Special Agents who interviewed them. You may recall in our first conversation, you used this word and I reacted quite viscerally. No doubt, Mr. Suderman is delighted by the reference, and we anticipate needing to address his news story somehow when it is published. I do note that in this filing D#233 at page 10 you do recognize that Mr. Zuberi was attempting to exploit his payment of Ms. Habib's tuition, which is a more realistic inference from the facts known to you. However, you again refer to Zuberi paying a "gratuity" at page 13. I cannot see this as other than a reference to the tuition payment to Ms. Habib. And if it is a reference to the tuition payment, it is a false assertion. Recall we provided you with a DOJ advisory that expressly states that a gratuity must be paid to the official "personally" as the statute requires.

I am not naive to the fact that we were aware that your goal in interviewing Amb. Olson was to obtain more ammunition against Mr. Zuberi. However, you have not given as well as you have received.

I am satisfied that Amb. Olson's interview, Ms. Habib's testimony, and Ms. Forest's legal research have thoroughly rebutted your prosecutorial theories against Amb. Olson, and that charges are not justified under DOJ guidelines. I would appreciate your acknowledging that your office will not pursue criminal charges against Amb. Olson.

A prompt response in the affirmative will save Amb. Olson further expense and useless anxiety.

Otherwise, we will need to continue our preparation of a written response to your theories.

You indicated last Friday that you wanted a third session with Amb. Olson. Please let me know if that is correct. We are getting you his calendar and information on email regarding John Allen.

Mike


**J. Michael Hannon**
HANNON LAW GROUP, LLP
333 8th Street, N.E.
Washington, DC 20002
(202) 232-1907, Direct
(202) 365-5561, Mobile
(202) 232-3704, Facsimile

www.hannonlawgroup.com

---

**zuberipleadings.zip**
397K

# EXHIBIT OO

## Re: State email

From: Rick Olson (rickscafedxb@yahoo.com)

To:   imaad.zuberi@mindspring.com

Date: Monday, October 19, 2015, 02:08 PM EDT

I saw Jon Finer, he said he's fine with receiving an email from your or Z-man. But if Zman sends, he should copy me.

*rgo*

Rick Olson

---

**From:** imaad zuberi <imaad.zuberi@mindspring.com>
**To:** 'Rick Olson' <rickscafedxb@yahoo.com>
**Sent:** Monday, October 19, 2015 12:33 PM
**Subject:** RE: State email

I have his CoS but I will ask him to email you to start
imaad

---

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Monday, October 19, 2015 8:28 AM
**To:** imaad zuberi <imaad.zuberi@mindspring.com>
**Subject:** Re: State email

# You can give him mine, I can't authorize giving Kerry's COS.

*rgo*

Rick Olson

---

**From:** imaad zuberi <imaad.zuberi@mindspring.com>
**To:** 'Rick Olson' <rickscafedxb@yahoo.com>
**Sent:** Saturday, October 17, 2015 1:02 PM
**Subject:** RE: State email

I do but don't want to give to him. Should I give your or his CoS?

ROMH00000565

Yahoo Mail - Re: State email

**From:** Rick Olson [mailto:rickscafedxb@yahoo.com]
**Sent:** Friday, October 16, 2015 8:23 PM
**To:** imaad zuberi <imaad.zuberi@mindspring.com>
**Subject:** Re: State email

# I don't have Secretary Kerry's email, not sure he even has one. If he sends me an email I can forward on to Kerry's staff.

*rgo*

Rick Olson

---

**From:** imaad zuberi <imaad.zuberi@mindspring.com>
**To:** Ambassordor Rick Olson - personal <rickscafedxb@yahoo.com>
**Sent:** Friday, October 16, 2015 9:26 PM
**Subject:** FW: State email

ZMan called from London wants email for Sec State Kerry. What you want me to do? Give him his CoS email or give him your email? I am on plane from Dubai to Los Angeles. I will call you to discuss or better you call me from your Vonage
imaad

ROMH00000566

# EXHIBIT PP

# FW: Points

From: imaad zuberi (imaad.zuberi@mindspring.com)

To:    rickscafedxb@yahoo.com

Date:  Friday, April 10, 2015, 02:46 AM EDT

Thanks. This is good. I will bring this up with Congressman Judge Ted Poe lunch tomorrow. I will mention to the Judge your meeting him in Europe.

I had great 3 hour lunch with Senator Richard Blumenthal of Armed Services Committee. We covered everything from unfreezing Libyan assets we have in US to Predator drones sales to UAE to billions in sales to Saudi. Never to leave Pakistan off the table. He asked me what I think about Pakistan and the proposed US military aid to Pakistan. I told him Pakistan is in need of border surveillance, perimeter surveillance and etc. Both their GHQ and Karachi airport were under attack. I believe the Karachi Naval base was too.

He told me he will talk to Lindsey and John and get back to me. I will reconnect when I am in Washington for dinner with President Obama on 23.

I will catch up with you when I am done with the Judge.

imaad
-----Original Message-----
From: Rick Olson
Sent: Thursday, April 9, 2015 10:20 PM
To: imaad.zuberi@mindspring.com
Subject: Points

Imaad:  as promised.  Ask that you not hand these over, I wrote them myself, but are not cleared.  This is what I would say if giving the brief.

General Points

Our relationship with Pakistan has been a difficult one, but there has been progress made over the past few years.

Although it is not a topic we can discuss publicly, our counter-terrorism cooperation (between our Services) has greatly increased. Pakistan has A Qaeda terrorists (notably Shukrijuma) off the battlefield at our request. They recently detained and deported to us an Al Qaeda operative (Farekh).

Pakistan has launched a military operation to clear North Waziristan Agency, one of the main safehavens for terrorists. Although the Pakistanis have not entirely wrapped up some of the groups we would have liked to (including the Haqqanis), their action has had a disruptive effect on terrorist groups operating there.

After the Peshawar massacre, there is a strong consensus in Pakistani society for going after the terrorists. To date this anger has been focused on Pakistan Taliban; it needs to extend to all extremist groups.

In terms of domestic Pakistani politics, the Army is playing an increasingly powerful role, but there is greater civilian-military coordination than in the recent past. The Government of Nawaz Sharif has made some progress in stabilizing the economy, improving foreign currency reserves, and beginning to address the deep energy crisis.

None of this is to suggest that Pakistan has completely turned the corner. Gains have been fragile and are easily reversible. The overarching objective for the US is to prevent Pakistan from being a failed State. With 200 million people and large nuclear arsenal, a failed Pakistan would be far more threatening than North Korea, Yemen, Somalia and Yemen combined.

Helicopter Deal

(Official State points)

- The State Department approved a possible foreign military sale to Pakistan for helicopters and associated equipment, parts and support for an estimated cost of $952 million.

- This proposed sale of helicopters and weapon systems will provide Pakistan with military capabilities in support of its counterterrorism (CT) and counter-insurgency (COIN) operations.

- Pakistan is engaged in COIN and CT operations in the Federally Administered Tribal Area.  We anticipate the AH - 1Z and Hellfire II missiles will enhance Pakistan's capacity in these operations in the long term.

- U.S. security assistance is focused on enhancing Pakistan's COIN and CT capabilities.

Supplemental Points:

- The Paks are currently flying Vietnam era attack helicopters (Cobra "Foxtrot" models). These have a single engine, and are incapable of climbing up into the mountains where the bad guys are. This deal would replace that fleet with a twin engine, export version of the Super Cobra ("Zulu" model), plus associated spare parts and munitions.

- This is currently being notified to Congress.

- The package is being co-financed by the US (FMF) and Pakistan.

rgo

Rick Olson


---
This email has been checked for viruses by Avast antivirus software.
http://www.avast.com

# EXHIBIT QQ

**From:** Brian E Denver – US Embassy Pakistan
**Sent:** Friday, March 13, 2015 1:37 PM
**To:** imaad zuberi
**Subject:** Congressional Engagements

Hi Imaad,

Good to finally meet yesterday…thanks for taking the time out of your schedule. Per our discussion, Ambassador Olson has time on the afternoon of Friday the 27th and the morning of Monday the 30th. If you can put me in touch with the right people for the Congressmen we discussed, I'd be grateful:

∀ Ted Poe

∀ Dana Rohrabacher

∀ Ed Royce

∀ Eliot Engel

Thanks

*Brian E. Denver*

*Chief of Staff*

*U.S. Embassy, Islamabad*

*denverbe@state.gov*

*denverbe@state.sgov.gov*

*brian.denver@dodiis.ic.gov*

SBU

This email is UNCLASSIFIED.

 This email has been checked for viruses by Avast antivirus software.
http://redirect.state.sbu/?url=www.avast.com

# EXHIBIT RR

**To:**  Denver, Brian E[DenverBE@state.gov]
**Cc:**  Weitz, Bill[Bill.Weitz@mail.house.gov]
**From:**  Beckman, Heather
**Sent:**  Fri 3/20/2015 6:44:18 AM
**Importance:**  Normal
**Subject:**  FW: Congressional Engagements
**MAIL_RECEIVED:**  Fri 3/20/2015 6:44:36 AM

;;;;;;;;;;;
**From:** Beckman, Heather
**Sent:** Thursday, March 19, 2015 11:09 AM
**To:** Brian Denver (DenverBE@state.gov)
**Subject:** Congressional Engagements

Hello,

I'm sorry but the times given will not work with Congressman Engel's schedule. He is all booked on the 24th and will not be in the office on the 30th (it is a district work week).

Please let me know if there are any other available times.

Thanks,

*Heather Beckman*

Scheduler & Office Manager

Congressman Eliot L. Engel (NY-16)
2462 Rayburn House Office Building

Washington, D.C. 20515
☎ 202.225.2464 (main)  |  202.225.5513 (fax)

**Click here to subscribe to Rep. Engel's eNewsletter**

  

**From:** "Denver, Brian E" <DenverBE@state.gov>
**Date:** March 19, 2015 at 6:14:06 AM EDT
**To:** Heather Beckman - Congressman Eliot Engel personal <Heather.Estler@gmail.com>
**Cc:** imaad zuberi <imaad.zuberi@mindspring.com>
**Subject: RE: Congressional Engagements**

Hi Heather,

Hope all is well. Please let me know if Representative Engel might be available on Monday morning, March 30, for a meeting with Ambassador Olson. If not, perhaps between 3:30 and 5:30 on Tuesday, March 24.

B_DENV00000004

Many thanks,

Brian

*Brian E. Denver*

*Chief of Staff*

*U.S. Embassy, Islamabad*

*denverbe@state.gov*

*denverbe@state.sgov.gov*

*brian.denver@dodiis.ic.gov*

SBU

This email is UNCLASSIFIED.

**From:** imaad zuberi [http://redirect.state.sbu/?url=mailto:imaad.zuberi@mindspring.com]
**Sent:** Thursday, March 19, 2015 3:39 AM
**To:** Heather Beckman - Congressman Eliot Engel personal; Denver, Brian E; Bill Weitz - Eliot Engel
**Subject:** FW: Congressional Engagements

Hello Heather-

Rick Olson our Ambassador to Pakistan will be in Washington. I suggest to him to meet Eliot to give him an update on Pakistan and talk about the letter Ed and Eliot wrote. I will ask Brian Denver Chief of Staff of US Embassy Pakistan to contract you directly.

Hello Brian-

Heather has control of schedule of my friend and Congressman Eliot Engel. Please contact her to get on schedule of Eliot. She is great to work with.

Thanks

imaad

**From:** Brian E Denver – US Embassy Pakistan
**Sent:** Friday, March 13, 2015 1:37 PM
**To:** imaad zuberi
**Subject:** Congressional Engagements

Hi Imaad,

Good to finally meet yesterday…thanks for taking the time out of your schedule.

Per our discussion, Ambassador Olson has time on the afternoon of Friday the 27th and the morning of Monday the 30th. If you can put me in touch with the right people for the Congressmen we discussed, I'd be grateful:

∀ Ted Poe

∀ Dana Rohrabacher

∀ Ed Royce

∀ Eliot Engel

Thanks

*Brian E. Denver*

*Chief of Staff*

*U.S. Embassy, Islamabad*

*denverbe@state.gov*

*denverbe@state.sgov.gov*

*brian.denver@dodiis.ic.gov*

SBU

This email is UNCLASSIFIED.

---

This email has been checked for viruses by Avast antivirus software.
http://redirect.state.sbu/?url=http://redirect.state.sbu/?url=http://redirect.state.sbu/?url=www.avast.com

**To:**       Denver, Brian E[DenverBE@state.gov]
**Cc:**       Castonguay, Stephane (Steve) M[CastonguaySM@state.gov]
**From:**     Kim, Craig PS
**Sent:**     Wed 3/25/2015 4:11:14 PM
**Importance:**       Normal
**Subject:**   RE: Senator Bob Menendez/Ambassador Rick Olson
**MAIL_RECEIVED:**    Wed 3/25/2015 4:11:23 PM

;;;;
Sure. I'll reach out to him tomorrow.

Thank you.

Best,

Craig

Craig P. Kim

Pol/Mil Desk Officer

Office of Pakistan Affairs

U.S. Department of State

Tel: 202-736-7924

SBU

This email is UNCLASSIFIED.

**From:** Denver, Brian E
**Sent:** Wednesday, March 25, 2015 4:44 PM
**To:** Kim, Craig PS
**Cc:** Castonguay, Stephane (Steve) M
**Subject:** RE: Senator Bob Menendez/Ambassador Rick Olson

May I ask you to be in touch with Menendez's staffer directly to see if this can be arranged? Might be easier if I step out of the middle.

Thanks

Brian Denver
Chief of Staff
Embassy Islamabad

Sent from iPhone

---

**From:** Kim, Craig PS <KimCPS@state.gov>

B_DENV00000010

**Date:** March 26, 2015 at 12:20:58 AM GMT+5
**To:** Denver, Brian E <DenverBE@state.gov>
**Cc:** Castonguay, Stephane (Steve) M <CastonguaySM@state.gov>
**Subject:** RE: Senator Bob Menendez/Ambassador Rick Olson

Hi Brian,

Ambassador said he won't be able to take time tomorrow, Thursday, March 26 for the Menendez meeting. Given his absence for the Ghani address, he did not want to request further time away. He's open to Friday if Congress stays in session, and we can find a time. We will have to move meetings around if that occurs.

Thank you.

Best,

Craig

Craig P. Kim

Pol/Mil Desk Officer

Office of Pakistan Affairs

U.S. Department of State

Tel: 202-736-7924

This email is UNCLASSIFIED.

**From:** Kim, Craig PS
**Sent:** Wednesday, March 25, 2015 11:20 AM
**To:** Denver, Brian E
**Cc:** Castonguay, Stephane (Steve) M
**Subject:** RE: Senator Bob Menendez/Ambassador Rick Olson

Hi Brian,

I'll flag when he returns. I hope he will stop by the office after the Hill, but will try to catch him after the conference day ends. On Thursday, he's stacked all day with meetings starting with Jeff Eggers. On Friday, its pretty bleak too. I could shift some Friday meetings around if needed though.

Thanks,

Craig

Craig P. Kim

Pol/Mil Desk Officer

Office of Pakistan Affairs

U.S. Department of State

Tel: 202-736-7924

This email is UNCLASSIFIED.

**From:** Denver, Brian E
**Sent:** Wednesday, March 25, 2015 9:30 AM
**To:** Kim, Craig PS
**Cc:** Castonguay, Stephane (Steve) M
**Subject:** FW: Senator Bob Menendez/Ambassador Rick Olson

Craig,

I have had zero success setting up any congressional engagements as they all go on recess after tomorrow. Is there any availability on Thursday that you can see? Please ask the Ambassador his thoughts on whether or not to push this…last hope.

Thanks

---------- Forwarded message ----------
From: **Kelly, Robert (Menendez)** <Robert_Kelly@menendez.senate.gov>
Date: Tue, Mar 24, 2015 at 8:46 PM
Subject: RE: Senator Bob Menendez/Ambassador Rick Olson
To: "turnerf@gmail.com" <turnerf@gmail.com>,

Thank you for the email. I will have to get back to you about our availability. I can tell you the Senate is in recess on Monday so that is out. If the Senate is in session on Friday due to the budget I'm happy to setup a meeting. Thursday would be better if possible.

Rob

This email is UNCLASSIFIED.

# EXHIBIT SS

Re: London dinner

From:   Rick Olson (rickscafedxb@yahoo.com)

To:     imaad.zuberi@mindspring.com; EJHoldingPractice@gmail.com

Date:   Tuesday, February 3, 2015, 09:22 AM EST

Thanks for forwarding. As I mentioned to you, I think it is really important to engage with VN on these issues -- she's a player.

*rgo*

Rick Olson

**From:** imaad zuberi <imaad.zuberi@mindspring.com>
**To:** Ambassordor Rick Olson - personal <rickscafedxb@yahoo.com>; EJHoldingPractice@gmail.com
**Sent:** Sunday, February 1, 2015 5:38 AM
**Subject:** FW: London dinner

**From:** RISBY, Lord [mailto:RISBYR@parliament.uk]
**Sent:** Sunday, February 1, 2015 2:06 AM
**To:** imaad zuberi
**Subject:** Re: London dinner

Dear Imaad
Thank you for so generously giving us an excellent dinner. You are always terrific company and Rick is a real pro and a pleasure to talk to
I would like to talk to you privately about the VN/DF dynamic. It have no knowledge of what DF has done in the past but at least he is part of a process which is trying to help the country when so many Ukrainians in business or politics are not doing anything at all. That is the key point. My involvement is entirely in that spirit and despite the friendly teasing you know how I am fully committed to the positive engagement of the US and am deeply grateful to you for your positive role in this
Regards
Richard

Sent from my iPad

 This email has been checked for viruses by Avast antivirus software.
www.avast.com

# EXHIBIT TT

J. MICHAEL HANNON *
DANIEL S. CROWLEY *†‡
ANN-KATHRYN SO §†
   PARTNERS

———————

HARRISON E. RICHARDS †
KIERAN L. REILLY*
RACHEL AMSTER
   ASSOCIATES

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
333 8TH STREET NE
WASHINGTON, DC 20002
EST. MARCH 17, 2006

———————

T (202) 232-1907 │ F (202) 232-3704
www.hannonlawgroup.com

WILLIAM CLAYTON BATCHELOR *†
OF COUNSEL

———————

* ALSO ADMITTED IN MARYLAND
† ALSO ADMITTED IN VIRGINIA
‡ ALSO ADMITTED IN MASSACHUSETTS
§ALSO ADMITTED IN NEW JERSEY

January 11, 2022

**VIA ELECTRONIC TRANSMISSION ONLY**

Daniel J. O'Brien
Assistant United States Attorney
United States Attorney's Office for the Central District of California
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

Evan N. Turgeon
Trial Attorney
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

     Re: <u>Attorney Proffer</u>

Dear Messrs. O'Brien and Turgeon:

   You shared with us some statements of Ambassador Olson to which you would like a more complete response from Ambassador Olson. The following is a list of your concerns followed by our proffer of Amb. Olson's responses:

*The following false and misleading statements pertain to the FBI June 2019 interview:*

   *False statement that defendant OLSON never received a specific job offer from ADIH: "we had a conversation in London about . . . possibilities for post-employment. There was never a specific job offer. There was never anything." In fact, ADIH had offered defendant OLSON a $300,000 per year job;*

   The context for this interview was that the FBI contacted Amb. Olson saying they wanted some "background" information. Amb. Olson assumed this was a routine background investigation for someone he knew who was seeking a government position requiring a security clearance. Amb. Olson was therefore unprepared to answer detailed questions about events that had taken place up to four years beforehand. Some of his spontaneous recollections may have been imperfect but were not intended to deceive.

Daniel J. O'Brien
Evan N. Turgeon
January 11, 2022
Page Two

The FBI Agents asked Amb. Olson whether Zuberi had paid for travel while the Ambassador was working for the USG.  Amb. Olson said Zuberi had not, but Amb. Olson volunteered that Esam Janahi had paid for a trip to London.  This led to a discussion about the London trip.  Amb. Olson's answer was specific to the London trip, during which Janahi did not make a specific job offer.  However, Amb. Olson's statement "There was never anything." was an overstatement, specifically the word "never," since later that year after the London trip Esam did indeed offer Amb. Olson a job.  His answer to the FBI was meant to convey only his recollections of what happened in London, but not to deceive the USG.

During the conversation in London, Esam described his interest in getting back into the financial market in the UAE, and how Amb. Olson could assist him, post-retirement, in this regard with Amb. Olson's connections in Abu Dhabi.  Amb. Olson does not recall Esam mentioning any firm name, i.e., ADIH, nor was there any discussion of remuneration, or any other specifics.  Amb. Olson filed a recusal afterwards in accordance with State Department ethics guidance, and the recusal accurately noted that Amb. Olson had discussed employment opportunities but had not received a specific offer.  This was the same format that Amb. Olson used in his recusals for other employment discussions, including with Abraaj, The Cohen Group, Raytheon, and Boeing.

After producing his documents to the FBI, Amb. Olson freely agreed to a second interview, at which he was very candid and detailed in his answers, including the job offer from Janahi.  Amb. Olson discontinued the interview to obtain counsel once he was advised he was a target of the investigation.

*False statement that defendant OLSON had "no idea" how Zuberi helped finance Habib's college tuition, when, in fact, Zuberi forwarded to defendant OLSON a bank statement showing that a $20,000 check had been deposited into Columbia's account for Habib and Zuberi 1 told defendant OLSON that both checks he issued had been cashed;*

The truth is that Amb. Olson had forgotten about the emails in which Zuberi had informed him that if the details of how the payments to Columbia had been made.  The email exchange took place in October 2015, and the FBI interview took place in 2019, nearly four years later.  Amb. Olson did not intend to deceive the USG; he had simply forgotten how Zuberi paid a portion of the tuition and forgotten about one email exchange in the many thousands of email exchanges he had participated in since that time.

Moreover, in the interval between 2015 and 2019 Amb. Olson had re-established a relationship with Muna Habib (in 2018) and in 2019 they were married.  Subsequent to their reconnection in 2018, Muna told Amb. Olson that Zuberi had not in fact lived up to his early financial commitment to her and had made only partial payments on her tuition.  In the context of the FBI interview of 2019, it was difficult for Amb. Olson to accurately recall the details of how Zuberi funded the tuition.  He certainly did not deny that Zuberi paid some of the tuition, the full scope of which he learned of when he and Ms. Habib reconnected.

Daniel J. O'Brien
Evan N. Turgeon
January 11, 2022
Page Three

*False/misleading statements that defendant OLSON had no knowledge Zuberi's business interests in military sales to foreign governments they discussed, claiming, "I had no reason to believe that [Zuberi] had any business interests in any of these [military] deals" and that his understanding was that Zuberi's interest in the sales was merely for "general information," when, in fact, defendant OLSON was aware that Zuberi was engaged in brokering military sales between General Atomics and foreign governments;*

Zuberi had mentioned his acquaintanceship with Linden Blue, as indeed he routinely bragged through WhatsApp/Email about his various contacts, mostly political figures, but also some business leaders. Amb. Olson did not know anything about any specific contractual arrangements Zuberi might have had with General Atomics. Amb. Olson was generally aware that General Atomics was interested in selling drones to the UAE (where Amb. Olson had previously served as US Ambassador). Amb. Olson was not aware that Zuberi and/or General Atomics had any interest in selling drones to Pakistan (where Amb. Olson actually had governmental responsibility at the time of their exchanges). In fact, Amb. Olson would have found such a proposition ludicrous for a variety of policy reasons. So, Amb. Olson's statement was overly broad; a more accurate and narrow statement would have been that he had no reason to believe that Zuberi had any business interest with General Atomics within the area for which he had responsibility at the time – that is, Pakistan.

*False/misleading statements that he and Zuberi only engaged in general-interest political discussions and "political gossip," that there "was no business relationship" between the two, and that he could not recall any "ask" from Zuberi, when, in fact, defendant OLSON agreed to assist Zuberi's efforts in lobbying members of Congress and provided Zuberi with talking points to promote weapon sales to foreign governments in response to a request from Zuberi;*

Again, Amb. Olson did not recall all of his email exchanges from four years beforehand (an interval in which he wrote hundreds if not thousands of emails), in an interview that Amb. Olson was completely unprepared for. When shown the email exchange by the agents regarding the "talking points", he did acknowledge having sent the unclassified statement of USG policy as background information.

In retrospect, and with the benefit of knowing what Amb. Olson knows now, he believes that he was naïve to have thought that Zuberi had no business interest in arms sales to Pakistan. Amb. Olson's motivation in providing the information to him was that in conversations with the Ambassador, Zuberi was very critical of Pakistan, sometimes on the basis of incorrect information. This was especially the case since US-Pakistan relations were tense, and Amb. Olson had a presidential mandate to improve the relationship. Since Zuberi made clear that he was engaging regularly with members of Congress, Amb. Olson thought it important that Zuberi have a correct impression of US policy toward Pakistan. Amb. Olson did not regard this as being part of a private lobbying effort, and to the extent the information Amb. Olson provided may have been used that way he greatly regrets it.

Daniel J. O'Brien
Evan N. Turgeon
January 11, 2022
Page Four

*False/misleading statements that he didn't "know much about Zuberi actual business operations because he has me advising him on, sort of, broadly speaking government relations, sort of strategic, ah, aspects of business" when, in fact, defendant OLSON participated in Zuberi's business operations with respect to lobbying campaigns to procure Qatar preclearance facilities and to modify U.S. policy with respect to the Gulf Diplomatic Crisis, by participating in the drafting of a lobbying proposal submitted to the Qatar government with respect to Qatar preclearance facilities and by meeting with Qatar Government Officials as well as U.S. Government officials to assist the Qatar government in its effort to modify the U.S. Government's response to the Gulf Diplomatic Crisis.*

The answer cited above was specifically in response to a question about Zuberi's business activities in Dubai and was a truthful explanation of Amb. Olson's role with regard to Zuberi's business activities in the UAE.  What Amb. Olson meant by not knowing about actual business operations was that Amb. Olson was not privy to any of Zuberi's financial dealings. Since Zuberi presented himself as running a private equity firm, Amb. Olson regarded finance as being the core of his business, and Amb. Olson was not privy to any of his financial arrangements, with one exception.  [Zuberi told Amb. Olson during 2018 when they were working with the Government of Qatar on a food security project that Zuberi was being paid $3 million.  This was the only time Amb. Olson was ever aware of a specific contractual or financial arrangement.  For the other projects that Amb. Olson worked with Zuberi on, the business terms were opaque.]

With regard to the specific statement to the FBI, Amb. Olson meant to convey that his primary role with regard to Zuberi was providing advice on government relations.  To Amb. Olson's mind, that included the editing of the pre-clearance proposal, and accompanying Zuberi to meetings with Government of Qatar officials, in which Amb. Olson saw his role as being one of advising Zuberi rather than the Government of Qatar *per se*.  The July 2019 interview did not focus on the June 2017 interactions with Qatar, although Amb. Olson did mention that he had traveled to Doha at various points on behalf of Avenue Ventures.  Amb. Olson did note in the interview that part of his job responsibilities with Avenue Ventures was interactions with USG officials, so there was no attempt to mislead on contact with the US Government.

*The following false statements pertain to the limited use immunity sessions:*

*False statement during limited use immunity proffer in which Olson claimed that discussions in June 2015 with Habib that referenced "the principal" were not in reference to Zuberi, but rather the Chief Minister of Jammu and Kashmir, when, in fact, contact with the Chief Minister occurred in late 2014 and, as the context of the Habib conversations make clear, Habib and Olson were discussing Zuberi.*

The sequence of events is as follows: At some time in 2014 Muna and Amb. Olson had discussed the fact that her family had a property dispute in Pakistani Kashmir, where her father had grown up.  In May of 2015, after the death of her father, Amb. Olson gave her contact information for Sardar Muhammad Yaqoob Khan, President of Azad Jammu and Kashmir (AJK

Daniel J. O'Brien
Evan N. Turgeon
January 11, 2022
Page Five

– Pakistani Kashmir).  However, Muna was still in the UK at the time.  She did not actually meet with the president until she visited Pakistan in June of 2015.  After that visit, when she had already departed Pakistan for Europe (where she did indeed meet Zuberi), Amb. Olson prompted her for a readout of her meeting with the AJK president, in case the president raised it with the Ambassador.  They referred to President Muhammad Yaqub Khan as "the principal" in the email because of concern that the Pakistani Government might be capable of reading their email exchanges.

Amb. Olson's recollection is that Muna called him and gave him a readout of her conversation with Sardar Mohammed Yaqub.

There was therefore no false statement regarding "the principal."

*False statement re the mechanics of his deletion of Allen emails in which he Olson claimed that he generally searched emails to and from Allen's email account and deleted them when, in fact, he produced many emails with Allen and made targeted deletions as to emails that are important to the government's investigation (which have been recently emailed to the defense).*

Zuberi asked Amb. Olson at some point in the spring of 2019 to delete emails related to John Allen because he wanted to "protect him."  In the second proffer session, Amb. Olson volunteered this information because of his awareness of its importance to the investigation.  Zuberi told Amb. Olson he was only facing charges for tax evasion.  Amb. Olson did not understand exactly what he meant by "protect", and Amb. Olson does not remember the specific parameters, if any, that Zuberi outlined.  Amb. Olson volunteered that he deleted email to protect General Allen "from the government," and apparently selected only those most directly related to the June 2017 trip to Doha.  Amb. Olson felt concern at having involved General Allen with Zuberi, about whom by this time Amb. Olson was having considerable doubts.  Amb. Olson had worked with General Allen for over five years, and Amb. Olson had, and continues to have, great respect for him and found him to be an honorable person.  Amb. Olson said he was aware email cannot be deleted, and recognizes his act was a useless gesture of remorse.

At the request of Mr. O'Brien, who admitted this was an area of importance to him, Amb. Olson and his counsel reviewed his email files and communicated with experts re: the possibility or recovering them.

Sincerely,

*s/ J. Michael Hannon*

J. Michael Hannon

# EXHIBIT UU



## United States Department of Justice

### United States Attorney's Office
### Central District of California

*AUSA Daniel O'Brien*
*Phone: (213) 894-2468*
*E-mail: daniel.obrien@usdoj.gov*

*1500 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

October 25, 2021

**<u>VIA HAND DELIVERY</u>**

J. Michael Hannon
HANNON LAW GROUP, LLP
333 8th Street, N.E.
Washington, DC 20002

      Re:    Richard Gustave Olson, Jr.

Dear Mr. Hannon:

Thank you for your letter of March 22, 2021. We appreciate your client's willingness to talk through issues related to the criminal investigation. We have reviewed your letter with an open mind and shared it with our supervisors. Based upon our review of the evidence to date, we do not plan to file conflict-of-interest charges at this time. We maintain our previously stated position that the evidence supports charges for false statements, gratuities, and violations of the restrictions on former employees of the Executive Branch (the "cooling off period"). We also believe that charges pertaining to the destruction of documents are warranted.

In the event you still wish to discuss our position on these violations with our supervisors, we request that you confirm that to us in writing by November 1, 2021, so that any such conference can take place in the month of November.

The attached internal memorandum addresses the issues you raised with respect to gratuity, 18 U.S.C. § 201(c), false statement, 18 U.S.C. § 1001(a)(1) & (2), and cooling-off period, 18 U.S.C. § 207(f), charges. We anticipate filing false statement charges that are broader than the false statements you discuss in your letter. We also intend to file charges relating to the destruction of documents in violation of 18 U.S.C. § 1519—the attached memorandum discusses these additional aspects of the case as well.

Our present intention is to file charges during the first or second week of December 2021. In the event your client is willing to entertain a pre-indictment disposition before then, we are willing to extend a plea offer for former Ambassador Olson ("Olson") to plead guilty to a false statement charge and a misdemeanor § 207(f) charge that includes a cooperation provision referencing § 5K of the Sentencing Guidelines based upon his willingness to share truthful information about lobbying efforts on behalf of the government of Qatar in 2017. Further, we are willing to work

J. Michael Hannon
RE:  Richard Gustave Olson, Jr.
October 25, 2021
Page 2

with you to determine a favorable sentencing guideline calculation and include within the plea agreement an acknowledgement of mitigating factors that should be considered by the court at sentencing.

To the extent you believe there are salient issues we have not addressed or wish to discuss matters not previously addressed in your letter, particularly the false statement allegations in connection with Olson's interview with the FBI in July 2019 and the document destruction allegations pertaining to the deletion of emails in 2019, please let us know.  However, we plan to adhere to our present schedule and therefore ask that you present any such submission by November 8, 2021.

We look forward to your response to the offer to resolve this matter prior to indictment.  Thank you for your willingness to discuss these matters in a thoughtful and professional way.

Sincerely,




DANIEL O'BRIEN
Assistant United States Attorney
Public Corruption & Civil Rights Section




EVAN N. TURGEON
Trial Attorney
U.S. Department of Justice
National Security Division
Counterintelligence and Export Control Section
950 Pennsylvania Avenue, NW, Suite 7700
Washington, DC 20530

# EXHIBIT VV



**United States Department of State**

*Washington, D.C.  20520*

May 18, 2016

**PERSONNEL/SENSITIVE**

Richard G. Olson
Olsonrg@state.gov

Dear Mr. Olson,

By letter dated December 9, 2015, you were informed of a proposal to suspend you for 20 calendar days under the provisions of 3 FAM 4300. The proposal was based on a report of investigation submitted by the Office of the Inspector General dated July 8, 2014.

In that letter you were provided 15 calendar days from the date of receipt to respond to the proposal. I received your written response on February 9, 2016 and heard your oral reply on March 7, 2016 in the presence of your representatives, Ms. Raeka Safai, American Foreign Services Association and Mr. J. Michael Hannon from the Hannon Law Group, as well as Ms. Annalise Nelson from the Office of the Legal Adviser and Ms. Kimberly Brooks from the Office of Employee Relations.

After careful review of the entire case file to include your replies and supplemental information submitted following the oral reply on March 7, 2016, I have decided not to sustain the charge and proposed suspension under the cited policy violations 22 CFR Part 3 and 3 FAM 4122. As such, no disciplinary action will be taken with respect to the charge and specification cited in the February 9, 2016 proposal, nor will documentation of the proposal or of this decision will be placed in your Official Performance File (OPF).

While there will be no disciplinary action for this charge, I am referring the question of the appropriate handling of the jewelry ensemble from the Emir of Dubai to the Department's Office of the Legal Adviser, Ethics and Financial Disclosure, to provide guidance as appropriate to you and to the Department.

Please complete the attached acknowledgment of receipt and return it to this office at your earliest convenience.

Sincerely,

Bruce Williamson
Deputy Assistant Secretary
Bureau of Human Resources

# EXHIBIT WW

RECEIVED MAY 1 0 2013

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
           Sheet 1

# UNITED STATES DISTRICT COURT

### District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JUAN CARLOS SCHWARTZMAN | **JUDGMENT IN A CRIMINAL CASE**<br>**FILED**<br><br>Case Number:  11CR166   MAY – 1 2013<br>USM Number: 31646-016  Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia<br>J. Michael Hannon<br><span style="font-size:smaller">Defendant's Attorney</span> |

**THE DEFENDANT:**

☑ pleaded guilty to count(s)    1 of the Information on July 8, 2011

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1349, 1341 and<br>1343 | Conspiracy to Commit Mail Fraud and Wire Fraud | Occurred from in or<br>about March 2005<br>thru October 2007 | 1 |

The defendant is sentenced as provided in pages 2 through    6    of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 19, 2013
Date of Imposition of Judgment

_Signature of Judge_

Reggie B. Walton                    U.S. District Court Judge
Name and Title of Judge

May 1, 2013
Date

AO 245B   (Rev. 09/11) Judgment in Criminal Case
Sheet 2 — Imprisonment

| | Judgment · Page | 2 | of | 6 |

DEFENDANT: JUAN CARLOS SCHWARTZMAN
CASE NUMBER: 11CR166

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
THIRTY (30) months

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL.

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev 09/11) Judgment in a Criminal Case
          Sheet 3 - - Supervised Release

| | Judgment- Page | 3 | of | 6 |

DEFENDANT:  JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:

THIRTY-SIX (36) months

　　　The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐　The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable)*

☐　The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable)*

☑　The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable)*

☐　The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable)*

☐　The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable)*

　　　If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

　　　The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) 　the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) 　the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) 　the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) 　the defendant shall support his or her dependents and meet other family responsibilities;

5) 　the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) 　the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) 　the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) 　the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) 　the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) 　the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) 　the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) 　the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) 　as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev 09/11) Judgment in a Criminal Case
           Sheet 3C -- Supervised Release

Judgment—Page __4__ of __6__

DEFENDANT:  JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall not possess or use any illegal drugs.

That the defendant is prohibited from incurring any new credit charges, opening additional lines of credit, or negotiating or consummating any financial contracts without the approval of the Probation Office.

The defendant shall provide the Probation Office with his income tax returns, authorization for release of his credit and any other financial information, and information concerning any business in which he has control or an interest.

The defendant shall pay restitution in the amount of $10,179,334.69 (for which the defendant is jointly and severally liable with Mardin Varela in 10cr284) and shall make monthly payments of at least $500.00 on his restitution obligation until the total amount is paid in full.

The defendant shall comply with the Bureau of Immigration and Customs Enforcement's deportation process.  If deported, the defendant shall not re-enter the United States without legal authorization during the period of his supervision.  Should the defendant not be deported or if he receive permission to return to the United States while he is still under supervision, the defendant shall report to the U.S. Probation Office in the area where he intend to reside within 72 hours of his release from prison or his return to the United States if he is deported and is then permitted to return.

The Probation Office shall release the presentence investigation report to all appropriate agencies in order to execute the sentence of the Court.  These agencies shall return the presentence report to the Probation Office upon completion and termination of the treatment involved.

The Court finds the defendant does not have the ability to pay a fine or the costs of his incarceration and community supervision.

AO 245B   (Rev 09 11) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment - Page   5   of   6

DEFENDANT:  JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 10,179,334.69 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Export Import Bank of the United States |  | $10,179,334.69 |  |
| 811 Vermont Avenue, NW |  |  |  |
| Washington, DC 20571 |  |  |  |

| **TOTALS** | $ 0.00 | $ 10,179,334.69 |
|---|---|---|

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑  the interest requirement is waived for the   ☐ fine   ☑ restitution.

☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B   (Rev 09'11) Judgment in a Criminal Case
          Sheet 6 — Schedule of Payments

Judgment - Page __6__ of ___6___

DEFENDANT:  JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☐   Lump sum payment of $ _____ due immediately, balance due

      ☐   not later than _____ , or
      ☐   in accordance      ☐  C,      ☐  D,      ☐  E, or   ☐  F below; or

B   ☐   Payment to begin immediately (may be combined with    ☐  C,    ☐  D, or    ☐  F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☑   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      100.00 (e.g., months or years), to commence    60 days (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

      Payments towards the restitution and special assessment by the Court shall be deducted from any funds earned
      while the defendant is serving his prison term. If the total amount is not paid in full upon the defendant's release,
      the defendant will have sixty (60) days from the date of his release to pay special assessment in the amount of
      $100.00 and shall continue to make monthly payments towards restitution amount of at least $500.00 until the total
      amount is paid in full as a condition of his supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial
Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
      and corresponding payee, if appropriate.

      The total amount of restitution owed is $10,179,334.69, for which the defendant is jointly and several liable with Mardin
      Varela in 10cr284

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☑   The defendant shall forfeit the defendant's interest in the following property to the United States:

      (See Order Dated 7/8/2011)

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B   (Rev 09/11) Judgment in a Criminal Case
        Attachment (Page 1) — Statement of Reasons

DEFENDANT:  JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166
DISTRICT:       District of Columbia

# STATEMENT OF REASONS
(Not for Public Disclosure)

**I   COURT FINDINGS ON PRESENTENCE INVESTIGATION REPORT**

A   ☒   **The court adopts the presentence investigation report without change.**

B   ☐   **The court adopts the presentence investigation report with the following changes.**
        (Check all that apply and specify court determination, findings, or comments, referencing paragraph numbers in the presentence report, if applicable.)
        (Use page 4 if necessary.)

   1   ☐   Chapter Two of the U.S.S.G. Manual determinations by court (including changes to base offense level, or
           specific offense characteristics)

   2   ☐   Chapter Three of the U.S.S.G. Manual determinations by court (including changes to victim-related adjustments,
           role in the offense, obstruction of justice, multiple counts, or acceptance of responsibility)

   3   ☐   Chapter Four of the U.S.S.G. Manual determinations by court (including changes to criminal history category or
           scores, career offender, or criminal livelihood determinations)

   4   ☐   Additional Comments or Findings (including comments or factual findings concerning certain information in the
           presentence report that the Federal Bureau of Prisons may rely on when it makes inmate classification, designation,
           or programming decisions)

C   ☐   The record establishes no need for a presentence investigation report pursuant to Fed.R.Crim.P. 32.

**II   COURT FINDING ON MANDATORY MINIMUM SENTENCE** (Check all that apply.)

A   ☒   No count of conviction carries a mandatory minimum sentence

B   ☐   Mandatory minimum sentence imposed

C   ☐   One or more counts of conviction alleged in the indictment carry a mandatory minimum term of imprisonment, but the
        sentence imposed is below a mandatory minimum term because the court has determined that the mandatory minimum
        does not apply based on

        ☐   findings of fact in this case

        ☐   substantial assistance (18 U S C  § 3553(e))

        ☐   the statutory safety valve (18 U S C  § 3553(f))

**III   COURT DETERMINATION OF ADVISORY GUIDELINE RANGE** *(BEFORE DEPARTURES):*

Total Offense Level:  _____ *obstruction* 26
Criminal History Category:  _____ I
Imprisonment Range:   63  to  78  months
Supervised Release Range:  ____ to  3  years
Fine Range: $ 12,500.00  to $ 12,500,000.00

☒   Fine waived or below the guideline range because of inability to pay.

AO 245B   (Rev 09/11) Judgment in a Criminal Case
Attachment (Page 2) — Statement of Reasons

DEFENDANT:  JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166
DISTRICT:        District of Columbia

# STATEMENT OF REASONS
## (Not for Public Disclosure)

**IV   ADVISORY GUIDELINE SENTENCING DETERMINATION** *(Check only one)*

   A   ☐   The sentence is within an advisory guideline range that is not greater than 24 months, and the court finds no reason to depart

   B   ☐   The sentence is within an advisory guideline range that is greater than 24 months, and the specific sentence is imposed for these reasons.
            *(Use page 4 if necessary)*

   C   ☐   The court departs from the advisory guideline range for reasons authorized by the sentencing guidelines manual.
            *(Also complete Section V)*

   D   ☒   The court imposed a sentence outside the advisory sentencing guideline system.  *(Also complete Section VI)*

**V   DEPARTURES AUTHORIZED BY THE ADVISORY SENTENCING GUIDELINES** *(If applicable)*

   A   The sentence imposed departs *(Check only one)*:
       ☒ below the advisory guideline range
       ☐ above the advisory guideline range

   B   Departure based on *(Check all that apply)*:

       1   **Plea Agreement** (Check all that apply and check reason(s) below):
           ☐  5K1.1 plea agreement based on the defendant's substantial assistance
           ☐  5K3.1 plea agreement based on Early Disposition or "Fast-track" Program
           ☐  binding plea agreement for departure accepted by the court
           ☐  plea agreement for departure, which the court finds to be reasonable
           ☐  plea agreement that states that the government will not oppose a defense departure motion.

       2   **Motion Not Addressed in a Plea Agreement** *(Check all that apply and check reason(s) below)*:
           ☐  5K1.1 government motion based on the defendant's substantial assistance
           ☐  5K3.1 government motion based on Early Disposition or "Fast-track" program
           ☐  government motion for departure
           ☐  defense motion for departure to which the government did not object
           ☐  defense motion for departure to which the government objected

       3   **Other**
           ☐  Other than a plea agreement or motion by the parties for departure *(Check reasons below)*:

   C   Reason(s) for Departure *(Check all that apply other than 5K1.1 or 5K3.1)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | 4A1.3 | Criminal History Inadequacy | ☐ 5K2.1 | Death | ☐ 5K2.11 | Lesser Harm | |
| ☐ | 5H1.1 | Age | ☐ 5K2.2 | Physical Injury | ☐ 5K2.12 | Coercion and Duress | |
| ☐ | 5H1.2 | Education and Vocational Skills | ☐ 5K2.3 | Extreme Psychological Injury | ☐ 5K2.13 | Diminished Capacity | |
| ☐ | 5H1.3 | Mental and Emotional Condition | ☐ 5K2.4 | Abduction or Unlawful Restraint | ☐ 5K2.14 | Public Welfare | |
| ☐ | 5H1.4 | Physical Condition | ☐ 5K2.5 | Property Damage or Loss | ☐ 5K2.16 | Voluntary Disclosure of Offense | |
| ☐ | 5H1.5 | Employment Record | ☐ 5K2.6 | Weapon or Dangerous Weapon | ☐ 5K2.17 | High-Capacity, Semiautomatic Weapon | |
| ☐ | 5H1.6 | Family Ties and Responsibilities | ☐ 5K2.7 | Disruption of Government Function | ☐ 5K2.18 | Violent Street Gang | |
| ☐ | 5H1.11 | Military Record, Charitable Service, Good Works | ☐ 5K2.8 | Extreme Conduct | ☐ 5K2.20 | Aberrant Behavior | |
| | | | ☐ 5K2.9 | Criminal Purpose | ☐ 5K2.21 | Dismissed and Uncharged Conduct | |
| ☐ | 5K2.0 | Aggravating or Mitigating Circumstances | ☐ 5K2.10 | Victim's Conduct | ☐ 5K2.22 | Age or Health of Sex Offenders | |
| | | | | | ☐ 5K2.23 | Discharged Terms of Imprisonment | |
| | | | | | ☐ | Other guideline basis (e.g., 2B1.1 commentary) | |

   D   **Explain the facts justifying the departure.** *(Use page 4 if necessary)*

AO 245B   (Rev 09/11) Judgment in a Criminal Case
Attachment (Page 3) --- Statement of Reasons

DEFENDANT:  JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166
DISTRICT:   District of Columbia

## STATEMENT OF REASONS
### (Not for Public Disclosure)

VI   COURT DETERMINATION FOR SENTENCE OUTSIDE THE ADVISORY GUIDELINE SYSTEM
*(Check all that apply)*

A   **The sentence imposed is** *(Check only one)*:
☒ below the advisory guideline range
☐ above the advisory guideline range

B   **Sentence imposed pursuant to** *(Check all that apply)*:

1   **Plea Agreement** *(Check all that apply and check reason(s) below)*:
☐ binding plea agreement for a sentence outside the advisory guideline system accepted by the court
☐ plea agreement for a sentence outside the advisory guideline system, which the court finds to be reasonable
☐ plea agreement that states that the government will not oppose a defense motion to the court to sentence outside the advisory guideline system

2   **Motion Not Addressed in a Plea Agreement** *(Check all that apply and check reason(s) below)*:
☐ government motion for a sentence outside of the advisory guideline system
☐ defense motion for a sentence outside of the advisory guideline system to which the government did not object
☒ defense motion for a sentence outside of the advisory guideline system to which the government objected

3   **Other**
☐ Other than a plea agreement or motion by the parties for a sentence outside of the advisory guideline system *(Check reason(s) below)*

C   **Reason(s) for Sentence Outside the Advisory Guideline System** *(Check all that apply)*

☐ the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U S C § 3553(a)(1)
☐ to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U S C § 3553(a)(2)(A))
☐ to afford adequate deterrence to criminal conduct (18 U S C § 3553(a)(2)(B))
☐ to protect the public from further crimes of the defendant (18 U S C § 3553(a)(2)(C))
☐ to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (18 U S C § 3553(a)(2)(D))
☒ to avoid unwarranted sentencing disparities among defendants (18 U S C § 3553(a)(6))
☒ to provide restitution to any victims of the offense (18 U S C § 3553(a)(7))

D   **Explain the facts justifying a sentence outside the advisory guideline system.** *(Use page 4 if necessary)*

The defendant had a cooperation agreement with the government, but the government refused to request a reduction of the defendant's sentence based on his cooperation, concluding that the defendant had not been totally truthful. Nonetheless, I concluded that he did provide some cooperation to the government. In addition, in my opinion the loss amount and its impact on the guideline sentence overstated the seriousness of the defendant's conduct. In addition, the defendant is subject to deportation and his codefendants did not receive sentences in line with the sentence the defendant would have received it it had been a sentence within the applicable guidelines

AO 245B    (Rev 09.11) Judgment in a Criminal Case
           Attachment (Page 4)    Statement of Reasons

DEFENDANT:   JUAN CARLOS SCHWARTZMAN
CASE NUMBER:  11CR166
DISTRICT:         District of Columbia

# STATEMENT OF REASONS
(Not for Public Disclosure)

## VII   COURT DETERMINATIONS OF RESTITUTION

A   ☐   Restitution Not Applicable.

B   Total Amount of Restitution:  $10,179,334.69

C   Restitution not ordered *(Check only one )*:

    1   ☐   For offenses for which restitution is otherwise mandatory under 18 U S C  § 3663A, restitution is not ordered because the number of
        identifiable victims is so large as to make restitution impracticable under 18 U S C  § 3663A(c)(3)(A)

    2   ☐   For offenses for which restitution is otherwise mandatory under 18 U S C  § 3663A, restitution is not ordered because determining complex
        issues of fact and relating them to the cause or amount of the victims' losses would complicate or prolong the sentencing process to a degree
        that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process under 18 U S C § 3663A(c)(3)(B)

    3   ☐   For other offenses for which restitution is authorized under 18 U S C  § 3663 and/or required by the sentencing guidelines, restitution is not
        ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweigh
        the need to provide restitution to any victims under 18 U S C  § 3663(a)(1)(B)(ii)

    4   ☐   Restitution is not ordered for other reasons  *(Explain )*

D   ☐   Partial restitution is ordered for these reasons *(18 U S C  § 3553(c))*:

## VIII  ADDITIONAL FACTS JUSTIFYING THE SENTENCE IN THIS CASE *(if applicable )*

Sections I, II, III, IV, and VII of the Statement of Reasons form must be completed in all felony cases.

Defendant's Soc. Sec. No.:  _____

Defendant's Date of Birth:  _____

Defendant's Residence Address:  _____

Defendant's Mailing Address:  _____

Date of Imposition of Judgment

*April 19, 2013*

Signature of Judge

Reggie B. Walton            U.S District Court Judge

Name and Title of Judge

Date Signed   *4/26/13*

# EXHIBIT XX

                                    Rachel Amster <ramster@hannonlawgroup.com>

---

## Plea Discussions

**OBrien, Daniel J. (USACAC)** <Daniel.Obrien@usdoj.gov>                    Thu, Jan 6, 2022 at 4:57 PM
To: "J. Michael Hannon" <jhannon@hannonlawgroup.com>, Russell Duncan <rduncan@clarkhill.com>
Cc: Rachel Amster <ramster@hannonlawgroup.com>, "Novak, Kate" <knovak@clarkhill.com>, "Jenkins, Mack (USACAC)"
<Mack.Jenkins@usdoj.gov>, "Turgeon, Evan (NSD)" <Evan.Turgeon@usdoj.gov>, "Greenfield, Jeremy Allen (LA) (FBI)"
<jagreenfield@fbi.gov>, "Adib, Babak (LA) (FBI)" <badib@fbi.gov>

Here are my quick responses and I will follow up as necessary:


1. I'm copying Jeremy and Bobby and am asking them to promptly send you the recording of the June 2019 FBI interview.  I'll let you all handle the logistics.
2. I can send the portions of the draft indictment that pertain to the false statement scheme and gratuity.  I've discussed this with Evan and we do not think we should release portions related to the Qatar aspects of the case because of its sensitive nature, prior leaks to the press, and commitments we have made to others not to release such information at this time.
3. I don't have a specific concern as to the obstruction enhancement other than the general possibility that the probation office or court might view false statement to the FBI as an obstruction of the broader investigation, notwithstanding Olson's admission as to the Form 278.  If you have any case law or argument that would allow us to stipulate that the obstruction should not apply, that would be helpful.
4. We are currently scheduled to appear before the grand jury on January 11 and 18.  Given our conversation today, I do want to provide Ambassador Olson with sufficient time to earnestly assess his own conduct and whether he will be willing to admit items addressed below.  However, we don't have much flexibility as to extensions.  The universal opinion here is that the case needs to move forward promptly.  The grand jury will expire on February 15 and there will be no extension from the Court because of Covid protocols.  I will send out a tolling agreement for the two-week period January 31 through February 15, but that should not be construed as the government's agreement to delay indictment.  We will assess whether we should delay indictment based upon Ambassador Olson's response.  I'm asking that we receive Ambassador Olson's response by noon (Eastern Time) Monday.


The following false and misleading statements pertain to the FBI June 2019 interview:


        False statement that defendant OLSON never received a specific job offer from ADIH: "we had a conversation in London about . . . possibilities for post-employment.  There was never a specific job offer.  There was never anything."   In fact, ADIH had offered defendant OLSON a $300,000 per year job;


        False statement that defendant OLSON had "no idea" how Zuberi helped finance Habib's college tuition, when, in fact, Zuberi forwarded to defendant OLSON a bank statement showing that a $20,000 check had been deposited into Columbia's account for Habib and Zuberi 1 told defendant OLSON that both checks he issued had been cashed;


        False/misleading statements that defendant OLSON had no knowledge Zuberi's business interests in military sales to foreign governments they discussed, claiming, "I had no reason to believe that [Zuberi] had any business interests in any of these [military] deals" and that his understanding was that Zuberi's interest in the sales was merely for "general information," when, in fact, defendant OLSON was aware that Zuberi was engaged in brokering military sales between General Atomics and foreign governments;


        False/misleading statements that he and Zuberi only engaged in general-interest political discussions and "political gossip," that there "was no business relationship" between the two, and that he could not recall any "ask" from

Hannon Law Group Mail - Plea Discussions

Zuberi, when, in fact, defendant OLSON agreed to assist Zuberi's efforts in lobbying members of Congress and provided Zuberi with talking points to promote weapon sales to foreign governments in response to a request from Zuberi;

False/misleading statements that he didn't "know much about Zuberi actual business operations because he has me advising him on, sort of, broadly speaking government relations, sort of strategic, ah, aspects of business" when, in fact, defendant OLSON participated in Zuberi's business operations with respect to lobbying campaigns to procure Qatar preclearance facilities and to modify U.S. policy with respect to the Gulf Diplomatic Crisis, by participating in the drafting of a lobbying proposal submitted to the Qatar government with respect to Qatar preclearance facilities and by meeting with Qatar Government Officials as well as U.S. Government officials to assist the Qatar government in its effort to modify the U.S. Government's response to the Gulf Diplomatic Crisis.

The following false statements pertain to the limited use immunity sessions:

False statement during limited use immunity proffer in which Olson claimed that discussions in June 2015 with Habib that referenced "the principal" were not in reference to Zuberi, but rather the Chief Minister of Jammu and Kashmir, when, in fact, contact with the Chief Minister occurred in late 2014 and, as the context of the Habib conversations make clear, Habib and Olson were discussing Zuberi.

False statement re the mechanics of his deletion of Allen emails in which he Olson claimed that he generally searched emails to and from Allen's email account and deleted them when, in fact, he produced many emails with Allen and made targeted deletions as to emails that are important to the government's investigation (which have been recently emailed to the defense).

---

**From:** J. Michael Hannon <jhannon@hannonlawgroup.com>
**Sent:** Thursday, January 6, 2022 12:58 PM
**To:** Turgeon, Evan (NSD) <Evan.Turgeon@usdoj.gov>; OBrien, Daniel J. (USACAC) <DOBrien@usa.doj.gov>
**Cc:** Rachel Amster <ramster@hannonlawgroup.com>; Russell Duncan <rduncan@clarkhill.com>; Novak, Kate <knovak@clarkhill.com>
**Subject:** [EXTERNAL] Plea Discussions

Dan and Evan,

In addition to the list of concerns you have regarding Amb. Olson's statements, please consider sending us the following:

1.  the tape of the first FBI interview.  This is critical to evaluating the Q&A.

2.  your draft indictment.  This would allow us to address all of your concerns and ensure Amb. Olson will earn a 5K.

3. any thoughts on what facts underlie your obstruction concern.  We have already done the legal research, and the enhancement is reserved for fairly egregious conduct focused directly on the offense.

Let us know whether we need to do anything relevant to the deadline.  The existing tolling agreement expires at the end of January.

Mike



**J. Michael Hannon**
HANNON LAW GROUP, LLP
333 8th Street, N.E.
Washington, DC 20002
(202) 232-1907, Direct
(202) 365-5561, Mobile
(202) 232-3704, Facsimile
www.hannonlawgroup.com

[Quoted text hidden]

# EXHIBIT YY

J. MICHAEL HANNON *
DANIEL S. CROWLEY *†‡
ANN-KATHRYN SO §†
PARTNERS

———————

HARRISON E. RICHARDS †
KIERAN L. REILLY*
RACHEL E. AMSTER
ASSOCIATES

HANNON LAW GROUP, LLP
COUNSELORS AND ATTORNEYS AT LAW
333 8ᵀᴴ STREET NE
WASHINGTON, DC 20002
EST. MARCH 17, 2006

———————

T (202) 232-1907 │ F (202) 232-3704
www.hannonlawgroup.com

WILLIAM CLAYTON BATCHELOR *†
OF COUNSEL

———————

* ALSO ADMITTED IN MARYLAND
† ALSO ADMITTED IN VIRGINIA
‡ ALSO ADMITTED IN MASSACHUSETTS
§ALSO ADMITTED IN NEW JERSEY

June 23, 2022

**VIA ELECTRONIC TRANSMISSION ONLY**

Stuart Douglas Allen
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, DC 20530

Evan N. Turgeon
Trial Attorney
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

      Re:    Amb. Richard G. Olson, Jr.; 1:22-cr-00144-GMH

Dear Messrs. Allen and Turgeon:

      Amb. Olson and I met with the pre-sentence report writer this week.  In advance of the government providing information to the pre-sentence report writer, I am constrained because of past conduct by Assistant U.S. Attorney Daniel J. O'Brien to alert you to my concerns about the information you chose to provide both to the pre-sentence report writer and to the Court.

      Section 1.B.1.8 of the Sentencing Guidelines provides that statements made by Amb. Olson pursuant to his cooperation agreement with the government may not be used in sentencing.  *United States v. Clark*, 214 Fed. Appx. 372 (5ᵗʰ Cir. 2006); *United States v. Washington*, 146 F.3d 219 (4ᵗʰ Cir. 1996); *United States v. Rivera*, 117 F. Supp.3d 172 (E.D.N.Y. 2015); *United States v. Tripodis*, 2007 U.S. Dist. LEXIS 110423 * (N.D.Ga. 2007).

      The burden is on the government to demonstrate that information provided to the pre-sentence report writer or the court is not derived from cooperation statements.  In providing information regarding sentencing, the government may not merely pay lip service to the plea agreement.

      If you have any concerns regarding the information you chose to provide, please let me know ahead of time so we might avoid an extensive evidentiary hearing prior to sentencing.

Stuart Douglas Allen
Evan N. Turgeon
June 23, 2022
Page Two

Thank you for your courtesy.

Sincerely,

*s/J. Michael Hannon*

J. Michael Hannon

cc:    Russell D. Duncan

# EXHIBIT ZZ

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:     0090 1:22CR00144-001 (SEALED)** |
| **Richard Gustave Olson Jr.** | ) | |

### RICHARD D. OLSON, JR.'s OBJECTIONS TO THE PRESENTENCE REPORT

| **Assistant U.S. Attorney** | **Defense Counsel** |
|---|---|
| Evan Nathaniel Turgeon | J. Michael Hannon |
| 950 Pennsylvania Avenue NW, Suite 7700 | 333 8th Street NE |
| (202) 353-0176 | Washington, DC 20002 |
| Washington, DC 20530 | (202) 232-1907 |
| evan.turgeon@usdoj.gov | jhannon@hannonlawgroup.com |
| | |
| Stuart Douglas Allen | Russell D. Duncan |
| 601 D Street NW | 1001 Pennsylvania Avenue NW, Suite 1300 |
| Washington, DC 20530 | South |
| (202) 252-7794 | Washington, DC 20004-2505 |
| Stuart.allen@usdoj.gov | (202) 640-6657 |
| | rduncan@clarkhill.com |

**Sentence Date:**     January 20, 2023, at 3:00 p.m.

**Offense:** Count 1:     Making a False Writing
18 USC § 1018
1 year imprisonment/$100,000 fine

Count 2:     Aiding and Assisting a Foreign Government with Intent
to Influence Decisions of United States Officers
18 USC § 207(f)(1)(B)
1 year imprisonment/$100,000 fine

**PART A. THE OFFENSE**

**Charge(s) and Conviction(s)**

1.  On March 22, 2022, the United States Attorney for the Central District of California filed a two-found Information charging defendant Richard Gustave Olson, Jr. with Making a False Writing, in violation of 18 USC §1018 (Count One) and Aiding and Assisting a Foreign Government with intent to Influence Decisions of United States Officers, in violation of 18 USC §207(f)(1)(B) (Count Two).

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  In the second line, there is a typo [two-found].

The plea agreement signed by Amb. Olson on January 14, 2022, required that his plea take place in either the Eastern District of Virginia or the District of Columbia.  After the plea agreement was signed, attorneys Daniel O'Brien, from the U.S. Attorney's Office for the Central District of California, and Evan N. Turgeon from the National Security Division of the Department of Justice, were unable to comply with that provision of the agreement.  At no time was there any case filed against Amb. Olson in the Central District of California.  Five weeks passed after the execution of the plea agreement.  On February 25, 2022, Mr. Turgeon left a message for Amb. Olson's counsel, J. Michael Hannon, to call him.  Mr. Hannon returned the call on February 28, 2022.

In the telephone call, Mr. Turgeon said that  "a technical glitch in the plea agreement" might result in Amb. Olson being charged with a felony, a violation of the plea agreement.  Mr. Turgeon then stated that the technical glitch could be remedied by Amb. Olson agreeing to an "addendum" to the plea agreement.  The proposed addendum would provide that the plea would take place in the Central District of California "in the event that neither the United States Attorney for the Eastern District of Virginia nor the United States Attorney for the District of Columbia agreed to accept the filing of the plea agreement in their respective district courts."

Mr. Turgeon stated that on February 25, 2022, the United States Attorney for the EDVA refused to accept the filing of the plea in that district.  Mr. Turgeon reported that neither the National Security Division at DOJ nor the U.S. Attorney's Office for the Central District of California had contacted the U.S. Attorney's Office for this district to determine whether that Office would accept the plea.  Mr. Turgeon reported that if Amb. Olson did not accept the proposed "addendum" to the plea agreement, Amb. Olson might be indicted in either the EDVA or this district.  As recounted in Mr., Hannon's letter memorializing the telephone call:

> Mr. Turgeon further stated that regardless of whether Amb. Olson agrees to the proposed addendum to the plea agreement, the USAO/CDCA and DOJ/NSD would file the plea agreement very soon in the Central District of California.  Mr. Turgeon stated that he and Mr. O'Brien would then approach the USAO for the District of Columbia for permission to transfer the plea to the District of Columbia.  He stated that in his view, with the plea already filed in CDCA, it would be easier to persuade the USAO/DC to accept the transfer.  In the event such a transfer were not accepted by that office, then under the proposed addendum to the plea agreement, Amb. Olson would enter his plea in the Central District of California and be sentenced in that court.

Mr. Turgeon's email response to the letter was received on the same day.  That email does not vary in material ways from Mr. Hannon's letter, and includes the threat that Amb. Olson might be

2

indicted in either the EDVA or DDC if he fails to agree to the addendum.  The email accused Amb. Olson's counsel of "gamesmanship".

Amb. Olson did not consent to the addendum, as entering his plea in either the EDVA or this district was material to the agreement.  On March 17, 2022, Messrs. O'Brien and Turgeon reported that they would file an information and the plea agreement in the Central District for California "shortly" and requested that Amb. Olson must execute a Rule 20 Transfer Request for the matter to be transferred to this district.  In a letter the next day, Mr. Hannon did not agree to the transfer and maintained anything filed should remain under seal to preserve the potential of Amb. Olson earning a 5K motion from the government in its purported prosecution of retired Marine Four-Star General John Allen, then director of the Brookings Institute.

The government then filed only an Information in the Central District for California on March 22, 2022, without any notice or agreement from Amb. Olson.  Amb. Olson was alerted to the filing of the information by the press.  Counsel for Amb. Olson previously learned from a national reporter that the reporter had a source in the Department of Justice.  As we discuss further in our Objections, AUSA O'Brien from the U.S. Attorney's Office caused a release of a search warrant affidavit to the press in violation of federal law and or under  Rule 6 of the Rules of Criminal Procedure regarding grand jury secrecy.

To effectuate the terms of the plea agreement, Amb. Olson had no choice but to execute the Rule 20 Transfer Request, which also was personally signed by both the United States Attorney for the Central District of California and the United States Attorney for this district.  The transfer was filed in this Court on April 7, 2022.  Amb. Olson never made an appearance in the Central District of California, nor did any counsel on his behalf.

2.   The Information does not provide notice to the defendant the Government intends to seek forfeiture as a part of the sentence.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  There were no proceeds eligible for forfeiture under the counts of conviction.

3.   The criminal conduct charged in the Information occurred on or about May 12, 2016 (as to Count One) and from on or about February 14, 2017 to on or about June 28, 2017 (as to Count Two).

4.   On June 3, 2022, the defendant pled guilty to the two-count Information, pursuant to a written plea agreement. The defendant understands a violation of Counts One and Two each carry a maximum term of imprisonment of one year, a one-year period of supervised release, a fine of $100,000 or twice the gross gain or gross loss resulting from the offense (whichever is greatest), and a mandatory $25 special assessment. The defendant understands that the total maximum sentence for all offenses to which the defendant is pleading guilty is two years' imprisonment, a one-year period of supervised release, a fine of $200,000 or twice the gross gain or gross loss resulting from the offenses (whichever is greatest), and a mandatory special assessment of $50.

5.   The parties agree to the statement of facts and agree the statement of facts is sufficient to support guilty pleas to the charges; however, the statement is not meant to be a complete recitation of all the facts relevant to the underlying criminal conduct. The Government agrees not to further criminally prosecute the defendant for violations of (1) 18 USC § 201(c)(1)(B)—Public Official Receiving Illegal Gratuity, related to September 2015 payments totaling $25,000 to a person with whom the defendant had a personal

relationship; (2) 18 USC §1519—Destruction of Documents, arising out of the deletion of emails pertaining to work performed for the Qatar Government; (3) 18 USC § 1001—False Statements, related to any statements made by the defendant during the pendency of the Government's investigation, (4) 18 USC §208(a)—Acts Affecting a Personal Financial Interest, or (5) any other violations of law relating to conduct described in the factual basis of the plea agreement or Information. The defendant understands the Government is free to criminally prosecute him for any other unlawful past conduct or any unlawful conduct that occurs after the date of the plea agreement

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Amb. Olson by agreeing to this portion of the Plea Agreement did not and does not concede that any of the alleged facts related to the offenses listed are relevant conduct for determining his guideline level or are factually accurate.

6.     The defendant understands at the time of sentencing, the Court may consider the uncharged conduct in determining the applicable guidelines range, the extent of any departures from that range, and the sentence to be imposed after considering the sentencing guidelines and all other relevant factors under 18 USC §3553(a). The parties agree the following US Sentencing Guidelines (USSG) calculation. The base offense level for Count One is 6, pursuant to USSG §2B1.1[3]. The base offense level for Count Two is 6, pursuant to USSG §2C1.3. The parties agree two levels are added because the counts do not group, pursuant to USSG §§3D1.1 through 3D1.4. The combined offense level is 8, pursuant to USSG §3D1.4, and the offense level is reduced by two levels pursuant to USSG §3E1.1, for acceptance of responsibility. The Government agrees, if necessary, to recommend an additional one-point reduction if available under §3E1.1; however, the parties anticipate the defendant's guidelines level will be below the threshold necessary for an additional one-level reduction to be available. The parties reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the USSG are appropriate. The defendant understands there is no agreement as to his criminal history points or criminal history category. The Government agree to recommend the defendant be sentenced to a term of imprisonment within the applicable USSG range.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The PSR Writer failed to note that "the parties anticipate the defendant's guidelines level will be below the threshold necessary for an additional one-level reduction to be available."  That threshold is 16; whereas, the guideline level recommended by the PSR Writer is well over that.

7.     On April 26, 2022, the defendant was placed on a personal recognizance bond. He was ordered to report for supervision to Pretrial Services Agency for the District of Columbia (PSADC) as directed; surrender his passport to PSADC within two weeks of his initial appearance and no later than May 10, 2022; not to obtain a passport or other international travel document; notify PSADC in advance of any and all travel outside the District of New Mexico; receive the Court's approval for any travel outside the continental United States; report to PSADC weekly as directed; and contact PSADC on April 27, 2022 to conduct an interview and verify his address.

8.     Automated PSADC records indicate the defendant has complied with all Court ordered conditions of release. His passport was surrendered on May 2, 2022.

### The Offense Conduct

9.     The following was obtained from the Statement of Offense (ECF doc. 1), the Information (ECF doc. 1), and information received from the Government.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   The information provided by the government to the PSR Writer [Paragraphs 17-54] was not shared with Amb. Olson's counsel at the time it was sent by the government to the PSR Writer as is the conventional conduct.  Consequently, Amb. Olson was unable to contest the information provided by the government before the PSR Writer prepared and delivered the Draft PSR on August 10, 2022.  This information was authored by AUSA Daniel O'Brien, who has caused significant harm to Amb. Olson through his release of grand jury information to the media.

We will note after each of the following paragraphs the source of the information: i.e., whether from the government, or the Information, or the Statement of Offense [ECF No. 1, Doc. 1-1].   Paragraphs 17-54 provided by the government, and they should be eliminated from the PSR.  Including these paragraphs in the PSR indicates an endorsement by the PSR Writer of the government's distorted rendering of the facts. Instead, the PSR Writer should substitute the objective statement of the offense which come directly from the Plea Agreement as set forth after Paragraph 16, below, in our Proposed Objections and Modifications.

The information contained in Paragraphs 17-54 should be left to the government's use in its sentencing memorandum or in litigation over the facts relevant to sentencing.

    Persons and Entities

10.    Defendant Richard Gustave Olson, Jr. was a career foreign service officer employed by the United States (US) State Department. Defendant Olson was appointed by the President and confirmed by the US Senate to serve as Ambassador to the United Arab Emirates (UAE) from on or about October 14, 2008 through May 2, 2011 and to serve as Ambassador to Pakistan from on or about October 31, 2012 through November 17, 2015. From on or about November 17, 2015 through his retirement on November 30, 2016, defendant Olson served as US Special Representative for Afghanistan and Pakistan (Special Representative). In or about December 2016, after retiring from government service, defendant Olson created an entity called Medicine Bear International Consulting, LLC ("Medicine Bear").

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ A.1 [ECF No. 1, Doc. 1-1 at 1-2].

11.    Imaad Zuberi was a naturalized US citizen born in Pakistan. Mr. Zuberi operated various informal and formal business entities collectively referred to as Mr. Zuberi's Company. As part of his business operations, Mr. Zuberi was retained by various foreign governments and individuals to engage in lobbying and public relations efforts. Mr. Zuberi received funds from foreign clients, used those funds to make political campaign contributions to US politicians, parlayed those contributions into political influence in the US, and lobbied US officials on behalf of his foreign clients.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ A.2 [ECF No. 1, Doc. 1-1 at 2].

12.    In or about March 2013, Mr. Zuberi met with defendant Olson in Islamabad, Pakistan. From in or about March 2013 through November 2016, Mr. Zuberi solicited defendant Olson's advice and assistance in his capacity as Ambassador with respect to a variety of business matters of interest to Mr. Zuberi.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ A.2.a. [ECF No. 1, Doc. 1-1 at 2].

<u>Ethics Obligations and Reporting Requirements</u>

13.  To increase public confidence in the federal government, demonstrate the integrity of government officials, and enhance the ability of the citizenry to judge the performance of public officials, the US Congress enacted the Ethics in Government Act of 1978 ("the Act"). The Act established an agency within the Executive Branch, the Office of Government Ethics ("OGE"), to oversee public employee compliance with US ethics laws.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ B.3 [ECF No. 1, Doc. 1-1 at 3].

14.  Because transparency was a critical part of government ethics, Congress determined that US citizens should know their leaders' financial interests. Accordingly, the Act and its implementing regulations required certain government employees ("public filers") to file public financial disclosure reports on an annual basis. The annual reports, known as OGE Forms 278, required the employee to disclose financial matters including their income, assets, liabilities, outside employment arrangements, gifts, reimbursements, and travel expenses. The OGE 278 forms certified that the statements the public filer made on the form and all attached schedules were true, complete, and correct to the best of the public filer's knowledge. In both his capacities as Ambassador and Special Representative, defendant Olson was a public filer.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ B.4 [ECF No. 1, Doc. 1-1 at 3].

15.  OGE and the employee's agency were jointly charged with ensuring compliance with ethics laws and reporting obligations, investigating possible violations, and referring possible violations to the agency's Inspector General and the US Department of Justice for civil enforcement or criminal prosecution.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ B.5 [ECF No. 1, Doc. 1-1 at 5].

16.  The Act also imposed "revolving door" prohibitions upon senior government officials. After retirement from government service, senior government officials were prohibited from representing foreign entities before US officials or aiding or advising any foreign entity, including through any behind-the-scenes consulting, with the intent to influence US officials during a one-year "cooling off" period. Congress enacted similar "revolving door" restrictions into a criminal statute, Title 18, United States Code, Section 207(f). In accordance with these laws, defendant Olson was prohibited from engaging in lobbying activity or aiding or advising any foreign government in its attempts to influence US officials during the period December 1, 2016 through December 1, 2017. During this time, defendant Olson was aware of the "revolving door" prohibitions and understood that they applied to him.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:   Information at ¶ B.6 [ECF No. 1, Doc. 1-1 at 4].

<u>The Offense</u>

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Paragraphs 17-54 are embellished assertions provided by the government to the PSR Writer which Amb. Olson was unable to review before the Draft PSR was delivered on August 10, 2021.  These Paragraphs were adopted in whole by the PSR Writer, rather than the recitation of facts included in the Information to which Amb. Olson agreed to plead guilty.  The facts recited in the Information should be substituted for Paragraphs 17-54, which are better left to the government's Memorandum Regarding Sentencing.

Consequently, Amb. Olson requests that the PSR Writer substitute the following, which comes directly from the Information, for Paragraphs 17-54:

> C. WHILE EMPLOYED BY THE FEDERAL GOVERNMENT, DEFENDANT OLSON RECEIVED OVER $18,000 IN TRAVEL EXPENSES FROM PERSON 1 TO ATTEND A JOB INTERVIEW WITH BUSINESSPERSON 2 IN LONDON

> 7. On or about January 15, 2015, defendant OLSON, who was then still serving as U.S. Ambassador to Pakistan, met with Person 1 in Los Angeles and discussed the possibility that defendant OLSON might work for Person 1's business associate, Businessperson 2, a citizen of Bahrain, who operated Businessperson 2's Company. On or about January 23, 2015, defendant OLSON agreed to meet Person 1 and Businessperson 2 in London on January 31.

> 8. On or about January 27, 2015, Person 1 procured defendant OLSON's first-class airfare from New Mexico, via Los Angeles, to London. Person 1 paid for the trip with a combination of credit card expenditures and approximately 330,000 frequent flyer miles. In total, the airfare was worth approximately $18,829. Person 1 paid for his and defendant OLSON's stay at a luxury hotel in London at a combined cost of approximately $2,298. Person 1 also paid for dinner in London for defendant OLSON, Businessperson 2, Person 1, and another individual at a cost of approximately $589.

> 9. On or about February 19, 2015, Businessperson 2's Company offered defendant OLSON a one-year contract with Businessperson 2's Company, commencing after defendant OLSON's retirement from government service, that included compensation of $300,000 per year.

> D. AFTER HIS RETIREMENT FROM GOVERNMENT SERVICE, DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR

> 10. After defendant OLSON began working for Person 1 and Person 1's Company in December 2016, despite being aware that he was subject to the "revolving door" prohibitions of the Act and Section 207(f), defendant OLSON violated these prohibitions on multiple occasions.

> > a. DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR TO FACILITATE LOBBYING U.S. OFFICIALS TO ESTABLISH U.S. CUSTOMS PRECLEARANCE FACILITIES AT DOHA INTERNATIONAL AIRPORT

> 11. U.S. Customs and Border Protection ("CBP") preclearance facilities at foreign international airports provided significant benefits to host countries and their national airlines. CBP allowed flights originating from a precleared airport to fly directly from that airport to over 160 destinations in the United States, regardless of whether the destination airport had a CBP port of entry. Preclearance facilities thus provided a host country's airport an advantage over competitors for the U.S.-bound traveler market.

12. In or about January 2014, while defendant OLSON was serving as Ambassador to the UAE, the U.S. and the UAE negotiated to establish a CBP preclearance facility at the Abu Dhabi International Airport in the UAE -- one of Qatar's regional rivals.

13. On or about October 25, 2016, Person 1 caused the drafting of a contract between Person 1's Company and a Qatar-based holding company controlled by Qatar Government Official 1, whereby Person 1's Company would be paid $3.5 million per year plus a 20% "success fee."

14. On or about November 14, 2016, Qatar Government Official 1 transferred by wire $2.8 million to Person 1's Company.

15. On or about December 27, 2016, Qatar Government Official 1 transferred by wire $3 million to Person 1's Company.

16. On or about January 23, 2017, Businessperson 3, a business associate of Person 1, sent defendant OLSON a draft plan for a lobbying campaign to convince the White House and the U.S. Department of Homeland Security ("DHS") to establish preclearance facilities at Doha International Airport.

17. The next day, on or about January 24, 2017, defendant OLSON sent Person 1 and Businessperson 3 an email that included his advice on how Qatar could "sell" its preclearance proposal to the U.S. government. For example, defendant OLSON advised that it would be important to secure the support of the U.S. Ambassador to Qatar, stating, "I know her well but can't do it because of State's post-employment ethics restrictions, but [Person 1] can charm her she's from LA. The deal closer would be for the Qataris help her get a new Embassy[.]"

18. On or about January 29, 2017, Businessperson 3 emailed a revised lobbying plan to defendant OLSON and Person 1, incorporating defendant OLSON's input. The revised plan called for Qatar to lobby the U.S. House of Representatives, U.S. Senate, White House National Security Council, DHS, and specific CBP officials, followed by a negotiated agreement between DHS and the government of Qatar to establish preclearance facilities at Doha International Airport.

19. On or about January 31, 2017, defendant OLSON sent Businessperson 3 further revisions to the lobbying plan. Defendant OLSON recommended that Qatar leverage its support for the U.S. military to obtain the preclearance facilities it sought, stating, "We also believe it should be possible to leverage Qatar's strong record of support for the U.S., particularly the U.S. military, to push the pre-clearance program through."

20. On or about February 14, 2017, Businessperson 3 emailed the preclearance lobbying plan that incorporated defendant OLSON's advice to a government email address of Qatar Government Official 3, an official with the Qatar Ministry of Interior, copying Qatar Government Official 1, defendant OLSON, and Person 1.

21. On or about March 9, 2017, Person 1 sent Qatar Government Official 1 a copy of Person 1's Company's draft contract with the Qatar-based holding company. In a cover email, Person 1 stated, "this will incorporate preclearance project."

     b.      DEFENDANT OLSON PROVIDED AID AND ADVICE TO QATAR TO FACILITATE LOBBYING U.S. OFFICIALS TO SUPPORT QATAR DURING A DIPLOMATIC CRISIS

22. On or about May 24, 2017, cyber hackers, reportedly funded by the UAE, committed a computer intrusion at the Qatar News Agency website. The hackers posted statements, purportedly by Qatar Government Official 2, that appeared supportive of the Government of Iran. Hackers also leaked emails of the UAE's Ambassador to the United States that discussed Qatar's support for the Muslim Brotherhood and militant groups.

23. On or about June 5, 2017, citing Qatar's purported support for Iran and terrorism, several Gulf states, including the UAE and the Kingdom of Saudi Arabia, cut ties with Qatar and implemented a blockade, closing all air and sea lanes to the country ("the Gulf Diplomatic Crisis").

24. On or about June 6, 2017, several U.S. House representatives introduced House Resolution 2712 "to impose sanctions with respect to foreign support for Palestinian terrorism[.]" The Resolution identified Qatar as providing financial support to Hamas, a terrorist organization.

25. On or about June 1, 2017, Person 1 enlisted the help of defendant OLSON, Businessperson 3, and Businessperson 4 to organize and participate in a lobbying and public relations campaign to convince the U.S. government to support Qatar during the Gulf Diplomatic Crisis. The lobbying and public relations effort sought to use the Gulf Diplomatic Crisis as a business opportunity and to profit from defendant OLSON's status as a former U.S. Ambassador to the UAE, Qatar's primary rival in the crisis, and defendant OLSON's ability to provide aid and advice to Qatar.

26. Defendant OLSON's aid included recruiting Person 3 to join defendant OLSON in providing aid and advice to Qatari government officials with the intent to influence U.S. foreign policy with respect to the Gulf Diplomatic Crisis. On or about June 6, 2017, defendant OLSON contacted Person 3 to enlist his support in the endeavor. That same day, defendant OLSON emailed Person 1 that he had been in touch with Person 3 and informed him that Person 3 was "interested in helping out with Qatar."

27. On or about June 10, 2017, defendant OLSON, Person 1, Person 3, Businessperson 4, and Qatar Government Official 1 traveled to Doha, Qatar. After checking into their hotel, defendant OLSON and Person 3 met with the U.S. Ambassador to Qatar to discuss the purpose of their trip.

28. That same day, on or about June 10, 2017, defendant OLSON, Person 1, and Person 3 traveled to the Qatari royal palace to meet with senior Qatari government officials, including Qatar Government Official 2, Qatar Government Official 4, Qatar Government Official 5, and Qatar Government Official 6. The Qatari government officials did not permit Person 1 to attend the meetings.

29. On or about June 15, 2017, defendant OLSON, Person 1, and Person 3 met for dinner with Qatar Government Official 4 at a hotel in Washington, D.C.

30. On or about June 28, 2017, defendant OLSON, Person 1, Person 3, and Qatar Government Official 5 met with several sitting members of the U.S. House of Representatives for the purpose of convincing the U.S. lawmakers to support Qatar rather than its regional rivals in the Gulf Diplomatic Crisis.

Information at ¶ 7-30 [ECF No. 1, Doc. 1-1 at 3-9].

**BELOW ARE PROPOSED OBJECTIONS TO PARAGRAPHS 17-54 PROVIDED BY THE GOVERNMENT WHICH INDICATE WHY THE PSR WRITER SHOULD REMOVE THEM.**

17.   On January 15, 2015, defendant Olson met with Mr. Zuberi in Los Angeles and discussed the possibility that defendant Olson might work for Mr. Zuberi's business associate, Esam Janahi who operated Abu Dhabi Investment House ("ADIH").

18.   On January 20, 2015, Mr. Zuberi told defendant Olson he "spoke to [Mr. Janahi] about you" and began making arrangements for defendant Olson to meet with Mr. Janahi for the purposes of facilitating an employment offer for defendant Olson. On January 23, 2015, defendant Olson agreed to meet Mr. Zuberi and Mr. Janahi in London on January 31, 2015.

19.   On January 27, 2015, while serving as the US Ambassador to Pakistan, defendant Olson received from Mr. Zuberi first-class airfare from New Mexico, via Los Angeles, to London. Mr. Zuberi paid for the trip with a combination of credit card expenditures and approximately 330,000 frequent flyer miles. In total, the airfare was worth approximately $18,829. Mr. Zuberi paid for his and defendant Olson's stay at a luxury hotel in London at a combined cost of approximately $2,298. Mr. Zuberi also paid for dinner in London for defendant Olson, Mr. Janahi, Mr. Zuberi, and another individual at a cost of approximately $589.

20.   On February 4, 2015, Mr. Zuberi provided defendant Olson with the terms of a one-year contract with ADIH, commencing on July 1, 2015, that included compensation of $300,000 per year, a 1% fee for business developed, compensated expenses, and a position on the advisory board of the company.

21.   On February 8, 2015, Mr. Zuberi told defendant Olson that Mr. Janahi was waiting for defendant Olson's decision. Defendant Olson then sent an email to Mr. Janahi stating that he was "very interested in the position with ADIH and would like to clarify a few points with [him]." Defendant Olson proposed terms identical to those provided by Mr. Zuberi just days earlier.

22.   On February 19, 2015, ADIH offered the same terms of the employment to defendant Olson as those set forth by Mr. Zuberi and as requested by defendant Olson.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The previous Paragraphs 17-22 are the government's misleading assertions of fact that relate to Count One charging failure to report the travel expenses for the job interview held in London to interview for a position with ADIH.

In reality, there is no evidence that Zuberi was a business associate of Janahi or associated with ADIH. In fact, Janahi has filed suit against Zuberi in California. Amb. Olson did not know the details of who paid for his travel and lodging, which were not important to him for the reason stated directly below. Although Zuberi's office was making the travel arrangements, Amb. Olson believed the costs were being paid by ADIH, as Zuberi had told Amb. Olson.

Moreover, State Department employees are permitted to accept travel expenses for interviews in post-employment positions as they are approaching retirement. Amb. Olson anticipated retirement, and the ADIH was the least among  the employment prospects Amb. Olson's  was pursuing before his retirement.

Amb. Olson – as required by State Department ethics advisories – filed a formal Recusal Notice with his embassy with respect to any Department dealings with ADIH because of his interviewing for a position. This filing makes clear that Amb. Olson had no need to hide anything from the government.

Indeed, Amb. Olson filed other recusal notices regarding his other post-employment interviews.

23. On March 12, 2015, at Mr. Zuberi's request, defendant Olson agreed to meet with members of Congress to convey a positive view with respect to a sale of military hardware to Pakistan. On March 18, 2015, Mr. Zuberi contacted Congressmembers' offices and suggested that they meet with defendant Olson so that he could provide them with an update on Pakistan.

24. On April 9, 2015, Mr. Zuberi reminded defendant Olson that defendant Olson "owed [him] a set of talking points for [a Congressperson] and asked for similar talking points for [a Senator] regarding a proposed arms sale to Pakistan which would have to be approved by Congress. That same day, defendant Olson sent Mr. Zuberi the talking points "as promised" via defendant Olson's personal email. The talking points consisted of a position paper defendant Olson wrote for the State Department that had not been approved for public release. The talking points portrayed Pakistan in a positive light with respect to its cooperation against terrorism and expressed support for the sale of military helicopters and associated equipment to Pakistan at an estimated cost of $952 million. Defendant Olson told Mr. Zuberi that the argument presented was what he intended to convey in the previously attempted meetings with members of Congress, saying, "This is what I would say if giving the brief."

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Paragraphs 23-24 provided by the government are also a gross distortion attempting to create the appearance of impropriety where none existed.  Zuberi unilaterally sought the participation of Amb. Olson with his efforts to engage members of Congress on behalf of Pakistan.  Amb. Olson did nothing to facilitate these efforts.

The so-called "Talking Points" consisted of publicly available information on the State Department's position as to Pakistan.  Amb. Olson provided them to Zuberi so that Zuberi would not present false information which would undermine the State Department's true position.  Zuberi regularly hob-knobbed with such politicians because of the millions of dollars in illegal campaign contributions he arranged for them.  None of Zuberi's efforts to meet with members of Congress on this issue where successful.

<u>Gratuities From Mr. Zuberi for Defendant Olson's Support for Arms Sales</u>

25. On June 3, 2015, in response to a Mr. Zuberi invitation that defendant Olson attend a congress member's birthday celebration, defendant Olson responded that they wouldn't want him "because he was poor." On June 14, 2015, defendant Olson told Mr. Zuberi about Muna Habib and her desire to attend Columbia University's School of Journalism and obtain financial support. Ms. Habib and defendant Olson had been romantically involved since 2013 but had a falling out over defendant Olson's affair with another woman.

26. Despite having not met Ms. Habib, on June 21, 2015, Mr. Zuberi told defendant Olson that "I will offer her $25,000 grant and $50,000 loan to be paid back after she graduates. Will this work for her?" Defendant Olson responded, "It is a very generous offer, and she should take it."

27. Defendant Olson kept tabs on Mr. Zuberi's offered help.  On July 1, 2015, defendant Olson emailed Ms. Habib for a status report on her meeting with Mr. Zuberi, saying, "Has it

occurred to you that it might be in your interest to give me a readout of your meeting, since the principal is likely, in fact has, reached out to me?"

28. Later that same day, Mr. Zuberi sent an email to Ms. Habib memorializing what he agreed to provide at the meeting: "Grant of $25,000 going directly to Columbia University . . . Help you get loan of $50,000 from US bank when you are in school or NYC . . . I can show proof of funds to Columbia University for you to start the school." Mr. Zuberi forwarded this communication to defendant Olson, and defendant Olson responded, "Many thanks."

29. On July 14, 2015, Mr. Zuberi provided Ms. Habib with a signed letter for Columbia University in which he falsely claimed, "I am professionally acquainted with Muna Habib through the work she has conducted for oppressed women in Pakistan, including the passionate advocacy she has undertaken on their behalf" and pledged to support her with $81,000 for the 2015 – 2016 academic year.

30. On August 6, 2015, Mr. Zuberi paid for Ms. Habib's August 8 flight to New York to begin her studies at Columbia.

31. On September 10, 2015, Mr. Zuberi issued two checks, one for $20,000 payable to Columbia and one for $5,000 payable to Ms. Habib. On September 22, 2015, Mr. Zuberi forwarded a bank statement to Ms. Habib showing that the $20,000 check had been deposited into Columbia's account for Ms. Habib and said, "I was told both your checks were cashed. Hope you are learning lot at Columbia."

32. Mr. Zuberi then forwarded this same email to defendant Olson along with the message, "My job is done." Defendant Olson responded, "Once again, you are very generous."

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The government's supplied Paragraphs 25-32 are a false attempt to convince the PSR Writer that Amb. Olson was receiving gratuities.  Amb. Olson is not charged with receiving gratuities because there is neither a factual nor a legal basis for such assertions.   During plea negotiations, the government actually agreed there was no basis for any charge against Amb. Olson of Conflict of Interest on account of the government's unproven contention that Amb. Olson granted favors to Zuberi while serving as Ambassador.

The government's assertion that Amb. Olson supported Zuberi's schemes for military sales to Pakistan is completely absurd.  Amb. Olson, the State Department, and the administration were uniformly opposed to any such scheme.

Regarding Para. 27, despite AUSA O'Brien's repeated claims that this email refers to Zuberi, the "principal", the email actually is referring to Sardar Yaqoob, President of Azad Jammu and Kashmir (a Pakistani province), to whom Olson had introduced Muna Habib to assist in settling her late father's estate.

33. Mr. Zuberi continued to convey favors to defendant Olson up until his retirement. From February 26 to February 28, 2016, at Mr. Zuberi's invitation, defendant Olson traveled to Los Angeles to be the keynote speaker at a dinner sponsored by a non-profit organization formed to address concerns of Pakistani Americans. Defendant Olson obtained State Department authorization to pay for the trip. Mr. Zuberi gifted defendant Olson with the use of a limousine driver during his stay in Los Angeles that was billed to Mr. Zuberi at a cost of $467.50 and for which Mr. Zuberi paid the vendor $400.

34.   On May 12, 2016, defendant Olson electronically signed and submitted his annual OGE Form 278 for the 2015 calendar year, in which he certified his answers were "true, complete and correct to the best of my knowledge." In this OGE Form 278, defendant Olson knowingly and willfully failed to disclose, as required, the travel benefits he received, namely, the roundtrip airfare between New Mexico and London and the lodging in London collectively worth over $19,000.

35.   On September 1, 2016, the OGE Form 278 was signed by a Designated Ethics Official for the US State Department who opined, "On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations."

36.   On his final financial disclosure form prepared upon his retirement in November 2016, defendant Olson falsely certified on his OGE Form 278 that his answers were true when he concealed Mr. Zuberi's gift of limousine rides worth at least $400 in connection with the speaking engagement in Los Angeles in February 2016. Defendant Olson did, however, disclose another gift on this form valued at $100.

37.   Other than the $300,000 per year job offer from ADIH, defendant Olson received no other job offers prior to his retirement from government service on November 30, 2016. Defendant Olson did not accept the employment offer or board membership from ADIH. However, either shortly before or shortly after his retirement, defendant Olson did accept a contracting relationship with Mr. Zuberi's company Avenue Ventures at a rate of $20,000 per month ($240,000 per year). Defendant Olson also agreed to accept a position on the board of ADIH's successor, Infra Capital, that would increase his compensation, although no final agreement was signed.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  The government's misleading Paragraphs 33-37 are intended to convince the PSR Writer that Amb. Olson accepted gratuities and failed to report receipt of money not alleged as part of the reporting violation in Count One. The government did not include in Count One the limousine expense in Paras. 33 and 36.  The government could have insisted on inclusion of this $400 expense in Count One in plea negotiations.  The government did not do so, presumably because it is *de minimis* or because State Department regulations impliedly treat the payment as being made to the government.  The ADIH proposed job and salary of $300,000 were never accepted, and must be ignored completely for sentencing purposes.

Cooling-Off Period Violations

38.   The defendant retired from government service on November 30, 2016. In or about November or December 2016, either just prior to, or shortly after, defendant Olson retired from government service, Mr. Zuberi agreed to retain the services of defendant Olson for $20,000 per month plus expenses. On or about December 15, 2016, Mr. Zuberi sent defendant Olson his first monthly check payable to Medicine Bear in the amount of $20,000.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Amb. Olson interviewed for several positions prior to his retirement.  After the election in November of 2016, his most interesting job prospect was withdrawn, based on the change in administrations anticipated after the election.  Amb. Olson had no interest in working for Zuberi as an employee.  Therefore, Amb. Olson established a consultant business and agreed to represent Zuberi as a consultant.  Amb. Olson did not agree to an engagement with Zuberi until December, after his retirement.

39.     Defendant Olson began working for Mr. Zuberi and Mr. Zuberi's company, despite being aware that he was subject to the "revolving door" prohibitions of Title 18 USC §207(f). Within the one-year cooling-off period after his retirement, the defendant provided aid and advice to the government of Qatar with the intent to influence decisions of US government officials.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  Of course Amb. Olson was aware he was engaged in providing consultant services to Zuberi and others during his "Cooling Off" period.  The full extent of the "aid and advice" is detailed by Amb. Olson below.

40.     On January 23, 2017, a business associate of Mr. Zuberi sent defendant Olson a draft plan for a lobbying campaign to convince the White House and the US Department of Homeland Security to establish preclearance facilities at Doha International Airport. The following day, defendant Olson sent Mr. Zuberi and his business associate an email that included his advice on how Qatar could "sell" its preclearance proposal to the US government.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Amb. Olson was responding to his client Zuberi on the plan.  This was not aid to Qatar.

41.     Beginning on February 14, 2017, the defendant participated in a lobbying effort to convince the US Government to endorse the establishment of the US Customs and Border Control preclearance facilities at Doha International Airport in Qatar. Defendant Olson helped draft the proposal that was sent to the Qatar government which explained how preclearance facilities could be achieved. Defendant Olson provided "two elements to the proposal in terms of selling this to Washington," recommending that the Qataris leverage their close military partnership with the United States and emphasize the positive experience the United States experienced with respect to the establishment of similar preclearance facilities in Abu Dhabi.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Amb. Olson provided two edits to the draft proposal prepared by others.   Amb. Olson will provide the Court with an actual copy of the edit showing the full extent of his contribution.

42.     On or about June 6, 2017, defendant Olson participated in a lobbying effort to convince the US Government to support Qatar in its efforts to oppose a blockade imposed upon it by its neighbors. Defendant Olson's aid included recruiting a retired US General ("the "General") to join defendant Olson in providing aid and advice to Qatari government officials with the intent to influence US foreign policy with respect to the Gulf Diplomatic Crisis.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  This is another example of language from the government that the PSR Writer should avoid adopting.  At the time, Amb. Olson was providing advice to his client Zuberi.  The scope of Zuberi's "lobbying" was entirely unknown to Amb. Olson.

43.     As part of his efforts to aid the Qatar Government, on June 6, 2017, defendant Olson recruited the General, who was working at a Washington DC think tank, to enlist his support in the endeavor.  On June 7, 2017, defendant Olson met with the General, a third party, and others a hotel in Washington, DC at which time the General explained how he would conduct the lobbying and public relations campaign. On June 8, 2017, the third party agreed to pay for the expenses of defendant Olson and the General to travel to Doha to meet with representatives of the Qatar Government. At the time, defendant Olson was

being paid $20,000 per month to provide services to the third party. The third party agreed to pay the General a fee for his efforts.

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  Amb. Olson acted at this time as a consultant to Zuberi, and recommended the General.

44.     On June 10, 2017, defendant Olson and the General met with the Qatar Emir and other representatives of his government. Defendant Olson and the General told the Qatari government officials that they had traveled to Qatar as private citizens, not on behalf of the US government, but noted that they had connections with US government officials that placed them in a position to help Qatar.

45.     During the meetings, the General advised the Qatar government officials to embrace US involvement in resolving the crisis, accept President Trump's offer to mediate, sign a pending deal to purchase US F-15 fighter jets, and use the US Al Udeid Air Base in Qatar as leverage to exert influence over US government officials. The Qatari officials were further advised to compete with Saudi Arabia's lobbying campaign in the US and to use a full spectrum of information operations to control the political narrative in the United States. The General informed the Qatar Government that they would use the US National Security Advisor to further their efforts.

**PROPOSED OBJECTIONS AND MODIFICATIONS [Paras. 44-45]:**  Zuberi was thrown out of the meetings by the Qatar representatives before they began.  This signifies that the Qatar representatives were more interested in communication with the General than in treating Zuberi as a member of the team.  It is also likely that the Qataris were relying on others more sophisticated than Zuberi in meeting with the General.  At the meetings, Amb. Olson did not actively participate, but acted as a scrivener.  In fact, his hand-written notes of the meetings – which Amb. Olson retained and provided to the government – became very important evidence to the government.  Amb. Olson created the only known record of the meetings.  In plea negotiations, the government characterized Amb. Olson as the "only witness" as to what occurred during the meetings in Qatar.

46.     From June 9 through June 15, 2017, with defendant Olson's knowledge, the General solicited the help of the National Security Advisor and his staff to support the Qatar's position with respect to the crisis.

47.     On or about June 15, 2017, the General informed defendant Olson that the US National Security Advisor and another senior US government official had been briefed on their efforts to convince the United States to support Qatar's cause.

48.     On June 16, 2017, the General reported to defendant Olson, the third party, and a senior Qatar Government Official that he personally asked the National Security Advisor to meet with senior Qatar officials and that while an "embassy request has to work its way up, our request will come down from above."

49.     On June 23, 2017, the General stated that two senior Qatar Government Officials would be visiting Washington, DC the next week and asked the National Security Advisor to meet with them.

50.     On June 28, 2017, defendant Olson attended a dinner with the General, representatives of the Qatar Government, and members of Congress to enlist Congress to support the Qatari cause.

**PROPOSED OBJECTIONS AND MODIFICATIONS [Paras. 46-50]:** Amb. Olson was not actively involved in these activities. The dinner mentioned in Para. 50 was arranged by Zuberi, which Amb. Olson did attend.

Paragraphs 38-50 were provided to the PSR Writer to adversely influence her understanding of the facts. As we indicate above, Amb. Olson requests that the PSR Writer report to the Court the "facts" contained in the Information found at ECF No. 1.

<u>Scope of Defendant Olson's False Statements and Concealment</u>

51.   On July 17, 2019, in a voluntary interview with the FBI, defendant Olson concealed information related to benefits he received from Mr. Zuberi by making the following false statements: (1) that his January 2015 travel to London was paid for by Mr. Zuberi's business associate, when in fact Mr. Zuberi paid for the travel; (2) that defendant Olson received no specific job offer from ADIH saying, "we had a conversation in London about . . . possibilities for post-employment. There was never a specific job offer. There was never anything," when in fact, ADIH had formally offered defendant Olson a $300,000 per year job; and (3) that defendant Olson had "no idea" how Mr. Zuberi helped finance Ms. Habib's college tuition, when in fact, Mr. Zuberi forwarded to defendant Olson a bank statement showing that Mr. Zuberi's $20,000 check had been deposited into Columbia University's account for Ms. Habib and Mr. Zuberi told defendant Olson that both checks he issued had been cashed.

**PROPOSED OBJECTIONS AND MODIFICATIONS:** (1) Amb. Olson had no knowledge that Zuberi paid for the London travel, except what Zuberi told him; (2) Amb. Olson in this interview four years after the events had no reason to recall specifics of the job offer because he was fairly dismissive of the opportunity from the beginning; and (3) Amb. Olson had no reason to remember the bank information from years before. These are hardly false statements and did not interfere with any investigation.

52.   In that same FBI interview, defendant Olson also concealed information related to the nature of his relationship with Mr. Zuberi by making the following false statements: (1) that he had no knowledge of Mr. Zuberi's business interests in military sales to foreign governments they discussed, claiming, "I had no reason to believe that [Zuberi] had any business interests in any of these [military] deals" and that his understanding was that Zuberi's interest in the sales was merely for "general information." In fact, defendant Olson was aware that Mr. Zuberi was engaged in the business of brokering military sales between a manufacturer of military drones and foreign governments; (2) that defendant Olson and Mr. Zuberi only engaged in general-interest political discussions and "political gossip," that there "was no business relationship" between the two, and that he could not recall any "ask" from Mr. Zuberi. In fact, defendant Olson agreed to assist Mr. Zuberi's business efforts in lobbying members of Congress and provided Mr. Zuberi with talking points to promote weapon sales to foreign governments in response to a request from Mr. Zuberi; and (3) after being handed a copy of the talking points by the FBI, defendant Olson falsely stated that that "whatever information I shared with [Zuberi] . . . I would share with anyone. I mean these were public[.]" In fact, the talking points defendant Olson shared with Mr. Zuberi had not been cleared for public distribution.

**PROPOSED OBJECTIONS AND MODIFICATIONS:** Amb. Olson knew Zuberi rarely brought any business relationship across the finish line in a formal sense. Zuberi's goal, looking back in the light of Zuberi's prosecution for illegal campaign contributions, was to create relationships based on his campaign funding. If the government had any hard information that Zuberi brokered military sales of weapons,

they surely would have indicted him. The "Talking Point" were not "cleared for pubic distribution" because there was no need for such a formal review. Amb. Olson prepared them from publicly available information.

53. On July 17, 2019, in his initial interview with the FBI, defendant Olson concealed information related to his business relationship with Mr. Zuberi after defendant Olson's retirement by making the following misleading statements: "I don't know much about [Zuberi's] actual business operations because he has me advising him on, sort of, broadly speaking government relations, sort of strategic, ah, aspects of business." In fact, defendant Olson participated in Mr. Zuberi's business operations with respect to lobbying campaigns to procure Qatar preclearance facilities and to modify US policy with respect to the Gulf Diplomatic Crisis, by participating in the drafting of a lobbying proposal submitted to the Qatar government with respect to Qatar preclearance facilities and by meeting with the Emir of Qatar and other high-ranking Qatari officials as well as US Government officials to assist the Qatar government in its effort to modify the US Government's response to the Gulf Diplomatic Crisis.

**PROPOSED OBJECTIONS AND MODIFICATIONS:** This contention assumes that Amb. Olson believed he had lobbied the government of the United States on behalf of Qatar. If the government wanted to elicit a specific answer related to Qatar, the FBI Agent would need to ask a more directed question for Amb. Olson to have actually made a false statement.

54. On December 17, 2019, in a second voluntary interview with the FBI, defendant Olson concealed information related to benefits he received from Mr. Zuberi by falsely stating that he was uncertain who paid for defendant Olson's January 2015 travel to London but that Mr. Zuberi did not pay for any trips while defendant Olson was employed by the US State Department. In fact, Mr. Zuberi paid for defendant Olson's travel and lodging in connection with the January 2015 travel to London.

**PROPOSED OBJECTIONS AND MODIFICATIONS:** Once again, the government asserts that Amb. Olson knew that Zuberi paid for the travel, which he did not.

In paragraphs 51-54 the government misled the PSR Writer with this information. If the government believed Amb. Olson made false statements, it would have indicted him.

### Victim Impact

55. These are Title 18 offenses and there is no identifiable victim. The Government advised there should be no restitution order in this case, and had the defendant been charged with a gratuity violation or bribery, restitution would be applicable. The Government related as these allegations were not charged, they should only be used for sentencing in accordance with 18 USC §3553(a) factors.

### Adjustment for Obstruction of Justice

56. The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when the defendant concealed information related to the benefits he received from Mr. Zuberi and concealed information related to the nature of his relationship with Mr. Zuberi. Accordingly, a two-level enhancement pursuant to USSG §3C1.1 is warranted.

**PROPOSE OBJECTIONS AND MODIFICATIONS:** See our Proposed Objections and Modifications below after Paragraphs 67 and 68.

### Adjustment for Acceptance of Responsibility

57. The defendant provided a statement to the probation officer wherein admitting involvement in the offense. Further, Defense Counsel provided the following written statement:  [No Changes Requested].

58. As provided for in Application Note 3 of USSG §3E1.1, entry of a guilty plea prior to trial combined with truthfully admitting conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct will constitute significant evidence of acceptance of responsibility; however, the evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. The entry of a guilty plea is not an entitlement to an adjustment under this section as a matter of right. Further, as provided for in Application Note 4 of §3E1.1, conduct that normally results in an enhancement under §3C1.1, ordinarily indicates the defendant has not accepted responsibility for his criminal conduct; however, there may be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply. In light of the above Application Notes, and in consideration of defendant Olson's overall conduct, the adjustment for acceptance of responsibility in this case remains applicable.

### Offense Level Computation (2021 US Sentencing Guidelines)

59. Count 1: Making a False Writing, 18 USC § 1018

60. Count 2: Aiding and Assisting a Foreign Government with Intent to Influence Decisions of United States Officers, USC § 18 USC § 207(f)(1)(B)

61. Count 1 is found in USSG §2B1.1 of the guidelines; Count 2 is found in USSG §2C1.3 of the guidelines.

62. Because the conduct in Count 1 does not involve the same risk of harm from the conduct in Count 2, pursuant to USSG §2D1.2, these counts are not grouped. The combined offense level is determined by taking the count producing the highest offense level and increasing that offense level by an amount of 'units' as provided in USSG §3D1.4.

**PROPOSED OBJECTIONS AND MODIFICATIONS**:  If the counts are not grouped, any relevant conduct must fall under §1B1.3(a)(1)(A) to be considered in the sentencing calculation.  The relevant conduct must be "acts and omissions committed . . . by the defendant that occurred **during the commission of the offense of conviction, preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense**."  §1B1.3(a)(1)(A) (emphasis supplied).  *See also United States v. Flores*, 149 F.3d 1272, 1281 (10th Cir. 1998).  The PSR Writer erroneously relied upon conduct alleged by the government in Paragraphs 17-54 which did not occur during the commission of the offense of conviction, preparation for those offenses, or in the court of attempting to avoid detection or responsibility for those offenses.

Count Group 1

63.   **Base Offense Level:** The guideline for 18 USC § 1018 offenses is found in USSG §2B1.1 of the guidelines. That section provides that an offense involving fraud has a base offense level of six. USSG §2B1.1(a)(2).                                                **6**

64.   **Specific Offense Characteristics:** None.                                **0**

65.   **Victim Related Adjustment:** None.                                        **0**

66.   **Adjustment for Role in the Offense:** None.                              **0**

67.   **Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, or a closely related offense (when he concealed information related to benefits he received from Mr. Zuberi); therefore, two levels are added. USSG §3C1.1.                                   **+2**

68.   **Adjusted Offense Level (Subtotal):**                                     **8**

**PROPOSED OBJECTIONS AND MODIFICATIONS:** There should be no enhancement under USSG §3C1.1 for obstruction of justice. First, the PSR Writer erroneously relied upon conduct alleged by the government in Paragraphs 17-54 which did not occur during the commission of the offense of conviction, preparation for those offenses, or in the court of attempting to avoid detection or responsibility for those offenses. Second, the obstruction of justice enhancement applies where: (1) "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing **of the instant offense of conviction**, and (2) the obstructive conduct related to (A) the defendant's **offense of conviction and any relevant conduct**; or (B) a **closely related offense**." (Emphasis supplied).

Application Note 4 supplies "Examples of Covered Conduct", including (G) "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." Application Note 5 gives "Examples of Conduct Ordinarily Not Covered", which includes (B) "making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies." Application Note 6 defines "material" as any information "that, if believed, would tend to influence or affect the issue under determination."

The information allegedly "concealed" by Olson in the interviews was: 1) "information related to benefits he received from Mr. Zuberi." Specifically, the trip to London, the job offer, and lack of knowledge as to the payments to Columbia (¶ 51); 2) information regarding Zuberi and his interests in military sales, no business relationship between Olson and Zuberi; and falsely claiming that he would share the "talking points" with Zuberi and anyone else (when the "talking points" were not cleared for public distribution) (¶ 52; and 3) information regarding his retirement and a business relationship with Zuberi, including Zuberi's actual business operations in connection with Qatar (¶ 53 ).

The government has the burden of proving an obstruction of justice by a preponderance of the evidence. *United States v. Rodriguez*, 336 F.3d 67, 71 (1st Cir. 2003); *United States v. Wilson*, 884 F.2d 1355 (11th Cir.1989).

In *United States v. Ring*, 811 F. Supp. 2d 359 (D. D.C. 2011), the government argued for an obstruction enhancement.  The trial court found that the government had not met its burden of proving obstruction.  *Id*. at 383.  Ring, a lobbyist from Greenberg Traurig, was found guilty for payment of an illegal gratuity, honest services wire fraud and conspiracy.  The government claimed that Ring made false statements to investigators hired by Greenberg Traurig, specifically pointing to Ring's "false and misleading statements about his knowledge of and participation in the [Michael] Scanlon-Abramoff kickback scheme, his receipt of $135,000 related to the Sandia Pueblo [tribe], as well as his knowledge [of] the corruption scheme involving payments to Julie Doolittle for a little-work job."  The court noted that the obstruction enhancement was not triggered unless the obstructive conduct "related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense."  The court explained that the first two instances of obstruction were not part of the offense of conviction and were not related to the offense of conviction.  Regarding the Doolittle matter, Ring at first stated he did not remember much about it, but in a later interview he recounted several details about it.  This did not amount to obstruction because Ring had reviewed emails about the matter prior to the last interview.  The court refused to impose the enhancement on this basis, holding:

> An enhancement under § 3C1.1 is only appropriate where the defendant acts with the intent to obstruct justice.  Where conduct is "directly and inherently obstructive" – that is, where the defendant engages in "behavior that a rational person would expect to obstruct justice" – the court may infer an intent to obstruct justice and need not make a separate finding of specific intent.

*Id*. at 384 (*quoting United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009).

The fact that Ring "changed" his story about the Doolittle job from "I don't remember, I need my recollection refreshed" to later providing additional details after having his recollection refreshed with contemporaneous emails is plainly not "directly and inherently obstructive" and is insufficient to demonstrate that Ring lied about this issue or intended to obstruct justice.

Applying *Ring* to Olson's case, the allegations contained in ¶¶ 51 and 52 are not related to the offenses of conviction or any relevant conduct.  As for ¶ 52, the "concealed" information was not material to the offense of violating the one-year "cool-off" period.  There is no evidence that any of the "concealed" information significantly affected the investigation.  *See e.g.*, *United States v. Shriver*, 967 F.2d 572, 575 (11th Cir. 1992) (no evidence showing defendant's false statement, not under oath, to IRS agent about "voided" Notice of Federal Tax Lien significantly obstructed or impeded the official investigation because the agent was already aware that defendant was the one who altered the Notice); *United States v. Manning*, 955 F.2d 770 (1st Cir. 1992) (obstruction enhancement was inappropriate because defendant's use of false identity in response to arresting officer's inquiries did not cause "significant hinderance to the investigation"); *United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991) ("section 3C1.1 specifically permits lies to investigating agents if they do not significantly impede the investigation"); *United States v. Urbanek*, 930 F.2d 1512 (10th Cir. 1991) (false statements denying guilt made to IRS Agent did not support obstruction enhancement).

The Fifth Circuit has held that to establish that a defendant's conduct resulted in an actual hindrance, "the government must present evidence of what action it took that it would not have taken had [defendant]'s identity been known" when he gave false information.  *United States v. Surasky*, 976 F.2d 242, 245-246 (5th Cir. 1992) *citing United States v. Banks*, 347 F.3d 1266, 1271 (11th Cir. 2003).  The language of the application notes "requires a

causal relationship between the materially false statement given and a resulting impediment upon the instant investigation or prosecution." *See also United States v. Selvie*, 684 F.3d 679, 684 (7th Cir. 2012) (materially false information provided to law enforcement must actually obstruct or impede the official investigation to merit an obstruction enhancement. "Without more, false statements to law enforcement authorities, if not made under oath, do not actually impact the investigation or prosecution."); *United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002) (government must prove "a detrimental effect upon [its] efforts to investigate or prosecute the instant offense.").

To show that Olson committed obstruction, the government must show how his "concealed" information resulted in an "impediment upon the instant investigation or prosecution" or that the "concealed" information "a detrimental effect" on its investigation. The government has not done so, and this enhancement must be eliminated.

Count Group 2

69.  **Base Offense Level:** The guideline for a violation of 18 USC § 207(f)(1)(B) is USSG §2C1.3. Pursuant to the cross reference at §2C1.3(c)(1), USSG §2C1.2 is used to determine the offense level because the offense involved a bribe or gratuity and that guideline results in a higher offense level. The base offense level is 11 because the defendant was a public official, specifically, a US Ambassador and US Special Representative. USSG §§2C1.2(a)(1) and 2C1.3(c)(1).                    **11**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**   The proper base offense level should be 6.   The PSR Writer's use of the cross-reference contained in §2C1.3(c)(1) is improper for three reasons: 1) the items the PSR is calling "gratuities" are not relevant conduct to the offense of conviction; 2) even if they somehow *could* be considered relevant conduct, they do not fall within the statutory definition of a "gratuity"; and, 3) the Plea Agreement did not allow the government to rely upon cross references contained in the sentencing guidelines.

The offense in Count 2 is providing "aid and advice to the government of Qatar" within the one-year "cool-off" period. The PSR includes the $300,000 job offer (that was not accepted), the money paid to Columbia University on behalf of Muna Habib, and the $400 paid to the limo service as gratuities; therefore, the cross-reference should not be applied.

**A.  Not Relevant Conduct**

The PSR, in ¶ 62, states that the two offenses are not grouped.  If the counts are not grouped, any relevant conduct must fall under §1B1.3(a)(1)(A) to be considered in the sentencing calculation.  The relevant conduct must be "acts and omissions committed . . . by the defendant that occurred during the commission of the offense of conviction, preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  §1B1.3(a)(1)(A). *See also United States v. Flores*, 149 F.3d 1272, 1281 (10th Cir. 1998).

None of the items the PSR calls "gratuities" fall under the definition of relevant conduct.  He did not accept the $300,000 position with ADIH and the proposed position had no relevance to the offense of conviction; *i.e.*, "aid and advice to the government of Qatar" within the one-year period."  For the same reason, the money paid to Columbia University had nothing to do with his providing "aid and advice to the government of Qatar" and was thus not relevant conduct.  Likewise, the $400 paid for the limo service was no way related to his "aid and advice to the government of Qatar."

In *United States v. Flores*, 912 F.3d 613 (D.C. Cir. 2019), the court reversed a sentence where the district court included, as relevant conduct, the defendant's participation in the murder of a Mexican kidnap victim. The court noted that neither the plea agreement nor the initial PSR mentioned §1B1.3. The court also pointed out the neither the record nor the government's brief contained any reference to §1B1.3(a)(1)(a). Further, even if the PSR and the government had argued that the kidnap/murder fell under §1.B1.3(a)(1)(A), the argument would have failed because the kidnap/murder was not related to the underlying racketeering offense of conviction. *See also United States v. West*, 643 F.3d 102 (3rd Cir. 2011) (conduct surrounding arrest five months after defendant was arrested for being a felon in possession should not have been included in relevant conduct under §1B1.3(a)(1)(a)); *United States v. Wernick*, 691 F.3d 108, 114 (2nd Cir. 2012) (offenses against young children were not relevant conduct because these offenses did not "occur[] during the commission of" or "in preparation for" the crimes against the teenagers "in the sense contemplated by the Guidelines."); *United States v. Caldwell*, 2020 U.S. App. LEXIS 5765; 2020 WL 914922 (11th Cir. 2020) (grand theft of the motor vehicle did not occur during commission of offenses of conviction and was not done in order to avoid detection or responsibility for those offenses. "Thus, under the Guidelines, it is not relevant conduct.").

In Olson's case, neither the Statement of the Offenses nor the PSR mention "relevant conduct" under §1B1.3(a)(1)(A). In fact, the PSR does not explain how the three activities are relevant conduct. Instead, the PSR bypasses this step and goes straight to "gratuity" without explaining the basis for considering them as gratuities. This is improper and the cross-reference should not be used.

**B. Three Activities Were Not Gratuities**

Even assuming the three activities *are* relevant conduct, they still were not gratuities and applying the cross-reference is improper.

Courts frequently refer to 18 U.S. Code § 201(c) as the "Gratuity Statute." *See e.g. United States v. Sun-Diamond Growers*, 138 F.3d 961, 963 (D.C. Cir. 1998) ("it is enough under the gratuity statute, 18 U.S.C.S. § 201(c)(1)(A), if the defendant gives an unpromised benefit for a past governmental favor."); *United States v. Heard*, 709 F.3d 413, 419 (5th Cir. 2013); *United States v. Jefferson*, 674 F.3d 332, 353 (4th Cir. 2012). While Olson was not charged under this statute, it offers the best definition of a "gratuity:"

18 U.S.C. § 201(c) Whoever –
    (1)    otherwise than as provided by law for the proper discharge of official duty –
    (B)    being a public official . . . directly or indirectly . . . agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person.

All three instances that the PSR counts as gratuities involve Zuberi, Janahi, and ADIH. If these are to be considered "gratuities" then Olson had to accept them "for or because of any official act" he had performed or was to perform. His alleged actions after 02/16/2015 (when he received the terms of the job offer from ADIH) were: 1) agree to meet with members of Congress regarding the sale of military hardware to Pakistan (¶ 23); 2) provide Zuberi with "talking points" on selling arms to Pakistan (¶ 24); and 3) accept the use of a limo service while presenting a State Department approved speech. The remainder of his actions set out in the PSR revolve around the pre-clearance facility at Doha and conduct charged in Count 2.

To constitute an illegal gratuity, a connection must be made between a thing of value and official act to be performed by the public official. It is not sufficient to merely show that gratuity was given because of recipient's official position or motivated by recipient's capacity to exert governmental power for donor's benefit. *United States v. Sun-Diamond Growers*, 526 U.S. 398, 413 (1999).

There is no evidence connecting the fact that Olson performed the tasks related to arms sales or his limo ride in return for the "thing of value" (proposed employment contract, money paid to Columbia, or payment for the limo service). Without this connection, there is no gratuity. *See also United States v. Schaffer*, 183 F.3d 833, (D. D.C. 1999) *reversed and vacated on other grounds* 1999 U.S. App. LEXIS 16923 (D.C. Cir. 1999) (vacated due to presidential pardon); *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007) (insufficient evidence to convict defendant of illegal gratuity). Furthermore, the Department of Justice Manual explicitly provides that under the facts of this case where the pubic official does not personally receive the gratuity, the offense must not be charged. *See DOJ Manual* attached as Exhibit A. The contention that Amb. Olson received gratuities was contested during plea negotiations, and the government conceded there is no basis for a charge of Conflict of Interest while serving as Ambassador.

### C. The Plea Agreement Does Not Permit Use of Cross References

Amb. Olson contends the government is bound by the agreed upon in Paragraph 14 of the Plea Agreement, resulting in a sentencing range of 0-6. In the event the government argues for a different guideline range, the Plea Agreement does not include resort to any cross reference for sentencing purposes. Paragraph 15 states: "Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate."

70.  **Specific Offense Characteristics:** Because the offense involved more than one gratuity, specifically, the university grant; the limousine; and the employment offer, two levels are added. USSG §2C1.2(b)(1)**.**                                                    **+2**

**PROPOSED OBJECTIONS AND MODIFICATIONS:** Because the cross reference does not apply, this provision does not apply.

71.  **Specific Offense Characteristics:** Because the value of the gratuity exceeded $6,500, the base offense level is increased by the levels from the table in §2B1.1. In this case, the number of offense levels from the table in §2B1.1 corresponded to the value of more than $250,000 but less than $550,000 (specifically, the $25,000 college tuition, $400 for the limousine; and $300,000 in the employment offer) thereby resulting in a 12-level increase to the base offense level, USSG §2C1.2(b)(2) and USSG §2B1.1(b)(1)(G).                                    **+12**

**PROPOSED OBJECTIONS AND MODIFICATIONS:** Because the cross reference does not apply, this provision does not apply. The $300,000 salary was not received. The $400 for the limousine was a benefit to the State Department, not Amb. Olson.

72.  **Specific Offense Characteristics:** Because the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, 4 levels are added. USSG §2C1.2(b)(3).                                           **+4**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  As stated above, here, again, because the cross reference does not apply, this provision does not apply. Moreover, Count 2 involves activities of Amb. Olson at a time when he was no longer serving in government. The commentary to §2C1.3, in Note 3(A), defines high-level decision-making or sensitive position as: "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process."  Even assuming the cross reference should be applied, none of the conduct that the government alleges occurred while Amb. Olsen was in the government with respect to alleged gratuities is relevant conduct to his post-government lobbying work.

Further, after lengthy negotiations, the Plea Agreement in this case was designed and intended by the parties to make available to Amb. Olson a sentence of probation.  AUSA O'Brien and DOJ Attorney Turgeon said so.  The parties explicitly agreed that the offense level would be 6.  Deference will generally be accorded an agreement negotiated between competent counsel, taking into account the "institutional incentives" that induce a prosecutor to plea bargain, and the observed phenomenon that the plea-bargaining process  usually "produces the right result" in terms of the seriousness of the underlying crime. *See United States v. Torres-Echavarria*, 129 F.3d 692, 694695 (2nd Cir. 1997).

In Amb. Olson's case, public safety is not an issue.  The prosecution and defense agreed to a specific set of offense conduct, including the calculation of a fair application of the guidelines.  The plea agreement and the Statement of The Offenses, agreed upon by both parties, produced the right result and deference to that agreement should be observed by the Court.

The PSR Writer should also  report that the government proposed that Amb. Olson cooperate in hopes of obtaining a 5K departure for assistance in the purported prosecution of General John Allen. Whether the government is willing to report to the Court the prospect of such a prosecution, Amb. Olson should be entitled to consideration of his good faith.

73. **Victim Related Adjustment:** None.                                                                                    **0**

74. **Adjustment for Role in the Offense:** None.                                                            **0**

75. **Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense (specifically, when he concealed information related to his relationship with Mr. Zuberi) ; therefore, two levels are added. USSG §3C1.1.                                                        **+2**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  *See* our Proposed Objections and Modifications after Paragraphs 66 and 67, above.

76. **Adjusted Offense Level (Subtotal):**                                                                      **31**

77. **Multiple Count Adjustment:** Units are assigned pursuant to USSG §3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

| **Group/Count** | **Adjusted Offense Level** | **Units** |
|---|---|---|

| | | |
|---|---|---|
| Count 1 | 8 | 0.0 |
| Count 2 | 31 | 1.0 |
| **Total Number of Units:** | | 1.0 |

78.  **Greater of the Adjusted Offense Levels Above:**   **31**

79.  **Increase in Offense Level:** The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at USSG §3D1.4.   **0**

80.  **Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.   **31**

81.  **Chapter Four Enhancement:** None.   **0**

82.  **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).   **-2**

83.  **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).   **-1[8]**

84.  **Total Offense Level:**   **28**

**PROPOSED OBJECTIONS AND MODIFICATIONS:**  The Total Offense Level should be 6.

### Educational, Vocational and Special Skills

119.  **OBJECTION**:  Amb. Olson may drink two glasses of wine each evening.

126.  **OBJECTION**:  Amb. Olson was a member of the National Honor Society and received an award for ability in French.  Amb. Olson was not a member of the "National French Honor Society" to the best of his recollection.

### Employment Record

130.  **OBJECTION**:  Amb. Olson resigned this position.  He was not terminated.

131.  **OBJECTION:**  Amb. Olson resigned this position.  He was not terminated.