**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

RICHARD GUSTAVE OLSON, JR.,

Defendant.

Criminal No. 1:22-cr-144-GMH

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

The defendant pleaded guilty to engaging in two separate courses of conduct, both of which involved his misuse of public office for personal gain.  Count One concerns the defendant's intentional submission of a false ethics form that failed to disclose benefits he received from a businessman ("Person 1"), whom the defendant had previously helped by providing him nonpublic information and by lobbying members of Congress to advance his business interests, and who hired the defendant after he retired from government service.  Count Two concerns the defendant illegally helping Qatar influence U.S. policymakers shortly after leaving government service, in violation of laws meant to prevent recent retirees from leveraging their high-level U.S. government service to serve foreign interests.  The defendant took numerous steps to conceal these illegal activities, including deleting emails, suggesting that Person 1 adopt a false cover story, and lying to the FBI during a recorded interview.  Far from expressing remorse, he has refused to admit fault even after pleading guilty.

This case has already received significant public attention.  The defendant's sentence will as well.  As the defendant surely can attest, the world looks to the United States as an example of good governance.  A major reason for that is that the United States does not tolerate corruption in

its public officials.  Under the facts of this case, a sentence of imprisonment will reinforce that principle, and a sentence of probation will undermine it.  The government therefore respectfully requests that the Court sentence the defendant to a term of imprisonment within the applicable sentencing guidelines range.

**The Nature and Circumstances of the Offenses – 18 U.S.C. § 3553(a)(1)**

In light of the central role that transparency plays in ensuring legal and ethical conduct by government officials, Congress has enacted financial disclosure laws to enable Americans to understand their leaders' financial interests.  One such law requires senior government officials to annually report their outside income, assets, liabilities, outside employment arrangements, gifts, reimbursements, and travel expenses on Office of Government Ethics (OGE) Form 278.  The U.S. government uses this information to identify actual or potential conflicts of interest between a filer's public responsibilities and his private interests.  In Count One, the defendant admitted to violating these disclosure obligations by intentionally making false statements on his 2015 OGE Form 278, in violation of 18 U.S.C. § 1018.  As detailed below, the defendant made these false statements to conceal an obvious conflict of interest that benefitted him financially.

The defendant served as U.S. Ambassador to Pakistan from October 31, 2012, through November 17, 2015, and as U.S. Special Representative for Afghanistan and Pakistan from November 17, 2015, through his retirement from government service on November 30, 2016.  While serving as Ambassador to Pakistan, the defendant had a relationship with Person 1 through which he did various favors and received various benefits.  One major favor was that the defendant agreed to lobby members of Congress on Person 1's behalf with respect to weapon sales to Pakistan and Middle Eastern countries that Person 1 was trying to broker.  The defendant also gave Person 1 a set of internal State Department talking points on weapons sales to Pakistan

that had not been cleared for release to the public.  In return, Person 1 provided the defendant a variety of benefits including (1) $25,000 paid to the defendant's girlfriend, (2) $18,000 in first-class travel for the defendant to attend a job interview Person 1 arranged with a foreign businessperson ("Businessperson 2"), and (3) a $300,000 post-retirement job offer from Businessperson 2, which eventually morphed into a $240,000 consulting contract for the defendant to work for Person 1.  The defendant concealed his relationship with Person 1 by violating multiple ethics regulations that required him to disclose the relationship and recuse himself from matters involving Person 1, filing the false financial disclosure form charged in Count One, and lying to the FBI during recorded interviews in July and December 2019.

Count Two, which concerns the defendant's post-retirement employment with Person 1, charges the defendant with illegally helping the government of Qatar influence U.S. government officials concerning two separate issues of importance to Qatar.  Given his high-level position in the U.S. government, the defendant was subject to the "revolving door" prohibitions in 18 U.S.C. § 207(f) for one year after leaving government service.  Congress enacted these prohibitions to prevent public officials from unfairly profiting from the contacts, associations, and special knowledge that they gained during their tenure as public servants.  The phrase "revolving door" describes the practice of public officials abandoning public service for lobbying positions. Prohibitions on this practice, often referred to as mandatory "cooling-off" or "waiting" periods, forbid individuals from engaging in lobbying activities for a period of time after leaving public service.  At issue here, § 207(f) bars senior officials—like the defendant—from representing a foreign government before any federal agency or from aiding or advising a foreign entity with the intent to influence the U.S. government for one year after leaving their positions.

The defendant knowingly violated these prohibitions by providing the Qatar aid and advice in furtherance of two Qatari goals: (1) convincing U.S. policymakers to establish U.S. Customs preclearance facilities at Doha International Airport, and (2) convincing U.S. policymakers to support Qatar, rather than its regional rivals, during the 2017 Gulf Diplomatic Crisis.  After learning that the government was investigating his activities on behalf of Qatar, The defendant obstructed the government's investigation by deleting incriminating emails, misleading the FBI in his July 2019 interview, and urging Person 1 to adopt a false cover story.

The false statement charged in Count One was part of a larger pattern of false statements and deception through which the defendant tried to conceal his mutually beneficial relationship with Person 1.  The parties agreed in the Plea Agreement that "the court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a)."  Plea Agreement at 4.  Accordingly, a summary of this conduct appears below, as supported by the attached exhibits.

### A.     *The Defendant Received Gratuities from Person 1 for Supporting Arms Sales to Multiple Countries*

1.      The Defendant Helped Person 1 Lobby the U.S. Congress to Authorize Sales of Military Hardware

The defendant developed a relationship with Person 1 as of early 2013, when the defendant was serving as U.S. Ambassador to Pakistan.  Exhibit 1.  By January 17, 2015, Person 1 had developed a relationship with the Vice Chairman of a major U.S. manufacturer of military drones ("Drone Manufacturer 1").  Exhibit 2.  On February 24, 2015, Person 1 forwarded the defendant his email communications with the Vice Chairman about arranging introductions

between representatives of Drone Manufacturer 1 and Saudi and Kuwaiti government officials.
Exhibit 3 (produced by the defendant).  Person 1 informed the defendant that Drone
Manufacturer 1 had a deal in the works to sell military drones to the UAE, and told the defendant
that "Kuwait, Saudi, and other countries could be doable."  *Id.*

On March 12, 2015, at Person 1's request, the defendant agreed to meet with members of
Congress to convey a positive view with respect to the sale of military hardware to Pakistan.
Exhibit 4.  On March 18, 2015, Person 1 contacted the offices of two members of Congress and
suggested that they meet with the defendant so that he could provide them an update on Pakistan.
Exhibit 5 (produced by the defendant).  On March 19, 2015, Person 1 warned the defendant that
the members of Congress might not be very receptive to the defendant's views on Pakistan,
stating, "You understand that this will be a difficult meeting.  Expect to be hit on Afridi, bin
Laden, Haqqani, double games Pakistan plays, etc to be on table."  The defendant responded,
"Yup."  *Id.*  From on or about March 12 through March 31, 2015, the defendant tasked State
Department employees with scheduling meetings between himself and members of Congress
who served on the House Foreign Affairs Committee and the Senate Foreign Relations
Committee during the last week of March 2015, when the defendant was scheduled to be in
Washington, D.C.  Exhibit 6.

On April 9, 2015, Person 1 reminded the defendant that the defendant "owed [him] a set
of talking points for [Congressperson 1]" and asked for similar talking points for Senator 1,
stating, "[Senator 1] is on Armed Services.  I am sure he will ask me about proposed $952
million arms sales to Pakistan which will now have to go to Congress to be approved.  You have
talking points?"  Exhibit 7.

That same day, the defendant sent Person 1 the talking points "as promised" from the defendant's personal email account.  Exhibit 8 (produced by the defendant).  The talking points consisted of a position paper the defendant wrote for the State Department that had not been approved for public release.  *Id.*  The talking points portrayed Pakistan in a positive light with respect to its cooperation against terrorism and expressed support for the sale of military helicopters and associated equipment to Pakistan at an estimated cost of $952 million.  *Id.*  The defendant told Person 1 that the argument presented was what he intended to convey in the previously attempted meetings with members of Congress, saying, "This is what I would say if giving the brief."  *Id.*  The defendant acknowledged his violation of State Department policy by releasing the talking points to Person 1.  The position paper noted that one matter discussed was "not a topic we can discuss publicly."  *Id.*  The defendant told Person 1 to "not hand these over" because the position paper had "not yet been cleared," or approved, for public release.  *Id.*

On April 10, 2015, after receiving the talking points, Person 1 reported back to the defendant that he had a three-hour lunch with Senator 1 in which they discussed drone sales to the governments of the UAE and Saudi Arabia, "[n]ever to leave Pakistan off the table."  Exhibit 9 (produced by the defendant).  Person 1 told the defendant that he would use the talking points in his discussions with Congressperson 1 the next day.  Exhibit 8 (produced by the defendant).  Person 1 also reported to a member of the defendant's staff his progress with Senator 1 saying, "[Drone Manufacturer 1] sales to UAE are in the process of being approved. We are working on other countries for the drones and surveillance equipment."  Exhibit 10.

On April 25, 2015, Person 1 forwarded a report of his lobbying efforts to the defendant and Pakistan's Ambassador to the United States.  Person 1 reported that he had hosted a lunch with several members of Congress, that drone strikes in Pakistan were major topic of discussion,

that "we are big advocates of drones especially [named drone] because of our relationship to owners of [Drone Manufacturer 1] (maker of [named drone])," and that Pakistan should expand its military "ask."  Exhibit 11.  On September 21, 2015, in response to a request from Person 1 that the defendant recommend members of Congress for a dinner he was planning in which Pakistan would be a topic of discussion, the defendant recommended that Person 1 choose Congressperson 1 and another member of Congress because "they are fierce critics" and, as Person 1 put it, "advocate[s] of cutting aid to Pakistan."  Exhibit 12 (produced by the defendant).

On December 16, 2015, the defendant testified before a joint session of the House Foreign Affairs Committee and the Senate Foreign Relations Committee.  During that hearing, the defendant argued, notwithstanding bipartisan objections from members of Congress, that Pakistan had made progress with respect to counterterrorism activities and that Congress should approve additional military sales to Pakistan.  Exhibit 13 (produced by the defendant); The Future of U.S.-Pakistan Relations, Hearing Before the H. Comm. on Foreign Affairs, 114th Cong. 4-11, at 10, 12 (Dec. 16, 2015) (Exhibit 54).

    2.    Person 1 Provided Contemporaneous Inducements and Rewards to the Defendant

    *a.*    *The $300,000 Per Year Job*

On January 15, 2015, the defendant met with Person 1 in Los Angeles and discussed the possibility that the defendant might work for Person 1's business associate, Businessperson 2, a citizen of Bahrain who operated an investment company ("Foreign Company 1").  On January 20, 2015, Person 1 told the defendant he "spoke to [Businessperson 2] about you" and began arranging for the defendant to meet with Businessperson 2 for the purposes of facilitating an employment offer for the defendant.  Exhibit 14 (produced by the defendant); Exhibit 15

(produced by the defendant).  On January 23, 2015, the defendant agreed to meet Person 1 and Businessperson 2 in London on January 31.  *Id.*

On January 27, 2015, Person 1 procured the defendant's first-class airfare from New Mexico, via Los Angeles, to London.  Person 1 paid for the trip with a combination of credit card expenditures and approximately 330,000 frequent flyer miles.  Exhibit 16.  In total, the airfare was worth approximately $18,829.  Person 1 paid for his and the defendant's stay at a luxury hotel in London at a combined cost of approximately $2,298.  Person 1 also paid for dinner in London for the defendant, Businessperson 2, Person 1, and two other individuals at a cost of approximately $589.  Exhibit 17.

On February 4, 2015, Person 1 provided the defendant with the terms of a one-year contract with Foreign Company 1, commencing on July 1, 2015, that included compensation of $300,000 per year, a 1% fee for business developed, and compensated expenses.  Exhibit 18 (produced by the defendant).  On February 8, 2015, Person 1 told the defendant that Businessperson 2 was waiting for the defendant's decision.  Exhibit 19 (produced by the defendant).  The defendant then sent an email to Businessperson 2 stating that he was "very interested in the position with [Foreign Company 1] and would like to clarify a few points with you."  Exhibit 20.  The defendant proposed terms identical to those provided by Person 1 just days earlier and referred to Businessperson 2's offer of a position on the advisory board of Foreign Company 1.  *Id.*  On February 19, 2015, Foreign Company 1 offered the same terms of employment to the defendant as those set forth by Person 1 and as requested by the defendant. Exhibit 21.

The defendant recused himself from matters involving Foreign Company 1 and Businessperson 2, an entity and individual with whom he had no professional interactions.  He

failed to recuse himself from matters involving Person 1, a person with whom he had an ongoing business relationship.  Exhibit 22; Exhibit 23 (produced by the defendant).[1]

b.      The $25,000 Paid to the Defendant's Girlfriend

On June 3, 2015, in response to a Person 1 invitation that the defendant attend a member of Congress's birthday celebration, the defendant responded, "They wouldn't want me for a variety of reasons, starting with the fact that I am poor."  Exhibit 24 at 4.  On June 14, 2015, the defendant told Person 1 about his girlfriend and her desire to attend an identified graduate school program and obtain financial support.  Exhibit 25 (produced by the defendant).  Despite never having met the defendant's girlfriend, on June 21, 2015, Person 1 told the defendant that "I will offer her $25,000 grant and $50,000 loan to be paid back after she graduates.  Will this work for her?"  The defendant responded, "It is a very generous offer, and she should take it."  *Id.*[2]  On June 24, 2015, Person 1 purchased a business-class flight for the defendant's girlfriend from Pakistan to the United Kingdom at a cost of $1,213.91.  Exhibit 26.  On June 30, 2015, Person 1 and the defendant's girlfriend met for the first time.

The defendant kept tabs on Person 1's offered help.  On July 1, 2015, the defendant emailed the defendant's girlfriend for a status report on her meeting with Person 1, saying, "Has it occurred to you that it might be in your interest to give me a readout of your meeting, since the

---

[1] Olson's failure to do so violated the government ethics provisions of 5 C.F.R. § 2635.502(a) and (a)(2), which prohibit an official from participating in a matter involving a person with whom he has a business, contractual or other financial relationship that involves other than a routine consumer transaction and the circumstances would cause a reasonable person to question the official's impartiality.  Olson was aware of these recusal requirements.  *See* Exhibit 56.

[2] Olson's solicitation of the gift violated the ethics provisions of 5 C.F.R. § 2635.202(a) which prohibit government employees from soliciting any gift (regardless to whom it is sent) from any person seeking official action from, doing business with, or conducting activities regulated by the employee's agency, or from any person whose interests could be substantially affected by the performance or nonperformance of the employee's duties.  It also prohibits also prohibits the solicitation of a gift given because of the official's position.

principal is likely, in fact has, reached out to me?"  Exhibit 27 (produced by the defendant).

Later that same day, Person 1 sent an email to the defendant's girlfriend memorializing what

Person 1 agreed to provide at the meeting: "Grant of $25,000 going directly to [University] . . .

Help you get loan of $50,000 from US bank when you are in school or NYC . . . I can show

proof of funds to [University] for you to start the school."  Exhibit 28.  Person 1 forwarded this

communication to the defendant, who responded, "Many thanks."  Exhibit 29 (produced by the

defendant).  On August 6, 2015, Person 1 paid for the defendant's girlfriend's flight to New

York to begin her studies.  Exhibit 30.  On August 9, 2015, the defendant's girlfriend expressed

her gratitude to the defendant: "I am going to [University]! Yay! Happy dance 😊 All thanks to

you Olson! . . . 😊😊x"  Exhibit 31 (produced by the defendant).

On September 10, 2015, Person 1 issued two checks, one for $20,000 payable to the

defendant's girlfriend's University and one for $5,000 payable to the defendant's girlfriend.

Exhibit 32.  On September 22, 2015, Person 1 forwarded a bank statement to the defendant's

girlfriend showing that the $20,000 check had been deposited into the University's account for

the defendant's girlfriend and said, "I was told both your checks were cashed. Hope you are

learning lot at [University]."  Exhibit 33 (produced by the defendant).  Person 1 then forwarded

this same email to the defendant along with the message, "My job is done."  The defendant

responded, "Once again, you are very generous."  *Id.*

        *c.*    *The Limousine Service*

Person 1 continued to convey favors to the defendant up until his retirement.  From

February 26 to February 28, 2016, at Person 1's invitation, the defendant traveled to Los Angeles

to be the keynote speaker at a dinner sponsored by a non-profit organization formed to address

concerns of Pakistani Americans.  The defendant obtained State Department authorization to pay for the trip.

Person 1 provided the defendant with the use of a limousine driver during his stay in Los Angeles that was billed to Person 1 at a cost of $467.50 and for which Person 1 paid the vendor $400.  Exhibit 35; Exhibit 36.  On his final financial disclosure form prepared upon his retirement in November 2016, the defendant did not disclose, as required, this gift.  Exhibit 37. The defendant did, however, disclose another gift on this form valued at $100.  *Id.*

### d.    *Employment with Person 1*

Other than the $300,000-per-year job offer from Foreign Company 1, the defendant received no other job offers prior to his retirement from government service on November 30, 2016.  The defendant did not accept the employment offer or board membership from Foreign Company 1.  However, either shortly before or shortly after his retirement, the defendant did accept a contracting relationship with Person 1's company at a rate of $20,000 per month ($240,000 per year).  Exhibit 34; Exhibit 38.  The defendant also agreed to accept a position on the board of Foreign Company 1's successor, Foreign Company 2, that would increase his compensation, although no final agreement was signed.  Exhibit 39 (produced by the defendant); Exhibit 40.

### B.    *The Defendant's False Statements and Concealment*

#### 1.    The Defendant Concealed the Job Offer from the State Department

As a public filer, the defendant was required to report to the State Department within three business days that he had engaged in negotiations for future employment.  The defendant failed to do so.  On February 19, 2015, prompted by a February 17 email from his chief of staff who inquired as to whether the defendant saw any "red flags" with respect to extending an

invitation for Businessperson 2 and others to attend a conference in Pakistan, Exhibit 41, the defendant provided written notice to the U.S. Embassy's Deputy Chief of Mission that he had discussed employment with Foreign Company 1 and stated that he should recuse himself from matters involving Businessperson 2 or Foreign Company 1.  Exhibit 22, Exhibit 23 (produced by the defendant).  The defendant's notice represented that he had received no specific job offer from Businessperson 2 or Foreign Company 1.  Exhibit 23 (produced by the defendant).  That same day, Foreign Company 1 formally offered the terms of the employment agreement to the defendant in conformance with those set forth by Person 1 and requested by the defendant. Exhibit 21.  The defendant did not amend his recusal notice.

Despite duties to disclose pursuant to the Code of Federal Regulations, his written promise to recuse himself from matters in which reasonable persons would question his impartiality, and his statement that no formal job offer had been extended to him, the defendant failed to file a recusal notice with respect to Person 1 or disclose to the State Department Person 1's central involvement in arranging the job offer.  In particular, the defendant failed to disclose: (1) Person 1's procurement of airfare and lodging worth over $19,000 in connection with the defendant's job interview with Foreign Company 1; (2) Person 1's participation in negotiations with respect to the defendant's future employment with Foreign Company 1; and (3) Person 1's procurement of a $300,000-per-year job offer for the defendant from Foreign Company 1.

2.      The Defendant Filed Two False OGE Forms

On May 12, 2016, as charged in Count One, the defendant falsely certified on his Office of Government Ethics (OGE) Form 278 financial disclosure that his answers were true, when in fact he concealed over $19,000 in travel benefits received from Person 1.  Exhibit 42.  On December 1, 2016, the defendant falsely certified on his OGE Form 278 that his answers were

true, when in fact he concealed Person 1's gift of limousine rides worth at least $400 in connection with a speaking engagement in Los Angeles.  Exhibit 37.  The defendant did disclose a gift of $100 from another source.  *Id.*

> 3. The Defendant Lied to the FBI About His Relationship with Person 1 While He Was in Office

On July 17, 2019, in a voluntary interview with the FBI, the defendant concealed information related to benefits he received from Person 1 by making several false statements. First, the defendant falsely stated that Businessperson 2 paid for the defendant's January 2015 travel to London.  Exhibit 43 at 10.  In fact, Person 1 paid for the travel.  Second, the defendant falsely stated that he received no specific job offer from Businessperson 2's company, Foreign Company 1, saying, "we had a conversation in London about . . . possibilities for post-employment.  There was never a specific job offer.  There was never anything."  *Id.* at 13.  In fact, Foreign Company 1 had formally offered the defendant a job paying $300,000 per year. Third, the defendant falsely stated that he had "no idea" how Person 1 helped finance the defendant's girlfriend's tuition.  *Id.* at 29.  In fact, Person 1 forwarded to the defendant a bank statement showing that Person 1's $20,000 check had been deposited into the University's account for the defendant's girlfriend and Person 1 told the defendant that both checks he issued had been cashed.

In the same FBI interview, the defendant also concealed information related to the nature of his relationship with Person 1 by making additional false statements.  First, the defendant falsely stated that he had no knowledge of Person 1's business interests in military sales to foreign governments they discussed, claiming, "I had no reason to believe that [Person 1] had any business interests in any of these [military] deals" and that his understanding was that Person 1's interest in the sales was merely for "general information."  *Id.* at 21.  In fact, the defendant

was aware that Person 1 was engaged in the business of brokering military sales between Drone Manufacturer 1 and foreign governments.  Second, the defendant falsely stated that he and Person 1 only engaged in general-interest political discussions and "political gossip," that there "was no business relationship" between the two, and that he could not recall any "ask" from Person 1.  *Id.* at 17.  In fact, the defendant agreed to assist Person 1's business efforts in lobbying members of Congress and provided Person 1 with talking points to promote weapon sales to foreign governments in response to a request from Person 1.  Third, after FBI agents handed the defendant a copy of the talking points, the defendant falsely stated that that "whatever information I shared with [Person 1] . . . I would share with anyone.  I mean these were public[.]"  *Id.* at 22.  In fact, the talking points the defendant shared with Person 1 had not been cleared for public distribution.

On December 17, 2019, in a second voluntary interview with the FBI, the defendant again concealed information related to benefits he received from Person 1 by falsely stating that he was uncertain who paid for the defendant's January 2015 travel to London but claiming that Person 1 did not pay for any trips while the defendant was employed by the State Department. In fact, Person 1 paid for the defendant's travel and lodging in connection with the January 2015 travel to London.

4.    The Defendant Lied to the FBI About His Relationship with Person 1 After the Defendant's Retirement

On July 17, 2019, in his initial interview with the FBI, the defendant also concealed information related to his business relationship with Person 1 after the defendant's retirement by falsely stating, "I don't know much about [Person 1's] actual business operations because he has me advising him on, sort of, broadly speaking government relations, sort of strategic, ah, aspects of business."  *Id.* at 15.  In fact, the defendant participated in Person 1's business operations with

respect to lobbying campaigns (1) to procure preclearance facilities for Qatar by participating in

the drafting of a lobbying proposal submitted to the Qatari government and (2) to modify U.S.

policy with respect to the Gulf Diplomatic Crisis by recruiting a retired General to join in the

effort and by meeting with the Emir of Qatar, other high-ranking Qatari officials, and members

of Congress.

> 5.   The Defendant Destroyed Incriminating Emails Relevant to
>       the Qatar Investigation

The government's investigation of the lobbying effort by Person 1, the defendant, and

others on behalf of the Qatari Government to end a blockade imposed by its neighbors is

partially set forth in the criminal information and in the defendant's plea agreement.  Information

at 7-9; Plea Agreement at 8-9.

The defendant became aware that Person 1 was under criminal investigation with respect

to Qatar in February 2019.  News of a federal criminal investigation of Person 1 was publicly

revealed in multiple news articles on February 4 and 5, 2019.[3]  On February 5, the defendant

received a request for interview from a reporter about Person 1.  The reporter said that Person 1

and his company were "in news today" and that he saw that the defendant spoke on their behalf

at a "Qatar-Pakistan event in Doha."  The defendant forwarded the request to Person 1 saying

that he was not responding to the inquiry.  Exhibit 44.  The defendant then sent Person 1 a

WhatsApp messages at 3:50 pm on January 5, stating, "please call me when you get a chance."

Exhibit 45.  On April 17, 2019, the Wall Street Journal published an article that described how "a

---

[3] *See, e.g.*, Rebecca Ballhaus and Rebecca Davis O'Brien, *Trump Inaugural Committee is Subpoenaed for Documents*, THE WALL STREET JOURNAL, Feb. 4, 2019, https://www.wsj.com/articles/lawyers-for-trump-inaugural-committee-receive-subpoena-for-documents-11549325383; Jim Mustian and Chad Day, *White House: Hysteria over Trump presidency spurred subpoena*, ASSOCIATED PRESS, Feb. 5, 2019, https://apnews.com/article/north-america-donald-trump-ap-top-news-subpoenas-politics-fdd1352f61414d49b6a2307c5aff66f5.

different team of federal investigators in Los Angeles have asked [Person 1]'s associates for records concerning his business entities and work with other nations" including "Pakistan, Sri Lanka, Qatar, and Turkey."[4]  The article went on to focus on Person 1's work to hire lobbyists for the Qatar government during the time of the diplomatic crisis.

On July 17, 2019, the FBI served the defendant with legal process seeking a variety of documents, including those relating to Person 1 and his company during the Qatar lobbying effort.  Exhibit 46.  In response, the defendant failed to produce incriminating email messages from his work and personal email accounts that pertained to the Qatar lobbying effort that the government later obtained from other sources.  Search warrants for the defendant's email accounts reveal that the missing emails no longer exist on the providers' servers.

6.     The Defendant Encouraged Person 1 to Conceal the Qatar Lobbying Effort

On or about July 16, 2020, Person 1 contacted the defendant and forwarded him a copy of a prior email authored by a retired U.S. General ("the General") in June 2017 in which the General acknowledged and thanked Person 1 "for facilitating what I think were very important talks with the Qataris.  They couldn't have taken place without your leadership."  Exhibit 47.

The defendant's response to Person 1's July 16 email shows an attempt by the defendant to conceal their joint efforts on behalf of Qatar in connection with the diplomatic crisis—conduct which the defendant has since admitted in pleading guilty.  In July 2020, however, the defendant tried to characterize their work as having been related to non-restricted activity related to the creation of a military advisory board ("MAB") for Qatar's armed forces.  On July 20, 2020, the

---

[4] Byron Tau, *Trump Donor Faces a Second Federal Probe*, THE WALL STREET JOURNAL, Apr. 17, 2019, https://www.wsj.com/articles/trump-donor-faces-a-second-federal-probe-11555523022.

defendant suggested to Person 1 that they coordinate their stories to present a false portrayal of

events, stating,

> Imaad: I'm puzzled by the message you sent me last week. I've reviewed
> my records (including notes I took at the time) and they do not accord with
> your recollections:
>
> • We had been discussing a Qatari defense project in the spring of 2017
>   (April & May).
>
> • After the announcement of the blockade (5 June), you asked me if I
>   knew any generals who might be interested in helping the effort. I
>   suggested [the General].
>
> • On 6 June I introduced you by email to [the General].
>
> • We traveled to Doha 9-11 June.
>
> • We continued working on the defense project through the summer,
>   although at some point [the General] dropped out.
>
> • I did not have any interaction with [the National Security Advisor]. I
>   met him once, socially, I believe on 27 September 2017, but never
>   discussed Qatar with him.
>
> I suggest you review your chronology of events in light of the above. Let
> me know if I can help.

*Id.*  In addition to supporting an enhancement for obstruction of justice as to Count Two, the

defendant's suggestion to Person 1 that they adopt a false cover story amid a government

investigation should be considered by the court at sentencing.  *See* 18 U.S.C. § 3553(a)(1).

**The Defendant's Objections to Sentencing Guidelines Provisions**

> ### A.  *The Job the Defendant Sought Was a Thing of Value*
> ### *Under 18 U.S.C. § 201(c)(1)(B)*

The defendant claims that his pursuit and receipt of a $300,000 job offer from Foreign

Company 1 was not a gratuity because he did not accept the job offer.  PSR at 43, 47.  However,

the gratuity statute states that anyone who

> being a public official, former public official, or person selected to be a
> public official, otherwise than as provided by law for the proper discharge
> of official duty, directly or indirectly demands, **seeks**, receives, accepts, or
> agrees to receive or accept anything of value personally for or because of
> any official act performed or to be performed by such official or person

has violated the statute.  18 U.S.C. § 201(c)(1)(B) (emphasis added).  "The phrase 'anything of

value' has been interpreted broadly to carry out the congressional purpose of punishing the abuse

of public office." *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014) (quoting *United

States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983)).  "Thus, 'thing of value' is defined broadly

to include 'the value which the defendant subjectively attaches to the items received.'"  *Id.*

(quoting *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986)).  A job qualifies as a

thing of value because it entails the receipt of money.  *See, e.g.*, *United States v. Skelos*, 988 F.3d

645, 650 (2d Cir. 2021) (affirming convictions for bribery and gratuities based on provision of

employment, among other things of value).  As the statute makes clear, it is not necessary that

the public official actually accept the thing of value—the statute is violated simply by seeking a

thing of value for or because of an official act.

However, the statute also requires a link between the thing of value and an official act by

the public official.  *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 414

(1999).  In this case, the government does not believe that there is a sufficient nexus between (1)

the defendant's agreement to advocate to Congress to support military sales to Pakistan or the

defendant's provision of non-public talking points to Person 1 and (2) Person 1's provision of

$25,000 to the defendant's girlfriend or Person 1's facilitation of the Foreign Company 1 job

offer for the defendant to support a gratuities charge.  Accordingly, the government believes the

court should consider these facts under § 3553(a).  *See* PSR at 45.

**B.      *The Defendant Served in a High-Level Decision-Making or Sensitive Position – U.S.S.G. § 2C1.2(b)(3)***

Defendant objects to the application of a four-level enhancement under U.S.S.G. § 2C1.2(b)(3) for serving in a, asserting, "the cross-reference does not apply and, assuming it did apply, none of the conduct that the Government alleges occurred while defendant the defendant was in the government (with respect to the alleged gratuities) is relevant conduct to his post-government lobbying working."  PSR at 47.

The advisory committee notes to § 2C1.2 define a "high-level decision-making or sensitive position" to mean "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process."  U.S.S.G. § 2C1.2  app. n.3(A).  In this case, the gratuities received by the defendant were received while the defendant was serving as Ambassador to Pakistan, which plainly qualifies as a high-level decision-making or sensitive position under the above definition.  *See, e.g.*, *United States v. Richards*, 674 F.3d 215, 224 (3d Cir. 2012) (upholding application of enhancement to county government's director of human resources); *United States v. Palmieri*, 681 F. App'x 130, 133 (3d Cir. 2017) (upholding application to director of division of facilities management for county government). Accordingly, if the court finds that the probation officer correctly applied the cross-reference to U.S.S.G. § 2C1.2, the enhancement for a public official serving in a high-level decision-making or sensitive position would apply.

C.      **The Defendant Obstructed Justice – U.S.S.G. § 3C1.1**

    1.      The Defendant Obstructed Justice as to Count One by Lying
        to the FBI During His Interviews

The defendant objects to the PSR's enhancement for obstruction of justice as to Count

One.  PSR at 46.  However, the enhancement is justified because the defendant misled the FBI

with respect to several material facts during his interviews in July and December 2019.  The FBI

interviewed the defendant in the course of investigating Person 1's attempts to influence U.S.

government officials on behalf of foreign clients.  Given that the defendant had a well-

documented relationship with Person 1 while in office and worked for him after leaving the

government, the defendant's relationship with Person 1 was central to the FBI's investigation.

However, the defendant made numerous false statements to the FBI, all of which were intended

to distance the defendant from Person 1.  Under these facts, an enhancement for obstruction of

justice is warranted.  *See* U.S.S.G. § 3C1.1 app. n.4(G) (noting that enhancement for obstruction

of justice should be applied for "providing a materially false statement to a law enforcement

officer that significantly obstructed or impeded the official investigation or prosecution of the

instant offense").

Probation has detailed five false statements that served to further the defendant's

concealment.  As described below, each of these false statements obstructed and impeded the

government's investigation by preventing the FBI from gaining an accurate picture of the

defendant's relationship with Person 1, which was what the FBI hoped to gain by interviewing

the defendant.  Truthful statements by the defendant would have eliminated the need for the FBI

to take further investigative steps over the following two and a half years, including subsequent

interviews of the defendant during which he was confronted with evidence of these false

statements.  Taken as a whole, the defendant's false statements to the FBI demonstrate his

concerted attempt to mislead investigators regarding his financial relationship with Person 1 while serving in the U.S. government—the same illicit motivation that yielded the false statement charged in Count One.

        *a.*     *False Statement: Businessperson 2 Paid for the Defendant's Travel to and Lodging in London.*

Three separate times in his objections to the presentence report, the defendant claims that he did not know who paid for his travel to London.  *See* PSR at 42 ("[D]efendant Olson believed the costs were being paid by Foreign Company 1, as Person 1 had told defendant Olson."); *id.* at 44 ("This Paragraph asserts the defendant knew Person 1 paid for the travel, which he did not."); *id.* ("The defendant had no knowledge that Person 1 paid for the London travel, except what Person 1 told him.").  In truth, however, documentary evidence establishes that the defendant did know that Person 1 paid for the flight.  On January 27, 2015, Person 1 emailed the defendant with two routing options for the flight to London, telling the defendant, "we will get tickets issued."  Exhibit 48 (produced by the defendant).  Two days later, Person 1 emailed the defendant to notify him that he sent the defendant both the New Mexico to LAX and LAX to London tickets.  Exhibit 49 (produced by the defendant).

Notably, the defendant does not claim to have believed that Businessperson 2 paid for the $589 dinner that the defendant, Person 1, Businessperson 2, and two others shared on January 31, 2015, during the defendant's visit to London.  Exhibit 50 (produced by the defendant); Exhibit 17.  Given that the defendant disclosed a $100 gift from another party on his OGE Form 278, the defendant surely realized that his portion of this dinner was reportable.

In addition to obfuscating his relationship with Person 1, this false statement served to conceal that the defendant knowingly made false statements on his OGE form.  If the defendant

had told the FBI that he knew Person 1 paid for his travel, lodging, and dinner, the FBI would have realized that the defendant knowingly lied on his OGE form.

<em>b.</em>      <em>False Statement: The Defendant Did Not Receive a Specific Job Offer from Businessperson 2's Company.</em>

The defendant claims that he "had no reason to recall specifics of the job offer, because he was fairly dismissive of the opportunity from the beginning[.]"  PSR at 44.  In truth, the defendant was not dismissive of the job offer, which was the only job offer he received.  On February 4, 2015, Person 1 told the defendant the details of the job offer, which included a yearly salary of $300,000, a 1% commission for fundraising or closing a transaction, and any expenses incurred while working for Foreign Company 1.  Exhibit 18 (produced by the defendant).  Four days later, the defendant emailed Businessperson 2, stating that he was "very interested in the position with [Foreign Company 1] and would like to clarify a few points with you."  Exhibit 20.  The defendant then asked Businessperson 2 to confirm what he had been told by Person 1, asking, "Would you be willing to offer $300,000 per annum? . . . You mentioned the possibility of bonuses.  I would like to propose an arrangement under which I receive 1 % for any transactions that I close, and 1 % for any funds that I raise[.]"  *Id.*

On February 19, 2015, Businessperson 2 forwarded the defendant an email from an attorney setting forth the terms of the contract as requested by the defendant and explaining that the defendant's primary role would be "leveraging your unique relationships in the US and the UAE in terms of positioning [Foreign Company 1] in respect of both private and public sectors."  Exhibit 51 (produced by the defendant).  Businessperson 2 noted that the defendant would be expected to devote 28 days to Foreign Company 1 per year in exchange for his $300,000 salary plus commissions.  On February 23, 2015, the defendant told Businessperson 2 that he would get back to him, stating that ethics regulations require that the defendant share with Businessperson

2 his recusal, which the defendant attached.  Exhibit 52 (produced by the defendant).  Although

the defendant had received an offer, his U.S. State Department recusal for Foreign Company 1

still represented that no offer had been extended.  *Id.*  Especially given this lengthy exchange, it

is not possible that the defendant forgot the only job offer he received.

> c.  *False Statement: The Defendant Did Not Know How Person 1
> Paid for the Defendant's Girlfriend's Graduate School Tuition.*

As detailed above, the defendant knew how Person 1 had provided $25,000 to the

defendant's girlfriend.  Despite never having met her, on June 21, 2015, Person 1 told the

defendant, "I will offer her $25,000 grant and $50,000 loan to be paid back after she graduates.

Will this work for her?"  On July 1, 2015, Person 1 sent her an email describing how he would

help her pay for graduate school.  Exhibit 28.  Person 1 forwarded this communication to the

defendant, and he responded, "Many thanks."  Exhibit 29 (produced by the defendant).  On

September 10, 2015, Person 1 issued two checks, one for $20,000 payable to the university and

one for $5,000 payable to the defendant's girlfriend.  Exhibit 32.  On September 22, 2015,

Person 1 forwarded a bank statement to the defendant's girlfriend showing that the $20,000

check had been deposited into the university's account for the defendant's girlfriend and said, "I

was told both your checks were cashed."  Exhibit 33 (produced by the defendant).  Person 1

likewise forwarded this email to the defendant, stating, "My job is done."  The defendant

responded, "Once again, you are very generous."  *Id.*

Like the other false statements described above, the defendant falsely told the FBI that he

did not know how Person 1 provided money to the defendant's girlfriend because he wanted to

falsely portray himself as uninvolved.  In fact, as these emails make clear, the defendant was

very much involved and aware of the payments, which Person 1 made as a way to covertly

provide benefits to the defendant.

        *d.*      *False Statement: The Defendant Did Not Know About Person 1's Business Interest in Military Sales to Pakistan.*

In his objections to the presentence report, the defendant claims, "[t]he Government's assertion that defendant Olson supported Person 1's schemes for military sales to Pakistan is completely absurd." PSR at 43.

The evidence detailed above, however, requires this conclusion. On February 24, 2015, Person 1 emailed the defendant and others that the Vice Chairman of Drone Manufacturer 1 has a deal in the works to sell military drones to the UAE, noting that he believes that "Kuwait, Saudi, and other countries could be doable." Exhibit 3 (produced by the defendant). On March 18 and 19, 2015, Person 1 arranged meetings between the defendant and members of Congress to discuss drone sales to Pakistan, warning the defendant that they might not be receptive to his stance in favor of drone sales. Exhibit 5 (produced by the defendant). On April 12, 2017, Person 1 emailed the defendant that he is engaged in discussions with the Vice Chairman of Drone Manufacturer 1 regarding drone sales to Saudi Arabia. Exhibit 53 (produced by the defendant). And on April 25, 2015, Person 1 emailed the defendant and Pakistan's Ambassador to the United States, stating that he had hosted a lunch with several members of Congress, that drone strikes in Pakistan were major topic of discussion, and that "we are big advocates of drones especially [named drone] because of our relationship to owners of [Drone Manufacturer 1] (maker of [named drone]), and that Pakistan should expand its military "ask." Exhibit 11. These emails make clear that the defendant knew Person 1 was not promoting drone sales in an effort to help Pakistan specifically; he had a relationship with a drone manufacturer and was simultaneously attempting to broker drone sales to numerous other countries.

The defendant's motive to mislead the FBI on this point is obvious. As detailed above, at Person 1's request, the defendant openly lobbied members of Congress to approve the sale of

military hardware to Pakistan, provided uncleared talking points to Person 1 for his use in doing the same, and testified before the HFAC and SFRC in support of military sales to Pakistan. Exhibit 4; Exhibit 8 (produced by the defendant); Exhibit 13 (produced by the defendant); Hearing Before the H. Comm. on Foreign Affairs (Exhibit 54).  Allowing the FBI to learn that the defendant was acting to advance Person 1's business interests would naturally prompt the FBI to investigate whether the defendant was receiving benefits from Person 1, which he was.

e.  *False Statement: The Talking Points that the Defendant Provided to Person 1 Consisted of Public Information.*

Finally, in his objections, the defendant claims that the talking points he provided Person 1 "consisted of publicly available information on the State Department's position as to Pakistan[.]"  This claim is inconsistent with the defendant's own statements in the talking points that they discuss a matter that was "not a topic we can discuss publicly."  Exhibit 8 (produced by the defendant).  The defendant's argument is also belied by his own request that Person 1 "not hand these over" because the position paper had "not yet been cleared" for public release.  *Id.* The defendant's false denial of having provided Person 1 nonpublic information prevented the FBI from understanding of the full scope of Person 1's political activities and relationship with the defendant.

2.  The Defendant Obstructed Justice as to Count Two by Deleting Emails and Encouraging Person 1 to Adopt a False Cover Story

Defendant does not appear to object to an obstruction-of-justice enhancement as to Count Two.  *See* PSR at 46.  As detailed in paragraph 185 of the presentence report, the defendant deleted incriminating emails relevant to the government's investigation after he learned about the investigation.  This fact alone is sufficient to support the PSR's enhancement for obstruction of justice as to Count Two.  *See* U.S.S.G. § 3C1.1 app. n.4(D) (noting that enhancement for

25

obstruction of justice should be applied for "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so").

The enhancement is also supported by the defendant's creation of the false July 2020 email discussed above, in which the defendant offered a false cover story for his and Person 1's Qatar-related activities in July 2017—claiming that these activities related solely to the military advisement board, not to aiding and advising Qatar during the diplomatic crisis—and urged Person 1 to adopt the same false story. Exhibit 47. *See* U.S.S.G. § 3C1.1 app. n.4(C) (noting that enhancement for obstruction of justice should be applied for "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding").

**The Defendant's History and Characteristics – 18 U.S.C. § 3553(a)(1)**

### A.   *The Defendant's History of Accepting Unethical Gifts*

As the factual narrative above makes clear, the legal violations detailed in Counts One and Two were not isolated incidents—the defendant has demonstrated a willingness to use his public office for private gain on other occasions as well. For example, as discussed above, at the defendant's prompting, Person 1 gave the defendant's girlfriend $5,000 in cash and $20,000 for graduate school. Rather than objecting to these gifts or recusing himself from matters involving Person 1, the defendant merely said, "Many thanks," called Person 1 "very generous," and continued working with him. Exhibit 29 (produced by the defendant); Exhibit 33 (produced by the defendant).

26

However, this was not the first time that the defendant accepted an inappropriate gift purportedly given to another. While serving as the head of the U.S. consulate in Dubai in the early 2000s, the ruler of Dubai sent $60,000 worth of jewelry to the defendant's then-mother-in-law, who lived with the defendant and cared for his children while his then-wife was in the United States. PSR at ¶ 189; Exhibit 55. Specifically, a pendant, a set of earrings, and a ring—a total of four diamonds set in white gold in a velvet presentation box—were delivered to the defendant's office at the U.S. consulate. *Id.* Rather than returning the diamond jewelry or delivering it to the U.S. government, the defendant gave it to his then-mother-in-law, stating, "You will not believe what [the Ruler of Dubai] has sent you." *Id.*

As any public servant would immediately realize, such gifts are wrong and create obvious conflicts of interest and the appearance of corruption. The fact that the defendant was willing to accept them—and, in the case of his relationship with Person 1, to lie to conceal them—shows the defendant's longstanding willingness to make ethical compromises when doing so would benefit him financially. *See* § 3553(a)(1) (directing the Court to consider "the history and characteristics of the defendant").

### B. The Defendant Has Not Demonstrated Remorse for His Offenses

A sentencing court may consider a defendant's lack of remorse as a § 3553(a) factor. *See United States v. Reed*, 522 F.3d 354, 363 (D.C. Cir. 2008) (affirming sentence where district court considered defendant's lack of remorse as part of his history and characteristics at sentencing); *see also United States v. Sweat*, 573 F. App'x 292, 298 (4th Cir. 2014) ("[L]ack of remorse is a fact that a district court can consider in its evaluation of the § 3553(a) factors."); *United States v. Mitchell*, 681 F.3d 867, 884–85 (6th Cir. 2012) (affirming within-guidelines sentence in bribery case where district court considered the defendant's lack of remorse for his

crimes); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236–37 (1st Cir. 2008) (rejecting

argument that including lack of remorse in section 3553 analysis was unfair "double counting"

where court also denied downward offense level adjustment for acceptance of responsibility);

*United States v. Smith*, 424 F.3d 992, 1016-17 (9th Cir. 2005) (affirming district court's above-

guidelines sentence in a fraud case based in part on defendant's lack of remorse).

Here, the defendant has steadfastly refused to admit wrongdoing.  In his objections to the

presentence report, the defendant has made unsupported claims of innocence that contradict the

sworn admissions he made in the plea agreement and under penalty of perjury at the plea

hearing, including the admissions that provide the basis for Counts One and Two.  *See* Plea

Agreement at ¶ 31.  As detailed below, however, each of defendant's claims is contradicted both

by documentary evidence and the defendant's sworn statements.

    1.    Count One: Making a False Writing

The defendant repeatedly claims that he had no motive to conceal the benefits he received

from Person 1, implying that his failure to disclose these things of value on the OGE form was

unintentional.  *See, e.g.*, PSR at 42 (claiming that the defendant's recusal notice regarding

Foreign Company 1 "is evident [sic] the defendant had no need to hide anything from the

government.").  In so doing, the defendant suggests that he lacked the criminal intent necessary

for a conviction under Count One.

Contrary to his suggestion, the defendant's omissions were intentional.  The defendant

had an obvious motive to conceal his relationship with and receipt of benefits from Person 1.  As

detailed above, the defendant was openly doing favors for Person 1 while serving as Ambassador

and later as Special Representative.  If the defendant had disclosed that Person 1 had given him

over $18,000 worth of travel, lodging, and meals, the conflict of interest would have been

obvious.  It also would have drawn attention to the fact that the defendant had not recused himself from matters involved Person 1.

The false statements on the OGE form furthered the defendant's concealment of his relationship with Person 1.  Lying to the FBI did the same.  The defendant's disclosure and recusal concerning Foreign Company 1 did nothing to highlight his conflicts of interest because the defendant had no relationship with Foreign Company 1 and had not been promoting Foreign Company 1's business interests.

In addition, the defendant's recent claims contradict his admissions in the plea agreement underlying Count 1.  There, the defendant acknowledged that he "knowingly and willfully" failed to disclose these payments:

> On May 12, 2016, defendant electronically signed and submitted his annual OGE Form 278 for the 2015 calendar year, in which he certified his answers were "true, complete and correct to the best of my knowledge." In this OGE Form 278, defendant knowingly and willfully failed to disclose, as required, the travel benefits he received, namely, the roundtrip airfare between New Mexico and London and the lodging in London collectively worth over $19,000.

Plea Agreement at 7.  The defendant's attempt to distance himself from his admissions in the plea agreement and at the plea hearing demonstrates a lack of remorse for his criminal conduct and an attempt to deny that he willfully broke the law.

### 2.    Count Two: Aiding and Advising Qatar

The defendant's objections show a similar attempt to negate his admissions of guilt as to Count 2, which concerns the defendant's provision of aid and advice to Qatar to facilitate Qatar's lobbying of U.S. government officials on two Qatari goals: (1) establishing U.S. Customs preclearance facilities at Doha International Airport, and (2) obtaining the United States' support for Qatar during the 2017 Gulf Diplomatic Crisis.  With regard to both Qatari goals, the

defendant claims that he did not seek to aid and advise Qatar.  Instead, he claims that he sought

only to aid and advise Person 1, who was being paid by Qatar to further these goals.

With regard to the preclearance facility effort, the defendant objects to paragraph 40 of

the Presentence Report, which recounts,

> On January 23, 2017, a business associate of [Person 1] sent defendant
> Olson a draft plan for a lobbying campaign to convince the White House
> and the US Department of Homeland Security to establish preclearance
> facilities at Doha International Airport. The following day, defendant Olson
> sent [Person 1] and his business associate an email that included his advice
> on how Qatar could "sell" its preclearance proposal to the US government.

PSR ¶ 40.  The defendant objects to this language—which mirrors the language in the criminal

information—claiming, "Defendant Olson was responding to his client Person 1 on the plan.

This was not aid to Qatar."  PSR at 43.  However, the defendant's claims contradict his

admissions in the Plea Agreement, where he acknowledged that he provided aid to Qatar, not

merely to Person 1:

> Beginning on February 14, 2017 [the date that the final preclearance facility
> proposal was sent to Qatar], defendant participated in a lobbying effort to
> convince the U.S. Government to endorse the establishment of U.S.
> Customs and Border Control preclearance facilities at Doha International
> Airport in Qatar.  Defendant helped draft a proposal that was sent to the
> Qatar government which explained how preclearance facilities could be
> achieved.  Defendant provided "two elements to the proposal in terms of
> selling this to Washington," recommending that the Qataris leverage their
> close military partnership with the United States and emphasize the positive
> experience the United States experienced with respect to the establishment
> of similar preclearance facilities in Abu Dhabi.

Plea Agreement at 8.

The defendant is more brazen still in his attempt to distance himself from his admissions

with regard to aiding and advising Qatar during the diplomatic crisis.  The presentence report

discusses these events as follows:

On or about June 6, 2017, defendant [ participated in a lobbying effort to convince the U.S. Government to support Qatar in its efforts to oppose a blockade imposed upon it by its neighbors. Defendant Olson's aid included recruiting a retired US General ("the "General") to join defendant Olson in providing aid and advice to Qatari government officials with the intent to influence US foreign policy with respect to the Gulf Diplomatic Crisis.

As part of his efforts to aid the Qatar Government, on June 6, 2017, defendant Olson recruited the General, who was working at a Washington DC think tank, to enlist his support in the endeavor. On June 7, 2017, defendant Olson met with the General, a third party, and others a hotel in Washington, DC at which time the General explained how he would conduct the lobbying and public relations campaign. On June 8, 2017, the third party agreed to pay for the expenses of defendant Olson and the General to travel to Doha to meet with representatives of the Qatar Government. At the time, defendant Olson was being paid $20,000 per month to provide services to the third party. The third party agreed to pay the General a fee for his efforts.

PSR ¶¶ 42-43.

These paragraphs are identical—word for word—with the Plea Agreement, which the defendant adopted wholesale at his plea hearing. *Compare id. with* Plea Agreement at 8. Undeterred by his own sworn admissions to the contrary, the defendant objects to these paragraphs, stating, with regard to the first paragraph, "Defendant Olson was providing advice to his client Person 1. The scope of the defendant's 'lobbying' was entirely unknown to defendant Olson[,]" and with regard to the second paragraph, "Defendant Olson acted at this time as a consultant to Person 1 and recommended the General." PSR at 44.

In making these claims, the defendant attempts to undercut the factual basis for his guilty plea and assert that he is blameless as to Count Two. Moreover, the defendant's claims are inconsistent with his promise in the Plea Agreement to "[n]ot contest facts agreed to in this agreement." Plea Agreement at 2. The Court should reject the defendant's revisionist history and consider his steadfast refusal to admit wrongdoing in sentencing. *See* § 3553(a)(1) (directing the Court to consider "the history and characteristics of the defendant").

**Avoiding Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(6)**

Although the government was not able to identify cases analogous to Count Two (aiding and advising a foreign government) two cases cited by the defendant in his objections to the presentence report are analogous to the conduct described in Count One (making false ethics disclosures) and support the government's request for a sentence of imprisonment.[5]

In *United States v. Blackley*, the defendant, who served as chief of staff to the Secretary of Agriculture, failed to disclose $22,000 he received in payments from USDA-regulated entities on annual ethics disclosure form SF 278 (the predecessor to OGE Form 278). 167 F.3d 543, 544 (D.C. Cir. 1999). When questioned separately by two different Inspectors General, the defendant repeated his lies in sworn statements. *Id.* at 545. The defendant was convicted of three counts of making false statements in violation of 18 U.S.C. § 1001. At sentencing, the district court found that the defendant should be sentenced under the fraud guideline, § 2F1.1. *Id.* at 551. In so doing, the court made an eight-level upward departure, relying on a mix of factors that it believed were not considered by the guidelines in this context, including the facts that (1) the defendant was a high-level official when he received monies from individuals regulated by USDA; (2) he was informed that he was not allowed to receive such payments; and (3) he twice lied under oath about their receipt. *Id.* The district court then sentenced the defendant to 27 months imprisonment. *Id.* The Court of Appeals affirmed the sentence, noting, "Although at first blush the number of levels seems high, the departure made Blackley's sentence more closely approximate what would follow for kindred crimes committed by high government officials

---

[5] One case cited by defendant, *United States v. Espy*, No. 97-cr-335 (D.D.C. 1997), is not relevant; the defendant was acquitted of all charges at trial.

under provisions such as § 2C1.2 itself.  We find the departure well within the broad discretion allowed the district court in such matters." *Id.* at 552 (citing *Koon v. United States*, 518 U.S. 81, 98 (1996)).

Another recent case, *United States v. Saffarinia*, is also instructive.  No. 1:19-cr-216 (D.D.C. 2023).  There, the defendant was a former Assistant Inspector General at the U.S. Department of Housing and Urban Development (HUD) who served as the head of contracting activity for HUD's Office of the Inspector General.  *Id.* at DE 1 at 2.  Over several years, the defendant concealed the nature and extent of his financial relationship with a HUD contractor, which included $80,000 in payments from the contractor to the defendant, the defendant's unauthorized disclosure of confidential government information to the contractor, and the defendant's efforts to steer government contracts to the contractor.  *Id.* at 4.  Specifically, the indictment alleged that the defendant violated his legal duty to disclose this relationship on OGE Form 278.  *Id.*  The defendant was convicted of concealing material facts in violation of 18 U.S.C. § 1001(a)(1) and (2); three counts of making false statements on his annual OGE Form 278, in violation of 18 U.S.C. § 1001(a)(1), and falsifying records, in violation of 18 U.S.C. § 1519.  The defendant has not yet been sentenced, but the government's sentencing memorandum argues for a within-guidelines sentence of 27 months imprisonment.  *Id.* at DE 183 at 1.

The parallels between these cases and the defendant's are striking.  In each of the three cases, Blackley's, Saffarinia's, and the defendant's, the government official provided favors and received financial benefits in return.  In each case, the official made misrepresentations on OGE ethics forms to conceal these improper relationships.  Like the defendant, Blackley lied to conceal the improper relationship when confronted by investigators.  Like the defendant,

Saffarinia disclosed confidential information to his patron.  And like the probation officer did in the defendant's case, the district court in Blackley considered the full scope of conduct in determining what sentencing guidelines to utilize.  But unlike either Blackley or Saffarinia, the defendant deleted emails, urged Person 1 to adopt a false cover story, and engaged in a separate course of illegal conduct: helping a foreign government in its effort to bend U.S. foreign policy to its will.

Given Blackley's 27-month sentence and the government's recommendation for a within-guidelines sentence of 27 months for Saffarinia, there would not be "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" if the defendant were to receive a within-guidelines sentence of 24 months imprisonment as contemplated by the presentence report.  18 U.S.C. § 3553(a)(6).  Indeed, a disparity would only result if the defendant received a sentence that did not include a term of imprisonment.

**Affording Adequate Deterrence – 18 U.S.C. § 3553(a)(2)(B)**

Deterrence is perhaps the most important of the § 3553(a) factors because at its core, this is a case of public corruption.  The United States entrusted the defendant with significant power and discretion, but he betrayed that trust by lying about his conflicts of interest and, after leaving office, illegally leveraging his public service to help Qatar influence U.S. policymakers.  In both instances, the law required the defendant to promote the best interests of the United States, but he chose instead to promote his own financial interests.

Public corruption presents an unquantifiable but irreparable harm.  "[C]orruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate

channels." *United States v. Ganim*, No. 3:01CR263 (JBA), 2006 WL 1210984, at *5 (D. Conn. May 5, 2006), *aff'd*, 510 F.3d 134 (2d Cir. 2007).  However, despite the significance of the harm that public corruption poses, the federal government lacks the resources to audit officials' public and private activities for signs of corruption.  Instead, the U.S. government and the American public must rely on their integrity.

Sentences in public corruption cases therefore must provide a significant deterrent to other would-be offenders.  As the court explained in *United States v. Spano*,

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable.  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials.

411 F. Supp. 2d 923, 940 (N.D. Ill.), *aff'd*, 447 F.3d 517 (7th Cir. 2006).

Numerous other courts have likewise recognized the crucial role general deterrence plays in sentencing for public corruption offenses.  *See, e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes. . . . General deterrence comes from a probability of conviction and significant consequences."); *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (key objective of sentencing public officials in particular should be "to send a message to other [public officials]"); *United States v. Anderson*, 517 F.3d 953, 996-97 (7th Cir. 2008) (highlighting need for general deterrence in public corruption prosecutions); *United States v. Saxton*, 53 Fed. Appx. 610, 613 (3d Cir. 2002) (affirming three-level upward departure where

fraud caused non-monetary harm of "loss of public confidence and trust in elected officials").

In this case, there is no precedent for violations of 18 U.S.C. § 207(f)—this case will set the precedent.  Because of the media coverage of this case, the defendant's sentence will send a message to U.S. government officials throughout the United States and around the world.  That message should be that the United States does not tolerate corruption by its public officials, and that if corrupt conduct is discovered, appropriate and meaningful punishment will follow.  A conviction without punishment is no deterrent at all.  Indeed, a conviction without incarceration under the facts of this case would only invite future offenders.

**The Government's Sentencing Recommendation**

The government recommends that the defendant be sentenced within the applicable Sentencing Guidelines range.  *See* Plea Agreement at 4 (regarding the government's obligations under the agreement).  More specifically, the government believes that a term of imprisonment is required in the case.  A sentence of probation would fail to account for: (1) the need to deter corruption and ensure government officials' adherence to ethics laws; (2) the defendant's multiple criminal offenses and repeated efforts to obstruct justice; and (3) the defendant's steadfast refusal to admit wrongdoing and attempts to undermine the factual basis for his plea.

## <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the court sentence the defendant to a term of imprisonment within the applicable guidelines range.

Dated: February 7, 2023        MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: _____/s/_____
STUART D. ALLEN
D.C. Bar No. 1005102; N.Y. Bar No. 4839932
Assistant United States Attorney
National Security Section
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20530
(202) 252-7794
stuart.allen@usdoj.gov

By: _____/s/_____
EVAN N. TURGEON
D.C. Bar No. 1010816
Trial Attorney
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW, Suite 7700
Washington, D.C. 20530
(202) 353-0176
evan.turgeon@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2023, I electronically filed the foregoing using the CM/ECF

system, which will send a notification of such filing to counsel of record.

By: _____/s/_____
Evan N. Turgeon
Trial Attorney, U.S. Department of Justice