**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 22-cr-144-GMH |
| | : | |
| RICHARD GUSTAVE OLSON, JR. | : | |
| | : | Judge G. Michael Harvey |
| Defendant. | : | |

**RICHARD G. OLSON, JR.'s REPLY**
**TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

Comes now Amb. Richard Gustave Olson, Jr. (Ret.), through counsel HANNON LAW

GROUP, LLP, and CLARK HILL, PLC, and respectfully presents this Reply to the

Government's Sentencing Memorandum [ECF No. 39].

**INTRODUCTION**

The government's Sentencing Memorandum is replete with language regarding gratuities,

obstruction, lying to the FBI and other alleged criminal activity reflecting the same information

provided to the Presentence Report Writer by AUSA Daniel J. O'Brien from California.

However, government counsel of record make only two affirmative contentions regarding how to

calculate a sentence under the Sentencing Guidelines:

1. The Defendant Obstructed Justice as to Count One by Lying to the FBI During His
   Interviews.   (Gov't Sentencing Memorandum at 20).

2. The Defendant Obstructed Justice as to Count Two by Deleting Emails
   and Encouraging Person 1 [Zuberi] to Adopt a False Cover Story.  (Gov't Sent. Mem. at
   25).

However, the government appears to withdraw its longstanding contention – and thereby

disagrees with the PSR Writer – on how to treat what it has persistently called "gratuities"

received by Amb. Olson.  The government states:

1

> In this case, the government does not believe that there is a sufficient nexus between (1) the defendant's agreement to advocate to Congress to support military sales to Pakistan or the defendant's provision of non-public talking points to Person 1 [Zuberi] and (2) Person 1's provision of $25,000 to the defendant's girlfriend or Person 1's facilitation of the Foreign Company 1 [ADIH] job offer for the defendant to support a gratuities charge.

(Gov't Sent. Mem. at 18).  The government did not include the $467.50 limousine ride. However, the limousine ride and the other alleged gratuities are lumped into a section of the Sentencing Memorandum the government calls: "Person 1 [Zuberi] Provided Contemporaneous Inducements and Rewards to the Defendant."  (Gov't Sent. Mem. at 7).  This section of the government's Sentencing Memorandum is entitled: "**The Nature and Circumstances of the Offenses – 18 U.S.C. § 3553(a)(1)."**  Therefore, it is logical to concluded – as the government concedes – that this information is meant to be considered by the Court under the sentencing factors contained in 18 U.S.C. § 3553(a), and not in consideration of how to apply the sentencing guidelines in the first instance.

Finally, the government's position on an upward adjustment for Count 2 is somewhat ambiguous:

> Accordingly, if the court finds that the probation officer correctly applied the cross-reference to U.S.S.G. § 2C1.2, the enhancement for a public official serving in a high-level decision-making or sensitive position would apply.

(Gov't Sent. Mem. at 19).  We will nevertheless discuss this suggestion in this Reply and how it may affect the calculation of the sentencing guidelines score.

Giving full play to the government's argument, the following guideline scores appear to accurately reflect the position the government now supports as to each Count. These conclusions from the Sentencing Memorandum differ significantly from the numbers derived by the Presentence Report Writer relying entirely on Mr. O'Brien's misleading submission to her.

**Count Group 1 -- Making a False Writing: 18 USC § 1018**

63.   **Base Offense Level:** The guideline for 18 USC § 1018 offenses is found in USSG §2B1.1 of the guidelines.  That section provides that an offense involving fraud has a base offense level of six.  USSG §2B1.1(a)(2).                                **6**

64.   **Specific Offense Characteristics:** None.                               **0**

65.   **Victim Related Adjustment:** None.                                **0**

66.   **Adjustment for Role in the Offense:** None.                          **0**

67.   **Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, or a closely related offense (when he concealed information related to benefits he received from Mr. Zuberi); therefore, two levels are added. USSG §3C1.1.                               **+2**

68.   **Adjusted Offense Level (Subtotal):**                           **8**

      Amb. Olson contests the adjustment for obstruction of justice which we discuss below.

**Count Group 2 -- Violation of the "Cooling Off Period": 18 USC § 207(f)(1)(B)**

69.   **Base Offense Level:** The guideline for a violation of 18 USC § 207(f)(1)(B) is USSG §2C1.3.  That provision has a base offense level of six.  The government concedes there were no gratuities, so the cross reference does not apply.       **6**

70.   **Specific Offense Characteristics:** The offense did not involve gratuities. None.                                                    **0**

71.   **Specific Offense Characteristics:** None                          **0**

72.   **Specific Offense Characteristics:** Because the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, 4 levels are added.  USSG §2C1.2(b)(3).                          **+4**

73.   **Victim Related Adjustment:** None.                                **0**

74.   **Adjustment for Role in the Offense:** None.                          **0**

75.   **Adjustment for Obstruction of Justice:** The defendant willfully obstructed or

3

impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense (specifically, by deleting emails and Encouraging Zuberi to Adopt a False Cover Story when he concealed information related to his relationship with Mr. Zuberi); therefore, two levels are added. USSG §3C1.1.                                                    **+2**

76.    **Adjusted Offense Level (Subtotal):**                                            **12**

Amb. Olson contests both the adjustment for high public official and the adjustment for obstruction of justice which we discuss below.

## I.    AMB. OLSON'S CALCULATION OF THE OFFENSE LEVEL

The following is an explanation of Amb. Olson's contentions as to the proper offense level under the Sentencing Guidelines.

### A.    COUNT 1 – Making a False Writing: 18 USC § 1018

In the plea negotiations between the government and Amb. Olson, the government accepted Amb. Olson's agreement to plead guilty to the misdemeanor count of making a false statement on his annual OGE Form 278 for calendar year 2015.  That is, Amb. Olson failed to include on his OGE Form 278 the travel expenses for meeting with Esam Janahi in London to consider a job offer from Janahi's company ADIH.  The Department of State permits Foreign Service Officers to accept travel expenses for job interviews as they approach retirement.  Amb. Olson later issued a recusal from any Department decisions related to Janahi and ADIH, pursuant to ethics guidance from the Department of State.  Amb. Olson admits he did not include these expenses on his OGE Form 278.

The alleged obstructive conduct identified by the government to increase the guidelines score for Count 1 consists of lying to FBI agents in two interviews in 2019.  These allegations cannot form the basis for an enhancement for the Count 1 offense.  Amb. Olson completed his

OGE Form 278 on May 12, 2016.  Under USSG §3C1.1, the obstruction of justice enhancement applies only where: (1) "the defendant **willfully** obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing **of the instant offense of conviction**, and (2) the obstructive conduct related to (A) the defendant's **offense of conviction and any relevant conduct**; or (B) a **closely related offense**." (Emphasis supplied).  Moreover, the government must prove that the statements to the FBI agents were actually lies.

When Amb. Olson was questioned twice by the FBI in 2019, Amb. Olson had already filed his OGE Form 278 for 2015.  The FBI already knew about the travel and the contents of the OGE Form 278.  Therefore, there can be no adjustment for obstruction for Count 1.  We also rely on our presentation in our Sentencing Memorandum at pages 32-49, in which we explain that the statements were not lies, and do not meet the legal standards under USSG §3C1.1.

### B.    COUNT TWO – Violation of the "Cooling Off Period": 18 USC § 207(f)(1)(B)

The government also accepted Amb. Olson's agreement to plead guilty to the misdemeanor charge of violating the one-year "Cooling Off Period" that prohibits certain federal employees from lobbying their government for one year after retirement.  The government acknowledges that this is the first criminal conviction under that statute.  (Gov't Sent. Mem. [ECF No. 39] at 36).

There are two parts to the lobbying allegations of Count 2: (1) a lobbying effort to convince the U.S. Government to endorse the establishment of a U.S. Customs and Border Control preclearance facility at Doha International Airport in Qatar, such as exists today at Shannon Airport in Ireland; and (2) a lobbying effort to convince the U.S. Government to

support Qatar in its efforts to oppose a blockade imposed upon it by its neighbors.  2022.01.14 Plea Agreement at 8.

**The Pre-Clearance Facility:**

From the information provided to Amb. Olson by the government, it appears that the events which form the basis of this Count began in late 2016.  At that time, attorney John R. Sandweg was operating through companies called Frontier Solutions and Frontier Public Affairs. Mr. Sandweg formerly was Acting Director of U.S. Immigration and Customs Enforcement and then the Acting General Counsel of the Department of Homeland Security from August of 2013, until his resignation on February 17, 2014.  Today, Mr. Sandweg is a partner with Nixon Peabody leading the so-called Cross-Borders Risk team.

Operating as a principal with Frontier Solutions and Frontier Public Affairs, on November 8, 2016, Mr. Sandweg emailed to Zuberi what Sandweg calls "an overview of the proposal" to assist Qatar in obtaining the pre-clearance facility.  Exhibit TT at PROD001_000057.  Amb. Olson was not involved until January 13, 2017, when Sandweg emailed to him and to Zuberi "the draft proposal [for work in obtaining a preclearance facility] we prepared in November."  Sandweg then said: "I have labeled this as a Frontier matter, but I defer to Imaad as to whether he wants to make this an avenue ventures proposal."  *Id.* at PROD001_000057.  Avenue Ventures is an entity under which Zuberi sometimes did business. Zuberi responded,  "I read this is too heavy on your company which will not be used for this project . . . ."  *Id.*  Sandweg then responds: "My people will be involved since they have the DHS and CBP connects."  *Id.* at PROD001_000056.

At this time, Zuberi was a client of Amb. Olson's newly-established consulting business called Medicine Bear.  The next day, Amb. Olson responded with two recommended points to be

included in the proposal and closed by saying: "Looking down the road, it will be important to bring the US Ambassador on board (Note: I know her well but cant do it because of States post-employment ethics restrictions), but Imaad can charm her (shes from LA)." *Id.*  Amb. Olson was reviewing the proposal at the request of  Zuberi.

On January 30, 2017, Amb. Olson then sent back to Sandweg his edit to a draft of the proposal.  The edit contains only two substantive additions and a marginal comment.  *Id*. at PROD001_001032-1035.  On February 14, 2017, Sandweg appears to have sent the proposal to Sheikh Saif Bin Ahmed Al-Thani.  Exhibit UU.  It is not clear from the government's discovery whether this email was ever received by anyone in the Qatar government.  The preclearance facility idea apparently collapsed.  We have seen no evidence that this was even a realistic opportunity for Qatar.

**The Qatar Diplomatic Crisis:**

The second part of the "Cooling Off Period" offense involves Amb. Olson travelling to Qatar with Zuberi and General John R. Allen on June 6, 2017.  When the three arrived and later met with the Qatar royal family, Zuberi was thrown out of the meeting by the Qataris.  During the following two meetings with members of the royal family, Amb. Olson largely played the role of scrivener.  His notes from the meetings were the only evidence obtained by the government of what took place.  It was Amb. Olson's perception that the Qataris were desperate to find someone who would listen to them in Washington, D.C., regarding the blockade initiated by their Arab neighbors.  The Qataris viewed General Allen – certainly not Zuberi – as someone who could deliver their concerns to members of the Trump administration.  General Allen did so, and informed both Amb. Olson and Zuberi of his communications with administration officials.

### 1.   Enhancement for High Public Official Under USSG §2C1.2(b)(3)

The government's argument for a "High Public Official" enhancement to Count 2 is presented at page 19 of its Sentencing Memorandum.  The "Cooling Off Period" offense is governed by USSG §2C1.3. (Conflict of Interest; Payment or Receipt of Unauthorized Compensation).  Under subsection (a) of that provision, the base offense level is 6.  Subsection (c)(1) says that if the offense involved a gratuity, then the gratuity provision of the sentencing guidelines contained in §2C1.2 (Offering, Giving, Soliciting, or Receiving a Gratuity) applies. However, the "Cooling Off Period" offense did not involve a gratuity, Amb. Olson was not a public official at the time of the Count 2 offense, and the government concedes that there are no gratuities because a "nexus" cannot be drawn between the things of value and an official act of Amb. Olson.  (Gov't Sent. Mem. at 18).  Therefore, the base offense level should remain as 6.

The government recognizes the impossibility of applying the high public official label to an offense that necessarily involves a former official because it now does not endorse the PSR Writer's conclusion that gratuities were involved.  The government knows the PSR Writer is wrong because: 1) the offense involved only post-government conduct and (2) the gratuity statute, which the PSR writer relied on for supposedly relevant conduct, cannot apply to such post-government conduct because it requires an official government act.  Nevertheless, the government shamefully suggests that the Court could adopt such a four-level enhancement that it must concede is not applicable: "if the court finds that the probation officer correctly applied the cross-reference to U.S.S.G. § 2C1.2 [that Count 2 involved gratuities], the enhancement for a public official serving in a high-level decision-making or sensitive position would apply" *Id.* The Court, accordingly, should reject the government's proposal that the Court commit error by

accepting the PSR Writer's proposal, which was derived from Mr. O'Brien's communications to her.

### 2. The Defendant Obstructed Justice as to Count 2 by Deleting Emails and Encouraging Person 1 [Zuberi] to Adopt a False Cover Story

We addressed Mr. O'Brien's contention that Amb. Olson obstructed justice by deleting email from his computer at pages 51-52 of Amb. Olson's Sentencing Memorandum [ECF No. 38]. "Section 1.B.1.8 of the Sentencing Guidelines provides that statements made by Amb. Olson pursuant to his cooperation agreement with the government may not be used in sentencing. (2022.06.23 Letter to O'Brien and Turgeon, Ex. ZZ)." *Id.* at 52. This information was disclosed by Amb. Olson in a debriefing with the government on November 6, 2020. The information was volunteered by Amb. Olson before the government ever raised the specter of a prosecution for deleting email at some unspecified time. Zuberi told Amb. Olson that he was in trouble with the IRS, and asked Amb. Olson to delete email regarding General Allen. Amb. Olson did so, knowing that email cannot be deleted merely through his computer. Use of this allegation for sentencing purposes is strictly prohibited. Moreover, the government had obtained the email elsewhere, and provides no information to the Court which would support an inference of obstruction.

The government also has developed a new theory of obstruction as to Count 2 which was not shared with the PSR Writer. This new theory is another far-fetched interpretation of an email between Zuberi and Amb. Olson on July 20, 2020, contained in Gov't Exhibit 47 to its Sentencing Memorandum and attached hereto. The email exchange was actually produced to the government by Amb. Olson during his cooperation agreement. For that reason, the government cannot rely on it for sentencing purposes. In any event, Amb. Olson's email was sent to Zuberi

and copied to two professionals who were advising Zuberi at the time regarding the government's investigation into Zuberi's activities.

Amb. Olson sent the email because in conversations during that time period, Zuberi was attempting to mis-characterize the role of General John R. Allen in the Qatar trip. Zuberi was angry that the Qataris threw him out of the meeting in June of 2017. Amb. Olson was reminding Zuberi that General Allen was first mentioned in connection with Zuberi's plan to create a Military Advisory Board for Qatar, modeled after a similar advisory board of American retired military officers to Saudi Arabia. The Advisory Board became a focus of Zuberi as early as April of 2017. The process of Zuberi attempting to create this advisory board continued well into 2017, even after the Qatar trip. General Allen was also a suggestion by Amb. Olson when Zuberi raised his concerns over the Qatar Diplomatic Crisis that broke on June 5, 2017. The Diplomatic Crisis began on that date when Saudi Arabia, the United Arab Emirates, Bahrain and Egypt severed diplomatic relations with Qatar and banned Qatar-registered planes and ships from using their airspace, land and sea routes, along with Saudi Arabia blocking Qatar's only land crossing, as a *de facto* blockade.

Both Amb. Olson and General Allen were sympathetic to Qatar's circumstances, as they felt the Trump administration was not responding properly to the crisis. They believed that the administration was unaware of how valuable Qatar had been in aiding the United States to bring peace in Afghanistan and the critical role of a U.S. military base in Qatar to regional stability in the Arab world. Whether Zuberi was attempting to set up his own new history of the trip to Qatar as a way out of his own criminal problems is not something known to Amb. Olson. The government says this email – under its own interpretation – is intended to obstruct the government's investigation of Count 2: Amb. Olson's violation of his cooling off period. The

government presents no information or argument as to how this email constitutes obstruction of justice under USSG §3C1.1 and the standards quoted above at pages 4-5.  Most importantly, nothing in this email indicates that Amb. Olson sought to have Zuberi "coordinate' their stories or "suggested" that they adopt "a false cover story."

The argument certainly does not meet the preponderance standard to establish a fact relevant to sentencing.

### C.    The Proper Calculation Under the Sentencing Guidelines

Consequently, Amb. Olson respectfully submits the following calculations are appropriate:

### Count Group 1 -- Making a False Writing: 18 USC § 1018

63.    **Base Offense Level:** The guideline for 18 USC § 1018 offenses is found in USSG §2B1.1 of the guidelines.  That section provides that an offense involving fraud has a base offense level of six.  USSG §2B1.1(a)(2).                                     **6**

64.    **Specific Offense Characteristics:** None.                                           **0**

65.    **Victim Related Adjustment:** None.                                                  **0**

66.    **Adjustment for Role in the Offense:** None.                                         **0**

67.    **Adjustment for Obstruction of Justice:** None.                                      **0**

68.    **Adjusted Offense Level (Subtotal):**                                                **6**

### Count Group 2 -- Violation of the "Cooling Off Period": 18 USC § 207(f)(1)(B)

69.    **Base Offense Level:** The guideline for a violation of 18 USC § 207(f)(1)(B) is USSG §2C1.3.  That provision has a base offense level of six.  The government concedes there were no gratuities, so the cross reference does not apply.        **6**

70.    **Specific Offense Characteristics:** The offense did not involve gratuities. None                                                                                   **0**

71.    **Specific Offense Characteristics:** None                                            **0**

72.    **Specific Offense Characteristics:** None.                                           **0**

73.   **Victim Related Adjustment:** None.                                    **0**

74.   **Adjustment for Role in the Offense:** None.                          **0**

75.   **Adjustment for Obstruction of Justice:** None**.**                   **0**

76.   **Adjusted Offense Level (Subtotal):**                                 **6**

77.   **Multiple Count Adjustment:** Units are assigned pursuant to USSG §3D1.4(a), (b) and (c).  One unit is assigned to the group with the highest offense level.  One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious.

      **Group/Count Adjusted Offense Level Units**

            Count 1   6  1.0 unit
            Count 2   6  1.0 unit

      **Total Number of Units:** 2.0

78.   **Greater of the Adjusted Offense Levels Above:**                      **6**

79.   **Increase in Offense Level:** The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at USSG §3D1.4.          **+2**

80.   **Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.                                                    **8**

      **Acceptance of Responsibility**                                       **-2**

      **Sentencing Score**                                                   **6**

## II.       THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553

Under the Sentencing Reform Act of 1984, the sentencing court must select a sentence from within the guideline range.  If a particular case presents features not covered by the guidelines, the Act allows the court to sentence outside the prescribed range, provided the court specifies reasons for departure.  18 U.S.C. § 3553(b).  The U.S. Sentencing Commission indicates that sentences outside the guidelines should be rare.  If the court sentences within the

guideline range, an appellate court may review the sentence to determine whether the guidelines were correctly applied. *Rita v. United States*, 551 U.S. 338 (2007). If the court departs from the guideline range, an appellate court may review the reasonableness of the departure. 18 U.S.C. § 3742. *See* USSG Ch.1, Pt.A, 2. intro. comment.

The government argues for a sentence of incarceration based on its application of three sentencing factors from 18 U.S.C. § 3553(a).

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(2)** the need for the sentence imposed—
>
>> **(B)** to afford adequate deterrence to criminal conduct.

The government's argument breaks § 3553(a)(1) into two parts: "The Nature and Circumstances of the Offenses" (Gov't Sent. Mem. at 2); and, "The Defendant's History and Characteristics" (Gov't Sent. Mem. at 26).

### A.     The Nature and Circumstances of the Offenses

The government says that Amb. Olson failed to report on his 2015 OGE Form 278 the travel expenses for his interview in London with Esam Janahi of ADIH in order "to conceal an obvious conflict of interest." (Gov't Sent. Mem. at 2). The government further claims that Amb. Olson "had a relationship with [Zuberi] through which he did various favors and received various benefits." *Id.* The government then goes on to repeat its claim that Amb. Olson received gratuities. However, the government has rightly abandoned its claim that any of the items were gratuities. We previously discussed in our Sentencing Memorandum that Amb. Olson did not have any ongoing "relationship" with Zuberi while he was in office, and that the government has

recognized this fact by formally abandoning its initial contention that Amb. Olson violated 18 U.S.C. § 208(a) (Acts Affecting a Personal Financial Interest).  This statute is the core protection against conflict of interest by government officials while in office, criminalizing conduct by an official who sells his office for financial gain.  There was no such relationship.  *See* Amb. Olson Sentencing Memorandum [ECF No. 38] at 21-32.  Nor has the government proven one through its Sentencing Memorandum.

The government in referring to Count 2 says that Amb. Olson was "illegally helping the government of Qatar influence U.S. government officials."  (Gov't Sent. Mem. at 3).  The government has announced its decision not to prosecute General John R. Allen for his part in the matter.  Presumably, the government has not prosecuted Nixon Peabody partner John R. Sandweg, who was the principal intellectual author of the Avenue Ventures Preclearance Facility Proposal.  Lobbying on behalf of a foreign government is not necessarily unlawful; however, Amb. Olson has only pled guilty to a violation of his cooling off period, an ethics violation.

The government then goes on to recount its version of the "gratuities" and "inducements" it alleges Amb. Olson received.  We fully addressed these contentions in our Sentencing Memorandum at 7-18.  The government then lists what it contends are Amb. Olson's lies at pages  11-15.  Amb. Olson responded to these contentions at pages 10-20 of his Sentencing Memorandum.  The government at pages 15-17 discusses Amb. Olson's admission to it that he deleted email from his computer and its new theory regarding Gov't Exhibit 47.  These contentions are answered above.

Then at page 20 of its Sentencing Memorandum, the government states the following:

Probation has detailed five false statements that served to further the defendant's concealment.  As described below, each of these false statements obstructed and impeded the government's investigation by preventing the FBI from gaining an accurate picture of the defendant's relationship with Person 1 [Zuberi], which was what the FBI hoped to gain by interviewing the defendant.

First, this is phrased as if the PSR Writer discovered these "five false statements"; whereas, we know from discussions with counsel of record that the information came from AUSA Daniel J. O'Brien. As for the assertion that the "five false statements" prevented the FBI from learning about Amb. Olson's "relationship" with Zuberi, the relationship was neither sinister nor criminal. If it were, O'Brien would have indicted Amb. Olson. The government is very unlikely to present any evidence to the Court regarding the latter contention that the FBI agents were frustrated in their investigation. Amb. Olson addresses the "five false statements" at pages 34-39 of his Sentencing Memorandum.

### B.    The Defendant's History and Characteristics

The effort to denigrate Amb. Olson is not surprising given the conduct of Mr. O'Brien in this matter. Moreover, the contentions in this section of the Sentencing Memorandum are now adopted by counsel of record. Regardless of their authorship, they are egregiously wrong and irresponsible.

### 1.  "The Defendant's History of Accepting Unethical Gifts"

We borrow the government's caption and place it in quotation marks. The government, as O'Brien did with the PSR Writer, falsely says Amb. Olson accepted $60,000 of jewelry for his mother-in-law from the Crown Prince of Dubai. Because of the outrageous nature of this allegation, we are constrained to repeat our footnote 13 from our Sentencing Memorandum:

> At ¶ 188, the PSR Writer, pursuant to 18 USC § 3553(a), states "the Probation Office has identified the following factors that would warrant a variance from the applicable guideline range." The Writer in ¶ 189 then reports a long story provided by O'Brien about a 2014 Department of State OIG investigation into a gift of jewelry to Amb. Olson's former mother-in-law. Once again, Mr. O'Brien in his elegant prose states elliptically: "The evidence did not support a finding that defendant Olson accepted or retained the gift; accordingly, he was not listed as a subject of the report." What Mr. O'Brien does not disclose is that the investigation involved Amb. Olson's former wife, Deborah Jones, herself then a United States Ambassador. Amb. Jones was cleared of any misconduct. There was no need to list Amb. Olson as a subject of that investigation.

Mr. O'Brien also fails to disclose – now clearly *Brady* information – that the Department of State did propose discipline of Amb. Olson in a separate investigation for "receipt" of the same jewelry.  Under Department regulations, receipt of a gift by a foreign service officer's dependent can be imputed to the officer.  The notoriously over-aggressive OIG investigators believed that Amb. Olson's mother-in-law was a dependent.  After receiving an opinion letter from a tax attorney that she was not a dependent, the Deciding Official exonerated Amb. Olson.  (2016.05.16 Decision of Amb. Williamson, Ex. VV).  This information should be known to Mr. O'Brien, and his intentional misrepresentation to the PSR Writer is an emblem of his bad faith.

### C.  The Defendant Has Not Demonstrated Remorse for His Offenses

The government contends that Amb. Olson has failed to demonstrate remorse for his offenses, citing a series of egregious cases where defendants belligerently sought to avoid responsibility at sentencing.  Remorse is not an element for consideration by the Court under the Sentencing Guidelines or under the sentencing factors contained in 18 U.S.C. § 3553(a).  *United States v. Lawrence,* 662 F.3d 551, 562-63 (D.C. Cir. 2011) (defendant not required to express remorse).  The Sentencing Guidelines do afford Amb. Olson a -2 point deduction for Acceptance of Responsibility under USSG § 3E1.1.  Remorse and Acceptance of Responsibility are not the same.

Application Note 1 of the Commentary to "Acceptance of Responsibility" provides the following relevant consideration to the Court:

In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:

(A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct).  Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct **beyond the offense of conviction** in order to obtain a reduction under subsection (a).  A defendant may remain silent in respect to relevant conduct **beyond the offense of conviction** without affecting his ability to obtain a reduction under this subsection.  A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is

16

unsuccessful does not necessarily establish that it was either a false denial or frivolous.  (Emphasis supplied).

Nothing the government says in this section affects the Court's ability to conclude that Amb. Olson has accepted responsibility for his conduct.  With respect to Count 1 involving the false statement on the OGE Form 278, the government contends that Amb. Olson lacks remorse because he refuses to admit that the false statement on the OGE Form 278 was for the purpose of concealing his relationship with Zuberi.  (Gov't Sent. Mem. at 28-9).  Such an admission is not an element of the offense, and the statement of the offense in the Plea Agreement at page 7 contains no such admission.

Regarding Count 2, the government contends that two comments made on behalf of Amb. Olson to the PSR Writer demonstrate a lack of remorse.  "Defendant Olson was responding to his client Person 1 [Zuberi] on the plan.  This was not aid to Qatar."  This comment is not inconsistent in any way with the facts contained in the Plea Agreement.  Amb. Olson agreed that he helped in the preparation of the Preclearance Facility proposal by rendering advice to Zuberi: to wit, Amb. Olson edited the proposal prepared by attorney John R. Sandweg.  This does not exhibit lack of remorse, but rather an acknowledgement of his responsibility for exactly what he did and no more.

The second such statement made to the PSR Writer cited by the government is the following: "Defendant Olson was providing advice to his client Person 1 [Zuberi].  The scope of the defendant's 'lobbying' was entirely unknown to defendant Olson[,]" and "Defendant Olson acted at this time as a consultant to Person 1 and recommended the General."  (Gov't Sent. Mem. at 51).  This is also entirely true, and in no way inconsistent with the language of the offense in the Plea Agreement at 7-9.  Amb. Olson does not deny he participated in a lobbying effort to convince the U.S. government to support Qatar in the Diplomatic Crisis and does not deny that

he recruited General Allen, to his great regret.  The "scope" of Zuberi's lobbying efforts beyond

that was unknown to Amb. Olson, and actually irrelevant to the offense.

> **D.      Avoiding Unwarranted Sentence Disparities – 18 U.S.C. § 3553(a)(6)**

In its introduction to this section of its Sentencing Memorandum, the government says

this is a case of public corruption.  It is not.  The government did not charge Amb. Olson with

any offense involving public corruption.  Amb. Olson failed to report the receipt of travel

expenses on his OGE Form 278 and violated his cooling off period.  These two misdemeanors

are at heart ethical violations.  Both are ordinarily handled within the administrative processes of

the Department of State, and the government admits this is the first criminal case ever under the

provisions applicable to the cooling off period for government employees.

The sentencing factor upon which the government relies states that the Court may

consider: "the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct."  We are unaware of anyone sentenced

to a term of incarceration for either offense to which Amb. Olson has pled guilty.  The

comparator cases cited by the government bear no relation to this case.  In *United States v.*

*Blackley*, 167 F.3d 543, 544 (D.C. Cir. 1999), the defendant received an eight-level upward

departure based on several factors, including his conviction after trial of multiple felonies.  The

pending case of *United States v. Saffarinia,* No. 1:19-cr-216 (D.D.C. 2023), is similarly an

egregious case of a thieving official.  The government could have tried to convict Amb. Olson of

similar offenses as Saffarinia but declined to do so.  In any event, because no sentence has been

imposed, no disparate sentence exists to compare.

The Court cannot sentence Amb. Olson according to the government's wishes for

offenses he has not committed.

### E.        Affording Adequate Deterrence – 18 U.S.C. § 3553(a)(2)(B)

The government argues that the offenses it agreed to in the Plea Agreement require a

sentence of incarceration as a deterrent.  Again, the government looks to cases which are

ludicrous to compare to that of Amb. Olson.

In *United States v. Ganim*, No. 3:01CR263 (JBA), 2006 WL 1210984, at *5 (D. Conn.

May 5, 2006), the defendant was convicted of sixteen counts of racketeering, bribery, extortion,

mail fraud and tax fraud.  The defendant in *United States v. Spano*, 411 F. Supp. 2d 923, 940

(N.D. Ill.) was convicted of accepting bribes, theft from a federally funded program, paying

bribes, aiding and abetting theft, and conspiring to embezzle, steal, or obtain by fraud monies

owed by an organization receiving federal funds.  In *United States v. Kuhlman*, 711 F.3d 1321,

1328 (11th Cir. 2013), the defendant pled  guilty to perpetrating a five-year, $3 million health

care fraud scheme.  In *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015), the case

was remanded for re-sentencing where the defendant stole nearly $3 million and "did not receive

so much as a slap on the wrist—it was more like a soft pat."  In *United States v. Anderson*, 517

F.3d 953, 996-97 (7th Cir. 2008), the defendant was convicted of wire and honest services fraud

and bribery for his part in offering a $10,000 bribe to a public works official in order to smooth

the way for a real estate development project.  In *United States v. Saxton*, 53 Fed. Appx. 610,

613 (3d Cir. 2002), the defendant was guilty of conspiring to steal hundreds of thousands of

dollars.

While sentencing for deterrence might have been necessary in those cases, that is not the

case for Amb. Olson.

### III.     THE COURT MUST ENFORCE THE IMPLICIT PROMISES CONTAINED IN THE PLEA AGREEMENT

The Plea Agreement contains the following provision at page 12:

Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction within or below the range corresponding to an offense level of 8 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court;

The Plea Agreement also contains the following promise by the government at page 3:

At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.  The parties anticipate that defendant's guideline level will be below the threshold necessary for an additional one-level reduction to be available.

On October 25, 2021, the government extended a plea offer to Amb. Olson that required him to plead guilty to a felony and a misdemeanor.  On November 30, 2021, Amb. Olson's attorneys were offered an opportunity to contest the plea offer in a video conference with supervisors from both the U.S. Attorney's Office for the Central District of California and the National Security Division of DOJ.  On December 9, 2021, attorneys for Amb. Olson had a phone call with DOJ attorney Turgeon regarding the potential terms of a plea agreement.  During that call, Mr. Turgeon was asked whether this is a case where the government has a strong interest in a period of incarceration.  Mr. Turgeon responded that the plea, plus cooperation, means a good chance of no incarceration, that the guidelines were likely to be low, and if so a non-custodial sentence.  He stated that in his view, "this is the path to no jail time."

Amb. Olson subsequently refused any plea agreement that required a felony.  Subsequently, on January 14, 2022, the current Plea Agreement was executed.

On February 15, 2023, the Court of Appeals for the Ninth Circuit issued an opinion in the case of *United States v. Farias-Contreras*, ___ F.4th ___ , 2023 WL 2004603 (9th Cir. 2023). In that case, the government promised in a plea agreement that it would recommend a sentence at the low end of the Sentencing Guidelines range. Mr. Farias-Contreras, however, was sentenced at the high end of the guidelines range. On appeal, he contended that the government's presentation of inflammatory argument and irrelevant information in its sentencing memorandum and at sentencing, could have had but one effect—to increase his sentence beyond the low end of the U.S. Sentencing Guidelines range. The Court of Appeals held that the government's arguments related to sentencing implicitly breached the plea agreement, and amounted to plain error that affected Farias-Contreras's substantial rights and undermined the integrity of the judiciary.

The Court further stated that the promises of the government can be broken either explicitly or implicitly:

> In other words, the government may not purport to make the bargained-for recommendation while "winking at the district court" to impliedly request a different outcome. *United States v. Has No Horses*, 261 F.3d 744, 750 (8th Cir. 2001) (internal quotation marks omitted).

2023 WL 2004603 at *6.

The government – principally through the hand of AUSA O'Brien – has done the same in this case. Amb. Olson contends that the Plea Agreement and statements made during its negotiation require the government to agree to a non-custodial sentence based on a guidelines score of no great than 8. In addition, the government is required to support reduction of the guidelines score by 2 points for Acceptance of Responsibility. Before counsel of record for the government in this case were even aware of it, Mr. O'Brien had painted an imaginative if unproven picture of treachery, receipt of gratuities of over $600,000 by Amb. Olson, and bold

and extensive lies to the FBI.  This is not advocacy, as O'Brien had not entered his appearance in this case, and was well aware that DOJ policy expressed in the *Justice Manual* forbids any charge of accepting a gratuity on these facts.

Counsel of record in their Sentencing Memorandum purport to back away from the incredible sentencing guideline calculations of the PSR Writer induced by O'Brien.  Yet, on the other hand, they contend that the Court might well accept application of a guidelines computation related to gratuities in connection with Count 2.  (Gov't Sent. Mem. at 19).

Even worse, counsel of record were alerted by Amb. Olson's attorneys shortly after the PSR Writer produced her DRAFT PSR on August 10, 2022, to the obvious errors in the report. They simply refused to engage with Amb. Olson's attorneys, directing them to simply file their objections.  Counsel of record never really re-trenched from their blind willingness to endorse the Presentence Report.  Their Sentencing Memorandum, filed in the early morning of February 7, 2023, is a very poor effort at the last minute to recover from the mess left by O'Brien.  The presentation – particularly when the Court compares their contentions with the actual emails supposedly supporting them – is unworthy of consideration.

Amb. Olson, for his part, was obligated to address each and every false, and distorted reading of hundreds of email which forms the basis of O'Brien's peculiar view of this case. Obtaining a plea appears to only begin the game for Mr. O'Brien, who then endlessly pursued the incarceration of Amb. Olson contrary to assurances during plea negotiations.  It is now two-and-a-half years since Amb. Olson agreed to cooperate with O'Brien's investigation.  Both Amb. Olson and General John R. Allen should be leading productive lives using their skills and reputations to benefit our interests around the world.  Because of the conduct of one Assistant United States Attorney, their professional lives are at an end.

WHEREFORE, Amb. Olson respectfully requests that the Court sentence him to a term of probation with minimal conditions.

Dated: March 7, 2023                     Respectfully submitted,

                                          HANNON LAW GROUP, LLP

                                          ___*s/J. Michael Hannon*_____
                                          J. Michael Hannon, #352526
                                          333 8th Street, NE
                                          Washington, DC 20002
                                          Tel: (202) 232-1907
                                          Fax: (202) 232-3704
                                          jhannon@hannonlawgroup.com

                                          CLARK HILL, PLC

                                          *s/Russell D. Duncan*_____
                                          Russell D. Duncan
                                          1001 Pennsylvania Ave. Suite 1300 South
                                          Washington, DC 20004
                                          (202) 640-6637
                                          rduncan@clarkhill.com

                                          *Attorneys for Defendant Richard Gustave Olson, Jr.*

Exhibit 47

**From:**          imaad.zuberi@avenueventure.com
**Sent:**          Mon, 20 Jul 2020 19:32:00 -0500
**To:**            "'Rick Olson'" <rickscafedxb@yahoo.com>; "'Robert Eatinger'"
<reatinger@eatingerlaw.com>; "claude.arnold@rebus-solutions.com" <claude.arnold@rebus-
solutions.com>
**Subject:**       RE: John Allen

This is regarding the travel to Qatar to meet the Emir. Where I bought the tickets and etc

**From:** Rick Olson <rickscafedxb@yahoo.com>
**Sent:** Monday, July 20, 2020 11:30 AM
**To:** Robert Eatinger <reatinger@eatingerlaw.com>; claude.arnold@rebus-solutions.com;
imaad.zuberi@avenueventure.com
**Subject:** Re: John Allen

Imaad:

 I'm puzzled by the message you sent me last week. I've reviewed my records
(including notes I took at the time) and they do not accord with your recollections:

•   We had been discussing a Qatari defense project in the spring of 2017 (April &
May).

•   After the announcement of the blockade (5 June), you asked me if I knew any
generals who might be interested in helping the effort. I suggested John Allen.

•   On 6 June I introduced you by email to John Allen.

•   We traveled to Doha 9-11 June.

•   We continued working on the defense project through the summer, although at
some point John Allen dropped out.

•   I did not have any interaction with H.R. McMaster. I met him once, socially, I
believe on 27 September 2017, but never discussed Qatar with him.

 I suggest you review your chronology of events in light of the above. Let me know if
I can help.

 Best,

*rgo*

Rick Olson

On Thursday, July 16, 2020, 03:53:47 PM EDT, imaad.zuberi@avenueventure.com <imaad.zuberi@avenueventure.com> wrote:

Imaad ... thank you again for facilitating what I think were very important talks with the Qataris.  They couldn't have taken place without your leadership.

I deeply regret your treatment on SAT night.  It was not right.

I hope the remainder of your travels were uneventful.

With great respect for what you're doing for our great country every day!

John Allen