# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

RICHARD GUSTAVE OLSON, JR.,

Defendant.

Criminal No. 1:22-cr-144-GMH

## UNITED STATES' RESPONSE TO
## DEFENDANT'S REPLY TO ITS SENTENCING MEMORANDUM

On March 7, 2023, the defendant filed its reply to the government's sentencing memorandum. On March 8, 2023, the court stated that it would benefit from a reply by the government concerning certain arguments made therein by the defendant and ordered the government to file a response by March 22, 2023. Accordingly, the government hereby submits its response to the defendant's reply memorandum. While this brief responds to many of the defendant's arguments, the absence of a response to an argument should not be interpreted as a concession by the government. Unless otherwise noted, the government stands by the arguments and positions in its prior sentencing memorandum.

## I.    Defendant's Receipt of Gratuities

The government appreciates the opportunity afforded by the court to correct an error in its sentencing memorandum, which states,

> In this case, the government does not believe that there is a sufficient nexus between (1) the defendant's agreement to advocate to Congress to support military sales to Pakistan or the defendant's provision of non-public talking points to Person 1 and (2) Person 1's provision of $25,000 to the defendant's girlfriend or Person 1's facilitation of the Foreign Company 1 job offer for the defendant to support a gratuities charge. Accordingly, the government believes the court should consider these facts under § 3553(a).

Dkt. 39 at 18.  Stated correctly, the government's position is that there is an insufficient nexus between the benefits Person 1 gave the defendant and the conduct described in Count Two of the Information (i.e., aiding and advising Qatar).  Indeed, the defendant's aid and assistance to Qatar did not occur until after the defendant's retirement from government service, and therefore cannot constitute an official act.

To be clear, the facts establish that the defendant did receive gratuities, as detailed in the section of the sentencing memorandum entitled, "The Defendant Received Gratuities from Person 1 for Supporting Arms Sales to Multiple Countries." *Id.* at 4-11.  But those gratuities only relate to Count One of the Information (i.e., making false statements on the Office of Government Ethics form), and were covered by the non-prosecution provisions of the plea agreement.  *See* Plea Agreement, Dkt. 1-2 at 3.  As a result, the government recommends that the court apply § 2C1.3—the sentencing guidelines stipulated by the parties in the plea agreement— in calculating the offense level for Count Two.

The government correctly argued in its sentencing memorandum that the high-ranking government official enhancement in § 2C1.2(b)(3) only applies if the court applies the gratuities guidelines.  Since the government believes that those guidelines should not be adopted by the court, neither does it believe that the court should impose the high-ranking government official enhancement.

Contrary to defendant's baseless assertions, the government never suggested to the probation officer that she should apply the gratuities guidelines to Count Two.  *Contra* Dkt. 43 at 2, 9, 22. As the attached email from the government to the probation officer makes clear, the government suggested precisely the opposite:

> Speaking for myself, it never crossed my mind that Count 2 (aiding and advising a foreign government) would implicate the bribery guideline. I did believe that Olson's actions in 2015 with respect to the college tuition for the mistress would implicate the bribery and/or gratuity guidelines, but those actions are covered by the non-prosecution provisions of the plea agreement and should only be considered in assessing the various 3553 factors for sentencing.

Exhibit 57. Despite this recommendation, the probation officer independently decided to apply the gratuities guidelines for the reasons detailed in the presentence report. *See* PSR at 45.

Accordingly, the government now reiterates its recommendation that the court consider the facts pertaining to the defendant's receipt of gratuities as part of its analysis under § 3553(a). For this purpose, it is irrelevant whether there was a gratuities offense (there certainly was), or whether it can be proved beyond a reasonable doubt or by a preponderance of the evidence. The underlying facts are what they are, and the court should consider them under § 3553(a).

For the court's reference, those facts are summarized below:

1. Person 1 contemporaneously stated his improper motive for making gifts to public officials.

    a. At the same time Person 1 was providing gifts to the defendant and his girlfriend, he made clear to another associate that his general practice was to pay public officials in return for official acts. Specifically, Person 1 claimed that donating to a specific political campaign was a necessary step in seeking to unfreeze Libyan assets. *See* Case No. 2:19-cr-00642-VAP, Dkt. 84 at 15-17 (C.D. Cal. Mar. 17, 2020).

2. The defendant concealed his relationship with Person 1.

    a. The defendant failed to recuse himself from matters involving Person 1 and failed to report the benefits provided by Person 1, as charged in Count One.

    b. After receiving the airfare and job offer, and only after an inquiry made by one of his subordinates, the defendant recused himself from matters involving Businessperson 2, a person with whom he had no working relationship, but failed to do so with regard to Person 1, a person for whom he had performed official acts.

c.    The defendant tried to minimize the significance of the recusal, falsely communicating to the State Department that no job offer had been extended to him.

d.    The defendant failed to report Person 1's payment of the first-class airfare and the limo ride, as required by his annual disclosure obligations.

3.    The defendant's official acts to benefit Person 1 were inappropriate.

a.    State Department policies required the defendant to run proposed contacts with Congress through the Office of the Legal Adviser (OLA).  Common sense dictates that direct advice to members of Congress concerning weapons sales would be first run by the Department of State so that the Department could speak with one voice.  The defendant sought no such prior approval.

b.    The defendant gave Person 1 uncleared talking points concerning a pending helicopter deal to Pakistan.  Notwithstanding the defendant's claims during his FBI interview that he would have provided the report to anyone, his admonitions to Person 1 not to disseminate the talking points indicates otherwise.

c.    The defendant engaged in these activities despite his duty recuse himself from matters related to Person 1.

4.    The defendant facilitated an improper gift of $25,000 to his girlfriend.

a.    The defendant was on notice of the inappropriateness of the tuition gift because he was aware of the then-pending the diamonds investigation. The same regulations cited by OLA in its letter concerning the diamonds make clear that the defendant's solicitation of a gift of tuition for his girlfriend was illegal.  The only difference is that OLA alleged that the defendant indirectly received the diamonds while the defendant indirectly solicited the tuition.  The defendant was interviewed by OIG in 2014, prior to Person 1's provision of the tuition and prior to his two false OGE 278 filings.

b.    The defendant solicited the tuition from Person 1, the same person who solicited the defendant to engage in inappropriate lobbying efforts.

c.    Person 1 agreed to give $25,000 to the defendant's girlfriend prior to even meeting her.

d.    Person 1 told the defendant that he would provide the tuition before telling the defendant's girlfriend.

e.    Person 1's agreement to pay the tuition was accompanied by a pretext. Person 1 provided the university with a specious justification for his

supposed philanthropy, falsely stating that it was based upon his professional relationship with the defendant's girlfriend and her involvement in women's causes.

    f.    The only significant obligation Person 1 would have owed the defendant would have been by virtue of the services the defendant agreed to provide with respect to Person 1's lobbying campaign.

    g.    Emails between Person 1 and the defendant reflect that they viewed the payment as compensation for some sort of obligation rather than as a charitable gift to the defendant's girlfriend. After the checks totaling $25,000 had cleared, Person 1 told the defendant, "My job is done." The defendant acknowledged that he benefitted from the payment when he responded with repeated expressions of personal gratitude.

5.    The sequence of events makes clear that the tuition payment was a reward for the defendant's acts.

    a.    The defendant complained to Person 1 that he was "poor" seven weeks after the release of the talking points and two weeks prior to soliciting Person 1 for the tuition. The table below summarizes the major events in 2015:

| Defendant Interviews with Person 1 and Businessperson 2 (Foreign Company 1) | |
|---|---|
| January 24 | Person 1 pays for the defendant's first-class airfare |
| January 31 | The defendant interviews for the job in London |
| **Person 1 Arranges the Job Offer** | |
| February 3 | The defendant's deadline to recuse concerning the job offer from Foreign Company 1 |
| February 8 | The defendant receives tentative Foreign Company 1 job offer, pending the defendant's decision whether to accept |
| February 19 | The defendant recuses himself from Foreign Company 1 and Businessperson 2; does not recuse from Person 1; claims that no job offer was made |
| February 19 | Foreign Company 1 makes a formal job offer to the defendant |
| **Defendant Agrees to Meet with Members of Congress to Facilitate Drone Sales** | |
| February 23 | Person 1 tells the defendant he is brokering drone sales to the Middle East |

| February 23 | Person 1 tells the defendant he had members of Congress meet with Drone Manufacturer 1 |
| --- | --- |
| March 13 | The defendant agrees to meet with members of Congress concerning drone sales |
| March 18 | Person 1 tells the defendant that meetings with certain members of Congress about drone sales to Pakistan will be difficult |
| March 23 | The defendant enlists the help of a State Department staffer to schedule meetings with members of Congress |
| March 30 | Meetings fail to transpire due to scheduling conflicts |
| **Defendant Gives Person 1 Talking Points** | |
| April 9 | The defendant provides uncleared talking points on Pakistan helicopter sale to Person 1 |
| April 10 | Person 1 reports to the defendant on progress with members of Congress regarding drone sales to the UAE & Saudi Arabia, recommending "never to leave Pakistan off the table" |
| **Defendant Solicits Tuition for His Girlfriend; Person 1 Agrees to Pay** | |
| June 3 | The defendant complains to Person 1 that he is poor |
| June 15 | The defendant solicits Person 1 for tuition assistance for his girlfriend |
| June 22 | Person 1 tells the defendant he will pay her tuition and provide a loan |
| June 27 | Person 1 flies the defendant's girlfriend to the UK, where they meet for the first time |
| July 1 | Person 1 tells the defendant how he plans to pay the tuition |
| July 1 | The defendant offers Person 1 "many thanks" for the tuition |

II.     **<u>Defendant's Obstruction of Justice</u>**

The probation officer correctly applied enhancements for obstruction of justice. Under

U.S.S.G. § 3C1.1, the court should apply an enhancement where

> the defendant willfully obstructed or impeded, or attempted to obstruct or
> impede, the administration of justice with respect to the investigation,
> prosecution, or sentencing of the instant offense of conviction, and (2) the
> obstructive conduct related to (A) the defendant's offense of conviction and
> any relevant conduct; or (B) a closely related offense.

Here, the government was investigating gratuities, violations of FARA, and obstruction

of justice. The defendant obstructed those investigations. His counts of conviction are related to

those matters. The enhancements therefore should apply.

Once again contrary to defendant's speculation, the government's sentencing

memorandum does not rely on information covered by defendant's cooperation agreement, in

violation of U.S.S.G. § 1B1.8. *Contra* Dkt. 43 at 9–10. This is true both with regard to the

defendant's deletion of emails and his suggestion to Person 1 that they adopt a false cover story

for the Qatar lobbying scheme.

**A.  Defendant's Creation of a False Cover Story for the Qatar Lobbying Scheme**

Defendant suggests that the government should be precluded from using at sentencing an

email reflecting the defendant's attempt to promulgate a false cover story that the defendant and

the General's for-profit work pertained to a military advisory board that did not involve lobbying

because the email "was actually produced to the government by Amb. Olson during his

cooperation agreement." Dkt. 43 at 9. This claim is false. The email was produced to the

government on October 9, 2020—weeks before the defendant's first proffer on October 30,

2020. Moreover, the email that accompanied the defendant's production of the email exchange

specified that the production consisted of "documents requested pursuant to the subpoenas" served upon the defendant and his company on September 2, 2020.  Exhibit 58.

Defendant next claims that his email was a truthful summary of his and Person 1's activities, and that the defendant's involvement in the Qatar lobbying scheme was purely philanthropic.  Contemporaneous documents make clear that this is false.

First, on June 8, 2017, the defendant and Person 1 exchanged messages via WhatsApp that revealed that their assistance to Qatar with respect to the lobbying effort was financially motivated.  While discussing the General's involvement and request for payment for traveling to Doha for the purpose of discussing the diplomatic crisis, Person 1 told the defendant via WhatsApp, "If we can do this we will own half of Qatar."  Exhibit 59.

Second, the defendant also acknowledged that the General's involvement in the lobbying campaign was for profit.  On June 8, 2017, the defendant told Person 1 via WhatsApp, "[The General] is tied up until 5:45 this evening but is happy to talk on phone. And ready to go to Doha tomorrow. But needs to have a chat about numbers."  *Id.*

Third, the General similarly told the defendant, Person 1, and others that he needed to be compensated for participating in the lobbying campaign.  On June 7, the General told the defendant and Person 1,

> I want to help if I can and if there is an intent that I'll help the Emir and Qatar, **we'll need to define that relationship**. I'm prepared to have another conversation, if your willing.  In the short term, if we're serious considering my going to Doha, i can leave FRI, but need to be back MON. That would give me SAT afternoon and evening and all day SUN on the ground in Doha. Please let me know if there's desire for me to do this.  If so, I'd be deeply grateful if some could assist me in procuring the airline tickets and setting up the logistics for the trip.

Exhibit 60 (emphasis added).  On June 8, the General contacted an acquaintance at the Defense Department about structuring business consulting contract with Qatar saying, "I think I'm being

offered a consulting contract akin to the one Jim had with MbZ, and wanted your advice on how

it was structured. Because it's essentially a business issue, I just want to conduct the

conversation over WhatsApp."   Exhibit 61.   On June 8, the General told the defendant and

Person 1, "what we can do is call and treat my visit to Doha over the weekend as 'a speaking

engagement', which I've done before, for which I'd be compensated at my standard rate.   Then

we can work out the fuller arrangement of a longer term relationship over the weekend as I

transition back and forth."   Exhibit 60.   On June 9, the General told the acquaintance,

> Long and the short of it is, [acquaintance], the Qataris have asked me to
> come out to Doha to discuss their crisis. . . .  Apart from this crisis, but as
> a direct result of their sense they were caught completely flat-footed in their
> capacity to react, the Qs are very interested in securing some longer term
> access to folks they know who can provide advice to them. I've made it
> clear them I have a lot of things going on that require I carefully coordinate
> any relationship with them, but I am going out this weekend, under the
> auspices of a speaker's fee. Returning from that trip I'll have a better feel
> for a way ahead on a relationship.

Exhibit 61.

Fourth, these emails make clear that the defendant's July 20, 2020, email

mischaracterized the General's financial interest in Qatar as having been related to a

contemplated military advisory board—an activity that would not implicate FARA—rather than

the lobbying effort.  After meeting with Qatari government officials in Doha for the sole purpose

of discussing the diplomatic crisis, Person 1 protested his exclusion from the meetings and the

fact that the General did not insist that he was included:

> Person 1:  [D]oes [the General] know his place or his position?  He is not
> that important so he should not play the part that he is important.  I think
> you need to make it clear to him he is here because of you and I.  He needs
> to understand this clearly. . . .
>
> Defendant:  I briefed [the General], he understands and fully appreciates
> that you pulled this all together

> Person 1:  He is on the same page with you?  Will you be able to make sure of this going forward?  I need your guarantee.  To me loyalty is more important than money and of course our country before anything else.  I will see all these ministers today.
>
> Defendant:  Yes.
>
> Person 1:  Okay done.  Let's move forward.  I will push hard for [the General] and you.

Exhibit 62.  The General then apologized to Person 1 and the two agreed to continue to pursue profitable objectives:

> General:  Thank you again for facilitating what I think were very important talks with the Qataris.  They couldn't have taken place without your leadership.  I deeply regret your treatment SAT night.  It was not right.
>
> Person 1:  Good.  Thanks.  Lets move forward with this and other project we talked about i.e. investments.
>
> General:  I look forward to the conversation about the future, [Person 1].  I think there's a lot of opportunity.

 Exhibit 63.

On July 16, 2020, Person 1 emailed the defendant an excerpt from the above email, reflecting their mutual involvement in the Qatar lobbying effort.  *See* Ex. 47.  The defendant's response on July 20 omitted any mention of this lobbying effort, and instead portrayed his and Person 1's involvement as exclusively focused on the prospective military advisement board.  *Id.*

The deception in the defendant's email is evident in his disclaimer of any involvement with the U.S. National Security Advisor, who was the primary target of the lobbying effort on behalf of Qatar.  The defendant stated, "I did not have any interaction with [the National Security Advisor].  I met him once, socially, I believe on 27 September 2017, but never discussed Qatar with him."  *Id.*  Although perhaps technically true, contemporaneous documents reveal how misleading this careful disavowal is.  The defendant's handwritten notes from June 2017 reflect

that the General briefed the National Security Advisor on Qatar and then provided the defendant and Person 1 a summary of that briefing.  Exhibit 64.  The same month, the defendant received emails reflecting that the General had asked the National Security Advisor to meet with Qatari government officials in furtherance of the lobbying effort.   Exhibit 65.  In one email, Person 1 said that either the defendant or the General should attend any such meeting, stating, "If we are doing the work then we should be involved."  Exhibit 66.  And, later in June 2017, the defendant received an email from the General stating that the National Security Advisor had declined to meet with the Qataris, lamenting, "I wish this was better news."   Exhibit 67.

### B.  Defendant's Deletion of Relevant Emails

The government did not rely on the defendant's admission during his proffer session in concluding that the defendant obstructed justice by deleting emails.  As a threshold matter, the government never informed the probation officer that the defendant had admitted deleting emails.  *See* PSR at ¶ 185; Dkt. 39 at 15-16.  References to an admission by the defendant appear only in the defendant's briefs.  *See* Dkt. 38 at 51-52; Dkt. 43 at 9, 14.

As reflected in the presentence report and the government's sentencing memorandum, the government reached this conclusion by comparing email productions in response to subpoenas and search warrant returns.  This comparison revealed that the defendant selectively deleted emails.  Many of these investigative steps preceded the defendant's proffer sessions.  As noted above, the defendant produced emails in response to a subpoena on July 23, 2019, Person 1 produced emails in response to a subpoena on July 2, 2020, the General produced emails in response to a subpoena on July 16, 2020, and the defendant produced documents in response to a subpoena on October 9, 2020.  Each of these productions preceded the defendant's first proffer.

A comparison of these document productions reveals that the defendant failed to produce responsive documents, and the government's investigation had revealed as much during the summer of 2020.  Specifically, the defendant failed to produce the email referencing the General's request for payment (Exhibit 60) or any of the incriminating National Security Advisor-related emails discussed above (Exhibits 65, 66, and 67).  A search warrant for the defendant's email account—executed after the defendant's proffer session—confirmed that the emails no longer existed on the provider's servers.  Contrary to defendant's claim, his deletions were effective; the government was not able to obtain the deleted emails from the provider.  The fact that the government was able to obtain them from other sources does not absolve the defendant of his criminal conduct.

Moreover, the proffer letter allows the government to make derivative use of the defendant's statements.  So even if the government had not been aware of the deletions prior to the defendant's proffer, the government was entitled to use the information he provided to investigate.

Finally, the defendant claims that his deletion of emails and creation of a false cover story have nothing to do with obstructing his violation of § 207(f).  This claim misses the point.  The government was investigating FARA violations related to lobbying activity on behalf of Qatar.  The defendant was trying to obstruct that investigation to prevent the government from learning about his and the General's involvement in the lobbying activity.  His involvement in the lobbying activity forms the basis for Count Two.  As a result, the facts satisfy the requirements of § 3C1.1.

### III.   **Defendant Defends His Receipt of $60,000 Worth of Diamonds**

The defendant represents that he was exonerated in the investigation into his receipt of $60,000 worth of diamonds.  Dkt. 43 at 15-16.  The defendant focuses on the legal issues presented rather than address the facts that must be considered by the court at sentencing.  Indeed, the defendant appears to believe that it's appropriate to facilitate the transfer of $60,000 in diamonds from a foreign official to his mother-in-law.

In support of this claim, the defendant cites Defense Exhibit VV, a letter dated May 18, 2016, which reflects that the Deputy Assistant Secretary from the State Department's Bureau of Human Resources decided not to sustain the charge and impose the proposed 20-day suspension against the defendant.  Contrary to defendant's suggestion, however, that was not the end of the story.  The letter concludes: "While there will be no disciplinary action for this charge, I am referring the question of the appropriate handling of the jewelry ensemble from the Emir of Dubai to the Department's Office of the Legal Adviser, Ethics and Financial Disclosure, to provide guidance as appropriate to you and to the Department."

On September 16, 2016, the Office of the Legal Adviser informed the defendant and his wife that the gift violated "[e]thics regulations [that] prohibit U.S. Executive Branch employees from directly or indirectly accepting a gift that is either from a prohibited source, or given because of the employee's position. 5 C.F.R. § 2635.202" and that indirect acceptance includes gifts "[g]iven with the employee's knowledge and acquiescence to the employee's parent, sibling, spouse, child, or dependent relative."  Exhibit 68.  OLA further advised that "[w]here no exception applies . . ., the gift must be refused, returned, paid for, or otherwise disposed of appropriately."  OLA also chastened the defendant and his wife for not seeking guidance from the ethics office with respect to the gifts, stating,

> Any gifts, accepted directly or indirectly by Department employees or accepted by the Department of State are governed by strict rules intended to avoid any appearance of impropriety that could negatively affect the Department's reputation. Going forward, you should take steps to become familiar with the ethics rules and regulations, how they may relate to your family members, and seek guidance if you ever have any questions as to your obligations.

On November 2, 2016, the defendant wrote a letter to OLA claiming that he did not "acquiesce" to the gift and provided a factual recitation that directly contradicted the facts reported by his mother-in-law.  Exhibit 69.  Specifically, the defendant claimed that he never saw the gift and only became aware of it after the fact.  *Id.*  The defendant also claimed that his "guide to my declaration responsibilities" was the form OGE-278, which only required him to report gifts given to close family members and dependents, not his mother-in-law.[1]  *Id.*  There is no evidence that the diamonds—valued at $60,000—were ever returned or delivered to the U.S. government.

This episode is relevant to the defendant's history and characteristics in three respects.  First, it reflects the defendant's willingness to accept an exorbitant and obviously inappropriate gift while serving in government, thereby monetizing his public office.  Second, it reflects his willingness to lie to avoid accountability.  The defendant's version of events conflicts with his mother-in-law's.  His version is self-serving; hers is not.  That should inform the court's opinion as to who was telling the truth.  Third, and even if the defendant is to be believed, the fact remains that he resisted returning the diamonds even after being told expressly that ethics rules forbade him from keeping them.  Even today, he fails to acknowledge the impropriety of the

---

[1] The defendant's stated familiarity with the OGE reporting requirements predated the filing of his second false OGE Form 278 referenced in the presentence report by approximately four weeks.

entire affair.  This demonstrates the defendant's complete lack of remorse for compromising his ethical obligations as a public servant for financial gain.

**IV.     The Government Did Not Implicitly Breach the Plea Agreement**

Finally, the defendant claims that the government implicitly breached the plea agreement in this case by providing information to the probation officer.  In support of this claim, the defendant cites *United States v. Farias-Contreras*, 60 F.4th 534, 554 (9th Cir. 2023).[2]

The Ninth Circuit's holding in *Farias-Contreras* does not support the contention that the government implicitly breached the plea agreement.  In that case, the Ninth Circuit found that the government had implicitly argued for a term of imprisonment greater than the low-end recommendation it had agreed to make in the plea agreement.  In this case, the plea agreement obligates the government to "[r]ecommend that defendant be sentenced to a term of imprisonment within the applicable Sentencing Guidelines range."  The government has taken precisely this position in its sentencing memorandum (*see* Dkt. 39 at 2, 36), reiterates that recommendation here, and will make the same recommendation at the sentencing hearing.

Moreover, the plea agreement expressly allows the government to provide the probation officer additional information:  "Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court."  Dkt. 1-2, at ¶ 28.  The plea agreement further states

---

[2] As a threshold matter, *Farias-Contreras* is neither settled law nor binding on the court. The case was decided last month, after which the Ninth Circuit granted the government's motion to extend the time to move for rehearing *en banc* based on the government's representation that it was seeking the Solicitor General's approval to do so.  *See id.*, No. 21-30055, Dkt. 52 at 2 (Feb. 22, 2023).  As the dissenting judge in that case noted, if permitted to stand, the decision could encourage the government to refuse to recommend a particular sentence, load the plea agreement with the most damaging possible facts, or reserve the right to make any sentencing argument at all—none of which would be desirable for defendants.  60 F.4th at 554.

that the "[d]efendant agrees that at the time of sentencing the Court may consider the uncharged

conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of

any departure from that range, and the sentence to be imposed after consideration of the

Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a)." *Id.* at ¶ 3(d).

That "uncharged conduct" was enumerated to include:

> violations of 18 U.S.C. § 201(c)(1)(B), Public Official Receiving Illegal
> Gratuity, related to September 2015 payments totaling $25,000 to a person
> with whom defendant had a personal relationship, 18 U.S.C. § 1519,
> Destruction of Documents, arising out of the deletion of emails pertaining
> to work performed for the Qatar Government, violations of 18 U.S.C. §
> 1001, False Statements, related to any statements made by defendant during
> the pendency of the government's investigation, 18 U.S.C. § 208(a) Acts
> Affecting a Personal Financial Interest, or any other violations of law
> relating to conduct described in the factual basis of this plea agreement or
> the information.

*Id.* Finally, the plea agreement expressly stated that the "[d]efendant and the USAO reserve the

right to argue that additional specific offense characteristics, adjustments, and departures under

the Sentencing Guidelines are appropriate." *Id.* at ¶ 15.

Indeed, the government has a duty to share relevant aggravating and mitigating

information with the probation officer, and it did so here.  Unlike in *Farias-Contreras*, the

government also provided mitigating information to the probation officer in this case, describing

the defendant's longstanding history of public service.  By the same token, the government

provided aggravating information to the probation officer.  This plainly does not constitute

misconduct.

Defendant also claims that discussions with the government during plea negotiations

compel the government to recommend a non-custodial sentence.  Dkt. 43 at 21.  Here too,

defendant's claims are misleading.  It is true that during initial plea negotiations, the government

stated that, depending on the charge to which the defendant pleaded guilty, full and truthful

cooperation by the defendant could yield low sentencing guidelines and ultimately result in a non-custodial sentence. The defendant states that he subsequently refused any plea agreement that required a felony. *See id.* at 20. In the following weeks, the government determined and informed defense counsel that the defendant could not serve as a cooperator because the government expected that any testimony the defendant gave would be riddled with self-serving, provable lies, all of which would have served to distance the defendant from Person 1. Despite extensive engagement with defense counsel on this issue, the government's concerns were not alleviated or mitigated.

As a result, the plea agreement that was ultimately negotiated and signed was not a cooperation plea agreement. The government made this fact clear to defense counsel and it is readily apparent from the plea agreement itself, which contains no cooperation agreement. Notably, both the defendant and defense counsel certified in the plea agreement that "No promises, inducements, or representations of any kind have been made to [the defendant] other than those contained in this agreement." Dkt. 1-2, at 18-19. The defendant now seeks the benefits he would have received under a different plea agreement premised on his willingness to tell the truth, but he is not entitled to benefits he did not earn based on a standard of honesty he refuses to satisfy.

## <u>Conclusion</u>

For the foregoing reasons and the reasons stated in the government's sentencing memorandum, the government respectfully requests that the court sentence the defendant to a term of imprisonment within the applicable guidelines range.

Dated: March 22, 2023                    MATTHEW M. GRAVES
                                         United States Attorney
                                         D.C. Bar No. 481052

                                         By:   _____/s/_____
                                         STUART D. ALLEN
                                         D.C. Bar No. 1005102; N.Y. Bar No. 4839932
                                         Assistant United States Attorney
                                         National Security Section
                                         U.S. Attorney's Office for the District of Columbia
                                         601 D Street, NW
                                         Washington, D.C. 20530
                                         (202) 252-7794
                                         stuart.allen@usdoj.gov

                                         By:   _____/s/_____
                                         EVAN N. TURGEON
                                         D.C. Bar No. 1010816
                                         Trial Attorney
                                         Counterintelligence and Export Control Section
                                         National Security Division
                                         U.S. Department of Justice
                                         950 Pennsylvania Avenue, NW, Suite 7700
                                         Washington, D.C. 20530
                                         (202) 353-0176
                                         evan.turgeon@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2023, I electronically filed the foregoing using the CM/ECF

system, which will send a notification of such filing to counsel of record.

By: _____/s/_____
Evan N. Turgeon
Trial Attorney, U.S. Department of Justice