**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Case No. 22-cr-144-GMH |
| | : | |
| RICHARD GUSTAVE OLSON, JR., | : | |
| | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Richard Gustave Olson signed a plea agreement and pleaded guilty to two misdemeanors.[1]  Subsequently, disagreements arose among Defendant, the prosecutors, and the United States Probation Office for the District of Columbia (the "Probation Office") as to the computation of his proper offense level under the Sentencing Guidelines (the "Guidelines" or "USSG") of the United States Sentencing Commission (the "Sentencing Commission") and the resulting Guidelines-sanctioned sentencing range.  To sharpen and narrow the areas of dispute about the Guidelines calculation, the Court has entertained copious briefing and held a hearing on those disputes, as well as some subsidiary issues, including Defendant's request for issuance of a subpoena to discover communications among the Probation Office, the prosecutors, and the Sentencing Commission.  In this Memorandum Opinion and Order, the Court both sets out the Guidelines calculation that it will use in sentencing Defendant[2] and addresses the motion for

---

[1] In April 2022, after this case was transferred to this district from the U.S. District Court for the Central District of California under Rule 20 of the Federal Rules of Criminal Procedure, *see* ECF No. 1, Defendant consented to proceed before a magistrate judge for all purposes pursuant to 18 U.S.C. § 3401(b), 28 U.S.C. § 636(a)(3), and Local Criminal Rule 58(a), *see* ECF No. 4.  The case was then assigned to the undersigned.  ECF Nos. 5–6.

[2] The Court does not address the sentencing factors of 18 U.S.C. § 3553(a) in this opinion.

issuance of a subpoena.  More specifically, the Court determines that the correct offense level is

eight, resulting in a Guidelines range of zero- to six-months incarceration with the possibility of a

non-custodial sentence, and that Defendant's motion for issuance of a subpoena will be denied.[3]

## I.       BACKGROUND[4]

Prior to his retirement from the State Department on November 30, 2016, Defendant served

as U.S. Ambassador to Pakistan from 2012 to November 2015, and U.S. Special Representative

for Afghanistan and Pakistan from November 17, 2015, to his retirement.  ECF No. 38 at 63; ECF

No. 20 at 9.[5]  Defendant's first meeting with the FBI in connection with the investigation that led

to his guilty plea occurred in July 2019.  *See* ECF No. 38-1 at 2–5 (Form FD-302 summarizing a

July 17, 2019 interview with Defendant).  At his second interview in December 2019, the FBI

informed him that he was the target of a government investigation, after which he retained counsel.

*See* ECF No. 38 at 6–7; *see also* ECF No. 38-1 at 7–11 (Form FD-302 summarizing a December

17, 2019 interview with Defendant).  According to Defendant, he learned in August 2020 from

Daniel O'Brien, a prosecuting attorney in the Central District of California—the district where this

case was set prior to its Rule 20 transfer here—that he was the target of an investigation arising

from a criminal case alleging that a person known to Defendant (denominated "Person 1" herein,

in conformance with the practice of the prosecution, *see infra* note 7) had attempted to influence

U.S. government officials on behalf of foreign clients, among other things.  *See* ECF No. 38 at 7;

ECF No. 39 at 20.  Defendant here was reportedly under investigation for violations of four

criminal statutes—receiving a gratuity while serving as a public official in violation of 18 U.S.C.

---

[3] Earlier in these proceedings, Defendant requested an evidentiary hearing.  *See* ECF No. 40 at 3.  He has since abandoned that request.  *See* ECF No. 58 at 87, 91.

[4] The following section includes an outline of the investigation, plea discussions and agreement, and sentencing disputes at issue here.  Further detail will be added where relevant in the analysis, *infra* Section III.

[5] The page numbers cited herein are those assigned by the Court's CM/ECF system.

§ 201(c)(1)(B); engaging in acts affecting a personal financial interest in violation of 18 U.S.C. § 208(a); representing, aiding, or advising a foreign government with intent to influence decisions of U.S. officers within one year of his separation from his position as a senior official of the State Department in violation of 18 U.S.C. § 207(f); and knowingly and willfully concealing a material fact, making false statements, or using a false document in violation of 18 U.S.C. § 1001(a). *See* ECF No. 38 at 7.  Violations of Section 201(c)(1)(B) and Section 1001(a) are felonies; violations of Section 208(a) and Section 207(f) can be charged as either misdemeanors or felonies depending on whether the violation was willful.  *See* 18 U.S.C. §§ 201(c), 216(a), 1001(a).  Thereafter, Defendant engaged in debriefing sessions with the government in October 2020, November 2020, and March 2021; each of those sessions was covered by a debriefing agreement (or what is commonly referred to as a "queen for a day" agreement) that generally prohibited the government from "offer[ing] in evidence" in a criminal prosecution against Defendant "any statements made by [Defendant] at the meeting[s]," but permitted the government to make derivative use of information learned, including in a prosecution of Defendant.[6]  ECF No. 56-1 at 3, 8, 12; *see also* ECF No. 38 at 8.

Defendant asserts that in in the last months of 2021, the government extended him a plea offer.  *See* ECF No. 37 at 7; ECF No. 38 at 58; ECF No. 43 at 20.  It appears that he was offered a cooperation plea agreement in which he would plead guilty to a felony count of using false document in violation of 18 U.S.C. § 1001(a)(3) and a misdemeanor count of aiding and assisting a foreign government with intent to influence decisions of U.S. officers in violation of 18 U.S.C. §§ 207(f)(1)(B) and 216(a)(1).  ECF No. 38-1 at 194 (unexecuted cooperation plea agreement).

---

[6] Specifically, the agreements allowed the government to "use . . . information derived directly or indirectly from the meeting for the purpose of obtaining and pursuing leads to other evidence, which evidence may be used for any purpose, including any prosecution of [Defendant]."  ECF No. 56-1 at 3, 8, 12.

That agreement also required Defendant to cooperate with the government's investigation and required the government to seek a downward departure under USSG § 5K1.1 from the Guidelines range otherwise applicable to Defendant if the government "determine[d], in its exclusive judgment," that he had provided "substantial assistance . . . in the prosecution or investigation of another." *Id.* at 194–95, 198.

Defendant ultimately chose not to enter into that plea agreement. ECF No. 43 at 20; *see also* ECF No. 58 at 93–94, 96. Rather, in January 2022 he signed a plea agreement that required him to plead guilty to two misdemeanors: (1) making a false writing in violation of 18 U.S.C. § 1018 (the "false writing violation") and (2) aiding and advising a foreign government with intent to influence decisions of U.S. officers within one year of his separation from government service in violation of 18 U.S.C. §§ 207(f)(1)(B) and 216(a)(1) (the "cooling-off period violation"). ECF No. 20 at 4. That plea agreement did not include a cooperation agreement or offer the possibility of a § 5K1.1 letter but did indicate that a deduction of two levels for acceptance of responsibility could be applied to the Guidelines calculation "[i]f appropriate under [the Guidelines]." ECF No. 20 at 12. It calculated Defendant's combined Guidelines offense level as eight—a base offense level of six for both the Section 1018 charge and the Section 207(f) charge and a grouping enhancement of two. *Id.* at 12. The agreement further provided that the prosecution "reserve[d] the right to argue that additional offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate," but promised to "[r]ecommend that [D]efendant be sentenced to a term of imprisonment within the applicable Sentencing Guidelines range." *Id.* at 6, 12.

Pursuant to the plea agreement, Defendant pleaded guilty to both the false writing violation and the cooling-off period violation on June 3, 2022. *See* Minute Order (June 3, 2022); ECF No.

20 (plea agreement); ECF No. 21 (statement of offenses); ECF No. 35 (transcript of plea hearing).

As set out in the papers and at the hearing, to prove a violation of Section 1018, the government

would have to establish that (a) Defendant was a public officer in the State Department authorized

to make a writing, namely an Office of Government Ethics Public Financial Disclosure Report,

Form 278; (b) Defendant knowingly made and delivered the Form 278 as true, knowing that it

contained a false statement; and (c) the Form 278 had a natural tendency to influence, or was

capable of influencing, the decision or activities of the State Department and Office of Government

Ethics. ECF No. 20 at 6; ECF No. 35 at 36–37. In connection with that count, Defendant admitted

in the plea agreement, the statement of offenses, and the allocution that, on January 27, 2015, while

serving as U.S. Ambassador to Pakistan, he received from a third party, first-class round-trip

airfare from New Mexico to London and hotel accommodations in London in late January and

early February 2015.[7] ECF No. 20 at 9; ECF No. 21 at 1; ECF No. 35 at 38, 50 (transcript of plea

allocution). The value of the airfare exceeded $18,000 and the value of the accommodations

exceeded $1,000. ECF No. 20 at 9; ECF No. 21 at 1; ECF No. 35 at 38, 50. Knowing he was

required to annually file a Form 278 disclosing, among other things, gifts and travel expenses, on

May 12, 2016, Defendant certified as true and submitted a Form 278 for the 2015 calendar year

that failed to disclose the air fare or accommodations received from the third party. ECF No. 20

at 9; ECF No. 21 at 1–2; ECF No. 35 at 38–39, 50. The Form 278 was signed by a Designated

Ethics Official for the State Department on September 1, 2016, who concluded, based on the

information in the form, that Defendant had complied with the applicable laws and regulations.

ECF No. 20 at 9; ECF No. 21 at 2; ECF No. 35 at 39, 50.

---

[7] The third party is not identified in the plea agreement or the statement of offenses. In later submissions, the prosecution denominates the individual as "Person 1." *See, e.g.*, ECF No. 39 at 1; *see also* ECF No. 58 at 4–5 (explaining that it is the policy of the Department of Justice to refer to uncharged people and entities in a particular case by pseudonyms in submissions and proceedings in that case). The Court follows that practice here.

As to the second count, to prove a violation of Section 207(f)(1)(B), the government would have to establish that (a) during Defendant's last year of employment with the federal government, his pay was over $160,112 (thereby making him a covered person under 18 U.S.C. § 207(c)); (b) Defendant knowingly aided or advised a foreign entity, namely, the government of Qatar; (c) Defendant intended to influence one or more U.S. governmental decisions through the aid or advice; and (d) Defendant's prohibited activities occurred within one year after leaving his government job.  ECF No. 20 at 6–7; ECF No. 35 at 37.  In connection with this count, Defendant admitted that he served as U.S. Special Representative for Afghanistan from November 17, 2015, through November 30, 2016 (when he retired from federal government service) and met the requirements subjecting him to a one-year "cooling-off" period during which he was prohibited from representing any foreign entity before any employee of any U.S. agency or from providing aid or advice to any foreign entity with the intent to influence a decision of any federal employee. ECF No. 20 at 9–10; ECF No. 21 at 2; ECF No. 35 at 39, 50.  During the one-year cooling-off period, Defendant admitted that he provided aid and advice to the government of Qatar with the intent to influence U.S. government officials in connection with two efforts: a plan to establish U.S. Customs and Border Patrol pre-clearance facilities at Doha International Airport in Qatar and a plan to convince the U.S. to support Qatar in resolving the Gulf Diplomatic Crisis.[8]  Specifically, Defendant admitted that:

(1)     Beginning on February 14, 2017, he participated in the lobbying effort involving establishing pre-clearance facilities.  He helped draft a proposal that was sent to the Qatar government which explained how preclearance facilities could be achieved, recommending that the Qataris leverage their close military partnership with the United States and emphasize the positive experience the United States experienced

---

[8] The "Gulf Diplomatic Crisis" or the "Qatar Diplomatic Crisis" refers to the severance of diplomatic and trade ties with Qatar by Saudi Arabia, the United Arab Emirates, Bahrain, and Egypt in June 2017.  As part of that crisis, Qatar's only land border was closed, Qatari ships were banned from docking at many ports, and much of the region's airspace was closed to Qatari aircraft.  Diplomatic ties were restored and the embargo lifted in January 2021.  Frank Gardner, *Qatar Crisis: Saudi Arabia and allies restore diplomatic ties with emirate*, B.B.C. News (Jan. 5, 2021), *available at* https://perma.cc/8X3E-6UYV.

with respect to the establishment of similar preclearance facilities in Abu Dhabi. ECF No. 20 at 10; ECF No. 21 at 2–3; ECF No. 35 at 40, 50.

(2)     On or about June 6, 2017, Defendant participated in a lobbying effort to convince the U.S. Government to support Qatar in its efforts to oppose a blockade imposed upon it by its neighbors during the Gulf Diplomatic Crisis. His aid included recruiting a retired U.S. General ("the "General"") to help provide aid and advice to Qatari government officials with the intent to influence U.S. foreign policy with respect to the Gulf Diplomatic Crisis.  ECF No. 20 at 10; ECF No. 21 at 3; ECF No. 35 at 40–41, 51.

On June 7, 2017, Defendant met with the General, a third party, and others at a hotel in Washington, D.C., at which time the General explained how he would conduct the lobbying and public relations campaign.  On June 8, 2017, the third party agreed to pay for the expenses of Defendant and the General to travel to Doha to meet with the Emir and representatives of the Qatar Government.  At the time, Defendant was being paid $20,000 per month to provide services to the third party. The third party agreed to pay the General a fee for his efforts.  ECF No. 20 at 10; ECF No. 21 at 3; ECF No. 35 at 41, 51.

On June 10, 2017, Defendant and the General met with the Qatar Emir and other representatives of his government.  Defendant and the General told the government officials that they had traveled to Qatar as private citizens but noted that they had connections with U.S. government officials that placed them in a position to help Qatar.  During the meetings, the General advised the officials to embrace U.S. involvement in resolving the crisis, accept the President's offer to mediate, sign a pending deal to purchase U.S. F-15 fighter jets, and use a U.S. air base in Qatar as leverage to exert influence over U.S. government officials. The Qatari officials were further advised to compete with Saudi Arabia's lobbying campaign in the U.S. and to use a full spectrum of information operations to control the political narrative in the United States.  The General informed the officials that he and his colleagues would use the U.S. National Security Advisor to further their efforts.  ECF No. 20 at 10–11; ECF No. 21 at 3–4; ECF No. 35 at 41–42, 51.

From June 9 through June 15, 2017, with Defendant's knowledge, the General solicited the help of the National Security Advisor and his staff to support Qatar's position with respect to the crisis.  On June 15, 2017, the General informed Defendant that the U.S. National Security Advisor and another senior U.S. Government official had been briefed on their efforts to convince the United States to support Qatar's cause. ECF No. 35 at 49.  On June 16, 2017, the General reported to Defendant, the third party, and a senior Qatar Government Official that he personally asked the National Security Advisor to meet with senior Qatar officials. On June 23, 2017, the General stated that two senior Qatari officials would be visiting Washington, D.C., the next week and asked the National Security Advisor to meet with them.  ECF No. 20 at 11; ECF No. 21 at 4; ECF No. 35 at 42–43, 49, 51.

On June 28, 2017, Defendant attended a dinner with the General, representatives of the Qatar government, and members of Congress to try to enlist Congress to support the Qatari cause.  ECF No. 20 at 11; ECF No. 21 at 4; ECF No. 35 at 43, 51.

Subsequently, the Probation Office filed its Final Presentence Investigation Report ("PSR").  ECF No. 32.  That document includes an offense-level calculation substantially different from the one in the plea agreement.[9]  As relevant here, relying on uncharged alleged conduct (which is generally permitted, *see, e.g.*, *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 185 (D.D.C. 2018)) and guidance from the Sentencing Commission, the PSR utilized a cross reference in the guideline for the Section 207(f) cooling-off period violation; that cross reference, which pointed to the guideline applicable to a crime involving a gratuity, resulted in a base offense level of eleven.  *See* ECF No. 32 at 20, 45; *see also* USSG §§ 2C1.2, 2C1.3.  Additional offense characteristics related to the alleged number and amount of the gratuities and to Defendant's employment in a high-level decision-making or sensitive position increased the offense level by eighteen points.  *See* ECF No. 32 at 20–21; *see also* USSG §§ 2B1.1(b)(1)(G), 2C1.2(b).  Including a two-point enhancement for obstruction of justice, a three-point reduction for acceptance of responsibility, and the multiple count adjustment, the PSR computed Defendant's total offense level as 28.  ECF No. 32 at 21–22; *see also* USSG §§ 3C1.1, 3D1.4, 3E1.1(a), (b).  With a criminal history category of I, Defendant's Guidelines range under the PSR computation was the statutory maximum of two-years of incarceration for his convictions.  ECF No. 32 at 22, 33; *see also* USSG Chapter 5, Part A & §§ 5C1.1(f), 5G1.2.  Under the calculation in the plea agreement, even without an acceptance of responsibility reduction, Defendant's offense level would be eight—twenty levels lower than the PSR's calculation—and the sentencing range would be zero to six months imprisonment, with the possibility of a non-custodial sentence of between one and five years.  *See*

---

[9] The Probation Office, like the Court, is not bound by the plea agreement.  *See* ECF No. 20 at 17–18.

USSG Chapter 5, Part A & §§ 5B1.1, 5B1.2(a)(1).

Unsurprisingly, Defendant objects to that calculation.  In recent months, he has filed voluminous submissions explaining his position and suggesting that the government has either acted in bad faith or breached the plea agreement by feeding information to the Probation Office that resulted in the PSR's significantly higher offense level calculation.  *See* ECF No. 38 at 52, 57 & n.13, 58 (suggesting the government acted in bad faith); *id.* at 61 (stating that "[t]he conduct of [AUSA] O'Brien in improperly influencing the PSR Writer to increase the offense level almost four-fold to that agreed upon is a violation of the plea agreement" and that if the current prosecutors "endorse [that] conduct . . . they too are acting in contravention of the plea agreement"); ECF No. 43 at 21 (arguing the government breached the plea agreement); ECF No. 46 at 2 (characterizing as "utterly pretextual" the government's contention that the two misdemeanor plea offer that Defendant ultimately signed was not a cooperation plea agreement because "the government expected that any testimony the defendant gave would be riddled with self-serving, provable lies"); *see generally* ECF No. 37.  More, he has sought the Court's permission to issue a subpoena to the Probation Office seeking production of communications involving the Probation Office, three of the attorneys who have prosecuted this case—AUSA O'Brien, AUSA Stuart Allen, DOJ Trial Attorney Evan Turgeon—and/or the U.S. Sentencing Commission.  *See generally* ECF No. 46. As for the prosecution, it has become clear through similarly voluminous submissions, as well as the initial sentencing hearing in this case, that it is not entirely on board with the PSR's calculation, either.  And so, to provide guidance to the parties prior to the final sentencing, this opinion resolves disputes among the stakeholders and sets out the proper Guidelines calculation, addressing the application of (1) the cross reference noted above, (2) the obstruction of justice enhancement, and (3) the acceptance of responsibility reduction.  It also denies Defendant's request for a subpoena,

which seeks information irrelevant to any issue that will be before the Court at final sentencing.

## II.    GUIDELINES CALCULATIONS GENERALLY

In any sentencing proceeding, the sentencing court must first "correctly calculate[e] the applicable . . . range" under the Guidelines.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  To do so, the court

> first decides which particular guideline (as set forth in Chapter 2 [of the Guidelines]) corresponds to the offense of conviction.  It chooses a "base offense level" among those provided in the applicable guideline and modifies that level based on any "specific offense characteristics."  Next, it considers whether any adjustments apply (as described in Chapter 3) and computes the defendant's "criminal history category" (Chapter 4). With the total offense level and criminal history category in hand, the Court determines the applicable sentencing range using the Guidelines' table (in Chapter 5).  Finally, the Court considers whether a departure from that range—either upward or downward—is warranted (using a process also laid out in Chapter 5).

*Abu Khatallah*, 314 F. Supp. 3d at 184–85; *see also* USSG § 1B1.1.  In the Guidelines calculation process, the court may consider "relevant conduct"—including uncharged conduct and conduct for which the defendant has been acquitted—that is established by a preponderance of the evidence.  *See Abu Khatallah*, 314 F. Supp. 3d at 185.  The Guidelines define relevant conduct as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  USSG § 1B1.3(a)(1).  "Relevant conduct also includes 'all harm that resulted from' or 'was the object of' those acts and omissions," *Abu Kattallah*, 314 F. Supp. 3d at 188 (quoting USSG § 1B1.3(a)(3)), and "any other information specified in the applicable guideline," USSG § 1B1.3(a)(4).  Where multiple counts of conviction are "group[ed]" because they "involve substantially the same harm," USSG § 3D1.2, relevant conduct includes "acts and omissions 'that were part of the same course of conduct or common scheme or plan as the offense

of conviction,'" *Abu Khatallah*, 314 F. Supp. 3d at 188 n.6 (quoting USSG § 1B1.3(a)(2)).

Although the Guidelines are merely advisory, it is a procedural error for a sentencing court to "fail[] to calculate (or improperly calculate[e]) the Guidelines range."[10]  *Gall*, 552 U.S. at 51. "When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." USSG § 6A1.3.  That opportunity can include, at the discretion of the sentencing court, an evidentiary hearing, *see* Fed. R. Crim. P. 32(i)(2); *see also, e.g.*, *United States v. Jones*, 43 F.3d 712, 1994 WL 665103, at *3 (D.C. Cir. 1994), but "[w]ritten statements of counsel or affidavits of witnesses may be adequate under many circumstances," USSG § 6A1.3 cmt.  In connection with the sentencing, the court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing[.]" Fed. R. Crim. P. 32(i)(3)(B).

## III.    DISCUSSION

This section addresses the offense level calculation that will be used to determine Defendant's Guidelines sentencing range and sentencing options and then moves on to Defendant's request for issuance of a subpoena.

### A.    Sentencing Guidelines Calculation

The Court here determines whether the cross reference used in the PSR should apply, whether Defendant's offense level should be increased by two levels for obstruction of justice, and whether the offense level should be decreased by two levels for acceptance of responsibility. At

---

[10] That is true even if the miscalculation does not affect the Guidelines range, although in such cases the error is generally deemed harmless. *See, e.g.*, *United States v. Sweeney*, No. 21-2982, 2022 WL 2903442, at *4 (6th Cir. July 22, 2022) ("[W]hen an error in the calculation of the guidelines does not affect the defendant's guidelines range[,] [w]e routinely find the[] . . .  error[] harmless.").

the outset, to anchor the ensuing discussion, it will be helpful to understand in more detail how the PSR arrived at its offense level calculation, especially as to those areas in dispute.

One area where there is no disagreement is over the grouping of Defendant's counts of conviction. The PSR found—and all parties agree—that each count comprises its own "group" pursuant to USSG § 3D1.2.[11] *See* ECF No. 32 at 20 (mis-citing USSG § 3D1.2 as USSG § 2D1.2). Appendix A of the Guidelines identifies the offense guideline applicable to the statute of conviction. For "Count Group 1," ECF No. 32 at 20, the false writing violation, that statute is 18 U.S.C. § 1018 and the corresponding guideline is § 2B1.1, which covers offenses involving fraud and deceit, among others. USSG § 2B1.1 & App. A. As the PSR found, the base offense level under that guideline is six; it applied no cross references, victim-related adjustments, or adjustments for specific offense characteristics or Defendant's role in the crime. ECF No. 32 at 20; *see also* USSG § 2B1.1(a)(2). The PSR did, however, apply a two-point enhancement for obstruction of justice under USSG § 3C1.1 based on Defendant's alleged concealment of his relationship with Person 1, the individual who paid for the travel and lodging at issue, resulting in an adjusted offense level of eight. ECF No. 32 at 20.

The statute of conviction for "Count Group 2," *id.*, the cooling-off period violation, is 18 U.S.C. § 207 and the corresponding guideline is USSG § 2C1.3. *See* USSG App. A. The base level for this offense is also six. USSG § 2C1.3(a). However, the cross reference of USSG § 2C1.3(c)(1) states that, if the offense "involved a . . . gratuity," the court should apply USSG § 2C1.2, the guideline for crimes involving the offering, giving, soliciting, or receiving a gratuity, if that guideline would result in a higher offense level. USSG § 2C1.3(c)(1). Under that guideline, the base offense level is eleven if the defendant was a public official. USSG §

---

[11] The specifics of the grouping analysis are discussed in detail at the end of Section III.

2C1.2(a)(1).  The PSR applied that cross reference.  ECF No. 32 at 20.  Specifically, it alleged that Person 1, who paid for Defendant's London trip in early 2015 (the basis for the false writing violation), also arranged for Defendant to receive a job offer in February 2015 compensated at over $300,000 per year and, in February 2016, a limousine ride worth over $400; and provided Defendant's close friend (and now wife) $25,000 in tuition and other assistance in September 2015 to allow her to enroll at the Columbia University School of Journalism.   ECF No. 32 at 8–10, 21. The PSR then increased the base offense level by two on the basis that the "offense involved more than one gratuity" pursuant to USSG § 2C1.2(b)(1); by twelve more levels pursuant to USSG § 2C1.2(b)(2) (which refers to the table at USSG § 2B1.1(b)(1)), because it calculated the amount of the gratuities to be between $250,000 and $500,000; and finally by four additional levels under USSG § 2C1.2(b)(3) because Defendant was a "public official in a high-level decision-making or sensitive position."  ECF No. 32 at 21.  With a two-level obstruction of justice enhancement (again for concealing his relationship with Person 1), the adjusted offense level for the Count 2 Group was 31.  *Id.* at 21.

Under USSG § 3D1.4, to determine the combined offense level, a court assigns a "unit" value to each of the count groups.  One unit is assigned to the group with the highest offense level and to any group at an equal level or from one to four levels less serious.  USSG §3D1.4(a).  One-half unit is assigned to any group that is five to eight levels less serious than the group with the highest offense level.  USSG § 3D1.4(b).  Any group that is nine or more levels less serious than the highest-offense-level group is disregarded for the purpose of calculating the applicable offense level but may provide a reason to sentence the defendant at the high end of the sentencing range. USSG §3D1.4(c).  The table in USSG § 3D1.4 delineates the appropriate increase in offense level for the number of units calculated.  Using those rules, the cooling-off period violation is valued at

one unit and the false writing violation is disregarded.  Where the number of units calculated is one, there is no increase in the offense level.  Therefore, the PSR calculated the combined offense level as 31.  ECF No. 32 at 21.

The PSR also recommended a decrease of 2 levels for acceptance of responsibility under USSG § 3E1.1(a).  ECF No. 32 at 22.  Pursuant to the plea agreement, the PSR recommended an additional one-level decrease pursuant to USSG § 3E1.1(b), which provides that, upon motion of the government, a defendant with an offense level of 16 or greater (prior to application of any decrease for acceptance of responsibility), will have the offense level decreased by one additional level.  Applying those adjustments, the PSR calculated the total offense level as 28.  ECF No. 32 at 22.  With a Criminal History Category of I, *see id.* at 22, Defendant's resulting range from the Sentencing Table would be 78 to 97 months imprisonment based on the calculation in the PSR. *See* USSG Ch. 5, Pt. A.  However, because each of the offenses to which Defendant pleaded guilty is a class A misdemeanor carrying a maximum term of imprisonment of one year, the Guidelines term of imprisonment under the calculation in the PSR is 24 months.  *See* 18 U.S.C. § 1018; 18 U.S.C. 216(a)(1); USSG § 5G1.1(a); *see also* ECF No. 32 at 33.

### 1.      Application of the Cross Reference

Both the prosecution and Defendant argue that the cross reference that the PSR applied to the cooling off period violation is not applicable in this case.  The Court agrees.

Recall that USSG § 2C1.3(a) sets six as the base offense level for a conflict-of-interest offense (such as the cooling-off period violation related to Defendant's provision of assistance to Qatar in 2017), but USSG § 2C1.3(c) provides that if the offense involves a gratuity, the offense level should be that found in USSG § 2C1.2, which governs gratuity-related offenses.  The Probation Office applied the cross reference, with a resulting base offense level of eleven (for a

public official) and additional increases found in USSG § 2C1.2 based on the number of gratuities allegedly received, the amount, and the official position Defendant held.   *See* USSG § 2C1.2(a), (b).

The statute criminalizing bribes and gratuities involving public officials found in 18 U.S.C. § 201(c)(1)(B) prohibits, in relevant part, "a public official, former public official, or person selected to be a public official," from "directly or indirectly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person," unless "provided by law for the proper discharge of official duty."   18 U.S.C. § 201(c)(1)(B).   An "official act" is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."   *Id.*, § 201(a)(3).   More, the government "must prove a link between a thing of value and a specific 'official act' for or because of which it was given."   *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 414 (1999).

Here, it is sufficient to say that the prosecution concedes that there is "an insufficient nexus" between the benefits Person 1 allegedly gave Defendant and the conduct to which Defendant admitted in pleading guilty to aiding and advising Qatar during the cooling-off period between his retirement of November 30, 2016, and November 30, 2017.   ECF No. 45 at 2.   Indeed, it points out that "[D]efendant's aid and assistance to Qatar did not occur until after [his] retirement from government service, and therefore cannot constitute an official act."   *Id.*   At the initial sentencing hearing, the prosecution confirmed its position and asserted that it would be "error" for the Court to apply the cross reference.   ECF No. 58 at 8.   Defendant agrees, asserting that the

cooling-off period offense cannot have involved a gratuity under the governing standards because Defendant "was not a public official at the time of the . . . offense" and, as the prosecution has stated, "a 'nexus' cannot be drawn between the things of value and an official act of [Defendant]." ECF No. 43 at 8.

The Court agrees and, therefore, will not apply USSG § 2C1.3(c)(1)'s cross reference to USSG § 2C1.2 or any of the offense-level increases attributable to the specific offense characteristic adjustments (for number of gratuities, total amount of gratuities, or Defendant's position when he received the alleged gratuities) associated with that guideline.

2.      Obstruction of Justice Adjustment

The obstruction of justice adjustment is applicable to either count of conviction if the government shows by a preponderance of the evidence that

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

USSG § 3C1.1; *see also United States v. Dozier*, 162 F.3d 120, 123–24 (D.C. Cir. 1998). The commentary cautions that "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." USSG § 3C1.1 cmt. n.2.

Given that USSG § 3C1.1 also applies to attempted obstruction, courts have held that, generally, the government need not show that the alleged obstructive conduct actually impeded the relevant investigation. *See, e.g.*, *United States v. Ewing*, 129 F.3d 430, 435 (7th Cir. 1997) (noting that USSG § 3C1.1 applies when a defendant attempts to obstruct justice and generally

"does not require the prosecution to provide evidence of any actual prejudice or impact"); *United States v. Patterson*, 890 F.2d 69, 72 (8th Cir. 1989) ("Section 3C1.1 . . . encompasses 'attempted' obstruction, which we construe as not requiring success in actual obstruction."). There is at least one situation, however, in which the government must establish that allegedly obstructive conduct hampered the investigation in some manner. According to the Guidelines, "[m]aking false statements, not under oath, to law enforcement officers" is ordinarily not sufficient to trigger application of the adjustment unless the information provided was both "materially false" and it "significantly obstructed or impeded the official investigation of the instant offense." USSG § 3C1.1 cmt. nn. 4(G), 5(C). Information that is "material" is information that, "if believed, would tend to influence or affect the issue under determination." *Id.* § 3C1.1 cmt. n. 6.

The PSR applied a two-level enhancement for obstruction of justice on each count of conviction, alleging that, during his interviews with the FBI on July 17, 2019, and December 17, 2019, Defendant concealed information regarding his relationship with Person 1 and the benefits he received from that person. *See* ECF No. 32 at 12–13. The prosecution takes a somewhat different approach. It asserts that the obstruction of justice adjustment is appropriate on the false writing violation because "defendant misled the FBI with respect to several material facts during his interviews in July and December 2019" when he was questioned in connection with the investigation of Person 1's "attempts to influence U.S. government officials on behalf of foreign clients." ECF No. 39 at 20. As to the cooling-off period violation, the prosecution asserts Defendant obstructed justice by (1) destroying incriminating emails relevant to its investigation of the lobbying efforts by Defendant, Person 1, and others "on behalf of the Qatari Government to end a blockade imposed by is neighbors" and by (2) encouraging Person 1 "to conceal their joint efforts on behalf of Qatar in connection with the diplomatic crisis" by concocting an exculpatory

cover story.  ECF No. 39 at 15–16.  Defendant objects to both adjustments.  *See* ECF No. 38 at 36–44, 48–52; ECF No. 43 at 4–5, 9–11.  The Court addresses each in turn.

*a.*     *False Writing Violation*

According to the government, Defendant made five materially false statements related to the false writing conviction:

(1)     that he did not know Person 1 paid for his travel to London, ECF No. 39 at 21–22; *see also* ECF No. 32 at 12;

(2)     that he did not receive an explicit job offer from a company whose owner he met through Person 1 (i.e., the $300,000 per year offer that the PSR alleged was a gratuity related to the cooling-off period violation), ECF No. 39 at 22–23; *see also* ECF No. 32 at 12; ECF No. 38-1 at 3–4;

(3)     that he did not know that Person 1 helped pay Columbia Journalism School tuition for Defendant's friend, now wife, ECF No. 39 at 23; ECF No. 38-1 at 5; *see also* ECF No. 32 at 12;

(4)     that he did not know about Person 1's business interests in military sales to Pakistan, ECF No. 39 at 24–25; *see also* ECF No. 32 at 12;

(5)     that talking points he provided to Person 1 were public information, rather than confidential information, as he represented to Person 1, ECF No. 39 at 25; *see also* ECF No. 32 at 12; ECF No. 38-1 at 4, 251.

As noted, for the obstruction of justice adjustment to apply here, the government must show by a preponderance of the evidence that (1) these statements were "materially false," (2) in making them, Defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of the false writing violation, (3) the false statements related to the false writing violation and any relevant conduct or to a closely related offense, and (4) they "significantly obstructed or impeded the official investigation of the instant offense."  USSG § 3C1.1 & cmt. nn.4(G), 5(C).

As was made clear at the initial sentencing hearing, the Court has some doubts as to whether most of these allegedly false statements relate to the false writing violation or a closely

related offense.  *See* ECF No. 58 at 20–21.  To be sure, the first statement—that Defendant did not

know Person 1 paid for his travel to London—is connected to the false writing violation.  Indeed,

Defendant's failure to report that a third party paid for his London trip is the basis for that

conviction.  *See* ECF No. 20 at 9; ECF No. 21 at 1–2; ECF No. 35 at 38–39, 50.  However, the

other four statements have little if anything to do with the false writing violation and the

prosecution has not offered a "closely related offense" to which they are applicable.[12]  The Court

need not determine that issue, however, because the prosecution fails to show that any of the

misstatements "significantly obstructed or impeded the official investigation of the instant offense"

as required for the obstruction of justice adjustment to apply.  USSG § 3C1.1 cmt. nn. 4(G).

First, it may be difficult to show that a factual misstatement significantly obstructed or

impede an investigation when, at the time the falsehood was uttered, law enforcement already

knew the truth.  *See, e.g.*, *United States v. Yaniro*, 303 F. App'x 100, 103 (3rd Cir. 2008) (rejecting

the application of an obstruction of justice adjustment where "[the defendant's] false statements

[to investigators] were largely irrelevant to the investigation and the prosecution because they were

quickly refuted by evidence already in the government's possession"); *United States v. Surasky*,

976 F.2d 242, 247 (5th Cir. 1992) (finding that a statement by an inmate that he was not involved

in an escape attempt did not significantly impede the investigation of that attempt where

---

[12] *United States v. Ring* is instructive as to what can constitute a relationship to the offense of conviction or a closely related offense.  There, the defendant was convicted of, among other things, three counts of honest services fraud in connection with the Jack Abramoff lobbying scandal.  *United States v. Ring*, 811 F. Supp. 2d 359, 361–62, 364, 371 (D.D.C. 2011).  The government sought to apply the obstruction of justice adjustment, pointing to the defendant's "false and misleading statements about his knowledge of and participation in the [Michael] Scanlon–Abramoff kickback scheme, his receipt of $135,000 related to the Sandia Pueblo [tribe], as well as his knowledge [of] the corruption scheme involving payments to Julie Doolittle for a little-work job."  *Id.* at 383 (alterations in original) (quoting the record).  Judge Huvelle found that any false statements regarding the Scanlon-Abramoff kickback scheme or the Sando Pueblo payment were not sufficiently related to the schemes for which he was convicted even though they were connected to the Abramoff scandal writ large.  *See id.*  Thus, to the extent that the prosecution suggests that any misstatement about any alleged wrong—be it an ethical lapse or even acceptance of a gratuity—uncovered during the investigation of Person 1 or of Person 1's dealings with Defendant is related to the offense of conviction, the Court does not agree.

investigators had other evidence of his guilt). The evidence here shows that, as to at least some of these statements, the FBI already knew the answers when they asked Defendant the questions. The FD-302 for Defendant's July 2019 interview with the FBI reflects that, when the agents asked whether Person 1 "offered [Defendant] anything like flights or hotels," they had "records" showing that the January 2015 London trip "was paid for by [Person 1]." ECF No. 38-1 at 3–4. Similarly, when Defendant asserted to agents in that same interview that any talking points he provided Person 1 were public information, the FBI had—and showed to Defendant—the email in which Defendant provided those talking points and indicated that some information included in them was "not cleared" or could not be "discuss[ed] publicly."[13]  *See* ECF No. 38-1 at 4, 251; *see also* ECF No. 58 at 27. For the rest of the statements, the prosecution was unable to represent at the initial sentencing hearing that law enforcement did not already have evidence to show that Defendant was misstating facts when he made the misstatements. *See* ECF No. 58 at 23–24, 25–27.

Second, and more decisively, it is not enough for the prosecution to say, as it has here, that it "believe[s] the false statements on these points were material to the government's investigation and impeded it." *Id.* at 22. To establish that an investigation was "significantly obstructed or impeded," the government must show "a causal relationship between the materially false statement given and a resulting impediment upon the instant investigation or prosecution." *United States v. Griffin*, 310 F.3d 1017, 1023 (7th Cir. 2002). Indeed, "[w]ithout evidence that the official investigation was [significantly] impeded," even a material misstatement "cannot support the obstruction enhancement." *Id.* Rather, "[t]he government must prove 'a detrimental effect upon [its] efforts to investigate or prosecute the instant offense.'" *United States v. Selvie*, 684 F.3d 679, 684 (7th Cir. 2012) (quoting *Griffin*, 310 F.3d at 1023) (second alteration in original); *see also,*

---

[13] Defendant's own statement in the email, by the way, is the only evidence the prosecution has presented that information communicated in those talking points was actually confidential.

*e.g.*, *United States v. Banks*, 347 F.3d 1266, 1271 (11th Cir. 2003) ("To show that [a defendant's] conduct actually resulted in a hindrance, the government must demonstrate how it fruitlessly spent investigation or prosecution resources due to [his or her] untruthfulness."). The burden may not be high, but neither is it non-existent: "Material misinformation that exerts any impact on the government's resources"—such as when it "burden[s] law enforcement and precipitate[s] 'expended resources to track down . . . false leads'"—"may elicit an obstruction enhancement." *Selvie*, 684 F.3d at 684 (ellipses in original) (quoting *Griffin*, 310 F.3d at 1023); *see also, e.g.*, *Banks*, 347 F.3d at 1271 ("[T]he government must present evidence of what action it took that it would not have taken [in the absence of the false statement to investigators]."). Here the prosecution provided no evidence of any impact on the false writing violation investigation. Indeed, at the hearing, it conceded that it had no information about any detrimental effect that these statements had on the investigation. *See* ECF No. 58 at 25–27. The Court therefore will not apply the obstruction of justice adjustment to the false writing violation. *See, e.g.*, *United States v. Adejumo*, 772 F.3d 513, 529 (8th Cir. 2014) (finding application of an obstruction of justice adjustment to be "clear error" where "[t]he government chose not to offer any evidence on th[e] issue at sentencing" and rejecting the argument that a court may rely on the representation of a prosecuting attorney that the defendant's false statements to investigators impeded the investigation because a "prosecutor's statement to the court [is] not evidence").

> b.  *Cooling-Off Period Violation*

The prosecution seeks application of the obstruction of justice adjustment on this count based on two theories. It contends first that Defendant obstructed justice by deleting emails related to his lobbying; second, that he attempted to concoct a cover story for Person 1 to parrot. The prosecution has established that Defendant deleted emails relevant to his aid and advice to the

Qatari government with respect to the Gulf Diplomatic Crisis, and that alone is sufficient to apply the obstruction of justice enhancement to the cooling-off period violation.  It has not sufficiently shown that Defendant attempted to create an exculpatory cover story as to that lobbying of the Qataris.[14]

The prosecution asserts that it discovered that Defendant selectively deleted emails by "comparing email productions in response to subpoenas and search warrant returns."  ECF No. 45 at 11.  Specifically, "[D]efendant produced emails in response to a subpoena on July 23, 2019[;] Person 1 produced emails in response to a subpoena on July 2, 2020[;] the General produced emails in response to a subpoena on July 16, 2020[;] and . . . [D]efendant produced documents in response to a subpoena on October 9, 2020."  *Id.*  A comparison of those productions "reveal[ed] that . . . [D]efendant failed to produce responsive documents."  *Id.* at 12.  A search warrant for Defendant's Yahoo account "confirmed that the emails no longer existed on the provider's servers"—that is, that they had likely been deleted.  *Id.*; *see also* ECF No. 58 at 59–60 (describing the government's investigation on this issue).  The prosecution has provided the Court with copies of certain emails that were found in the document production of either Person 1 or the General but not in Defendant's and that were not found on Yahoo's servers.  *See* ECF No. 45-1 at 12–13, 32; ECF No. 57-1 at 2–3; *see also* ECF No. 55 at 4–5, 12.  These missing emails appear to relate to the Qatar lobbying effort.  For example, one of them, from the General to Person 1 and Defendant, discusses plans for the trip to Doha in June 2017, *see* ECF No. 45-1 at 12–13; ECF No. 57-1 at 2–3.  Defendant admitted in the plea agreement, the Statement of Offenses, and at the plea hearing that the 2017 Doha trip was a part of the cooling-off period violation's offense conduct.  *See* ECF

---

[14] That makes no practical difference to the Guidelines calculation because there can be only one obstruction of justice enhancement for any one offense.  *See* USSG § 3C1.1 (tying a single two-level increase to a single offense of conviction).  The Court nonetheless addresses both theories, as they may both be relevant at final sentencing under the Section 3553(a) factors.

No. 20 at 10–11; ECF No. 21 at 3–4; ECF No. 35 at 41–42, 51.  Another of the emails missing from Defendant's production was among those same people and discusses a note from the National Security Advisor suggesting that the Secretary of State should see the Qataris.  *See* ECF No. 55 at 12.  Again, the offense conduct related to this count includes the attempt to solicit the help of the National Security Advisor to support Qatar's position with regard to the Gulf Diplomatic Crisis.  *See* ECF No. 20 at 11; ECF No. 21 at 4; ECF No. 35 at 42–43, 49, 51.  Defendant's counsel acknowledged as much at the initial sentencing hearing.[15]  *See* ECF No. 58 at 57. Together, the Court finds this evidence sufficient to demonstrate by a preponderance of the evidence that Defendant destroyed, attempted to destroy, or, at the very least, withheld these relevant emails from the government in response to its subpoena.

"[W]here a defendant willfully engages in behavior that is inherently obstructive—that is, behavior that a rational person would expect to obstruct justice—[the D.C. Circuit] has not required a separate finding of specific intent to obstruct justice." *United States v. Henry*, 557 F.3d 642, 646 (D.C. Cir. 2009).  Destruction or withholding of relevant emails in response to a subpoena would fit into that category, and the fact that the Guidelines specifically list destruction or concealment of evidence as an example of obstructive behavior supports an inference that the Sentencing Commission has determined that such behavior is generally inherently obstructive.  *See*

---

[15] It is undisputed that Defendant admitted that he deleted emails during his protected debriefing session in November 2020 and that the document productions upon which the prosecution relies occurred prior to that debriefing, but the search warrant return occurred after it.  *See* ECF No. 58 at 32–33, 49, 59–60.  It is also undisputed that pursuant to the protections in Defendant's debriefing (or "queen-for-a-day") agreement, the prosecution is prohibited from using Defendant's statement against him for any purpose, but that it can make derivative use of those statements to develop evidence against Defendant.  *See* ECF No. 38 at 55–56; ECF No. 43 at 9; ECF No. 45 at 11–12; ECF No. 58 at 42, 52; *see also* note 6, *supra*.  Finally, all parties agree (and the Court finds) that Defendant himself, rather than the government, disclosed his statements to the Court, that the government has not relied on those statements to make its case that Defendant obstructed justice, and that the other evidence the government has developed is properly before the Court and not in violation of his debriefing agreement.  *See* ECF No. 58 at 49–50 (Defendant's counsel acknowledging that they "interjected the issue about the plea agreement and [the prosecution] not being able to use what [Defendant] said [at the debriefing session]"), 52 (Defendant's counsel acknowledging that the only evidence related to the deletion of emails that the Court cannot rely on is Defendant's statements during the debriefing session).

*id.* at 647; *see also* USSG § 3C1.1 cmt. n.4(D) (listing "destroying or concealing . . . evidence that is material to an official investigation" as conduct covered under the obstruction of justice adjustment guideline).   Moreover, unlike with a claim that a defendant made material misrepresentations to investigators (discussed in Section III.A.2.a above), where the government has shown that a defendant destroyed material evidence, there is no need to establish that the obstruction actually impeded the investigation.  *See, e.g. United States v. Mason*, 168 F. App'x 905, 908 (11th Cir. 2006) (noting that the Guidelines do not require the government to show that an attempt to destroy evidence actually impeded the investigation); *Ewing*, 129 F.3d at 435 (noting that application of the obstruction of justice adjustment generally "does not require the prosecution to provide evidence of any actual prejudice or impact"); *Patterson*, 890 F.2d at 72 ("Section 3C1.1 . . . encompasses 'attempted' obstruction, which we construe as not requiring success in actual obstruction.").

The government is not so successful in its argument that Defendant attempted to concoct an exculpatory cover story and influence Person 1 to use it if asked by law enforcement about aid and advice provided to Qatar in connection with the Gulf Diplomatic Crisis.  The prosecution's theory is based on an exchange of two emails between Person 1 and Defendant.  Specifically, in an email dated July 16, 2020—the subject line of which was the General's name—Person 1 forwarded to Defendant a June 2017 email from the General to Person 1 stating, in relevant part, "thank you again for facilitating what I think were very important talks with the Qataris.  They couldn't have taken place without your [i.e. Person 1's] leadership."  ECF No. 39-1 at 173; *see also* ECF No. 39 at 16.  Defendant is not mentioned in that email.  Defendant responded to the forwarded email with an email to Person 1 that states:

[Person 1]:

I'm puzzled by the message you sent me last week.  I've reviewed my records (including notes I took at the time) and they do not accord with your recollections:

- We had been discussing a Qatari defense project in the spring of 2017 (April & May).
- After the announcement of the blockade (5 June), you asked me if I knew any generals who might be interested in helping with the effort.  I suggested [the General].
- On 6 June I introduced you by email to [the General].
- We traveled to Doha 9–11 June.
- We continued working on the defense project through the summer, although at some point [the General] dropped out.
- I did not have any interaction with [the National Security Advisor].  I met him once, socially, I believe on 27 September 2017, but never discussed Qatar with him.

I suggest you review your chronology of events in light of the above.  Let me know if I can help.

ECF No. 39-1 at 172; *see also* ECF No. 39 at 17.  The government reads that later email as Defendant "suggest[ing] to Person 1 that they coordinate their stories to present a false portrayal of events."  ECF No. 39 at 17.  The prosecution argues that the email was "extremely carefully drafted" to nudge Person 1 into asserting (presumably in connection with any questioning by the government) that the events of the summer of 2017—the recruitment of the General and trip to Doha, etc.—were not connected to lobbying about the Gulf Diplomatic Crisis, but, rather to a military advisory board that Defendant and Person 1 were attempting to set up to aid Qatar.  *See* ECF No. 58 at 71–72, 79–80.

If this is an effort to orchestrate an exculpatory cover story, it is both subtly done and somewhat awkward.  Awkward because, although Defendant's email follows in the email chain the forwarded email between Person 1 and the General, Defendant's email does not appear to be a response to Person 1's forwarded email.  Defendant's response indicates that the "message that

[Person 1] sent [Defendant] last week" included some "recollections" and a "chronology of events" in 2017; but Person 1's July 16, 2020 email between Person 1 and the General reflects no such information.  *See* ECF No. 39-1 at 172–73.  The Court is left to imagine either that there was some other "message" from Person 1 to Defendant between July 16 and July 20, or that Defendant's response is a glaring non-sequitur.  The government seems to think the fact that the July 20, 2017 email is "not responsive to what Person No. 1 emailed previously" weighs in favor of its theory that Defendant was hatching a false cover story.  ECF No. 58 at 81.  The Court is not so sure, especially given the subtlety with which that alleged cover story is assembled.  As discussed at the initial sentencing hearing, none of the statements in that email, taken individually, are false.  It appears that Defendant and Person 1 *did* discuss a Qatari defense project in Spring 2017; Person 1 *did* ask Defendant about generals who might be "interested in helping" with some effort involving the Qataris; Defendant *did* introduce Person 1 to the General; they all *did* travel to Doha in June 2017; and Defendant *did not* have any interaction with the National Security Advisor about Qatar.  *See* ECF No. 58 at 73–79.  More, the government acknowledged that the discussions about the military advisory board occurred in the run-up to and during the Gulf Diplomatic Crisis and that at some point the General was recruited to participate in the advisory board.  *See id.* at 76–77.  And Defendant has submitted emails that are not inconsistent with the narrative that in June 2017 Person 1 and Defendant were recruiting the General not only in connection with the Gulf Diplomatic Crisis lobbying, but also with the advisory board.  *See* ECF No. 55 at 36 (email of Person 1 dated May 13, 2017, proposing the names of four U.S. generals (not including the General discussed herein) to provide advice to Qatar, apparently in connection with the military advisory board); *id.* at 38 (email from Defendant dated June 6, 2017 (admittedly not in the same email chain as the email cited above) stating that the General "is interested in helping out with Qatar").  That

is, the prosecution contends that Defendant sent an email "extremely carefully drafted" to include only truthful statements designed to fabricate a story that might help to exonerate him as a response to an email that has almost nothing to do with the cover story Defendant allegedly concocted.  The Court's best guess here is that there is some important context missing—perhaps contemporaneous communications between Defendant and Person 1—without which it is left adrift.

More importantly, Defendant's June 20, 2017 email is not especially exculpatory. Defendant's recruitment of the General and the Doha trip are centerpieces of his offense conduct, *see* ECF No. 20 at 10; ECF No. 21 at 3–4; ECF No. 35 at 40–42—and they are admitted in the alleged cover story email—which, moreover, specifically mentions the Gulf Diplomatic Crisis in the same breath as it speaks of recruiting the General.  And the initial sentencing hearing, the prosecution acknowledged it was possible thatDefendant's involvement in establishing a military advisory board for Qatar—which, again, was according to the prosecution the "cover story" that Defendant was offering Person 1—might, itself, have violated 18 U.S.C. § 207(f)(1)(B).  ECF No. 58 at 80.  The prosecution has not offered—nor has the Court found—a case in which a similarly inscrutable "cover story" communication has formed the basis for an obstruction of justice adjustment.  *Cf., e.g.*, *United States v. Heckard*, 238 F.3d 1222, 1227, 1232–33 (10th Cir. 2001) (affirming the application of an obstruction of justice enhancement where the Defendant prepared a false affidavit for a potential witness stating that the witness "had no knowledge of any illegal activity conducted by Defendant"); *Ewing*, 129 F.3d at 433–35 (affirming the application of an obstruction of justice enhancement where the defendant directed his co-defendant to "write that [the defendant] had no knowledge of any of that [illegal] activity until the night we were arrested" and to make sure that the co-defendant's stories to the judge and to pretrial services "matche[d] up together"); *United States v. Cherif*, 943 F.2d 692, 703 (7th Cir. 1991) (affirming the application of

27

an obstruction of justice enhancement where the defendant wrote a letter to his girlfriend, whom he had involved in his crime and who was a potential witness against him, stating that she "could not know anything about deals or stock" and that she knew she was "innocent and there [was] no conceivable way that [she] could have known anything about anything").  The Court recognizes that the communication at issue is susceptible to the interpretation the prosecution urges.  But it is the government's burden to show obstruction by a preponderance of the evidence, and it has fallen short of that standard as to this theory.

In sum, the Court will apply the obstruction of judgment enhancement to this charge based only on Defendant's destruction of emails relevant to cooling-off period conviction.

### 3.    Acceptance of Responsibility

USSG § 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3"—which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and all harm caused by those acts or omissions or was the object of those acts or omissions.  USSG §§ 1B1.3(a)(1)(A), 3E1.1 cmt. n.1(A).  "A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous[.]"  USSG § 3E1.1 cmt. n.1(A).  Pleading guilty before trial, truthfully admitting the conduct comprising the offense, and not falsely denying any additional

relevant conduct "constitute[s] significant evidence of acceptance of responsibility for the purposes of subsection (a)." *Id.* § 3E1.1 cmt. n.3. Conduct resulting in an obstruction of justice adjustment can co-exist with acceptance of responsibility "in extraordinary cases." *Id.* § 3E1.1 cmt n.4.

Defendant, of course, believes that the reduction should apply. *See* ECF No. 54 at 6; ECF No. 58 at 84. More, both the Probation Office and the prosecution agree that this is an extraordinary case where both obstruction and acceptance of responsibility adjustments should apply (thus canceling each other out). *See* ECF No. 58 at 83; ECF No. 32 at 19. The timeline supports such a finding. Courts have held that, "[i]n evaluating whether [a defendant's] case was an 'extraordinary' one, [the court] must look at the relationship between his obstructive conduct and his acceptance of responsibility." *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003). Where the obstructive conduct pre-dated the acceptance of responsibility, the acceptance adjustment may apply. *See id.* ("All of his obstructive conduct predated the indictment and the guilty plea. He has fully cooperated subsequently."); *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) ("Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice."). Here, the obstructive conduct all predates the plea agreement in January 2022 and guilty plea in June 2022. More, even before the plea agreement and guilty plea, Defendant admitted to the conduct that provides the basis for the obstruction of justice enhancement when debriefing with the government. Finally, he has largely cooperated with the government's investigation.

The Court will therefore apply a two-level reduction in the total offense level for acceptance of responsibility.

*        *        *        *        *        *

Given the analyses and findings above, the Court lays out the Guidelines calculation that will be considered at final sentencing.  Pursuant to USSG § 3D1.1, where, as here, a defendant has been convicted of more than one count, the court must, first, group closely related counts together using the rules in USSG § 3D1.2; second, determine the offense level applicable to each group using the rules in USSG § 3D1.3; and third, determine the combined offense level applicable to all groups taken together using the rules in USSG § 3D1.4.  USSG § 3D1.1.  Under USSG § 3D1.2, counts involve "substantially the same harm" and therefore are grouped together if (1) they "involve the same victim and the same act or transaction," (2) they involve the same victim and two or more acts or transactions with a common criminal objective or constituting part of a common scheme, (3) "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts," or (4) the offense level is largely determined by some "measure of aggregate harm"—such as total amount of loss or the quantity of substance involved—or "the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior."  The two crimes here do not fit into any of those categories and thus, as the PSR found, each is in its own group. ECF No. 32 at 20.

**Offense Level Computation**

<u>The False Writing Violation—18 U.S.C. § 1018</u>

| | |
|---|---|
| Base Offense Level, *see* USSG § 2B1.1(a)(2) & App. A: | **6** |
| Specific Offense Characteristics, *see id.* § 2B1.1(b): | **None** |
| Cross References*, see id.* § 2B1.1(c): | **None** |
| Adjustments (Victim-Related, Role, Obstruction), *see id.* Ch. 3: | **None** |

30

| | |
|---|---|
| Adjusted Offense Level: | **6** |

The Cooling-Off Period Violation—18 U.S.C. § 207(f)(1)(B)

| | |
|---|---|
| Base Offense Level, *see* USSG § 2C1.3(a) & App. A: | **6** |
| Specific Offense Characteristics, *see id.* § 2C1.3(b): | **None** |
| Cross References*, see id.* § 2C1.3(c): | **None** |
| Adjustments—Obstruction of Justice, *see id*. § 3C1.1: | **+2** |
| Adjusted Offense Level: | **8** |

Multiple Count Adjustment

Under USSG § 3D1.4, the Court takes as a base the count group with the highest offense level. That group counts as one Unit. *Id.* § 3D1.4(a). Any group with a level "that is equally serious or from 1 to 4 levels less serious also counts as one Unit. *Id.* To calculate the combined offense level, the highest offense level (here, eight) is increased by, in this case, two units (pursuant to the table in § 3D1.4). Thus:

| Count | Adjusted Offense Level | Units |
|---|---|---|
| False Writing Violation | 6 | 1 |
| Coolin-Off Period Violation | 8 | 1 |
| | | |
| Total Number of Units: | | 2 |
| | | |
| Higher Adjusted Offense Level: | | 8 |
| | | |
| Increase in Offense Level: | | 2 |
| | | |
| Combined Adjusted Offense Level: | | **10** |
| | | |
| USSG Ch. 4 Enhancement (Criminal History/Career Offender) | | **None** |
| | | |
| Acceptance of Responsibility Adjustment, *see* USSG § 3E1.1(a) | | **-2** |
| | | |
| **Total Offense Level:** | | **8** |

**B.   Motion for Issuance of Subpoena**

Finally, Defendant has filed a motion seeking the Court's permission to issue a subpoena

*duces tecum* on the Probation Office seeking documents "evidencing communications between

any person in the U.S. Probation Office and AUSA Daniel O'Brien, AUSA Stuart Allen, DOJ Trial Attorney Evan Turgeon, and the U.S. Sentencing Commission in connection with preparation of the Presentence Investigation Report."  ECF No. 46 at 5.  The motion asserts that he seeks the evidence in connection with arguments that (1) the government's reasons for refusing to offer him a cooperation plea agreement are pretextual and (2) the government "implicitly breached the plea agreement through the distorted representations [to the Probation Office] created by [AUSA] O'Brien."  *Id.* at 2–3.  At the initial sentencing hearing, Defendant floated a couple of additional theories—that it required the evidence (1) to show that the government fraudulently induced him to sign the plea agreement by orally representing that he would receive a non-custodial sentence if he did so and (2) to determine what information the prosecution provided to the Probation Office to include in the PSR.  ECF No. 58 at 92, 94.  The motion is denied because the information it seeks is not relevant to any issue before this Court.[16]

"[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971).  However, "[w]hile the government is obligated to fulfill the promises it made in a plea agreement, defendants are not entitled to have promises read into their plea agreements because they claim that they believed the agreement included such promises." *Feliciano v. United States*, 914 F. Supp. 776, 780 (D.P.R. 1996) (internal citation

---

[16] Defendant asserts that the communications he seeks are *Brady* material, *see* ECF No. 58 at 95, referring to *Brady v. Maryland*, in which the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  *Brady* and its progeny apply only to evidence that is "material," which means that "there must be a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Wilson*, 605 F.3d 985, 1005 (D.C. Cir. 2010) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).  Leaving aside the question of whether communications among the Probation Office, the prosecutors, and the Sentencing Commission can ever be considered *Brady* material, the information requested here cannot be, because it is irrelevant to the issues before the Court and therefore not "material."

omitted), *aff'd sub nom. Rivera-Feliciano v. United States*, 107 F.3d 1 (1st Cir. 1997).

"In interpreting the terms of a plea agreement, [courts] look to principles of contract law." *United States v. Henry*, 758 F.3d 427, 431 (D.C. Cir. 2014).  The mere presence of an integration clause in a plea agreement is "strong evidence that no implied promises existed—after all, integration clauses 'establish that the written plea bargain was adopted by the parties as a complete and exclusive statement of the terms of the agreement.'"  *United States v. Ahn*, 231 F.3d 26, 36 (D.C. Cir. 2000) (some internal quotation marks omitted) (quoting *United States v. Fentress,* 792 F.2d 461, 464 (4th Cir. 1986)).  Where the defendant also assents to the terms of the agreement in open court, "inferring [unwritten] promises is virtually foreclosed."  *United States v. West*, 392 F.3d 450, 456 (D.C. Cir. 2004).

Here, Defendant seeks evidence to support a claim that the government was obligated to make the plea agreement he signed a cooperation plea agreement with the possibility of a USSG § 5K1.1 motion; that claim, however, is doomed.  The plea agreement—which includes an integration clause, *see* ECF No. 20 at 18–19 ("Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.")—does not mention cooperation or a USSG § 5K1.1 motion.  More, in a hearing on May 27, 2022 (prior to Defendant's guilty plea), Defendant's counsel suggested that Defendant was induced to enter into the plea agreement he signed by the "promise of an opportunity" for a USSG § 5K1.1 motion.  ECF No. 17 at 30.  At the continued plea hearing on June 3, 2023, the Court revisited that issue with Defendant's counsel:

> THE COURT:        [T]here was some suggestion last week . . . that perhaps
>                   there was further promises that were made that were not

reflected in the plea agreement and should be.  Are you going to make any of those assertions here today, Mr. Hannon?

MR. HANNON:   No, Your Honor.

THE COURT:    I will ask Mr. Olson, are there any side agreements, whether or not the plea agreement reflects the entirety of the agreement between himself and the government.  He will be asked that question.

MR. HANNON:   Yes, sir.

THE COURT:    If he responds no, then we're not going to go forward with the plea.

MR. HANNON:   Understood.

THE COURT:    That includes as well any promises allegedly made with respect to 5K disagreements. It does not reflect any promises with respect to 5K. You understand that, Mr. Hannon?

MR. HANNON:   Absolutely.

THE COURT:    And your client does as well?

MR. HANNON:   He does.

ECF No. 35 at 6–7.  When Defendant allocuted, the Court did as it said it would:

THE COURT:    Mr. Olson, have you read that entire plea agreement?

DEFENDANT:   Yes, sir.

THE COURT:    Every word of it?

DEFENDANT:   Yes, sir.

THE COURT:    Does that agreement represent in its entirety the understanding that you have with the government with respect to your plea?

DEFENDANT:   Yes, it does.

THE COURT:    Have you been promised anything else in return for your plea of guilty other than what's reflected in that document?

34

| | |
|---|---|
| DEFEDNANT: | No, sir. |
| THE COURT: | Then there are no side agreements, correct? |
| DEFENDANT: | That is correct, sir. |

. . . .

| | |
|---|---|
| THE COURT: | The certification also states that no promises, inducements, or representations of any kind have been made to you other than those contained in the plea agreement; is that correct, sir? |
| DEFENDANT: | Yes, that is correct, sir. |
| THE COURT: | It also states that no one has threatened or forced you in any way to enter into the agreement; is that correct? |
| DEFENDANT: | Yes, it is correct, Your Honor. |

*Id.* at 15, 16–17.  Having admitted that the plea agreement he signed embodies the full agreement between the parties, Defendant cannot now argue that he was induced to enter into it by some prior unwritten promise regarding a USSG § 5K1.1 motion or that the government has breached it by failing to file such a motion.  As the D.C. Circuit stated in *West*, addressing a plea agreement with a similar integration clause:

> By itself, this language argues strongly against the existence of any unwritten promises by either party to the agreement.  Inferring such promises is virtually foreclosed where, as here, the district court has also conducted a flawless plea proceeding at which the defendant was made fully aware of, and assented to, the important terms of the agreement.  At the plea hearing, the court reviewed all the relevant aspects of the agreement with West, including the integration clause and the disclaimer of promises with regard to sentencing.  West, represented by counsel at the hearing, was then asked whether any other promises induced him to plead guilty; he replied "no."  If the government had made any unwritten promises to West about his sentence, this was the time for West (or his counsel) to say something.  Neither did.

392 F.3d at 456; *see also, e.g.*, *United States v. Buchanan*, No. 02-cr-85, 2007 WL 1748919, at *5 (D.D.C. June 18, 2007) (similar).  Because those arguments are foreclosed, Defendant has no need

for evidence that might support them.

For that same reason, it is irrelevant whether the government's reasons for not offering a cooperation plea agreement are pretextual.  Defendant agreed to the terms of a plea agreement that did not include a cooperation agreement or representations about a Section 5K1.1 motion.  And he did so knowing the reason that the government provided for not offering one.  Defendant admits that the government—through AUSA O'Brien—informed Defendant prior to offering the plea agreement that was ultimately signed that he would not be offered a cooperation plea agreement because the government believed any testimony he would give would be tainted by untruths designed to distance himself from Person 1.  *See* ECF No. 46 at 2.  Defendant nevertheless agreed to the terms of the plea agreement he signed.

A similar analysis applies to the argument that Defendant is entitled to evidence that the government induced him to enter into the plea agreement by promising it would advocate for a non-custodial sentence.  He appears to rely on pre-plea discussions in which prosecutors indicated that pleading guilty was "the path to no jail time."  ECF No. 43 at 20.  But Defendant acknowledges that those discussions related to the agreement that Defendant rejected because it required that he plead guilty to a felony.  *See* ECF No. 38 at 60 ("When O'Brien proposed the December 16, 2021, plea agreement that included a felony, he represented that the agreement would enable [Defendant] to achieve a non-custodial sentence[.]"); *see also* ECF No. 43 at 20 ("On October 25, 2021, the government extended a plea offer to [Defendant] that required him to plead guilty to a felony and a misdemeanor. . . .    On December 9, 2021, attorneys for [Defendant] had a phone call with . . . [Turgeon] regarding the potential terms of a plea agreement. . . .  He stated that in his view, 'this is the path to no jail time.'  [Defendant] subsequently refused any plea agreement that required a felony.").  The plea agreement he signed does not require him to plead guilty to a felony,

but to two misdemeanors.  Moreover, the plea agreement states explicitly that the government will "[r]ecommend that [D]efendant be sentenced to *a term of imprisonment* within the applicable Sentencing Guidelines range."  ECF No. 20 at 6 (emphasis added).  That is, Defendant seeks evidence to support an argument that is foreclosed by the explicit language of the plea agreement he signed and acknowledged in open court.

During the initial sentencing hearing, counsel for Defendant asserted that he was also seeking communications between the prosecuting attorneys and the Probation Office because the prosecutors "sen[t] things to the presentence report writer that we know nothing about."  ECF No. 58 at 94.  There is no mystery here—or at least no mystery that could be relevant to sentencing. The PSR says what it says.  It is clear to the Court that the information Defendant objects to— information that formed the foundation of the PSR's application of the cross reference and of the obstruction of government adjustments—were provided to the Probation Office by the prosecutors. Defendant has made that point over and over in his submissions.  *See, e.g.*, ECF No. 38 at 61 ("The conduct of Mr. O'Brien in improperly influencing the PSR Writer to increase the offense level almost four-fold to that agreed upon is a violation of the plea agreement.").  And the Court has found (and the prosecution agrees) that the cross reference should not be applied[17] and has independently evaluated the evidence as to obstruction of justice.  There is nothing to be gained from the communications sought.  Faced with a similar situation, the First Circuit made a similar decision.  In *United States v. Nelson-Rodriguez*, the defendant argued that the prosecution violated the Federal Rules of Criminal Procedure "by having ex parte communications with the probation officer who wrote the presentence report" and asked the court "to eliminate the two enhancements

---

[17] The Probation Office apparently relied on guidance from the Sentencing Commission regarding application of the cross reference.  *See* ECF No. 32 at 45.  Because the Court will not apply that cross reference, communications between the Probation Office and the Sentencing Commission are immaterial.

added to his offense level and remand the case to the district judge for re-sentencing." 319 F.3d 12, 61 (1st Cir. 2003). Before the district court, he "demand[ed] disclosure of all documents that the probation officer used in preparing the presentence report" and "asked to be able to call the probation officer as a witness at the sentencing hearing to examine the extent of the communications." *Id.* at 62. The First Circuit affirmed the district court's denial of the request because, even if the contact violated the rules, the defendant "failed to show that he . . . suffered any harm as a result." *Id.* The presentence report included all the evidence the probation officer relied on in making her recommendations, so it was unclear what would be accomplished by additional discovery or the testimony of the probation officer. *See id.* More, the court noted that "the report is only a recommendation to the court; the court is not bound to accept these recommendations" and that the defendant had ample opportunity to dispute the report's recommendations. *Id.* at 62–63. The same is true here.

Defendant's motion for issuance of the requested subpoena is denied.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendant's total offense level under the Guidelines is eight. With a criminal history category of I, his Guidelines sentencing range is zero to six months imprisonment. *See* USSG Ch. 5, Pt. A. Under USSG §§ 5B1.1 and 5B1.2(a)(1), Defendant is eligible for a sentence of probation lasting at least one and up to five years in lieu of imprisonment.

The Court further finds that, because of the decisions made herein leading to that offense level calculation and because Defendant's arguments in support of its motion for issuance of the subpoena are otherwise legally unsound, the communications he seeks from the Probation Office are not relevant to the final sentencing in this case. Accordingly, it is hereby

**ORDERED** that Defendant's motion for issuance of a subpoena (ECF No. 46) is **DENIED.**  It is further

**ORDERED** that Defendant's request for an evidentiary hearing, which he has since abandoned, *see* note 3, *supra*, is **DENIED**.

The Court will communicate with the parties to schedule a final sentencing hearing.


**SO ORDERED.**


Date: August 3, 2023

                                    _____
The Honorable G. Michael Harvey
United States Magistrate Judge